02GRBRIs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                         23-CR-134(VSB)

CHARLES BRISCOE,

          Defendant.

------------------------------x

                              New York, N.Y.
                              February 16, 2024
                              10:00 a.m.

Before:

                  HON. VERNON S. BRODERICK,

                              District Judge

                    APPEARANCES


DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
KEVIN MEAD
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
BY:  IAN MARCUS AMELKIN

02GRBRIs

| | |
|---|---|
| 1 | THE COURT:  You may be seated.  If I could ask counsel |
| 2 | to please identify themselves for the record. |
| 3 | MR. MEAD:  Good morning, your Honor.  AUSA Kevin Mead |
| 4 | appearing for the government. |
| 5 | THE COURT:  Okay.  Good morning. |
| 6 | MR. MARCUS AMELKIN:  Good morning, your Honor.  Ian |
| 7 | Marcus Amelkin of the Federal Defenders of New York on behalf |
| 8 | of Mr. Briscoe.  I would like to introduce members of |
| 9 | Mr. Briscoe's family who traveled here this morning.  First, |
| 10 | his wife, who is present right there in purple; his mother, who |
| 11 | traveled from Arkansas to be with us; as well as his aunt, who |
| 12 | is also here.  And you received letters from many of them. |
| 13 | THE COURT:  I did, yes.  Okay.  So this matter is on |
| 14 | today for sentencing.  Mr. Briscoe, if at any point in time you |
| 15 | don't understand something that I've said, or if you would like |
| 16 | some additional time to speak with your attorney, just let me |
| 17 | know, and I'll give you the time you need to speak to your |
| 18 | attorney or I'll try and answer whatever question you might |
| 19 | have.  Okay? |
| 20 | THE DEFENDANT:  Yes, your Honor. |
| 21 | THE COURT:  All right.  First, as an initial matter, I |
| 22 | want to review for the parties the materials I've received and |
| 23 | read in connection with today's sentencing.  So I've received |
| 24 | and read the presentence investigation report, which was |
| 25 | initially prepared on January 2 of 2024 and revised on |

02GRBRIs

1    January 29 of 2024.  I've received the defense submission,

2    which is a letter dated February 5, 2024, which contains

3    various attachments, including letters from Mr. Briscoe, his

4    mother and father, his sister-in-law, his wife, his

5    father-in-law, a friend of his, certain medical records that

6    relate to a flare up of his diverticulitis, a letter from

7    school relating to his volunteer work, and some statistics

8    relating to the sentencing guidelines relating to the Southern

9    District of New York.  I've also received the government's

10   letter of February 8 of 2024, and the letter of, I think it's

11   Athlete-2; is that correct, Mr. Mead?

12              MR. MEAD:  Yes, your Honor.

13              THE COURT:  A letter from Athlete-2, who is a victim.

14   Let me ask first, have each of the parties received those

15   documents?

16              MR. MEAD:  Yes, your Honor.

17              MR. MARCUS AMELKIN:  Yes.  Is the victim impact

18   statement publicly filed?  Should I refer to him by his last

19   name or by Athlete-2?

20              THE COURT:  Let me ask Mr. Mead.  I know you sent it

21   by email to my chambers:  (a) can it be filed on the docket,

22   and (b) do you need to redact certain things from the docket

23   and would you prefer that the victim be referred to as

24   Athlete-2?

25              MR. MEAD:  My understanding is that the victim would

02GRBRIs

1    prefer to be referred to as Athlete-2.  It's my understanding

2    that the victim impact statements are frequently not filed on

3    the docket at all and kept under seal, and we respectfully ask

4    that the entirety of the victim impact statement be kept under

5    seal.

6            MR. MARCUS AMELKIN:  No objection.

7            THE COURT:  All right.  I think I do refer to the

8    victim as Athlete-2, but as long as we're all on the same page

9    as to whom victim number two, what it refers to, and I think we

10   are.

11           All right.  So let me ask, is there anything else I

12   should have received that I have not mentioned, other than the

13   consent order of restitution, which I have a copy of now?

14           MR. MEAD:  Nothing further, your Honor.

15           THE COURT:  All right.  From the defense?

16           MR. MARCUS AMELKIN:  No, your Honor.

17           THE COURT:  Okay.  All right.  First, let me ask

18   Mr. Marcus Amelkin, have you received a copy of the presentence

19   report?

20           MR. MARCUS AMELKIN:  I have.

21           THE COURT:  And have you discussed it with your

22   client?

23           MR. MARCUS AMELKIN:  I have.

24           THE COURT:  Mr. Briscoe, have you received a copy of

25   the presentence report?

02GRBRIs

1          THE DEFENDANT:  I have.

2          THE COURT:  Have you reviewed it with your attorney?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  And have you had time to point out any

5    mistakes or errors or things that you believe should be brought

6    up with me or with your attorney?

7          THE DEFENDANT:  Yes, your Honor.

8          MR. MARCUS AMELKIN:  All right.  Let me ask Mr. Marcus

9    Amelkin, do you have any objections to the report?

10          MR. AMELKIN:  No, your Honor.

11          THE COURT:  Mr. Mead, does the government have any

12    objections?

13          MR. MEAD:  No, your Honor.

14          THE COURT:  So I am going to adopt the factual

15    findings in the report, and the report will be made part of the

16    record in this case.  It will be placed under seal.  However,

17    if an appeal is taken, counsel on the appeal can have copies of

18    the report without further application to me or one of my

19    colleagues.

20          So Mr. Briscoe, you may recall back when you pled

21    guilty that I referred to a set of guidelines called the

22    sentencing guidelines.  Now, those are guidelines that were

23    created to assist judges like myself when we impose sentence.

24    At a certain point in time, those guidelines were mandatory,

25    which would have meant I would have had to apply them in just

02GRBRIs

about every case.  However, they are no longer mandatory.  I

still, as a matter of law, must consult them in determining

what an appropriate sentence is for you.

So part of that process includes me doing my own

independent calculation of the guideline range that applies in

your case.  So first, the crime to which you're charged, the

guideline range -- actually could you hold on one moment?

I apologize.  I just have to go back into the robing

room for a second.  I'll be right back.

MR. MARCUS AMELKIN:  Thank you, your Honor.

(Recess)

THE COURT:  Nothing quite like the government servers

weren't working so the document I had been working on

disappeared, but we've recovered it.  All right.

MR. MARCUS AMELKIN:  Good.

THE COURT:  So I think I was asking Mr. Briscoe, have

you read the presentence report and gone over it with your

attorney?  Is that correct?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And you had an opportunity to go over any

mistakes or things that you felt should be added to the report

with him?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  All right.  I think I'm repeating myself,

but do you have any objections to the report, Mr. Marcus

02GRBRIs

Amelkin?

MR. MARCUS AMELKIN:  No, your Honor.

THE COURT:  Mr. Mead?

MR. MEAD:  No, your Honor.

THE COURT:  As I was saying, I adopt the findings in the presentence report.  The report will be made part of the record, and it will be placed under seal.  And attorneys on any appeal will not have to apply to me or one of my colleagues to get a copy.  They will have access to it.

