O9OJDAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                           23 Cr. 134 (VSB)

5   CALVIN DARDEN, JR.,

6                                            Trial
                Defendant.
7   ------------------------------x

8                                            New York, N.Y.
9                                            September 24, 2024
                                             3:40 p.m.
10

11  Before:

12                    HON. VERNON S. BRODERICK,

13                                           District Judge
                                             -and Jury-
14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    KEVIN MEAD
17  STEPHEN J. RITCHIN
    WILLIAM C. KINDER
18  BRANDON C. THOMPSON
         Assistant United States Attorneys
19
    DONALDSON CHILLIEST & MCDANIEL LLP
20  BY:  XAVIER R. DONALDSON
         -and-
21  ANTHONY RICCO
    STEVEN Z. LEGON
22       Attorneys for Defendant

23  Also Present:
    Alexander Ross, Paralegal
24  Arjun Ahuja, Paralegal
    Melissa Baccari, FBI Special Agent
25

O9OJDAR1

             (A jury of twelve and three alternates was impaneled
and sworn)

             (In open court; jury not present)

             THE COURT:  Is there anything that we need to do
before we take our lunch break?

             MR. MEAD:  Two very brief things, your Honor.

             One is the witness from Aflac, who may or may not
testify today, I have been getting her name wrong in various
documents, including the documents to the Court.  I had named
her as "Mary McMullen."  Her name is, in fact, Jennifer Michele
McMullin.

             THE COURT:  Okay.

             MR. MEAD:  The second thing is we informed the Court
yesterday morning, we do intend to introduce a number of
documents.  In particular, before even we call our first
witness, the government intends to introduce a number of emails
pursuant to a certification.  Those are the same emails that
were in the email to defense counsel that I handed up yesterday
morning.  It's all of the 2000 series within that document.

             We have not yet been informed of any defense
objections, but obviously we don't want to break the trial to
deal with objections when we offer those documents, your Honor.

             THE COURT:  Okay.  So it's the 2000 series in the
email that you provided yesterday.  Let me hear from the
defense with regard to those documents.

1          MR. DONALDSON:  One second, Judge.

2          THE COURT:  Sure.

3          (Counsel conferred)

4          MR. DONALDSON:  Judge, I believe that I did, but to

5     make sure, let me just get the lunch hour, but I don't think I

6     do at this point.

7          THE COURT:  All right.  So I'd ask, Mr. Donaldson, if

8     you take a look at that and if anything comes up, notify the

9     government immediately and let me know so that I can take a

10    look at each of the documents that there may be a dispute about

11    and make a ruling, okay?  We'll hear from the parties and make

12    a ruling.

13          Okay.  All right.  So we're going to come back at

14    3:30, all right?  Oh, I'm sorry.  Was there another issue?

15          MR. MEAD:  No, Judge.  Does it make sense for us to

16    come back five minutes before?

17          THE COURT:  That's fine.  3:25 is fine.  Thank you

18    very much.

19          (Luncheon recess)

20

21

22

23

24

25

O9OJDAR1

AFTERNOON SESSION

3:40 p.m.

(In open court; jury present)

THE COURT:  Ladies and gentlemen, you are now the jury.  There is no higher function in our legal system.  From now on, whenever you enter or leave the courtroom as a jury, the parties and the audience will rise, the same way as they do for me, because you're every bit as important and powerful as any judge.

Let me introduce or reintroduce some of the people who are here in the courtroom.  You have met the defendant, Mr. Darden.  His attorneys are in the back row, and the prosecution team is here in the front table.  My courtroom deputy that you've also met, Ms. Disla, is seated to my right, and my deputy clerk, Ms. Folly.  Is seated directly in front of me.  Now, it's Ms. Folly's job to help me with any research if there are any legal issues that come up.

Now, throughout this trial there will also be court reporters who you've seen throughout the jury selection, and they will continue to be here during the trial so that there's a verbatim record as to what has happened.

Preliminary instructions, the role of the judge and the jury.  In the American system of justice, the judge and the jury have separate roles.  My job is to instruct you as to the law that governs the case.  I will give you some instructions

O9OJDAR1

1    now, and others from time to time during trial.  At the end of

2    the trial, I will give you detailed instructions about the law

3    you will need to apply when you deliberate.  Your job as jurors

4    is to determine the facts based on the evidence presented at

5    the trial.

6         You are the only triers of the facts, and your

7    decisions on factual issues will determine the outcome of this

8    case.  It is important that you discharge your duties without

9    discrimination, meaning that bias regarding the race, color,

10   religious beliefs, national origin, sexual orientation, gender

11   identity, or gender of the defendant, any witnesses, and the

12   lawyers should play no part in the exercise of your judgment

13   throughout the trial.

14        You must not take anything that I say or do during the

15   trial as indicating what my opinion is or what your verdict

16   should be.  It is not my job to even have such an opinion.  And

17   if I did, it should not influence you in any way.

18        With regard to evidence, you must pay close attention

19   to all of the evidence presented.  Evidence consists of the

20   testimony of witnesses, exhibits that are admitted as evidence,

21   and stipulations agreed to by the attorneys.  A stipulation is

22   simply an agreement between the lawyers about facts or

23   testimony.

24        Certain things are not evidence in the case, and you

25   must not consider them as evidence.  For example:

O9OJDAR1

1          One, statements and arguments by the lawyers are not

2     evidence.  They are simply arguments in which they will tell

3     you what they think the evidence proves and how they think you

4     should analyze the evidence.  You should consider these

5     statements and arguments only to the extent they appeal to your

6     own common sense, and you should under no circumstances

7     consider them as evidence.  My statements are not evidence

8     either.

9          Two, questions by the lawyers are not evidence; only

10    the answers given by the witness are evidence.  For example, if

11    a witness is asked, "It was raining that day, wasn't it?"  And

12    the witness stays, "No, it wasn't," then based upon that

13    question and answer, there is no evidence in the case that it

14    was raining that day, no matter how convinced the lawyer

15    sounded when he or she was asking the question.

16          Three, objections to questions are not evidence.  The

17    lawyers are obligated to make an objection when they believe

18    evidence being offered is improper under the rules of evidence.

19    You should not be influenced by the objection or by my ruling

20    on it.  If the objection is sustained, ignore the question and

21    any answer that may have been given.  If the objection is

22    overruled, treat the answer like any other.

23          Four, any testimony that I exclude or strike or tell

24    you to disregard is not evidence, and you must not consider it.

25    If I instruct you that some evidence is only to be considered

O9OJDAR1

1    for a certain purpose, you must follow that instruction.

2                Five, and of course anything you may see or hear

3    outside the courtroom is not evidence and should be disregarded

4    by you.  You are to decide the case only on the evidence

5    presented here in the courtroom.

6                In deciding the facts of the case, you will have to

7    decide the credibility of the witnesses — that is, how truthful

8    and believable they are.  How do you decide what to believe and

9    what not to believe?  You are going to listen to the witnesses,

10   observe them, and then decide, just as you would decide such

11   questions every day in your ordinary life.

12               Did they know what they were talking about?  Were they

13   honest, open, and truthful?  Did they have a reason to falsify,

14   exaggerate, or distort their testimony?  Is there any reason to

15   think they might be mistaken about what they are telling you?

16   What was their demeanor or manner when testifying?  How did

17   their testimony square with the other evidence in the case?  In

18   other words, is there other evidence that supports their

19   testimony or undermines it?  Considering these sorts of issues

20   will help you determine what testimony to accept and what

21   testimony to reject.

22               As the trial proceeds, you may have impressions of a

23   witness or a subject, but you must not allow those impressions

24   to become fixed or hardened.  Because if you do, in a sense you

25   foreclose consideration of the testimony of other witnesses or

O9OJDAR1

1    other evidence that is to come.  This would be unfair to one or

2    the other.

3              A case can be presented only step by step, witness by

4    witness, until all the evidence is before you.  We know from

5    experience that frequently we will hear a person give his

6    version of an event that sounds most impressive and even

7    compelling.  And yet, when we hear another person's version of

8    the same event or even the same witness questioned further with

9    respect to it, what seemed quite compelling and impressive may

10   be completely dissipated or weakened.

11             Likewise, if a witness testifies about something and

12   it does not make much of an impression, but later evidence

13   supports what the witness said, what did not seem particularly

14   compelling or impressive when you first heard it may be

15   considerably strengthened.

16             So remember that there may be another side to any

17   witness's story, and there may be more to come on an issue.  I

18   cannot emphasize strongly enough that you must keep an open

19   mind until the trial is over.  You should not reach any

20   conclusions until you have all the evidence before you.

21             In order to ensure that you decide the case only on

22   the evidence and that you not be influenced in any way by

23   anything that might occur outside the courtroom, I must give

24   you a specific set of instructions.

25             First, do not discuss this case with anybody while the

O9OJDAR1

case is going on.  That includes even members of your own

family and close friends.  You may tell your family, friends,

and employer that you are a juror in a case and approximately

how long it is expected to last, but do not tell them anything

else about the case until after you have been discharged.

Not discussing the case includes not blogging,

tweeting, texting, using Facebook and the like.  Until you are

discharged, you cannot say anything by any means or in any

forum other than that you are a juror.  I cannot emphasize

strongly enough how important it is that you not discuss the

case — in person, by social media, or otherwise — until the

case is over.

My instruction that you not discuss the case also

includes not discussing it even amongst yourselves while the

trial is ongoing.  You will have the opportunity to — indeed,

the duty to — discuss the case among yourselves later on, but

that can happen only after all of the evidence is in and the

case is given to you to discuss and decide in the jury room.

This rule is important because experience has shown

that when people express an opinion about the case or about a

witness, they may become attached to that opinion and their

views may harden.  And it is important that that not happen and

that you keep an open mind until you have heard all of the

evidence.

So do not talk about the case, even with each other,

O9OJDAR1

1    until I tell you to do so.  Not talking to each other about the

2    case includes not texting, emailing, creating a Facebook group,

3    or doing anything like that.

4         Second, you are not to read anything in the newspapers

5    or elsewhere about the case, if that should occur.  Also, you

6    are not to listen to or view any reporting about this case if

7    that should be broadcast on TV, over the radio, or on the

8    internet.  And I think I also mentioned can't watch *Dancing*

9    *with the Stars*, all right?

10        Third, do not do any research or any investigation

11   about the case on your own.  Do not go to visit any place you

12   may hear described during trial.  Do not do any research on the

13   internet or in the library or any other reference source.  Do

14   not Google anyone or anything related to the case.