Now, as I mentioned, Mr. Briscoe, you may recall that I mentioned a set of guidelines, and I believe I was about to start that guideline calculation when I realized that the materials I had were not the ones that I should have had.  So you are charged with a conspiracy under Title 18, United States Code, Section 371.  The applicable guideline for that statute is 2X1.1.  Since you conspired to commit wire fraud, the applicable guideline is 2B1.1, and that's the guideline for conspiracy to commit wire fraud.  Because the offense of conviction does not have a statutory maximum term of imprisonment of 20 years or more, the base offense level is six.  Because the total loss is more than $550,000 but less than $1.5 million; specifically, the loss here was $1 million, 14 levels are added.  Your adjusted offense level, therefore, becomes 20.  That offense level is reduced by three for your acceptance of responsibility, making your total offense level

02GRBRIs

1  of 17.  You do qualify for the zero-point offender reduction,

2  which reduces your guideline range by two additional points, to

3  make it a level.  You have no criminal history points, so your

4  criminal history category is I.  So based on a total offense

5  level of 15, criminal history category of I, your guideline is

6  18 to 24 months' imprisonment.  Do the parties agree that

7  Mr. Briscoe's guideline range is 18 to 24' months imprisonment?

8          MR. MEAD:  Yes, your Honor.

9          MR. MARCUS AMELKIN:  Yes, your Honor.

10          THE COURT:  I note that my calculations are consistent

11  with what is in the plea agreement as well as the presentence

12  report.  Now with regard to the applicability of any departures

13  here, I recognize that I have the authority to depart, but I

14  have reviewed the record, and I don't believe there are any

15  bases for a departure.  However, I do understand that I have

16  the authority to grant a variance in this matter.

17          Now, Mr. Marcus Amelkin, in your submission to me, you

18  suggest that a variance would be appropriate here and suggest

19  that a noncustodial sentence based on Mr. Briscoe's background,

20  personal history and characteristics, among other things, in

21  essence, of a sentence of time serve.  Probation recommends a

22  sentence of eight months, and the government has recommended a

23  sentence within the guideline range of 18 to 24 months.

24          Let me ask, does the government wish to be heard with

25  regard to sentencing?

02GRBRIs

```
 1              MR. MEAD:  Just very briefly, your Honor.

 2              THE COURT:  Yes.

 3              MR. MEAD:  This was a relevantly blatant fraud.  The

 4    defendant took advantage of his relationship with Athlete-2,

 5    who trusted him.  The defendant then forged his signature and

 6    used it to defraud Athlete-2 out of $1 million, which is a lot

 7    of money.  I think this is a sentence that calls for a jail

 8    term.  I recognize the Court did not impose a jail term on

 9    Mr. Gilder.  I think they are relatively similarly situated in

10    that they are both at the bottom of culpability scale in this

11    case.  I think that this was in some ways -- I don't want to

12    distinguish them too much, but for the reasons stated, I do

13    think that a jail sentence is appropriate.  And I'm happy to

14    answer any questions of the Court.

15              THE COURT:  Okay.  First, on the first page of

16    government's submission, it states that Athlete-2 provided

17    77 percent of the funding for Agency-1, which leaves

18    23 percent.  Mr. Marcus Amelkin, in his submission, indicated

19    that a part of that 23, or maybe all of it, was a contribution

20    by Mr. Briscoe, which represented a commission that he received

21    from another client or some other business matter.  Do you know

22    or do you have a sense of what that other 23 percent was made

23    of?

24              MR. MEAD:  It did come from other athletes.  I think

25    Mr. Marcus Amelkin is correct.  I know the money came from
```

02GRBRIs

1    other athletes, and I think it did come because of

2    Mr. Briscoe's role as those other athletes' agent.

3            THE COURT:  Okay.  And whose idea was it to form

4    Agency-1?

5            MR. MEAD:  I'm not sure.  I'm not sure that that it

6    was this defendant's idea.  I think it was partially the idea

7    of Mr. Cohen.  I think it was mainly the idea of Mr. Cohen.  I

8    think Athlete-2 had some interest in the idea as well though,

9    and I think the facts about Agency -- well, those facts about

10   the financial aspects of Agency-1, I think are useful

11   background for the Court in understanding the relationship, but

12   they are also not the core of the fraud here.

13           THE COURT:  Yes.  Also, on the first page, it states

14   that Briscoe informed Athlete-2 that a highly touted athlete

15   preparing for the NBA draft, Athlete-6, had signed with Briscoe

16   and Agency-1.  How was that communicated?  Do you know?

17           MR. MEAD:  I think there are certainly text messages

18   about it, your Honor.  And then, there's ultimately a signed --

19   there's a standard player-agent contract in the NBA, and

20   ultimately, the defendant transmits what purports to be a fully

21   executed version of that signed player agent contract to

22   Athlete-2, I think, again, by text message.

23           THE COURT:  I guess what I'm getting at, because in

24   Mr. Marcus Amelkin's submission, there's a reference to I think

25   it was maybe Mr. Darden's indicating to Mr. Briscoe that

02GRBRIs

1    Athlete-6 was interested in signing up with an agency with

2    Mr. Briscoe; either that agency or Agency-1, but I think it was

3    Mr. Briscoe's agency.  And there appears to be some suggestion

4    that somehow Mr. Briscoe thought that maybe Athlete-6 was going

5    to join, and because then it refers to I think later on speaks

6    to Athlete-2 about the possibility of Athlete-6 joining the

7    agency.  I'm just trying to clear up that.

8              MR. MEAD:  Sure, your Honor.  I think perhaps some

9    larger background about the case might be helpful.

10             THE COURT:  Yes.

11             MR. MEAD:  Mr. Darden is a repeat fraudster.

12             THE COURT:  Yes.

13             MR. MEAD:  Several fraud convictions.

14             THE COURT:  Yes.

15             MR. MEAD:  Mr. Briscoe and Mr. Darden were charged

16   together with this part of the scheme and also the WNBA team

17   part of the scheme.

18             THE COURT:  Yes.

19             MR. MEAD:  And the government's view in some of the

20   documents seized at the time of arrest indicated that

21   Mr. Darden may have been lying to Mr. Briscoe about some

22   aspects of that scheme.  Therefore, we decided to back off the

23   allegations against Mr. Mr. Briscoe in that dispute.  I don't

24   think there's any dispute that Mr. Darden may have lied to

25   Mr. Briscoe at times.  The government, obviously, has limited

02GRBRIs

1    insight into kind of the relationships between coconspirators

2    at times.  In this case, we spoke with Athlete-6.  Athlete-6

3    said, I have no idea what you're talking about.  I never talked

4    to any of these people.  I have never heard of any of these

5    people.  I was never close to signing up with them.  I never

6    knew I was supposed to get a loan.

7            What we know for absolute certainty about

8    Mr. Briscoe's involvement is that he forged this signature of

9    Athlete-6.  It is, I suppose, possible that he believed from

10   Mr. Darden that, you know, this was going to happen anyway, and

11   he was just forging it to speed things up or something like

12   that.  Obviously, he still represented to Athlete-2 that this

13   was a real signature, and that was the basis for getting the

14   money.  So it's a little bit hard for the government to know

15   exactly what was going on there, but I don't think any of that

16   takes away too much from Mr. Briscoe's involvement in this case

17   and the fake signature.

18           THE COURT:  Okay.  All right.  I mean, that is

19   helpful, I guess.  But I take it from what you're saying that

20   there are no text or email messages or things where you can see

21   the progression?  I think you are right in terms of at the end

22   of the day -- well, let me ask, I'm not sure what the

23   significance of this is, but in the defense submission, they

24   refer to an IP address from which it came rather than saying --

25   I'm not sure if there's a suggestion that someone else sent it

02GRBRIs

1    from the IP address.  First of all, do you know what IP address

2    it came from, the contract with the fraudulent signatures?