15        I know it is hard in this day and age not to go to the

16   internet when you're curious about something, but I cannot

17   emphasize enough how important it is that you not do that or

18   conduct any form of outside research relating to this case

19   while the trial is going on.

20        The reason for the rules against media reports or

21   independent research are that you might learn something that is

22   wrong, and it would be unfair to the parties if you were to

23   have information from outside sources that the parties did not

24   know about and did not have the opportunity to address.

25        Fourth, be sure that I am informed if any person that

O9OJDAR1

1    you recognize comes into the courtroom.  This is a public

2    trial, so that could happen, but it is important that you not

3    hear from them what may have happened in court while the jury

4    was not present.  If you should see a friend, relative, or

5    acquaintance come into the courtroom, please send a note to me

6    through my deputy clerk, Ms. Disla, at your first opportunity.

7           Fifth, you are not to allow anyone to speak to you

8    about this case.  If you are approached by anyone to speak

9    about it, politely tell them that the judge has instructed you

10   not to do so.  If any person approaches you or seeks to contact

11   you about the case, you are also required to report the

12   incident promptly to me, and you can do that through Ms. Disla.

13          As I mentioned earlier, the lawyers, the parties, and

14   the witnesses are not supposed to talk to the jury outside the

15   courtroom, even to offer a friendly greeting.  So if you happen

16   to see any of them outside the courtroom, they will and should

17   ignore you.  Please take no offense to this.  They will be

18   acting properly by doing so.  Experience has shown that even

19   innocent conversations with jurors can sometimes be

20   misinterpreted, so courts have a hard and fast rule that the

21   lawyers, parties, and witnesses cannot speak to jurors, period.

22          The parties are entitled to have you personally render

23   a verdict in the case on the basis of your independent

24   evaluation of the evidence presented here in this courtroom.

25   Speaking to others about this case or exposing yourself to

O9OJDAR1

1    information outside the courtroom would compromise your

2    fairness to the parties.  So that is why you cannot communicate

3    about the case or learn anything about the case from any source

4    other than what is presented in the courtroom during the trial.

5          Finally, if anything should happen involving any juror

6    which is of an unusual nature or which you think I should be

7    told about, do not discuss it with any other juror.  Simply

8    give Ms. Disla a note to the effect that you want to speak with

9    me about it, and I can hear what it is that you have to say.  I

10   make these remarks not expecting anything unusual or improper

11   to happen.  It's just safer to take the precaution to alert you

12   in advance just in case.

13         Finally, let me say a few words about trial procedure.

14   The trial essentially has four parts.

15         First, each side will have the opportunity to make

16   opening statements to you.  As I have told you already, these

17   statements are not evidence.  Their purpose is to give you an

18   idea in advance of the evidence that the lawyers expect you to

19   hear and see.  These statements allow the lawyers to give you a

20   preview of what this case is about, but the only evidence comes

21   from the witnesses, exhibits, and stipulations.

22         The government has the burden of proof, so it will go

23   first.  The defendant has no burden of proof and does not have

24   to do anything at this trial.  So the defendant does not have

25   to give an opening statement.  But if he chooses to, the

defendant's lawyers will go next.

Second, after the opening statements, you will hear the testimony of witnesses. This is the longest part of the trial. The government's witnesses go first. Each witness will first give direct testimony, and then he or she may be cross-examined by the other side. Sometimes there will be redirect testimony and occasionally recross-examination.

Again, a defendant does not have to question witnesses, but may choose to do so. Documents or physical objects or stipulations will be received in evidence. Following the government's case, the defendant may, but need not, present witnesses and other evidence. If the defendant does call witnesses, those witnesses will be examined and cross-examined just as the government witnesses were. If the defendant chooses to present evidence, it is possible that the government would then present some brief rebuttal to that evidence.

Third, after all of the evidence has been received, each party will have an opportunity to make closing arguments. The lawyers will review the evidence and make arguments to you as to what conclusions they think you should or should not draw from the evidence. These arguments also are not themselves evidence, but they may be helpful to you in summarizing the case before your deliberations.

Fourth, after these arguments or summations, as they

1    are called, I will give you detailed instructions as to the law

2    that applies and controls in this case, and you must follow

3    those instructions.  These instructions to the jury are

4    sometimes referred to as the jury charge.  After the jury

5    charge, you will go to the jury room to deliberate and discuss

6    the evidence in order to decide the facts and render a verdict.

7            A few housekeeping matters before we begin with

8    opening statements.  I believe Ms. Disla has shown you the jury

9    room, and that is where you should report in the morning.  She

10   will give you her telephone number where you can reach her if

11   there is an emergency.  Please give her your home, work, and

12   cell phone numbers just in case we have to leave a message

13   concerning a last-minute schedule change or other issue.

14   Please also give her your email address.

15           As I mentioned, this trial is scheduled to last

16   approximately two and a half weeks.  As I mentioned, we will

17   sit Monday through Friday.  Our trial day will begin at

18   10:00 a.m.  We will take a lunch break from approximately

19   12:45 to 2:00, and we will end at 5:30 each day.

20           We will also have one morning break and one afternoon

21   break.  For the lunch break, you're welcome to bring your lunch

22   for that break or you may walk out and get something to eat.

23   If you need to take a break before the scheduled morning or

24   afternoon break, just raise your hand.  But if you can wait

25   until the scheduled break, I'd ask that you do so.

O9OJDAR1

1          Be on time after the breaks and in the morning.  If

2     you are late, you will be keeping everyone waiting because we

3     can't get started unless all of you are here.  If there are

4     days when we deviate from the 10:00 a.m. to 5:30 schedule, I

5     will let you know in advance.

6          If you wish, you can take notes.  Ms. Disla will

7     provide you with paper and pen for that purpose.  But if you

8     take notes, you must leave them in the jury room when you go

9     home for the night.  And remember, any notes you take are for

10    your own personal purposes to help you recall or focus, but

11    they are not to be relied on by anyone else.

12         It is completely up to you whether or not you take

13    notes.  Some people find it helps them concentrate; other

14    people find it's distracting.  It's entirely up to you.  If you

15    do not take notes, you should rely on your independent

16    recollection of the evidence.

17         Either way, when you deliberate, you should discuss

18    what the evidence was, not what one juror's or another's notes

19    do or do not say.  So we're just going to get the notebooks,

20    ladies and gentlemen, to distribute them to you.  Remember, you

21    don't have to take notes.  It's entirely, as I said, up to you,

22    and they're for your personal use.

23         When you are given the opportunity to deliberate, you

24    should not rely on your notes exclusively.  If there's some

25    question about testimony or an exhibit, you can ask for the

testimony to be read back to you.  In addition, I will endeavor

to provide all of the exhibits to you in the jury room so that

you'll have them with you when you deliberate.  Okay?

All right.  So in a moment, we will begin with the

government's opening statement.  All right.  We're just going

to get you the pads just in case you want to take notes.  All

right.  Thank you.

And we might end slightly early today, and by that I

mean 5:20, 5:25 so that Ms. Disla can show you how to enter and

leave the jury room because there are going to be swipe cards

and some other things.  Okay.

I think everyone has a pad and pen, okay?  All right.

We can begin with the government's opening statement.  Thank

you.

MR. KINDER:  This case is about how the defendant,

Calvin Darden, Jr., cheated two professional basketball players

out of millions of dollars, and how he spent their money on

himself.  The defendant and his co-conspirator, a sports agent,

tricked one of those players into sending $7 million that the

player thought was going toward the purchase of a professional

women's basketball team.

THE COURT:  So ladies and gentlemen that is the fire

alarm.  We're going to wait to hear instructions from the fire

safety director in a moment, okay?  I apologize for the

interruption.

O9OJDAR1                          Opening – Mr. Kinder

1          (Pause)

2          THE COURT:  Okay.  Why don't we continue.  There will

3     be a subsequent announcement, ladies and gentlemen -- I guess

4     we're going to have to wait.  We'll wait until the alarm stops

5     and we get a notification.

6          Just so you know, typically when this happens, they

7     discover it's nothing, and they'll let us know, all right?

8          (Pause)

9          THE COURT:  Why don't we see if we can continue and

10    hopefully we'll hear shortly.  Go ahead.

11         MR. KINDER:  The defendant and his co-conspirator, a

12    sports agent, tricked one of these players into sending

13    $7 million that the player believed would go toward the

14    purchase of a professional women's basketball team.  They

15    tricked the other player into sending $1 million as a loan for

16    a top professional basketball prospect.

17         The defendant and the sports agent lied to the players

18    about purchasing the team and about making the loan.  Instead

19    of using the money as they promised, the defendant and the

20    sports agent stole it.  The defendant wired it from account to

21    account to cover his tracks, and he spent it on luxury cars,

22    expensive jewelry, a grand piano, and the victims got nothing.

23         How did the defendant pull this off?  He lied over and

24    over.  The defendant pitched himself as a guy with the right

25    know-how and the right connections to get deals done.  But the

con here was simple.  Two victims paid $8 million because of
the defendant's lies.  They got nothing for it, and the money
ended up in the defendant's pockets.

That is why we are here today.  Because when the
defendant cheated two professional basketball players out of
their money and spent their money on himself, he committed
multiple federal crimes.

This is the government's opening statement.  It's our
opportunity to explain what the evidence at this trial is going
to show and how that evidence will prove that the defendant is
guilty.

So what will the evidence show?  You'll learn that
Dwight Howard, a player in the National Basketball Association,
or NBA, wanted to buy the Atlanta Dream, a team in the Women's
National Basketball Association or WNBA.  In 2020, when it
looked like the owners of the Dream might sell the team, Howard
talked to his sports agent about buying it.

The sports agent was the defendant's co-conspirator.
The sports agent introduced Howard to the defendant.  The
defendant and the sports agent proposed to Howard that he buy
the team indirectly through a company.  That company, they told
Howard, would be run by the defendant's father, Calvin Darden,
Sr.  The defendant's father was a former corporate executive
and a prominent Atlanta businessman.  The defendant and the
sports agent told Howard that if Howard paid for the team, the

O9OJDAR1                        Opening – Mr. Kinder

1    company would buy it and run it for him.

2           Now, the defendant didn't simply ask Howard for the

3    money; he made Howard think that this was a real transaction.

4    He mixed fact with fiction.  The defendant enlisted his father,

5    who actually was a prominent Atlanta businessman, to attend

6    meetings about buying the team.  The defendant himself met with

7    the sellers of the team and representatives of the WNBA, and

8    the defendant created and sent Howard a pitch deck that

9    explained the company's vision for the Atlanta Dream.