3         MR. MEAD:  So again, I'm doing this a little bit from

4    memory.

5         THE COURT:  Sure.

6         MR. MEAD:  The fraudulent signature was done

7    digitally.  It was done through a service called DocuSign.

8    DocuSign records don't tie to an IP address.  They tie to email

9    addresses, and they show that Mr. Briscoe's email address is

10   the email address that was used to sign on behalf of Athlete-6.

11        THE COURT:  Let me ask Mr. Marcus Amelkin, you refer

12   to an IP address, why?

13        MR. MARCUS AMELKIN:  The truth of the matter is that

14   Mr. Briscoe doesn't remember forging the signature, but he

15   accepts that he did it and accepts responsibility for it.  You

16   know, in my presentation, I'll go through this, but Darden was

17   constantly running scams on him, and it's hard for him to

18   remember exactly who did what when.  But the bottom line is

19   that he never met Athlete-6 or Athlete-6's mother, and he sent

20   a document that didn't have their real signatures on it to

21   Athlete-2.

22        THE COURT:  Okay.

23        MR. MARCUS AMELKIN:  And this is certain that he

24   remembers doing, which is that the loan amount that Mr. Darden

25   told him was for $900,000, and Mr. Briscoe asked Athlete-2 for

02GRBRIs

1    $1 million.  Now, I think that's also mitigated by the fact

2    that he thought that their agencies were merging, and he needed

3    money for overhead costs, not for personal use, but he didn't

4    tell that to Athlete-2.

5            And so, I think one of the main arguments we'll have

6    is his early acceptance of responsibility in a case that was

7    probably triable is, I think, an mitigating fact for

8    Mr. Briscoe in this instance.

9            MR. MEAD:  Just one additional brief point on that,

10   your Honor?

11           THE COURT:  Sure.

12           MR. MEAD:  I want to kind of emphasize how unusual it

13   would be for an NBA agent to sign up a player without even

14   having met them or talked to them.

15           THE COURT:  Well, what I'll say is, it would be

16   unusual, especially since it's a young person and the person's

17   parents are there.  There's no way that a parent isn't going to

18   be somehow involved in that, you know, if they are on the

19   scene.  So I recognize that it would be very unusual for it not

20   to happen, especially when you are talking about the amount of

21   money that sometimes is connected with these type of contracts.

22           So as I understand it, the proof of the forged

23   signature is that it came from Mr. Briscoe's email address, and

24   it utilized the DocuSign in order to do the signatures.  So did

25   it actually have an actual signature of these individuals?  It

1   just said signed by or?

2          MR. MARCUS AMELKIN:  Right.  It's like when you type

3   Judge Broderick after the slash S.

4          THE COURT:  Okay.

5          MR. MEAD:  The victim impact statement is actually

6   DocuSigned.  That's a real one, but that's basically what it

7   looks like.

8          THE COURT:  All right.  Although, you see in the one

9   from Athlete-2, there appears to be -- it said DocuSigned by,

10  and then there's squiggles and underneath it, it says the name.

11  Do you have to have the squiggles, I guess for lack of a

12  better -- what I want to determine is:  Was there ever a use or

13  did the government ever suspect that there was a use of actual

14  signatures of Athlete-6 and Athlete-6's mother, or was it just

15  that DocuSign was used to basically type in their names?

16         MR. MEAD:  I think the latter.  I think there is a

17  squiggle, but our understanding is that it was entirely made up

18  by Mr. Briscoe, rather than copying an actual signature.

19         THE COURT:  Do you know if Mr. Briscoe had any

20  identifying information of either Athlete-6 or Athlete-6's

21  mother?

22         MR. MEAD:  I don't believe so, your Honor.

23         THE COURT:  Okay.  On page 2 of the government's

24  submission, it says Briscoe used approximately $306,642 of the

25  funds to pay off a prior debt, and wired approximately $544,000

02GRBRIs

to the bank account controlled by Darden.  The first question I
have is:  Do you know of that $306,642, what that debt was?

MR. MEAD:  I suspect Mr. Amelkin does.  I have a vague
memory that there was -- I want to be clear that I'm not sure
that this is right.

THE COURT:  Yes.

MR. MEAD:  I have a vague memory that someone was
considering investing in or purchasing one of Mr. Briscoe's
companies, made a down payment, and then wanted the money back
and that that was what this money was.  But, again, that's from
memory.  I'm not 100 percent sure about that, your Honor.

THE COURT:  Okay.  And the 544 went to Mr. Darden's
account.  Do you know what the balance of it was?  Because when
I added it up, it didn't add up to $1 million.

MR. MEAD:  I think the remaining 140 or so or maybe
100, the defendant kept.

THE COURT:  Okay.  So it was the 306 Mr. Briscoe used
in connection with paying off a debt.  544 went to Mr. Darden's
account, and the balance Mr. Briscoe used in connection with --
well, Mr. Briscoe kept.  Do you know what he did with that?

MR. MEAD:  I don't recall, your Honor.

THE COURT:  Okay.

MR. MEAD:  Essentially, our view is they came close to
splitting the money.  Darden got a little bit more than half.
Briscoe got about 450.  He needed to spend two-thirds of that

02GRBRIs

```
1   to pay off a debt, and then he kept the remaining 150 or so.

2              MR. MARCUS AMELKIN:  Do you want me to respond to that

3   now in terms of taking it in order?

4              THE COURT:  If you want, that's fine.

5              MR. MARCUS AMELKIN:  Yes, just on this point, we don't

6   dispute he kept the rest.  The 306 he paid to a prominent

7   business person who was planning to invest in his sports agency

8   that he was paying back.  But he believed that that amount of

9   money, the 306, was going to be added to the 544 and be sent to

10  Athlete-6.  He still believed at that point that he was signing

11  Athlete-6.

12             THE COURT:  What is the proof of that?

13             MR. MARCUS AMELKIN:  Just proffer.  But also there's

14  multiple -- I think that there's a lot of circumstantial

15  evidence that points to it, which is that Mr. Briscoe believed

16  he was merging with Athlete-2's new agency.  He was really

17  excited about it.  It was to his benefit to do so given

18  Athlete-2's connections.  And even after Athlete-6 signed with

19  his real agency, Darden told Mr. Briscoe that that agency was

20  interested in merging with Athlete-2's new agency.

21             THE COURT:  Let me ask, did Athlete-2 know that

22  Mr. Briscoe viewed the business transaction with Agency-1 as a

23  merger with his agency?

24             MR. MARCUS AMELKIN:  Yes, of course.  I think

25  Athlete-2 knew that, because Cohen and Athlete-2 recruited
```

02GRBRIs

1    Briscoe to be the lead agent for this new agency.

2              THE COURT:  That's because Athlete-2 couldn't be the

3    agent, right?

4              MR. MARCUS AMELKIN:  Well, not only that, it's also

5    because they liked Mr. Briscoe and wanted to work with him, and

6    Mr. Briscoe wanted to work with them.  You know, before this

7    case, Mr. Briscoe was a respected member of this community, and

8    it makes sense that they were interested in him.  And I'll note

9    that the relationship between Athlete-2 and Mr. Briscoe even

10   continued after this Athlete-6 business fell apart.  When

11   Athlete-2 was injured, you know, effectively ending his playing

12   career, Athlete-2 asked Mr. Briscoe to be an expert witness for

13   him in the civil deposition to determine the lost wages he was

14   likely to have, and Mr. Briscoe agreed to do so.