10          The defendant's pitch deck was polished,

11   sophisticated, and seemingly backed by big names, big

12   companies, and serious professionals.  So Howard directed his

13   bank to send $7 million to an account controlled by the

14   defendant for the purpose of buying the Atlanta Dream.

15          But the defendant's proposal was full of lies.  The

16   pitch deck's claims about the companies supporting the bid for

17   the Dream, most of those were simply made up.  The claims about

18   prominent people supporting the bid for the Dream, most had no

19   idea their names were being used.

20          The promise to use Howard's money to buy the team, it

21   was a lie.  Instead, almost immediately after Howard sent the

22   money, the defendant began spending it on himself.  He sent

23   some of it to his co-conspirator, the sports agent.  The rest,

24   the defendant moved through other accounts he controlled to

25   launder it.

O9OJDAR1                          Opening – Mr. Kinder

1              And he spent that money on extravagant purchases for

2       himself.  A Rolls-Royce, works of art, a brand new house with a

3       koi pond worth tens of thousands of dollars.  Not one single

4       dollar of the 7 million that Howard sent was used to buy the

5       Atlanta Dream.  The defendant and his co-conspirator stole all

6       the money.

7              Now, you'll learn that this was not the only time that

8       the defendant and the sports agent scammed an NBA player.

9              THE COURT:  One moment.

10             (Pause)

11             THE COURT:  Okay.  You may continue.

12             MR. KINDER:  You'll learn that this was not the only

13      time that the defendant and the sports agent scammed an NBA

14      player.

15             In 2019, the sports agent and the defendant wanted

16      Chandler Parsons, an NBA veteran, to make a loan to a college

17      basketball player who was certain to be a top pick in that

18      year's NBA draft.  The sports agent went to Parsons with the

19      proposal.  To persuade Parsons to send the money, the defendant

20      lied to the sports agent about having a connection to the

21      college player, and the sports agent passed that lie on to

22      Parsons.

23             The defendant and the sports agent had fraudulent

24      contracts drafted, including one falsely showing that the

25      college player had signed the co-conspirator as his agent.

1        Parsons then wired $1 million to the sports agent for

2   the purpose of funding a loan to the college player.  But just

3   as with the deal to purchase the Atlanta Dream, that loan, it

4   was a lie.  The college player never signed with the sports

5   agent, never received a loan, never agreed to take a loan.  The

6   sports agent and the defendant simply stole Parsons' money and

7   spent the $1 million themselves.

8        Most of it went to the defendant, who made more

9   extravagant purchases, a Mercedes G-Wagon, lavish watches.

10  None of the money went to the college player, and none of the

11  money was sent back to Chandler Parsons.

12        So that is what the evidence will show, that the

13  defendant conned two NBA players out of their money and spent

14  their money on himself.

15        Now let's talk about how we are going to prove that

16  the defendant is guilty beyond a reasonable doubt.

17        The evidence will come in many forms.  You'll hear

18  from witnesses like Dwight Howard, who will explain how the

19  defendant and the sports agent tricked him into thinking their

20  lies were real.  You'll hear from people involved in the actual

21  sale of the Atlanta Dream who will explain that, although the

22  defendant discussed the company's bid with the team sellers,

23  the defendant ultimately was told that the dream was going to

24  be sold to another buyer.

25        You'll hear from individuals and companies listed in

1    the defendant's pitch deck.  They will tell you that the

2    representations in the pitch deck about their involvement in

3    the company's bid to buy the Dream were not true.  Multiple of

4    them had never even heard of the defendant or his company.

5              You will hear from the college player who now plays in

6    the NBA who will tell you he does not know the defendant, never

7    signed with the sports agent, and never received any loan from

8    the defendant, the sports agent, or Parsons.

9              You'll see texts and emails to and from the defendant.

10   Those messages will show you how the defendant and the sports

11   agent hatched and executed their scheme to steal from Howard

12   and Parsons.

13             And you will see the financial records, records that

14   will allow you to follow the money.  Those records will show

15   you how the victims' money ended up in the defendant's pockets,

16   how the defendant received the money in an account in the name

17   of a corporation that he controlled, and moved it through

18   multiple accounts to hide where it came from and to hide his

19   control of it, how the defendant used the money for himself,

20   how none of Howard's money was used to buy the Atlanta Dream

21   and none of Parsons' money was used as a loan to the college

22   player, how the defendant's promises were lies.

23             At the end of the trial, we will have an opportunity

24   to speak with you again and to show you how everything you've

25   seen and heard fits together.  Between now and then, we ask

1    that you do three things:  First, pay close attention to the

2    evidence; second, listen to Judge Broderick's instructions on

3    the law; and, third, use your common sense, the same common

4    sense you use every day.

5           If you do those three things, you will return the only

6    verdict that is consistent with the evidence, the law, and

7    common sense — the defendant, Calvin Darden, Jr., is guilty.

8           THE COURT:  Okay.  Thank you.

9           Defense opening statement, Mr. Ricco?

10          MR. RICCO:  Not only is it -- well, first of all, good

11   afternoon, everybody.  Good afternoon, Judge.  Good afternoon,

12   prosecution, defense, and the community.

13          These are opening remarks, and it's always difficult

14   to give an opening remark.  It's kind of difficult to stand

15   before a group of people and talk about your view of the case

16   when a person just says you're a liar, you're a liar, you're a

17   liar, you a conman, you stole, you a conman, you stole.

18          My brow is this way because I recognize that this is

19   an important time in the case.  It's the beginning, and I often

20   find myself in difficulty as to how do you start?  After a

21   person has been accused, called a liar over and over, how do

22   you start with that?

23          Well, you really start where the government left off,

24   and that is you must keep an open mind.  You must wait until

25   you hear the instructions of the Court because that's what the

O9OJDAR1                        Opening – Mr. Ricco

1    law requires.

2              We spent the last couple of days picking a jury,

3    difficult to do, and it was time consuming, but it's for a

4    reason.  The reason is because we have hope.  All of us have

5    hope, one simple word — hope that we can find 12 or more

6    people — here 15 — who, given the world we live in with all of

7    its difficulty, can come in and do something that's required,

8    and that is to hold the government to its burden of proof.

9              Here, the government has charged five counts against

10   Calvin Darden, Jr.  And I want -- an opening sometimes is what

11   people say is like a guidepost for how do you think about what

12   you're going to experience over the next two weeks.

13             And what you're going to experience is you're going to

14   hear evidence from witnesses, and you're going to see exhibits.

15   And it's going to be very important that your heart is not

16   taken by the words of the direct or an opening.  The witnesses

17   will testify on direct, but they're going to be cross-examined.

18   They'll be cross-examined by Mr. Donaldson, Mr. Legon, perhaps

19   myself or another lawyer that you've heard about, but haven't

20   met yet, which is Ms. Reed.

21             And so I want to remind you of something that happened

22   many years ago, and then I'm done.  This is not a defense

23   story.  It's not a prosecution story.  It's a story about hope,

24   and it's directly related to your jobs here.  And that is that

25   many years ago, many years ago, a young man went off to Vietnam

O9OJDAR1                        Opening – Mr. Ricco

1    as a teenager, good looking young man.  And he went to serve

2    our country.  And he went to Vietnam in 1967 and he was there

3    two weeks and his life was lost.

4         Most of us today have no memory of him, no knowledge

5    of him, nothing about his tremendous sacrifice that he made as

6    a teenager.  And but for a small boy who knew him, his memory

7    may have been lost forever.  And as I grew, I often wondered

8    what Jimmy Grant felt like on his way to Vietnam.  What was his

9    hopes?  What motivated him as a teenager to make such a great

10   risk and sacrifice?  A part of that great risk and sacrifice is

11   who you are today and who we all are today.

12        And so yeah, you know, we sit here late in the day,

13   many hours working hard to try to get it right.  And for some

14   of us, we recognize that that effort is a small price that was

15   paid because other young people that you never met or never

16   knew about paid a greater price for that.  And that price is

17   the ability to sit here as a juror.

18        And so what I'm saying to you all, as we go through

19   over the next two weeks, is that we give honor and dignity, not

20   only to our oath, which everybody gave, but to that tremendous

21   sacrifice that was made for you to be jurors, and for a

22   defendant to receive a fair trial.

23        And so as I sit back and think about that kind of

24   sacrifice, as I'm here late in the day and I'm asked to try one

25   more time a little harder, it grounds me.  And so I suggest to

O9OJDAR1                    Opening – Mr. Ricco

1    you — and it's only a suggestion — when it gets tough and you

2    know you feel like you've heard enough, remember what Judge

3    Broderick said, don't do that.  Don't fall into that.  Keep

4    your mind open.  Everybody swore they could do it, and we hope

5    that everybody was telling the truth about that.

6          And so on behalf of Attorney Donaldson, Legon, and

7    Ms. Reed, we all hope that you're able to fulfill that promise

8    and that you don't rush to judgment.

9          Now I'm getting ready to get right out your way.

10   Don't worry about it because the case needs to start.  The

11   evidence is going to come from the witness stand, not from the

12   lawyers.  That is on both sides.  And so I would say to you all

13   serve this case, do your sworn oath, honor.  Keep in mind the

14   tremendous sacrifice that was made by lot of young people that

15   none of us even know about or care about.

16         That's not a defense story to get you to go along with

17   me, and it's not a story to get you to go along with the

18   prosecution.  It's a story to remind you, as it's late in the

19   day, that this is an important event for everybody concerned.

20   So your Honor, thank you.  And we're prepared to get started

21   with the case.

22         THE COURT:  All right.  Thank you, Mr. Ricco.

23         Okay.  The government's first witness.  I know you

24   probably need to move the podium.

25         MR. MEAD:  Before the government calls its first

1    witness, your Honor, we're introducing into evidence pursuant

2    to the 902(11) certification our 2000Z, the following exhibits:

3    2101, 2102, 2107, 2117, 2119 and 2119A, 2129, 2136, 2139, 2142,

4    2144, and 2144A, 2145, 2154, 2158, 2201, 2303, 2401, 2402,

5    2404, 2405, 2407, 2408, 2410, 2413, 2414, 2418, 2419, 2501,

6    2506, 2508, and, finally, 2510.

7              THE COURT:  Okay.  So any objection to those exhibits?

8              MR. DONALDSON:  No.

9              THE COURT:  Okay.  So Government's Exhibits 2101,

10   2102, 2107, 2117, 2119, 2119A, 2129, 2136, 2139, 46, 44, 44A,

11   45, 54 and 58 are admitted in evidence, as are Government

12   Exhibits 2201, 2303, 2401, 2402, 04, 05, 07, 08, 10, 13, 14,

13   18, 19, are admitted in evidence.  And 2501, 2506, 08, 10.