15             Also, once Mr. Briscoe realized that this was all a

16   sham, he offered to pay Athlete-2 what he had in his business

17   accounts.  And Athlete-2 said at that point that he was already

18   suing Cohen, and he was going to get it back that way.  So

19   there was an offer to pay back Athlete-2, and I think the

20   reason why he wanted to was because he felt terrible about how

21   this whole thing went down and really ashamed and embarrassed

22   that he messed this up.  And I think what is key to this whole

23   thing is that this fake Trevor Steven individual, this cousin

24   of Athlete-2.

25             MR. MEAD:  Athlete-6.

02GRBRIs

MR. MARCUS AMELKIN:  Athlete-6, this cousin of
Athlete-6.  So let's take a step back on this.  Baldwin, I'm
sorry, not Stevens.

So Athlete-6 played college for a prominent prior NBA
player, so I'm not going to identify everybody's names here.

THE COURT:  That's fine.

MR. MARCUS AMELKIN:  It would just identify Athlete-6.
And that coach/former athlete has a best friend who is a
prominent lawyer in the city where Athlete-6 played basketball.
And this lawyer, who actually later went to jail for his own
issues, Darden told Briscoe that the lawyer approached him and
said that he was interested in signing with Briscoe.  And then,
Darden introduced him to Baldwin, who purported to be
Athlete-6's cousin, and Briscoe hired Baldwin, this fake
cousin, to work at the agency as a way to grease the wheels of
signing Athlete-6, which is pretty common in this space.

All of that to say is that the record is pretty muddy
about his *mens rea* and what he knew and when he knew it.  But I
think what's clear is that he knew that he was being dishonest
with Athlete-2 about the signatures, and he knew he was being
dishonest with Athlete-2 about the amount of the loan that
Athlete-6 requested.  But I think there's strong circumstantial
evidence, especially the Brady disclosure to the government,
that there were lies told to Mr. Briscoe and lies told about
this scheme as well to induce Mr. Briscoe to act.

02GRBRIs

```
 1            THE COURT:  But at a certain point he knew that --
 2   when Athlete-6 signed with another, he knew that this was just
 3   a scam.  Well, we'll get back to it.  Thank you for that
 4   clarification.  I just have a few more questions for the
 5   government, and then I'll ask to hear from you.
 6            MR. MARCUS AMELKIN:  Thank you, your Honor.  Sorry for
 7   the long interlude.
 8            THE COURT:  No, that's okay.
 9            So I think I covered the next question I had, which
10   was the referencing of the defense submission that in
11   November 2019 Calvin Darden, Jr., told Mr. Briscoe that a
12   highly touted college player, Athlete-6, wanted to sign with
13   his agency, but that Athlete-6 was asking for a $900,000 loan.
14   And then it says it was not uncommon.  So I think I've gotten
15   the explanation related to that.  So I think for now, I don't
16   have any additional questions, so I'll turn to Mr. Marcus
17   Amelkin.
18            MR. MARCUS AMELKIN:  Thank you, your Honor.  Did you
19   want to start with questions or should I begin?
20            THE COURT:  Well, my understanding is that it's in the
21   proffer that your client doesn't remember signing these
22   documents and sending them from his email to Athlete-2.
23            MR. MARCUS AMELKIN:  That's right.  We both have
24   lamented that we kind of prefer -- we wish that he remembered
25   because we want to take full responsibility for his actions,
```

02GRBRIs

| | |
|---|---|
| 1 | but for me to stand up and say that he did it when he doesn't |
| 2 | remember it, I think would be disingenuous. |
| 3 | THE COURT:  Understood.  I'm just curious -- |
| 4 | MR. MARCUS AMELKIN:  Yes. |
| 5 | THE COURT:  -- because this seems to be a pretty big |
| 6 | deal in the sense that there was a combination of things, |
| 7 | right.  There's the Agency-1.  There's this prominent athlete. |
| 8 | There's the whole thing coming together. |
| 9 | MR. MARCUS AMELKIN:  If you want my take on it from |
| 10 | reviewing discovery, talks with the government, talking, you |
| 11 | know, with Mr. Briscoe a lot.  You know, we talked a lot in |
| 12 | this case, you know.  I think that there was a lot of pleasure |
| 13 | from Darden to get the deal done to get this $1 million, and |
| 14 | what Darden was telling Briscoe was that you have to get this |
| 15 | money because we'll get Athlete-6 this way -- |
| 16 | THE COURT:  Yes. |
| 17 | MR. MARCUS AMELKIN:  -- and he signed it because he |
| 18 | believed that he would be able to clean it up later.  But then, |
| 19 | before that happened, the scam was revealed. |
| 20 | THE COURT:  Yes. |
| 21 | MR. MARCUS AMELKIN:  And I'll just note that he then, |
| 22 | after it happened, voluntarily resigned as an agent, like |
| 23 | basically closed his business in disgrace, well before he was |
| 24 | charged for this crime, and started to restart his life because |
| 25 | he realized that at that point, his career would be effectively |

02GRBRIs

1  over given the mistake that he made in associating with Darden

2  but also what happened with Athlete-2 and 6.  He just knew

3  that -- in my view, he was taking responsibility before he took

4  legal responsibility for his actions.

5  THE COURT:  Well, what I'll say, right, your

6  reputation takes a lifetime to build up and just, you know,

7  different people have said different amounts of time, but it

8  takes mere seconds to destroy.

9  MR. MARCUS AMELKIN:  I agree with that, and I think

10  that that is -- it's emblematic of this case.  And that's why,

11  I think, when we talk about the offense conduct, which is

12  serious that there is significant collateral consequences here

13  that far exceed a typical case because of the reputational

14  harm, his loss of his business and the fact that he will now

15  have a felony conviction, which will close the door from many

16  job opportunities that might have been available to him prior

17  to his pleading guilty.

18  I think that his early acceptance of responsibility,

19  him and Gilder both, I think, got in the door the same week to

20  plead.  He didn't plead after he learned this Gilder pleaded.

21  He learned they both had already accepted plea agreements.

22  Gilder just went first.  That's a mitigating fact in this case.

23  Of course, acceptance to responsibility is always important and

24  may result in a lesser sentence, but here where we have a

25  pretty shocking *Brady* demand from the jump in this case, in

02GRBRIs

1    that one of two cases he is charged with, the government is

2    basically abandoning because the evidence makes clear that

3    Darden was likely deceiving him.

4           I think at that point many a client that has as much

5    to lose as Mr. Briscoe would say let's go to trial and fight

6    this thing to the end.  I do feel like -- we feel like he was a

7    victim of Darden's manipulation and lies, but instead,

8    Mr. Briscoe felt that the better course of action was to accept

9    responsibility early and agree to a felony conviction plea

10   agreement.  I really hoped that we could avoid a felony, but we

11   didn't in this case.  And I think that by pleading to a felony

12   early and not requiring the government to prepare to go to

13   trial when the two main codefendants are digging in and appear

14   to be pushing in that direction, and I imagine that Darden has

15   to go given his -- I think this will be his third or fourth

16   federal fraud conviction.  Third, I think.

17          THE COURT:  I'm not sure.  I know of at least one, but

18   yes, which actually raises another question.

19          MR. MARCUS AMELKIN:  Right.  Well, I think it raises

20   that Mr. Briscoe is naive.  How did he not Google him and

21   realize --

22          THE COURT:  I think I Googled him early on in this

23   case.  The first page of the results basically has the article

24   that you reference.