14             (Government's Exhibit 2101, 2102, 2107, 2117, 2119,

15   2119A received in evidence)

16             (Government's Exhibit 2129, 2136, 2139, 2144, 2144A

17   received in evidence)

18             (Government's Exhibit 2145, 2154, 2158, 2201, 2303,

19   2401, 2402 received in evidence)

20             (Government's Exhibit 2404, 2405, 2407, 2408, 2410,

21   2413 received in evidence)

22             (Government's Exhibit 2414, 2418, 2419, 2501, 2506,

23   2508, 2510 received in evidence)

24             THE COURT:  Mr. Mead, did I get each of those

25   exhibits?

O9OJDAR1                         Opening – Mr. Ricco

1              MR. MEAD:  I don't think you read 2142, but apologies

2      if I missed it, your Honor.

3              THE COURT:  So it's 2142?  I had not written that

4      down.  So 2142 is also admitted in evidence.

5              (Government's Exhibit 2142 received in evidence)

6              THE COURT:  Thank you.

7              Are we ready for the government's first witness?

8              MR. THOMPSON:  Yes, your Honor, the government calls

9      John Brock, III.

10     JOHN BROCK,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O9OBDAR2                          Brock- Direct

1          MR. THOMPSON:  Your Honor, with the Court's permission

2     my understanding is that the screen at the podium is not

3     working.  If the Court would allow me to examine Mr. Brock from

4     standing here if the Court would allow it.

5          THE COURT:  The only thing I would ask is that you

6     move one way or the other so counsel can make sure they can see

7     the witness.  That's fine if you examine from in place.

8          MR. THOMPSON:  May I proceed?

9          THE COURT:  You may.

10    DIRECT EXAMINATION

11    BY MR. THOMPSON:

12    Q.  Good afternoon, Mr. Brock.

13          Please describe your educational background for us?

14    A.  I graduated from high school in Moss Point, Mississippi,

15    and I have bachelor's degree, master's degree in chemical

16    engineering from Georgia Tech in Atlanta.

17    Q.  Please describe for us your working career after you

18    completed your education?

19    A.  I first started at Procter and Gamble in Cincinnati in

20    product development, stayed there 11 years.  I was recruited to

21    join Cadbury Schweppes in Stanford, Connecticut where I had a

22    variety of positions.  Became a general manager, ultimately was

23    transferred to London for seven years where I was chief

24    operating officer.  After that period of time, I moved to

25    Brussels, Belgium where I was the chief executive officer of

O9OBDAR2                              Brock- Direct

1    Interbrew which became InBev, a large beer company.  And then

2    in 2006, I joined Coca Cola Enterprises in Atlanta and CEO and

3    chairman.  And I was there until 2016 when I retired.

4    Q.  Are you familiar with the Atlanta Dream?

5    A.  Yes.

6    Q.  What is it?

7    A.  It is a professional women's basketball team located in

8    Atlanta, Georgia, a member of the WNBA.

9    Q.  How did you become to be familiar with Atlanta Dream?

10   A.  My wife Mary Brock and her partner Kelly Loeffler were

11   50/50 partners who purchased the Dream in 2010.

12   Q.  Did there come a time when you personally played a role

13   with respect to the Atlanta Dream?

14   A.  Yes.

15   Q.  What role did you play?

16   A.  During the ten years that my wife Mary and her partner

17   Kelly owned the Dream, I was an advisor, informal advisor from

18   time to time helping them with their strategies.  And then when

19   they decided to sell the team in late 2019, the two owners ask

20   me if, based on my history, I would be willing to act as the

21   primary contact to sell the Atlanta Dream.

22   Q.  When you were involved with selling the Atlanta Dream, who

23   owned the team?

24   A.  The Dream was owned by an LLC called Me Too LLC, Dream Too,

25   LLC.  My apologies.  Dream Too, LLC which was a 50/50

O9OBDAR2                        Brock- Direct

1  partnership between Mary Brock and Kelly Loeffler.

2  Q.  Do Mary Brock and Kelly Loeffler currently own the Atlanta

3  Dream?

4  A.  No.

5  Q.  When you began working to sell the Atlanta Dream, what, if

6  anything, did you do with respect to the Women's National

7  Basketball Association?

8  A.  I contacted Cathy Engelbert who is the commissioner of the

9  WNBA located in the New York City so that I could inform her

10 that Mary and Kelly had decided they'd like to sell the Dream,

11 and that they'd ask me if I would be the point person for

12 carrying out that program.

13 Q.  Approximately when did you contact Ms. Engelbert?

14 A.  In January of 2020.

15 Q.  After you first made contact with Ms. Engelbert, did you

16 meet her in person?

17 A.  Yes.

18 Q.  Approximately when did that happen?

19 A.  In early 2020, most likely in February of 2020 here in

20 Manhattan.

21 Q.  During this meeting, what did you say to Ms. Engelbert?

22 A.  I said that Mary and Kelly had had a rewarding ten-year

23 period in owning the Dream, but that they had come to the

24 decision that they would like to sell it, and they'd asked me

25 if I would be the point person in doing that.  And so I said to

O9OBDAR2                              Brock- Direct

1    the commissioner I'd like to, A, inform her; B, understand the

2    process I believe had in place; and C, get her help.

3            MR. DONALDSON:  I'm sorry.  What was that last answer?

4            THE WITNESS:  C, get her help, get her advice and

5    counsel on how we could best do that.

6            MR. DONALDSON:  Thank you.

7    Q.  After this meeting, did you notify others that the Atlanta

8    Dream was for sale?

9    A.  Yes.

10   Q.  After this did parties interested in purchasing the Atlanta

11   Dream contact you?

12   A.  Yes.

13   Q.  When did interested parties begin contacting you?

14   A.  Almost immediately.

15   Q.  When parties interested in purchasing the Atlanta Dream

16   contacted you, what steps did you take?

17   A.  My first step was typically to have a 30 to 45 minute to

18   one-hour phone or zoom conversation with the interested party

19   to make sure that I understood who they were, what their

20   rationale was, a little bit more about their background and;

21   frankly to determine if I thought they were a legitimate

22   potential buyer.

23   Q.  What, if any, documents or paperwork did you have

24   interested parties complete?

25   A.  The first step is I explained to them was for my attorney

O9OBDAR2                         Brock- Direct

1   David Brown in Atlanta to send them a nondisclosure agreement,

2   which we would call a NDA, and that would enable them to

3   receive from us confidential information, financial, business

4   information about the Dream so that they would have information

5   and could make a decision about whether it was truly something

6   they were interested in or not.

7   Q.   Did there come a time when Dwight Howard contacted you?

8   A.   Yes.

9   Q.   Approximately when did Mr. Howard contact you?

10  A.   In early July of 2020.

11  Q.   What topic or topics did you and Mr. Howard discuss?

12  A.   We talked about his interest in potentially acquiring the

13  Dream.  He said to me that, John, as you know, I played

14  basketball in Atlanta.

15            MR. DONALDSON:  Objection.

16            THE COURT:  Well, objection overruled.  Ladies and

17  gentlemen, Mr. Brock's testimony about what Mr. Howard said to

18  him is not being offered, am I correct, is not being offered

19  for the truth, but just the fact that it was said.  So

20  Mr. Brock will be allowed to testify about that communication.

21  And, counsel, if you like, I think the podium is back working

22  so.

23            MR. THOMPSON:  Thank you, your Honor.

24            THE COURT:  Thank you.  So objection overruled.

25            THE WITNESS:  May I continue?

O9OBDAR2                              Brock– Direct

1          THE COURT:  You may.

2    A.  Dwight Howard indicated to me he had a keen interest in

3    potentially acquiring the Dream, that he had a connection with

4    the Dream cause he had been to a number of Dream's games.  As I

5    was saying he was -- he had played basketball for the Atlanta

6    Hawks.  He had been to a number of Dream's games.  He was

7    well-known in Atlanta.

8          And he said to me, John, I very much like to be

9    seriously considered as a potential buyer of the Dream.

10   Q.  After this initial conversation, did you have additional

11   contact with Mr. Howard pertaining to the Atlanta Dream?

12   A.  Yes.

13   Q.  Approximately how much time past between your first

14   conversation and when you next communicated with Mr. Howard

15   about the Atlanta Dream?

16   A.  Probably only one day.

17   Q.  What, at a high level, happened during this next

18   conversation with Mr. Howard?

19   A.  I explained to him that the next step if he was truly

20   interested was to sign a nondisclosure agreement that my

21   attorney would get it to him.  And as soon as he signed it, we

22   would then furnish to him several important pieces of financial

23   and business information for him to consider.

24   Q.  Did there come a time when you interacted with an

25   individual name Charles Briscoe?

O9OBDAR2                        Brock- Direct

1   A.  Yes.

2   Q.  Who was Charles Briscoe?

3   A.  Charles Briscoe was part of the second conversation I had

4   with Dwight Howard.  He was introduced to me as Dwight Howard's

5   agent and someone who would also be involved in the group

6   interested in purchasing the Atlanta Dream.

7   Q.  When did you first come into contact with Mr. Briscoe?

8   A.  The day after I had my initial conversation with

9   Mr. Howard.

10  Q.  And what, if anything, did Mr. Briscoe say to you?

11  A.  He emphasize that he was keenly interested also in being

12  part of the group that Dwight Howard had mentioned the day

13  before; that he was Dwight Howard's agent in the NBA; and that

14  he would be involved in the purchase process.

15  Q.  Did there come a time when you introduced Mr. Howard and

16  Mr. Briscoe to Ms. Engelbert?

17  A.  Yes.

18          MR. THOMPSON:  Mr. Ross, can you please publish what's

19  been admitted as Government Exhibit 2102 for the witness and

20  the jury.  If you could just zoom in slightly, Mr. Ross,

21  please.

22          THE COURT:  Ladies and gentlemen, does it appear on

23  the screens in front of you?