25          MR. MARCUS AMELKIN:  There's no question.  And what is

02GRBRIs

1    interesting about that is what Mr. Briscoe said is that there

2    were times, you know, when he was unsure about Darden, but he

3    kept coming through in these odd ways.  Like, Darden introduced

4    Mr. Briscoe to Kanye West before he fell off the earth, like

5    was one of the biggest stars in the world.  He introduced him

6    to his father --

7              THE COURT:  Before or after the Grammy incident?

8              MR. MARCUS AMELKIN:  Right, who knows.  Post Yeezus

9    pre Yeezus is God.

10             THE COURT:  I understand, you know.

11             MR. MARCUS AMELKIN:  But introduced him to his father,

12   Charles Darden, Sr., who was on the board of Coca-Cola, all

13   this stuff.  Mr. Briscoe felt he was legit.  He knew all these

14   famous people.  It was good for business to know famous people,

15   and as a result, he ruined his entire life, my client, at least

16   his business life.

17             THE COURT:  Okay.  Let's, you know, I'll just say it,

18   and then I'll have some questions.  Look, it's a snapshot in a

19   relatively young man's life --

20             MR. MARCUS AMELKIN:  Yes.

21             THE COURT:  -- so no matter what happens here, and

22   it's the reason why the folks here are supporting you,

23   Mr. Briscoe.  It seems like from the submissions that you've

24   taken certain steps in your life to try and, you know, turn

25   things around.  I understand what you're saying, Mr. Marcus

02GRBRIs

1    Amelkin.

2         MR. MARCUS AMELKIN:  Thank you, your Honor.

3         THE COURT:  I recognize in terms of his business

4    career, what he was doing as an agent, yeah, it was a

5    significant blow so that obviously.

6         MR. MARCUS AMELKIN:  Thank you.

7         Just to close with some final points I wanted to make

8    about the offense conduct.  Number one, the government concedes

9    and, of course, I think it's appropriate that Mr. Briscoe and

10   Mr. Gilder are similarly situated.  I'll also note that

11   Mr. Gilder, probation recommended a year and a day.  In this

12   case, they only recommended eight months for Mr. Briscoe.

13   Mr. Gilder had a higher loss amount, and the Court sentenced

14   Mr. Gilder to time served, which --

15        THE COURT:  Hold on.  This is maybe in the vagaries of

16   the way back when the schemes went down, but all of the money,

17   he waived everything before he came in and was sentenced.  So

18   no one was owed any money, and I understand what part of that

19   has to do with someone's different circumstances, and at times,

20   you have no control over that.  I'll just leave it at that.

21        MR. MARCUS AMELKIN:  Fair enough.  I'm note to that

22   point, Mr. Briscoe does have $500 today to pay towards

23   restitution.  Actually, that's the first time that I've had

24   that happen at a sentencing in a fraud case to have the client

25   try to scrape together money to pay it back.  It's clear that

02GRBRIs

1    Mr. Briscoe's life was not particularly enriched by this.  He

2    lost his home.  His cars were repossessed.  His family is in

3    great debt, and it seems like Darden and Cohen got to live on

4    the high horse from this money, at least according to the PSR.

5            THE COURT:  I will just say that everything comes to

6    an end.

7            MR. MARCUS AMELKIN:  There's no question of that.

8            THE COURT:  I'm sorry.  That was with regard to

9    Mr. Darden.

10           MR. MARCUS AMELKIN:  I understood what you meant, your

11   Honor.  I hope it comes to an end for Mr. Briscoe.  I think

12   it's been very hard on him and his wife that they've had to

13   move in with her sister and live off of her generosity.  And I

14   think it demonstrates their recognition and their willingness

15   to take responsibility for this crime by not trying to continue

16   to live off of loans or debt or whatever, but instead try to

17   rebuild the right way.

18           THE COURT:  Yes.

19           MR. MARCUS AMELKIN:  So that closes the loop, I think,

20   the offense conduct.  You know, the government agrees that

21   Mr. Briscoe invested in the business.  Mr. Briscoe was excited

22   to work with Athlete-2, and he really feels terrible for what

23   he did to both ruin that business relationship as well as for

24   the misstatements he made to Athlete-2.  But I think that his

25   history and characteristics, regardless of, you know, if the

02GRBRIs

1  Court believes that the crime itself is deserving of punishment

2  of some form of incarceration, mitigates that need here.

3          This is an individual who, I think, is a pretty

4  inspirational person, and I admire his efforts and his -- both

5  to succeed when he was younger and now to rebuild his life.  I

6  think his mother's letter was really beautiful.  It really

7  painted a picture -- and they wrote it together, painted the

8  picture of a life that he was raised in.  To go from a town of

9  200 people in rural Arkansas to become a 20-year-old NBA agent

10  without any connections to the business.  His first client was

11  a signee out of his home state.  And just building

12  relationships with these young men, signing them, getting

13  first-round draft picks.

14          His mother told me this is the first time she's ever

15  been in New York, and I think it's devastating that she's not

16  here to accompany him to the NBA draft or some business event

17  but instead is here for today.  And I think that that story is

18  inspirational and the loss of that career is hard, but what I

19  admire is that both Mr. Briscoe and his wife have really leaned

20  into their faith in this trying time.  You know, they prayed in

21  the courthouse before they came in, and they've written a

22  devotional book that they are going to probably get published.

23  They go to church every week, and every night he has a streak

24  going of almost a year of daily prayer, which has fortified him

25  and his family in this difficult time.

02GRBRIs

1          I think that his children and the special bond that he

2     has with them is extremely mitigating and warrants serious

3     consideration.  I thought the letter from his child's school

4     was really impressive, that he goes every week and volunteers,

5     spends the whole day at the school through their watch dogs

6     program.  No matter where he was for work, even if he was

7     meeting with a client in California, every day, he was home for

8     bedtime to put those kids to sleep.  So a prison sentence would

9     be absolutely devastating.

10         I think his health is an important concern in this

11    case.  I'll make that argument in combination with the current

12    conditions in the Bureau of Prisons.  The Bureau of Prisons,

13    when it operates functionally, is difficult for people with

14    special diets, and right now I think there's a real danger to

15    his health given the short-staffed countrywide problem of not

16    having enough correctional officers or civilian staff.  You

17    know, nutrition is definitely one of the things that has fallen

18    by the wayside.  I have received letters from clients all over

19    the country complaining about expired food, warm meals that

20    were served really cold.  No warm meals for long stretches of

21    time because they are locked down because there isn't staff.

22    And I think if you have a stomach condition that can leave you

23    hospitalized, the need for treatment is an important

24    consideration in this case.

25         And finally, the last consideration is the need to pay

02GRBRIs

1    restitution.  We take issue with Athlete-2's letter just to the

2    extent that Mr. Briscoe is fully dedicated to paying back this

3    money.  I think it's likely that, at least in the short term,

4    he may be the only one paying.  He is willing to have his wages

5    garnished once he starts making them and to pay back Athlete-2,

6    because he would not feel whole if he did not do so.  He's only

7    36 years old, and I think that there's a good chance that a

8    large portion of this money will be repaid as long as he gets

9    back on his feet and is able to work.  I think a prison

10   sentence would delay that as well as hamper his ability to find

11   meaningful and well-paid work.  I think it would make future

12   employers more concerned about hiring him if the Court was to

13   impose a custodial sentence.