24          JUROR:  Yes.

25          THE COURT:  Thank you.  Go ahead.

1          MR. THOMPSON:  Thank you, Mr. Ross.

2     Q.  Mr. Brock, what is this?

3     A.  It is an email.

4     Q.  And are you on this email?

5     A.  Yes.

6     Q.  What's the date of this email?

7     A.  July 10, 2020.

8     Q.  And who are the recipients?

9     A.  Cathy Engelbert who is the Commissioner of the WNBA, Jamin

10    Dershowitz who is the general counsel of the WNBA.

11    Q.  Who is CC'd?

12    A.  I am, Dwight Howard and Charles Briscoe.

13    Q.  What does the subject line say?

14    A.  Introduction to Dwight Howard and his investor group.

15         MR. THOMPSON:  Government Exhibit 2102 the body says:

16    Hi, Cathy and Jamin.  This is to introduce the two of you and

17    the WNBA to Dwight Howard and his investor group.  Dwight is

18    coordinating an investor group consisting of his agent Charles

19    Briscoe, as well as two others, Cal Darden, Sr., and Cal

20    Darden, Jr. As we have very recently discussed, Dwight's group

21    is seriously interested in discussing the possibility of

22    acquiring the Atlanta Dream and continuing to have the Dream

23    located in Atlanta.  Dwight has signed our NDA, Chris Sienko

24    and I have had several conversations with his group, and we

25    have furnished important business and financial docs with them.

1    Q.  Who is Chris Sienko?

2    A.  Chris Sienko was the general manager of the Atlanta Dream.

3           MR. THOMPSON:  Turning back to Government Exhibit

4    2102.  Our discussions will continue. The primary contact

5    person for the group will be Charles.  He will ensure that

6    other members are kept in the loop.  I'm connecting all of you

7    because Mary and Kelly and Jeff and I are convinced that it's

8    now time for Dwight's group to progress discussion with the

9    WNBA about their plans.

10   Q.  This email references Mary and Kelly, who is Mary?

11   A.  Mary is my wife one of the 50 percent owners of the Atlanta

12   Dream.

13   Q.  Who does Kelly refer to?

14   A.  Kelly is Kelly Loeffler the other 50 percent owner of

15   Atlanta Dream.

16          MR. THOMPSON:  Turning back to Government Exhibit

17   2102.  Although Dwight needs no introduction, it is important

18   to know that he lives in Atlanta and has been regular attendee

19   at Dream games.  His mother is a long-term season ticketholder.

20   He is friends with several of the Dream players, including

21   Tiffany and Renee. Dwight also knows Mary and Kelly well.  I

22   know their investor groups looks forward to linking up with the

23   two of you.  Thanks to both of you for ensuring that this

24   happens and for any assistance you can provide as they develop

25   their thinking about the Dream.  Let me know if I can help in

1  any way.  Regards, John.

2          Mr. Ross, you can take down that exhibit, please.

3  Q.  After you sent Government Exhibit 2102, did there come a

4  time when you were contacted by Calvin Darden, Jr.?

5  A.  Yes.

6  Q.  Approximately when did Calvin Darden, Jr. contact you?

7  A.  A day or perhaps two days after those initial conversations

8  with Dwight Howard and Charles Briscoe.

9  Q.  What month and year was that?

10  A.  July, early July 2020.

11  Q.  Had you previously met Calvin Darden, Jr.?

12  A.  No.

13  Q.  What did Calvin Darden, Jr. tell you during this

14  conversation?

15          MR. DONALDSON:  Objection.

16          THE COURT:  I'll allow it.  Overruled.  You may

17  answer.

18  A.  He said that he would be involved with Charles Briscoe and

19  Dwight Howard in evaluating the potential purchase of the

20  Atlanta Dream.  He further said that his father Cal Darden, Sr.

21  passed on a hello to me.  He reminded me of course that I knew

22  his father Cal Sr. well from the fact that he was a member of

23  the board of directors of Coca Cola Enterprise for the ten

24  years that I was CEO.

25  Q.  What, if anything, did Calvin Darden, Jr. tell you about

O9OBDAR2                          Brock- Direct

1    his father's involvement with the effort to purchase the

2    Atlanta Dream?

3    A.   He indicated that his father would be one of the major

4    investors in the group purchasing the Atlanta Dream.

5    Q.   Who did Calvin Darden, Jr. tell you was part of the

6    investment group?

7    A.   Calvin Darden, Sr., Charles Briscoe and Dwight Howard.

8    Q.   Did there come a time when you received a letter of intent

9    pertaining to Howard Briscoe and Darden Seniors effort to

10   purchase the Atlanta Dream?

11   A.   Yes.

12   Q.   Who provided you with this document?

13   A.   Cal Darden, Jr.

14          MR. THOMPSON:  Mr. Ross, could you please publish for

15   the witness alone what's been marked for identification

16   purposes as Government Exhibit 41 and for the defense.

17   Q.   Mr. Brock, do you recognize this document?

18   A.   Yes.

19   Q.   What is this document?

20   A.   It is a letter of intent which we may refer to as an LOI.

21   Q.   Did you receive this document?

22   A.   Yes.

23   Q.   From whom did you receive it?

24   A.   From Cal Darden, Jr.

25          MR. THOMPSON:  Your Honor, the government offers

O9OBDAR2                          Brock- Direct

1   Government Exhibit 41.

2           MR. DONALDSON:  No objection.

3           THE COURT:  Government Exhibit 41 is admitted in

4   evidence and may be published to the jury.

5           (Government's Exhibit 41 received in evidence)

6           MR. THOMPSON:  Thank you, your Honor.  Mr. Ross, can

7   you please publish to the jury.

8           Government Exhibit 41 says: Letter of intent.  This

9   non-binding letter of intent is signed as of July 31, 2020 by

10  and between Dwight Howard, Calvin Darden Sr., and Charles

11  Briscoe, purchasers, and Dream Too, LLC, sellers.

12          Section one says.  This letter of intent, or the

13  letter, sets forth the current intensions of the parties as the

14  framework for negotiating the definitive agreement, purchase

15  agreement, that would set forth the terms of a potential

16  acquisition of the assets, sellers business, by purchasers.

17  This letter of intent does not create any legal binding

18  obligations except for confidentiality and exclusivity, as

19  stated below, unless and until parties execute the purchase

20  agreement.  Costs for this work undertaken by a party shall be

21  bourne by such party.  The parties shall use their good faith

22  efforts to negotiate and complete the purchase agreement on or

23  about August 15, 2020.

24  Q.  What transaction did this letter of intent contemplate?

25  A.  The purchase of the Atlanta Dream by the three individuals

O9OBDAR2                          Brock- Direct

1    listed.

2    Q.   And which three individuals are you referring to?

3    A.   Dwight Howard, Cal Darden, Sr., Charles Briscoe.

4    Q.   Directing your attention to the bottom of the first page of

5    Government Exhibit 41.

6            MR. THOMPSON:  Mr. Ross, if you could focus the screen

7    on section two, two consideration.

8            Consideration.  The aggregate consideration for the

9    assets of the purchase business shall be $3 million to be paid

10   at closing.

11   Q.   What was the price that the letter of intent contemplates

12   the purchasers paying for the Atlanta Dream?

13   A.   Three million U.S. dollars.

14           MR. THOMPSON:  Mr. Ross, could you please advance

15   Government Exhibit 41 to page four.  If you could bridge page

16   four and five.  Could you scroll up a little bit, please.

17   Q.   Directing your attention to the bottom of page three and

18   the top of page four, whose names are listed as the purchasers?

19   A.   Dwight Howard, Cal Darden, Sr., Charles Briscoe.

20   Q.   Is there a signature associated with or provided for each

21   of those names on this document?

22   A.   Yes.

23   Q.   What date is listed under the signatures?

24   A.   July 31, 2020.

25   Q.   Did there come a time when Government Exhibit 41 was

1    provided to the WNBA?

2    A.  Yes.

3    Q.  Did you hear back from the WNBA about this document?

4    A.  Yes.

5    Q.  What, if anything, was discussed pertaining to this

6    document?

7    A.  The WNBA, the Commissioner specifically said, thank you for

8    submitting this letter of intent.  We appreciate you furnishing

9    this information, and we will be prepared to engage with this

10   potential purchasing group and take them as appropriate through

11   the process that we need to follow in potentially purchasing

12   the Atlanta Dream.

13   Q.  What, if any, issues were raised with respect to members of

14   the investment group?

15   A.  The commissioner pointed out that Dwight Howard was an

16   active NBA player and that that might create a problem because

17   the NBA has a rule that no active NBA player can be part of an

18   ownership group of an NBA team.  The view is that probably

19   would extend to a WNBA team.  So the view was this is an issue

20   that may well need to be settled.

21   Q.  Did you and Calvin Darden, Jr. discuss the issue that

22   Mr. Howard's status as a player in the NBA opposed his efforts

23   to acquire the Dream?

24   A.  Yes.

25   Q.  Approximately when did you and Calvin Darden, Jr. discuss

O9OBDAR2                              Brock- Direct

1    this issue?

2    A.  In early August of 2020.

3    Q.  During this discussion what did you say to Calvin Darden,

4    Jr.?

5    A.  I relaid the views from the WNBA commissioner that it could

6    well be an issue if Dwight Howard continued to be an active

7    player.  That if he chose not to play, then there would not be

8    an issue, but that candidly he needed to make up his mind.

9    Q.  What did Calvin Darden, Jr. say to you after you explain

10   this issue?

11   A.  He understood.

12   Q.  Did Calvin Darden, Jr. tell you who the owners of the

13   Atlanta Dream would be if the investment group was successful

14   in acquiring the Dream?

15   A.  Yes.

16   Q.  Who did he tell you?

17   A.  Dwight Howard, Cal Darden, Sr., Charles Briscoe.

18            MR. THOMPSON:  Mr. Ross, can you please publish for

19   the witness and the jury what's been admitted as Government

20   Exhibit 2119.

21   Q.  Mr. Brock, what is this document?

22   A.  It's an email.

23   Q.  What's the date of this email?

24   A.  October 22, 2020.

25   Q.  Who is it from?

O9OBDAR2                              Brock- Direct

1   A.  Calvin Darden, Jr.

2   Q.  Who is the recipient?

3   A.  I was.

4           MR. THOMPSON:  This email says:  John, my apologies

5   for the delay.  Per our discussion, please see attached Atlanta

6   Dream vision plan.  I look forward to speaking tomorrow at

7   11:30 a.m. to address any questions and/or concerns you may

8   have.  Looking forward to it.  Thanks again best Calvin.

9   Q.  The second paragraph of this email begins, per our

10  discussion.  What had you and Calvin Darden, Jr. discussed?

11  A.  I had said to Calvin Darden, Jr. that it would be most

12  helpful if he and his investor group could put together a plan

13  for how they would manage, run, organize the Atlanta Dream

14  under new ownership and make it successful.  That I thought

15  based on my conversations with the WNBA with the league that

16  such an outline of their plans would be incredibly helpful.