14        If the Court is inclined to punish him beyond the

15   serious collateral consequences that a felony conviction and

16   the restitution and the supervised release would provide, we

17   would ask that he be required to be detained at home or serve

18   community service or some other non-incarceratory sentence.

19   But at the same time, Mr. Briscoe is a homebody anyway.  He's

20   not going anywhere, so I don't think it's necessary in this

21   case.  But I will throw it out there just in the event that

22   that is something that the Court is considering.

23        THE COURT:  Okay.  Let me ask, the 23 percent, the

24   commission, was that all from Mr. Briscoe for Agency-1 or a

25   substantial portion or do you know not exactly?

02GRBRIs

```
 1              MR. MARCUS AMELKIN:  He signed an extension for one of
 2     his clients, which was a fairly lucrative extension, and he put
 3     the entire commission amount into Agency-1.
 4              THE COURT:  Okay.
 5              MR. MARCUS AMELKIN:  Whether that equals to
 6     23 percent, I didn't look at the books.
 7              THE COURT:  All right.  Now, you mentioned in your
 8     submission that Mr. Briscoe was financially struggling.  Let me
 9     go back the $306,000, so I take it, there was a down payment.
10     The investor decided not to invest in the agency, and so
11     Mr. Briscoe owed the money back; is that what occurred?
12              MR. MARCUS AMELKIN:  Let me just clarify?
13              THE COURT:  Yes, go right ahead.
14              (Counsel and defendant conferred)
15              MR. MARCUS AMELKIN:  All right.  So now I understand.
16     So the investor gave the $300,000 because he wanted to buy a
17     piece of Briscoe Sports Group.  But when Agency-1 was created
18     and Mr. Briscoe agreed to be the lead agent, he backed out of
19     the deal with the businessman, so he had to pay him back.
20              (Counsel and defendant conferred)
21              MR. MARCUS AMELKIN:  And Mr. Briscoe had loaned
22     Mr. Darden a similar amount of money, that the businessman had
23     given him for his sports agency, for a venture that Mr. Darden
24     was working on, and so Mr. Briscoe believed that because Darden
25     owed him that amount of money, he would take that amount of
```

02GRBRIs

money plus the rest of the $544 and give it to Athlete-6.  So

basically, it was an end-around.  Instead of A pay C, A pay B

and B pay C.

            THE COURT:  All right.  I think I missed the thread on

the Darden piece.  So there was $300,000 or so from the

businessman for Mr. Briscoe's agency.  But then, Agency-1 came

in and Mr. Briscoe stepped back from that, so he needed to pay

him back.  What money went to Mr. Darden, or did it go to

Mr. Darden?

            MR. MARCUS AMELKIN:  First off, the businessman and

Mr. Darden and Mr. Briscoe negotiated the businessman's

investment.  Darden introduced the businessman to Mr. Briscoe.

            THE COURT:  Yes.

            MR. MARCUS AMELKIN:  Separate and apart from that

agreement, Darden borrowed money from Mr. Briscoe in a similar

amount.

            THE COURT:  So the $300,000 didn't go from businessman

to Mr. Briscoe and then Mr. Briscoe to Mr. Darden?

            MR. MARCUS AMELKIN:  I think it was different money.

            THE COURT:  Okay.  Got it.

            MR. MARCUS AMELKIN:  In a sense, yes, like if it's all

one pot.

            THE COURT:  No, no.  The reason I'm trying to figure

out whether it was something that was simultaneous, I was going

to ask what happened to the $300,000 that the businessman gave

02GRBRIs

1   as part of the initial investment.  It sounds like it was spent

2   on other things.

3              MR. MARCUS AMELKIN:  I think that's right.  I think

4   Mr. Briscoe's business was struggling because he had a lot of

5   employees and a lot of overhead, and he wasn't able to keep up

6   with those costs.  And that's what put him into financial

7   struggles, but Mr. Briscoe believed that because Mr. Darden

8   paid him a similar amount of money, that Mr. Briscoe paid to

9   the business man, because he assured him that he would; Darden,

10  he would give that portion of money to Athlete-6.  So Briscoe

11  was taking --

12             THE COURT:  To athlete-6 or --

13             MR. MARCUS AMELKIN:  Yes, Athlete-6.  The 544 plus the

14  three something, he thought would add up to nine to go to

15  Athlete-6 because he believed that that was the amount that

16  Darden --

17             THE COURT:  I see, for the loan.  All right.

18             MR. MARCUS AMELKIN:  Yes.  Exactly.

19             So again, I think it's mitigating as to the offense

20  conduct even though it requires you to accept the defense's

21  proffer that he believed that Athlete-6 was going to sign with

22  him.  This was in ought all some fake ruse to get Athlete-2 to

23  give him $1 million.  And I think that it wouldn't make sense,

24  in my opinion, for -- if that was the plan, why he would give

25  so much of it to Darden when Mr. Briscoe is the one who induced

02GRBRIs

1    Athlete-2 to give this money.

2              THE COURT:  Let me ask, in terms of a couple things on

3    page 10.  There's a reference to, last year judges in this

4    district sentenced defendants convicted of fraud below the

5    guideline 78.9 percent of the cases.

6              MR. MARCUS AMELKIN:  Mm-hmm.

7              THE COURT:  First, I think it's actually for fiscal

8    year 2022, so it's not actually 2023.

9              MR. MARCUS AMELKIN:  Yes, that's a typo.  I'm sorry,

10   your Honor.

11             THE COURT:  No, it's fine.  And this is something, the

12   78.9 percent, my reading of it, is an aggregation of not only

13   the variances but also departures under 5K1.1.

14             MR. MARCUS AMELKIN:  Yes, 8 percent were 5K departures

15   and 70.9 percent were variances.

16             THE COURT:  All right.  The only thing I ask in the

17   future, and if you can spread this to your office because it

18   happened in another case where a Federal Defender was involved;

19   you need to be clear in the submission that it's separate.  It

20   doesn't matter for me because I'm going to look at that, but

21   I'm not sure every judge is going to look at that.  Well, it's

22   not, at least in my mind, there's a difference, right, because

23   the folks, what you're talking about for your clients,

24   typically is a variance.  The aggregation, I think, even though

25   it's a small percentage, you understand what I'm saying?

02GRBRIs

1          MR. MARCUS AMELKIN:  I think it's a fair criticism and

2     one I will take back to the office.  I used to do this

3     paragraph longer, but it was so busy that I took out the

4     granularity.  But I understand the Court's point and will do so

5     in the future.

6          THE COURT:  Or just refer to the variance.

7          MR. MARCUS AMELKIN:  Yes.  The number was still very

8     high, so it doesn't take anything away from it.

9          THE COURT:  Although, it does vary because the year

10    before it was 60-something.

11         MR. MARCUS AMELKIN:  67.  Thank you, your Honor.

12         THE COURT:  Mr. Briscoe, would you like to be heard?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  All right.  You can remain seated if you

15    want.  Just pull the microphone closer.  Go ahead.

16         THE DEFENDANT:  Thank you for allowing me to speak.

17    First off, I would like to say I'm sorry for taking up your

18    time today.  I would like to say I'm sorry to the victims that

19    I've hurt and caused the pain and suffering in their lives.

20    You know, I wake up every day with regret for everything that

21    I've done to lead me to this point today.  I remember about

22    almost a year now, on March the 23rd when I was arrested, and I

23    didn't know what to do.  The only thing I could think about was

24    to pray to God.  It's because of God's strength that I'm here

25    today.  My family, you know, because of them, also, I'm

02GRBRIs

1    embarrassed for my community, my family, my kids.