17  Q.  Now, directing your attention to the attachments line of

18  the email.  Do you see that?

19  A.  Did you ask me to read it?

20  Q.  Do you see the attachments?

21  A.  Yes, I do.

22  Q.  Can you read the text listed next to attachments?

23  A.  Atlanta Dream vision plan-1.PDF.  Untitled attachment

24  00071.HTM.

25          MR. THOMPSON:  Mr. Ross you can zoom out.  And can you

O9OBDAR2                          Brock- Direct

1    please scroll Mr. Ross slowly through Government Exhibit 21,

2    more slowly if you're able, 2119.

3    Q.  Mr. Brock, what is this document that's scrolling in front

4    of you?

5    A.  This is entitled Atlanta Dream vision plan.

6    Q.  And is this the attachment that was attached to the email?

7    A.  Yes.

8    Q.  What, if anything, did Calvin Darden, Jr. tell you about

9    this document?

10   A.  Calvin Darden, Jr. explained that this was a document which

11   again outlined how his ownership group or how the ownership

12   group of which he was apart would manage, own and cause the

13   Atlanta Dream to be successful going forward.

14         MR. THOMPSON:  Mr. Ross, can you please go to the

15   first page of the attachment to Government Exhibit 2119.

16   Q.  What does the cover page say?

17   A.  Atlanta Dream.

18         MR. THOMPSON:  And if you could please scroll down to

19   page three, Mr. Ross.  Thank you.  And if you're able to zoom

20   in on this slide.  Thank you.

21   Q.  Do you see a logo on this slide?

22   A.  Yes.

23   Q.  What does it say?

24   A.  DSG Darden Sports Group.

25         MR. THOMPSON:  Below that logo Government Exhibit 2119

O9OBDAR2                          Brock- Direct

1    says, Darden Sports Group, DSG, led by prominent Atlanta

2    businessman Cal Darden, Sr. is proud to have an opportunity to

3    become the next owner of the WNBA's Atlanta Dream.

4          Mr. Ross, you can exit from this slide and please

5    advance to page five.  And again if you could zoom in on this

6    slide, please.  Thank you.

7    Q.  Who is pictured here?

8    A.  Cal Darden, Sr.

9    Q.  What, if anything, did Calvin Darden, Jr. tell you about

10   his father's involvement with the Darden Sports Group?

11   A.  Calvin Darden, Jr. said that his father would be one of the

12   principle owners in the group interested in buying the Atlanta

13   Dream.

14         MR. THOMPSON:  Mr. Ross, can you zoom out of here and

15   please advance to page seven.  Again, thank you.

16   Q.  Directing your attention to page seven of Government

17   Exhibit 2119.  This says advisory board.  Darden Sports Group

18   has assembled a world class advisory board comprised of

19   superstar leaders within the areas of music, television, film,

20   professional sports, business and community.  Each board member

21   has committed to using their ideas, voices, platforms,

22   resources, relationships and influence to support the Atlanta

23   Dream and its various initiatives.  The individuals listed are

24   Jennifer Baltimore, Senior Vice President Universal Music

25   Group, Rosalind Brewer, chief operating officer, Starbucks;

O9OBDAR2                          Brock- Direct

1    Shirley Franklin, former mayor of Atlanta board member of Delta

2    Airlines, Lamar Jackson, quarterback 2019 NFL's most valuable

3    player Baltimore Ravens. Naomi Osaka, number one ranked women's

4    tennis player, 2020 U.S. Open champion, Women's Tennis

5    Association; Tyler Perry, writer, director, producer, actor,

6    Emmy and NAACP awards winner, Tyler Perry Studios, Issa Rae

7    actress, writer, and producer, Emmy award nominee HBO's

8    Insecure, Golden Globe Nominee; Kanye West, rapper, producer

9    and fashion designer, 21X time grammy awards Yeezy/Adidas.

10           What effect, if any, did this list of individuals and

11   their involvement with the Darden Sports Group have on you?

12   A.   It's quite an impressive list of members of an advisory

13   board spanning again, film, television, music, sports, very

14   impressive group of people on an advisory board.

15   Q.   What effect if any did the advisory board have on your

16   assessment of Darden Sports Group viability as a potential

17   purchaser of the Atlanta Dream?

18   A.   My assessment was that if this advisory board had been

19   assembled it would be really a huge step forward in their

20   likelihood of being able to buy the Atlanta Dream and be

21   successful.

22   Q.   Did you ask Calvin Darden, Jr. about the individuals listed

23   on the advisory board?

24   A.   Yes.

25   Q.   What did you ask him?

1   A.  Had each of them been contacted, and did they commit to

2   being on this advisory board.

3   Q.  What did he say?

4   A.  Yes.

5           MR. THOMPSON:  Mr. Ross, could you please zoom out and

6   advance to page 17 of Government Exhibit 2119.  This slide

7   reads: Corporate affiliations.  DSG will be committed to

8   keeping fans at the core of its business strategy by

9   customizing and tailoring, messaging and engagements with fans

10  via brand partnerships.  The new Atlanta Dream will embrace

11  innovation to drive enhanced fan engagement and extend the

12  spirit of these dealings to its corporate and media partners.

13  Given DSG's extensive relationships with the C-suites of some

14  of America's largest corporation, especially those based in the

15  Atlanta area, the new Atlanta Dream will attract a

16  significantly higher amount of corporate support and investment

17  than ever before.

18          This slide lists the following companies:  UPS,

19  McDonald's, Starbucks, Target, Aramark, Coca Cola, Universal

20  Music Group, delta, the Home Depot, Yeezy, TikTok, Tyler Perry

21  Studios, Cardinal Health, Aflac, Equifax and AJC.

22          What effect, if any, did this list of corporate

23  partners have on you?

24  A.  It had a very positive effect as you got some significant

25  corporations here, major Fortune 500 corporations, several of

1    which are physically located their headquarter in Atlanta.

2    Q.  Now, how did this list of corporate partners compare to the

3    Atlanta Dream corporate affiliations at the time you were

4    trying to sell it?

5    A.  It's a much greater and more expanded list of potential

6    corporate sponsorships.  Coca Cola had been and was a

7    significant sponsor and Delta had been a minor sponsor, but

8    candidly most of the others were not sponsors of the Atlanta

9    Dream.

10    Q.  What effect, if any, did the corporate partners listed in

11    Government Exhibit 2119, page 17, have on your assessment of

12    Darden Sports Group viability as a purchaser?

13    A.  My assessment was that with this group of corporate

14    sponsors, their likelihood of being successful in running and

15    managing the Atlanta Dream in a positive way was greater than

16    it would have been without these.

17    Q.  Did you ask Calvin Darden, Jr. any questions about the

18    companies listed on this slide?

19    A.  Yes.

20    Q.  What did you ask him?

21    A.  I said have you had preliminary or discussions of any kind

22    with these potential corporate sponsors.

23    Q.  What did he say?

24    A.  Yes.

25            MR. THOMPSON:  Mr. Ross, you can take down this

O9OBDAR2                        Brock- Direct

1   exhibit.  Thank you.

2   Q.  Did there come a time when Calvin Darden, Jr. sent you a

3   second version of the vision plan?

4   A.  Yes.

5          MR. THOMPSON:  Mr. Ross, can you please publish for

6   the witness and the jury what's been admitted as Government

7   Exhibit 2144.

8   Q.  Mr. Brock, what is this document?

9   A.  This is an email.

10  Q.  And what's the date of this email?

11  A.  December 7, 2020.

12  Q.  Who is the sender?

13  A.  Cal Darden, Jr.

14  Q.  Who's the recipient?

15  A.  I am.

16  Q.  And who is copied?

17  A.  Chris Sienko the general manager of the Atlanta Dream and

18  Cal Darden, Jr.

19  Q.  What is the subject?

20  A.  Atlanta Dream vision plan.

21  Q.  And does this email have any attachments?

22  A.  Yes.

23  Q.  What are the names of the attached files?

24  A.  Atlanta Dream vision plan revised PDF, untitled attachment

25  0068.TXT.

1          MR. THOMPSON:  Mr. Ross, could you please exit the

2    zoom in and could you please scroll.  You can actually stop and

3    go back to the first page of this document.

4    Q.  Mr. Brock, do you recognize this?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's the Atlanta Dream vision plan revision.

8    Q.  And was this attached to the email that you just described?

9    A.  Yes.

10   Q.  What does the cover page say?

11   A.  Atlanta Dream.

12         MR. THOMPSON:  Mr. Ross, can you please advance to

13   page three and could you please zoom.

14   Q.  Do you see a logo?

15   A.  Yes.

16   Q.  What does the logo say?

17   A.  DSG Darden Sports Group.

18         MR. THOMPSON:  The text under this logo says:  Darden

19   Sports Group, DSG, lead by prominent Atlanta businessman Cal

20   Darden, Sr. is proud to have an opportunity to become the next

21   owner of the WNBA's Atlanta Dream.  In addition to Mr. Darden,

22   DSG ownership ranks are comprised of former Atlanta mayor and

23   businesswoman Shirley Franklin and one of the entertainment

24   industry's powerful woman Jennifer Baltimore.

25   Q.  Did you talk to Calvin Darden, Jr. about these three

O9OBDAR2                          Brock- Direct

1   owners?

2   A.  Yes.

3   Q.  What, if anything, did he say about them?

4   A.  He said that Calvin Darden, Sr. would be the majority owner

5   and that Shirley Franklin and Jennifer Baltimore were committed

6   to be part of the ownership group.

7           MR. THOMPSON:  Mr. Ross, you can exit the zoom and

8   please advance to page five.

9   Q.  Who's pictured here?

10  A.  Cal Darden, Sr.

11          MR. THOMPSON:  Mr. Ross, please advance to slide six.

12  Q.  Whose name appears toward the top of this slide?

13  A.  Shirley Franklin.

14  Q.  Please advance to the slide seven.

15          Whose name appears toward the top of this slide?

16  A.  Jennifer Baltimore.

17          MR. THOMPSON:  Ms. Ross, please advance to slide nine.

18  Q.  What is the heading of this slide?

19  A.  Advisory board.

20  Q.  Are the people on this slide, Mr. Brock, the same as those

21  that are shown in the version of the vision plan that you

22  received in October?

23  A.  Yes.

24  Q.  Did you at any point speak with any of the individuals

25  featured on the advisory board?

O9OBDAR2                          Brock- Direct

1    A.  Yes.

2    Q.  Who was that?

3    A.  Shirley Franklin.

4    Q.  What did Shirley Franklin say?

5    A.  Shirley Franklin said that she was very pleased to be part

6    of the ownership group, that as a former mayor of Atlanta she

7    was very hopeful that this group would be successful in buying

8    the Atlanta Dream, keeping the Atlanta Dream in Atlanta and

9    making it prosperous and successful.