2         I'm sorry that I caused this pain.  And like I said,

3    you know, I started -- when I prayed to God, I asked him to

4    help me get through, and I started praying.  The first thing I

5    do in the morning is pray to God.  The last thing I do when I

6    wake up is pray to God because.  The person that you guys are

7    reading about and actions I made for the mistakes in a brief

8    period in my life, that wasn't me.  So I ask the Court today if

9    they would in part view me as my life as a whole because, you

10   know, I try to do things the right way because I have a lot of

11   people that look up to me, even people that I didn't know that

12   looked up to me.  And it's through this time that, you know,

13   God sat me down and showed me the impact that I could have on

14   other peoples' lives just by doing things the right way, by

15   helping in the community, just by giving back.  Not only that

16   but just trying to be a positive role model.

17        I realize that, and it's part because of my devotion

18   and the time that I've spent, it's been 320 days that I've been

19   getting up, reading the devotionals, listening to God, praying

20   to him and actually reading the Bible.  I've been inspired and

21   it inspired me to write a devotional with my wife.  It helps me

22   to deal with the regret and the pain that I caused the victims.

23   And I know that one day that I can help and make amends, you

24   know, to them for this pain that I caused.  And I hope that

25   they can, you know, accept my apologies.

02GRBRIs

1        I know that, you know, right now things are -- it

2   seems bad, but at the end of the day, you know, this is not me.

3   Who I am standing in front of you today is who I truly am, and

4   like I said, I'm truly sorry.  I'm sorry for rambling on, but I

5   thank you for your time and I thank you for just hearing me

6   out.

7        THE COURT:  All right.  Thank you.  Let me ask, is

8   there any reason why sentence should not be imposed at this

9   time?

10        MR. MEAD:  No, your Honor.

11        MR. MARCUS AMELKIN:  No, your Honor.

12        THE COURT:  As I stated and the parties agree,

13   Mr. Briscoe's guideline range is 18 to 24 months.  Under the

14   Supreme Court's decision in *Booker* and its progeny, the

15   guideline range is just one factor that I must consider in

16   deciding what an appropriate sentence is.  I'm also required to

17   consider the other factors set forth in 18, United States Code,

18   Section 3553(a), and I have done so.  Those factors include but

19   are not limited to:  The nature and circumstances of the

20   offense and the personal history and characteristics of

21   Mr. Briscoe since each defendant must be treated as an

22   individual.

23        I am also required to consider the need for the

24   sentence imposed to reflect the seriousness of the offense,

25   promote respect for the law, provide just punishment for the

02GRBRIs

 1    offense, provide adequate deterrence to criminal chuck and

 2    avoid unwarranted sentencing disparities among other things.

 3    First, I'll address the circumstances of the offense.  There's

 4    no question you've been convicted of a serious offense.

 5    Conspiracy to commit wire fraud is a serious offense, and here

 6    it involved $1 million from Athlete-2 and the signing of

 7    fraudulent signatures of Athlete-6.  And once you received that

 8    money, you used the money to pay off a debt, and then sent

 9    $544,000 to Mr. Darden.  But none of that money eventually made

10    its way to Athlete-6 as had been represented to Athlete-2.

11          Later when Athlete-2 inquired about getting paid what

12    he thought was a loan, he was again put off and told, we're

13    going to get it.  We're going to get it.  So I recognize it's

14    what I'll say is more murky than I initially anticipated in the

15    sense that I think the best gloss on it would be that there may

16    have been some representation by Mr. Darden, but there was

17    never any communication by yourself or anyone else with

18    Athlete-6.  And it was clear, to me at least, that Athlete-2

19    believed that there already was this connection.  And I wasn't

20    about a possibility or they may sign or anything like that.

21          And for whatever reason at the time of your life, you

22    were trying to right the ship of your business, and you owed a

23    lot of money and this was a way of getting it and perhaps

24    Mr. Darden.  But at the end of the day, you fraudulently

25    signed, based upon the evidence before me, fraudulently signed

02GRBRIs

1    folks names, having never spoken with them, for a loan that

2    basically wasn't a loan.

3            So that's a serious offense.  And to the point that

4    you've made in your statement as well as in the submission, it

5    was a breach of trust.  I know you're aware of this.  I mean,

6    according to your submission, you were the youngest person to

7    become a registered agent.  I think it summarized the breach of

8    trust, at least from my perspective, in something that your

9    parents said in their letter, which is true and it will

10    continue to be true for you because you can still be a role

11    model to people.  But your folks said, After several years, he

12    finally got his first first-round draft pick.  This is about

13    you.  It was huge for not only him but those who looked up to

14    him.  Then when we got another first round draft pick and was

15    invited to sit in the green room, those kids were able to see

16    someone who looked like them and that came from where they came

17    from to see that anything was possible and that their dreams

18    could also be a reality.

19            Now, I don't know, I don't have a sense of Athlete-2,

20    but I imagine that many of the folks you were dealing with were

21    dealing with you in part because they recognized you as

22    somewhat of a kindred spirit.  Some of that is based upon the

23    fact that, I imagine, certain of your clients were black and

24    you're black, and they trusted in that and they wanted to do

25    business with you.  And so, I recognize that.  And that was,

02GRBRIs

1   you know, in part what I think you were referring to about

2   letting folks down.

3           Now, next I'll address your history and

4   characteristics.  In that regard, I've read the sentencing

5   submission.  I've read all the letters that have been submitted

6   to me.  You and your siblings were raised in Winchester,

7   Arizona.

8           THE DEFENDANT:  Arkansas.

9           THE COURT:  Arkansas, I'm sorry.  I was making the

10  same mistake last night when I was reading through it.  A town

11  of 200 people.  I actually looked it up and Wikipedia had it in

12  the 2010 census at about 179, so small town.  You told the

13  probation officers that your folks worked multiple jobs to make

14  ends meet for your family.  And that for a time your father

15  worked as a farmer as well as working at a welding company, and

16  your mom worked in the fast food industry.  But because of

17  their hard work, your basic needs were always met and your

18  sibling's were always met, and your family was never without

19  shelter or utilities.

20          You worked with your dad for a while on the farm, and

21  you credit that with your appreciation for what it means to

22  work in manual labor and that motivated you to excel in school.

23  And your parents, obviously, support you, and they supported

24  you because I read their letter.  And they supported you when

25  you were younger, and it really drove you to try and do what

02GRBRIs

1    you did.  In other words, to follow your passion, which was

2    sports, and to try and make a career out of that.

3              Now, your family and friends describe you as a loving,

4    caring father, husband and friend.  They also say over the

5    years, you've given back to the community by -- you know, when

6    your business was doing well, having Christmas meals for the

7    community as well as various giveaways and things like that at

8    Christmas time.  Oh, and you also volunteer at your daughter's

9    school and have done so even before the crime here.  And each

10   of them expressed surprise that you were involved in this -- in

11   the criminal activity.

12             So I'm going to take their views of your character

13   into consideration in determining what an appropriate sentence

14   is for you.  Your family and friends also commented on what a

15   good father you are to your daughter and your son, and

16   described how involved you are in their lives.  And it sounds

17   as if you were involved before this incident and perhaps you

18   are involved even more so now.  And so I'll take account of

19   your family circumstances, including the impact your

20   incarceration might have on your family in determining what an

21   appropriate sentence is for you.

22             However, I do note that, you know, your situation is

23   different than many of the defendants I have who appear before.