10   Q.  Aside from Shirley Franklin, how many other people are

11   listed on the advisory board?

12   A.  Seven.

13   Q.  Did you contact or speak with any of those seven people?

14   A.  No.

15        MR. THOMPSON:  Could you please advance to slide 19,

16   Mr. Ross.

17   Q.  What's the heading of this slide?

18   A.  Corporate affiliations.

19   Q.  Are the companies or corporations listed on this slide the

20   same as those listed in the version of the vision plan that you

21   received in October of 2020?

22   A.  Yes.

23   Q.  How, if at all, did the vision plans that Calvin Darden,

24   Jr. sent you influence your view as Darden Sports Group as a

25   purchaser of the Dream?

O9OBDAR2                          Brock- Direct

A.  My sense was that I was positively encouraged by what I saw

in the Atlanta Dream vision plan.

          MR. THOMPSON:  Mr. Ross, could you please scroll to

page one of this exhibit.

Q.  When did Calvin Darden, Jr., send you the revised version

of the vision plan?

A.  December of 2020.

Q.  Mr. Ross, you can take down this exhibit please.

          Did there come a time when the second version of the

revised version of the vision plan was sent to the WNBA?

A.  Yes.

Q.  After the second version of the vision plan was sent to the

WNBA, were you still trying to sell the Atlanta Dream?

A.  Yes.

Q.  After the second version of the vision plan was sent to the

WNBA, did you learn that of any additional potential

purchasers?

A.  Yes.

Q.  Who was that?

A.  Northland Financial from Boston.

Q.  What was your view -- excuse me.  What was your view of

Northland as a potential acquirer?

A.  Northland was suggested as a potential buyer by Cathy

Engelbert from the WNBA.  So at the outset I was positively

inclined to talk with them, listen to them and see what they

O9OBDAR2                              Brock- Direct

1    might be interested in.  We also did some fact checking and

2    realize that it was a significant real estate company

3    headquartered in Boston; and therefore concluded that this

4    group could be a potential and very legitimate buyer of the

5    Dream.

6    Q.  When you say fact checking, what do you mean by that?

7    A.  Looking at -- it's a privately owned company, but we

8    checked out the kinds of businesses they owned and their

9    background and their history all of which is public

10   information.

11   Q.  And what view, if any, did you form of Northland?

12   A.  My view was that Northland Financial was a legitimate and

13   potentially attractive buyer.

14   Q.  Did you speak with any representatives from Northland?

15   A.  Yes.

16   Q.  Who was that?

17   A.  Suzanne Abair at the time who was executive vice president.

18   Q.  After you spoke with representatives of Northland, did you

19   speak again to Calvin Darden, Jr. about the Dream?

20   A.  Yes.

21   Q.  What did you say to Calvin Darden, Jr.?

22   A.  I explained that I thought the offer that they had put

23   forward from the group that Calvin represented would not be in

24   all likelihood significant to be the preferred buyer.

25   Q.  And what did Calvin Darden, Jr. tell you?

1    A.  That he understood.

2           MR. THOMPSON:  Mr. Ross, could you please publish

3    what's been admitted as Government Exhibit 2158.

4    Q.  What is this document?

5    A.  It's an email.

6    Q.  Who sent this email?

7    A.  I did.

8    Q.  What's the date?

9    A.  December 29, 2020.

10   Q.  Who's the recipient?

11   A.  Cal Darden, Jr.

12   Q.  What text does it say next to the "to" line?

13   A.  The revised LOI.

14   Q.  Excuse me, Mr. Brock.  What text does it say next to the

15   "to" line?

16   A.  Calvin Darden, Jr. Calvin@Dardenenterprises.com.

17   Q.  What email address did you use to communicate with Calvin

18   Darden, Jr.?

19   A.  Calvin@Dardenenterprises.com.

20   Q.  What does the subject of this email say?

21   A.  Revised LOI.

22   Q.  What does LOI stand for?

23   A.  Letter of intent.

24          MR. THOMPSON:  This email says:  Hi, Calvin.  Hope you

25   are keeping safe.  Just checking to see if you were expecting

O9OBDAR2                          Brock- Direct

1    to be able to get a revised updated LOI to me fairly soon.  All
2    the best, John.
3    Q.  Did there come a time when Calvin Darden, Jr. provided you
4    with a revised letter of intent?
5    A.  Yes.
6          MR. THOMPSON:  Mr. Ross, you can take down this
7    exhibit.  Could you please publish what's been admitted as
8    Government Exhibit 2201.
9    Q.  What is this document?
10   A.  An email.
11   Q.  What's the date?
12   A.  6th of January 2021.
13   Q.  Did you receive this email?
14   A.  Yes.
15   Q.  Who sent it to you?
16   A.  Calvin Darden, Jr.
17         MR. THOMPSON:  This email says:  Hi, John, per our
18   conversation, please see attached revised letter of intent that
19   reflects the new purchase price.  Please let me know if you
20   have any questions or require any additional information.
21   Thank you.  Best Calvin.
22         Could you please exit the zoom out and could you
23   please scroll to the second page of Government Exhibit 201.
24   Q.  What is this document?
25   A.  It's a letter of intent to purchase the Atlanta Dream.

O9OBDAR2                         Brock- Direct

1    Q.  Who sent you this document?

2    A.  Calvin Darden, Jr.

3            MR. THOMPSON:  This document says:  Letter of intent.

4    This non-binding letter of intent is signed as of December 24,

5    2020 by and between Calvin Darden, Sr. and Shirley Franklin,

6    purchasers, and Dream Too, LLC.

7            Could you please focus in on section two, Mr. Ross.

8            This says:  Proposed terms.  Dream Too LLC, seller,

9    owns the WNBA team Atlanta Dream, the purchase business, which

10   plays in the City of Atlanta, Georgia, seller, is seeking to

11   sell 100 percent of its assets to purchasers.  Purchasers may

12   form an entity that is owned by them for the purpose of

13   acquiring the assets.  A summary profile of each of the

14   purchasers attached hereto as exhibit A.

15           Mr. Ross, you can exit that, please.

16   Q.  What transaction did this letter of intent contemplate?

17   A.  Purchase of the Atlanta Dream.

18   Q.  Purchase by whom?

19   A.  By Calvin Darden, Sr. and Shirley Franklin.

20           MR. THOMPSON:  Section 22 consideration says:

21   Aggregate consideration for the assets of the purchase business

22   shall be 3, 500,000 to be paid at closing.

23   Q.  What were the purchasers willing to pay for the Atlanta

24   Dream?

25           MR. DONALDSON:  I'm sorry, Judge, which purchasers?

O9OBDAR2                          Brock- Direct

1              MR. THOMPSON:  I'm happy to restate the question.

2              THE COURT:  Yes.

3    Q.  Mr. Brock, directing your attention to the first line under

4    the heading letter of intent.  Is there a defined term

5    purchasers?

6    A.  The purchasers were Calvin Darden, Sr. and Shirley

7    Franklin.

8    Q.  Now, what price according to this letter of intent were

9    Calvin Darden, Sr. and Shirley Franklin willing to pay to

10   purchase the Atlanta Dream?

11   A.  3, 500,000 U.S. dollars.

12   Q.  Did you and Calvin Darden, Jr. discuss the second letter of

13   intent that Calvin Darden, Jr. sent you?

14   A.  Yes.

15   Q.  What, if anything, did you tell Calvin Darden, Jr.?

16   A.  I said thank you for the revised letter of intent.  Thank

17   you for increasing the proposed purchase price, but candidly I

18   don't think this is going to be sufficient to end up being the

19   preferred buyer.

20   Q.  After you told him that, did Calvin Darden, Jr. raise the

21   offer purchase price?

22   A.  No.

23              MR. THOMPSON:  Mr. Ross, you can take down this

24   exhibit, please.

25   Q.  Did your effort to sell the Atlanta Dream succeed?

1   A.  Yes.

2   Q.  To whom did you sell the team?

3   A.  Northland Financial.

4   Q.  Who was your point of contact at Northland?

5   A.  Suzanne Abair, executive vice president.

6   Q.  Approximately when did you sell the team?

7   A.  Around March the 1st of 2021.

8   Q.  And is March 1st, is that when the deal closed or when you

9   sold the team?

10  A.  That's when the deal closed.

11  Q.  Did you tell Calvin Darden, Jr. that the Atlanta Dream

12  would be sold to another group of buyers?

13  A.  Yes.

14  Q.  Approximately when did you tell Calvin Darden, Jr. that the

15  team would be sold to another group?

16  A.  In February of 2021.

17  Q.  What, if anything, did Calvin Darden, Jr. say to you after

18  you told him this?

19  A.  He said thank you for letting me know.  I'm sorry we're not

20  the preferred buyer, but I understand.

21  Q.  After you told Calvin Darden, Jr. that the team had

22  accepted a different purchase offer, did you have any further

23  discussions or conversations with him pertaining to the Atlanta

24  Dream?

25  A.  No.

O9OBDAR2                            Brock- Direct

1              MR. THOMPSON:  Mr. Ross, could can you please publish

2       what's been admitted as Government Exhibit 2413.  Actually, you

3       cannot zoom out here.  Can you scroll to page two, please.

4       Forgive me, Mr. Ross.  Exit the zoom out and scroll back up to

5       page one, please.

6       Q.  Mr. Brock, who sent this email?

7       A.  Calvin Darden, Jr.

8       Q.  And is there a document attached?

9       A.  Yes.

10      Q.  What does the attachment say?

11      A.  Darden Sports Group Atlanta Dream PDF.

12             MR. THOMPSON:  Mr. Ross, now please exit this and

13      scroll to page two.  Could you zoom in, please.

14      Q.  Before preparing to testify in this trial had you ever seen

15      Government Exhibit 2413?

16      A.  No.

17             MR. THOMPSON:  Government Exhibit 2413 says:  Letter

18      of intent.  This letter of intent is signed as of February 15,

19      2021 by and between Darden Sports Group, Calvin Darden, Sr. and

20      Shirley Franklin purchasers and Dream Too, LLC and Lawrence

21      Gottesdiener.

22      Q.  Did Dream Too, LLC, ever enter into a letter of intent to

23      jointly sell anything with Lawrence Gottesdiener?

24      A.  No.

25      Q.  Who is Lawrence Gottesdiener?

O9OBDAR2                         Brock- Direct

1   A.  He's a senior executive at Northland Financial.  I think

2   he's currently the CEO.