24   Well, similar in the sense that there is always collateral

25   damage in these circumstances; in other words, where family

02GRBRIs

1    members, husbands, wives and children are collateral damage of

2    a defendant's criminal acts.  You know, I also note that

3    obviously several of the folks who wrote on your behalf are

4    here and that you will continue to have support.  And I'll also

5    take into consideration the fact that you have a medical issue

6    that you suffer from.  I guess I would say a chronic medical

7    issue that occasionally flares up, and in your circumstance,

8    unlike some others, when it flares up, it has been at times

9    severe for you, at least once resulting in your hospitalization

10   and need for surgery.  And I think at some point, a perforation

11   from what you had, another procedure.  So I'll take that into

12   consideration as to what an appropriate sentence is for you.

13          Mr. Briscoe, if you could please rise as I sentence.

14   I'm going to grant what your attorney has requested and give

15   you a sentence of time served.  You can be seated.  I can tell

16   you that I was going to give you jail time.  You can be seated.

17   I was going to give you jail time, but my discussion and the

18   answers to my questions about how this all came about changed

19   my view somewhat of the conduct.

20          There's no question you just pocketed this money, and

21   there's no question that at a time when you had an opportunity

22   to basically, you know, sort of turn away from what had

23   transpired, that didn't happen.  It may be that you were

24   thinking that you were going to get the money from somewhere,

25   do whatever to sort of work out, but that didn't happen.  I'm

02GRBRIs

1    going to give you three years of supervised release, the first

2    six months to be spent on home detention.

3            With regard to supervised release, you'll be subject

4    to the mandatory conditions on page 34 of the presentence

5    report.  The standard conditions on page 34 and 35 and the

6    special conditions described in the PSR on pages 35 and 36.

7    Those conditions include a risk condition, so that if a

8    probation officer determines that you pose a risk to another,

9    including an organization, the officer, with prior approval

10   from me or one of my colleagues, may require you to notify that

11   person or entity about the risk, and you must comply with that

12   instruction.  In other words, you are going to work for a

13   company and you are going to be dealing with money, there may

14   be a situation where the probation officer will request, well,

15   the employer or whomever needs to be notified of the risk.  I'm

16   not saying that that is going to happen, but that's basically

17   what it means in the context.

18           You must not incur new credit charges or open

19   additional lines of credit without the approval of the

20   probation officer unless you are already in compliance with the

21   installment payment schedule.  You must provide access to any

22   financial documents that the probation officer may ask about.

23   You'll also be subject to a search condition, and that's of

24   your person, your home and the like, on reasonable suspicion by

25   the probation officer.  What that means is there could be a

02GRBRIs

```
 1    search conducted, so you should inform the folks that you live
 2    with that there's a possibility at some point that there may be
 3    such a search.
 4              Now, with regard to restitution, there is a
 5    restitution order.  Let me ask, Mr. Briscoe, did you sign this
 6    restitution order earlier today?
 7              THE DEFENDANT:  Yes, your Honor.
 8              THE COURT:  And have you read it and gone over it with
 9    your attorney?
10              THE DEFENDANT:  Yes, your Honor.
11              THE COURT:  Okay.  I'm going to sign the restitution
12    order.  The forfeiture order had already been entered or filed
13    on November 9, so that has been taken care of.
14              Yes, Mr. Marcus Amelkin?
15              MR. MARCUS AMELKIN:  Thank you.  As to the
16    restitution, would the Court mark on the judgment that interest
17    is waived because he is indigent?
18              THE COURT:  I typically do, and I will in this case.
19              MR. MARCUS AMELKIN:  Thank you, your Honor.
20              THE COURT:  So the forfeiture was in the amount of
21    $1,571,000, and that forfeiture is imposed if I needed to do it
22    orally; although, I believe it's already in a document.
23    Mr. Briscoe you will not have to pay a fine.  I find that you
24    do not have the wherewithal to pay a fine.  You must, however,
25    pay a $100 special assessment, which is mandatory.
```

02GRBRIs

1        I believe that this sentence is sufficient but not

2   greater than necessary to comply with the purposes of

3   sentencing set forth in 18, United States Code, Section

4   3553(a).  Do either counsel know of any legal reason why this

5   sentence should not be imposed as stated?

6            MR. MEAD:  No, your Honor.

7            MR. MARCUS AMELKIN:  No, your Honor.  We thank the

8   Court for the sentence.

9            THE COURT:  Well, there's no need to thank you.  I

10  mean, it's my job.

11       The sentence as stated is imposed.  Let me just say,

12  Mr. Briscoe, I imagine that your supervision is going to be

13  transferred, and I hope that you don't see you again.  The only

14  thing I'll say is no matter what circumstances you're in, you

15  should avoid shortcuts, right?  No matter what you tell

16  yourself, Oh, I'll make it up.  I'll pay it back.  I'll do

17  this.  I'll do that.  I can't tell you the number of folks I

18  see, especially in financial crimes, bank tellers who say, I'll

19  take this money but I'll pay it back.  It's not going to

20  happen.  It typically doesn't happen.  If it seems too good to

21  be true, it usually is.

22       Now, you have a right to appeal your conviction and

23  sentence in the sense that it is inconsistent with your plea

24  agreement.  The notice of appeal must be filed within 14 days

25  of the judgment of conviction.  If you are not able to pay the

02GRBRIs

```
 1   cost of appeal, you may apply for leave to appeal in forma
 2   pauperis.  If you request, the Clerk of Court will file a
 3   notice of appeal on your behalf.
 4            Mr. Briscoe, as I said, I hope I don't see you again,
 5   and I wish you luck.  I hope you do right by the people here
 6   supporting and who wrote on your behalf and your kids.
 7            So I am going to dismiss any underlying counts or
 8   indictments related to Mr. Briscoe.  Anything else from the
 9   government?
10            MR. MEAD:  No, your Honor.
11            THE COURT:  All right.  From the defense?
12            MR. MARCUS AMELKIN:  Yes, your Honor, two matters.
13   The first is we'd request -- I would request that you would put
14   on the record, because he is going to be supervised in Texas as
15   opposed to in New York, that home detention means he is
16   permitted to leave for work, religious, volunteer work, or for
17   medical but has to remain home for everything else.
18            THE COURT:  Okay.  I will do that.  Just to make sure
19   I have it, it would allow, obviously, for religious, medical,
20   work.
21            MR. MARCUS AMELKIN:  School.  He's not in school but
22   in case he goes back or college or something.
23            THE COURT:  For him?
24            MR. MARCUS AMELKIN:  Yes.
25            THE COURT:  Okay.  Yes.
```

02GRBRIs

1          MR. MARCUS AMELKIN:  Just so you are clear, you can

2     ask your probation officer for other requests without having to

3     go to court is generally how it works on supervision.  But the

4     second request I'd like to make is if the Court could recommend

5     that he be monitored on his phone as opposed to having to wear

6     the ankle monitor.  Given he's not a risk of flight and not

7     going anywhere, they can ensure that he can be at home with the

8     cell phone.

9          THE COURT:  Okay.  I don't know what the process is,

10     but I'll make the recommendation.  But it is at the discretion

11     of the probation office and the technology that they use for

12     the situation and the comfort and the officers involved in the

13     supervision.

14          MR. MARCUS AMELKIN:  I respect that, your Honor.

15     Thank you.

16          THE COURT:  Anything else?

17          Okay.  All right.  We stand adjourned.  Thank you very

18     much.

19          (Adjourned)

20

21

22

23

24

25