3   Q.  What is the date of this letter of intent?

4   A.  February 15, 2021.

5   Q.  Was February 15, 2021 before or after the Dream was sold to

6   Northland?

7   A.  It was before.

8   Q.  Did your wife Mary Brock and Ms. Loeffler still own the

9   team as of the date of this letter of intent?

10  A.  Yes.

11         MR. THOMPSON:  Mr. Ross, can you please zoom in on

12  section two.

13         Proposed terms.  Dream Too, LLC, seller, owns the WNBA

14  team Atlanta Dream, the purchase business, which plays in the

15  city of Atlanta Georgia.  Seller is seeking to sell nine

16  percent of its assets to purchasers along with the option for

17  purchasers to increase their stake, ownership stake at 51

18  percent after the conclusion of the 2023 season, and prior to

19  the beginning of the 2024 season for no additional financial

20  consideration.

21  Q.  Given your role in the sale of the team is a letter of

22  intent of this nature something about which you would have been

23  aware?

24  A.  Yes.

25  Q.  Did Dream Too LLC ever seek to sell nine percent of its

O9OBDAR2                          Brock- Direct

1    assets to the purchasers listed on this letter of intent?

2    A.  No.

3    Q.  Did Dream Too, LLC ever seek to sell nine percent of its

4    assets to anyone?

5    A.  No.

6           MR. THOMPSON:  Mr. Ross, could you please pull up page

7    four.  Keep going, please.  Mr. Ross, page five.  There you go.

8    Could you zoom in, please.

9    A.  Could you repeat the question.

10   Q.  Yes, Mr. Brock.  What name is written under purchasers?

11   A.  Calvin R. Darden.

12   Q.  What title is provided under the name Calvin R. Darden?

13   A.  Chairman and chief executive officer Darden Sports Group,

14   LLC.

15   Q.  What date is listed?

16   A.  February 15, 2021.

17          MR. THOMPSON:  You can exit this document, please,

18   Mr. Ross.

19   Q.  Was there at any point any agreement between the Darden

20   Sports Group and the owners of the Atlanta Dream?

21   A.  No.

22   Q.  Was there at any point an agreement between Calvin Darden,

23   Jr. and the owners of the Atlanta Dream?

24   A.  No.

25          MR. THOMPSON:  Your Honor, may I have a moment.

O9OBDAR2                          Brock- Direct

1          THE COURT:  Yes.  I was going to ask now is a good

2     time for us to break for the day.

3          MR. THOMPSON:  Yes, your Honor, this would be good

4     time for a break.

5          THE COURT:  All right.  So, ladies and gentlemen,

6     we're going to break for the day.  Remember, do not discuss the

7     case.  Go home, relax.  You can leave your pads on your chairs

8     or you could take them back to the jury room, but you must

9     leave them in the jury room in the courthouse, sorry, in this

10    courtroom.  Remember, do not discuss the case.  No research, no

11    Googling.  Don't discuss it with your family members.  Don't

12    discuss it with one another.  If anyone approaches you about

13    the case, please just tell them you can't talk about the case

14    and let Ms. Disla know.  Okay.  Thank you very much.  I'll see

15    everyone tomorrow.  We're going to begin at 10:00, 10:00 in the

16    morning.  Thank you very much.  Have a good evening.

17          (Jury not present)

18          THE COURT:  You may be seated.  Mr. Brock, you may

19    step down.  Thank you very much.

20          (Witness excused)

21          THE COURT:  Okay.  Is there anything -- well, let me

22    first ask in terms of -- so, Mr. Brock will continue tomorrow

23    with his testimony.  What is the potential lineup tomorrow of

24    witnesses?

25          MR. MEAD:  We're a little bit in flux to be honest,

O9OBDAR2                         Brock- Direct

 1   your Honor.  We hope to get Ms. McMullin from Docusign and

 2   from -- I'm sorry.  McMullin from Aflac and Ms. Ashlock from

 3   Docusign on and off today.  They're both very short.  We have a

 4   couple of other people who we plan to get here kind of first

 5   thing tomorrow morning and, so we're still figuring it out.  I

 6   think that potential candidates are Ms. Ashlock, Ms. McMullin,

 7   Ms. Abair, Ms. Rae, Mr. Schmidt and Mr. Howard.  Certainly not

 8   expecting we'll get through all of those witnesses, and we're

 9   hoping that the first order of business this evening is kind of

10   figuring out which of those witnesses and in what order.

11            THE COURT:  I know there was a request with regard to

12   certain of those witnesses, and I don't have an objection of

13   accommodating that, but I just need to know if that's going to

14   happen tomorrow or Thursday or what have you?  This is with

15   regard to leaving --

16            MR. MEAD:  My hesitancy is --

17            THE COURT:  -- you just don't know.

18            MR. MEAD:  Mr. Howard is almost certainly coming to

19   court tomorrow.  Ms. Rae, I'm seeing a nod of the head. So both

20   of those witnesses we expect to have tomorrow.

21            (Continued next page)

22

23

24

25

O9OJDAR3

1          MR. MEAD:  Ms. Rae is very brief.  Mr. Howard is a

2     much more substantial witness, and my team has reminded me also

3     that Ms. Baltimore is certainly a potential witness for

4     tomorrow as well.

5          THE COURT:  Okay.

6          MR. DONALDSON:  I'm sorry, Judge.  We're saying

7     McMullin from Aflac, Docusign, Abair, Rae, Schmidt, Howard, and

8     Baltimore, that's what we're saying might happen tomorrow?

9          THE COURT:  That's my understanding.

10          MR. MEAD:  Certainly not expecting we'll get through

11     all of them.  That had been kind of the game plan to have at

12     least started by the end of the day tomorrow.  We just need to

13     figure out witnesses' availability and travel and all of that.

14          THE COURT:  Okay.  What I would say is at some point

15     this evening, Mr. Mead, if someone from the prosecution team

16     can sort of, as you figure out who's going to be able to make

17     it and the timing, if you could provide the defense with more

18     of a better understanding of which witnesses are likely to be

19     here tomorrow.

20          MR. MEAD:  Certainly, your Honor.

21          I think something that would be at least somewhat

22     helpful in that regard, I think we're likely to have very

23     little, if anything, additional with Mr. Brock in the morning

24     tomorrow.  Certainly not holding the defense to anything, but

25     it would be helpful to know are they thinking half an hour of

1  cross, two hours of cross?  Just a ballpark number so we can

2  think about how far we're likely to get tomorrow.

3       THE COURT:  Sure.  So Mr. Donaldson, are you going to

4  be doing the cross-examination?

5       MR. DONALDSON:  Yes.

6       THE COURT:  And if the government doesn't have any

7  additional questions for Mr. Brock, how long do you currently

8  anticipate the potential cross to be?

9       MR. DONALDSON:  Judge, I have no idea, but I can tell

10 you I'm going to not take up too much of the Court's time.  But

11 I don't know how long it will be.  It won't be less than an

12 hour, I can tell you that.

13      THE COURT:  That's helpful.  For purposes of timing

14 and so the government can arrange for other witnesses, that is

15 helpful.  Okay.  Let me ask is there anything else -- and

16 obviously to the extent there are exhibits that the government

17 intends to offer tomorrow, I'd like, if possible, for you to do

18 as you did earlier and indicate what these -- it may be that

19 it's the same list that was provided in that email of

20 September 23.  I just want to make sure that there aren't any

21 evidentiary issues we need to deal with in advance of the jury

22 being seated in the box.

23      MR. MEAD:  We'll do that, your Honor.

24      THE COURT:  Okay.  All right.  Anything else from the

25 government?

O9OJDAR3

1          MR. MEAD:  Just very briefly, I think Alternate No. 1

2    discussed needing to leave by 5:00 is my memory.  Obviously we

3    stayed till 5:30, which was great today.  Just wondering what

4    the Court's view is on the end of the day.

5          THE COURT:  I think what I will do is I'll have

6    Ms. Disla check tomorrow.  My understanding — and again, I

7    could be mistaken concerning what the juror Alternate No. 1 was

8    saying during jury selection.  I think he just needs to -- if

9    he's going to be later than 5:00, if it's going to be 5:30, he

10   just needs to communicate with his wife so they can make sure

11   that they have the childcare pickup, I guess, arranged for.  So

12   what we can do is figure out whether or not we can be

13   consistently ending at 5:30 or whether or not there will be

14   times when we may have to end a little bit early.  If we know

15   in advance, we can try and start a little bit earlier.

16          But with regard to tomorrow, we'll start at 10:00 when

17   we'll find out whether Alternate 1 needs to leave at 5:00.

18          MR. MEAD:  If Ms. Disla is speaking to him this

19   evening, I think tomorrow will be a particularly helpful day if

20   we can stay till 5:30, given the stack of witnesses.

21          THE COURT:  Anything from the defense?

22          MR. DONALDSON:  No, your Honor.  Thank you.

23          THE COURT:  Okay.  All right.  Thank you, everyone.

24          I'll see everybody at 10:00.  We'll complete the

25   testimony of Mr. Brock, and then continue with the other

O9OJDAR3

1    witnesses.  All right?  Thank you very much.

2            If there are any things that we need to discuss in

3    advance, I'd ask that you send an email to my chambers inbox

4    and specifically to Ms. Folly so that we can make sure that I

5    am here early and so that we can deal with those things before

6    we bring the jury out.  All right?

7            Obviously if it doesn't involve the first couple of

8    witnesses and it can wait until a break, we can do that.  But I

9    would like to resolve any evidentiary issues so we're not

10   spending time at sidebar discussing things that we could take

11   care of in advance.  All right?

12           Thank you very much.  See everybody tomorrow.

13           (Adjourned to September 25, 2024, at 10:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3    JOHN BROCK

4    Direct By Mr. Thompson . . . . . . . . . . . .74

5                        GOVERNMENT EXHIBITS

6    Exhibit No.                               Received

7     2101, 2102, 2107, 2117, 2119, 2119A   . . . . .72

8     2129, 2136, 2139, 2144, 2144A   . . . . . . .72

9     2145, 2154, 2158, 2201, 2303, 2401, 2402   . .72

10    2404, 2405, 2407, 2408, 2410, 2413   . . . . .72

11    2414, 2418, 2419, 2501, 2506, 2508, 2510   . .72

12    2142    . . . . . . . . . . . . . . . . . . .73

13    41    . . . . . . . . . . . . . . . . . . .85

14

15

16

17

18

19

20

21

22

23

24

25
```