O9UJDAR1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        23 Cr. 134 (VSB)

5    CALVIN DARDEN, JR.,

6                                           Trial
                    Defendant.
7    ------------------------------x

8                                           New York, N.Y.
9                                           September 30, 2024
                                            10:00 a.m.
10

11   Before:

12                    HON. VERNON S. BRODERICK,

13                                          District Judge
                                            -and Jury-
14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KEVIN MEAD
17   STEPHEN J. RITCHIN
     WILLIAM C. KINDER
18   BRANDON C. THOMPSON
          Assistant United States Attorney
19
     DONALDSON CHILLIEST & MCDANIEL LLP
20   BY:  XAVIER R. DONALDSON
          -and-
21   ANTHONY RICCO
     STEVEN Z. LEGON
22   ERICA A. REED
          Attorneys for Defendant
23
     Also Present:
24   Alexander Ross, Paralegal
     Arjun Ahuja, Paralegal
25   Melissa Baccari, FBI Special Agent
```

O9UJDAR1

1          (Trial resumed; in open court; jury not present)

2          THE COURT:  So I received an email from Mr. Donaldson

3   relating to scheduling.  So is Mr. Dershowitz going to be

4   called on Tuesday?  In other words, has he been confirmed?

5          MR. DONALDSON:  Good morning, gentlemen.

6          From my understanding, he has been confirmed to be

7   here on Tuesday.

8          THE COURT:  Okay.  All right, great.  And I know that

9   you advised the government about Mr. Sienko.

10         MR. DONALDSON:  Yes.

11         THE COURT:  Has there been any development since you

12  sent the email?

13         MR. DONALDSON:  No.  I did not get -- not this

14  weekend, no.  My goal was to get through to him today, but I

15  haven't -- no.  Short answer to that question is no, not since

16  Friday night.

17         THE COURT:  Mr. Paddock.

18         MR. DONALDSON:  I spoke to the government about that.

19  We conversed about that.  We also conversed about that this

20  morning.  I sent them over a proposed stipulation, so maybe we

21  can not go through all that.  They're reviewing the

22  stipulation.  We're still in conversation about that as well.

23         THE COURT:  Let me ask the government with regard to

24  Mr. Sienko --

25         MR. DONALDSON:  Judge, there's one more.  I let the

O9UJDAR1

1    government know this morning that we also, based upon what we

2    were reading this weekend, may call Mr. Kenyatta Slade.  I

3    believe he -- Mr. Kenyatta Slade.  I gave them that information

4    this morning.  I did confer with Mr. Slade that he can

5    definitely be here to testify either tomorrow or Wednesday

6    morning.  Mr. Slade has also communicated with the government

7    already.  They have 3500 material related to Mr. Slade.  So

8    that was the last email I sent them this morning.

9            THE COURT:  Okay.  All right.  So it looks like

10   Mr. Dershowitz and Mr. Slade will be tomorrow.  Mr. Sienko

11   is -- we're not sure what his status is.  Okay.  And so with

12   regard to Mr. Darden, at some point today I intend to allocute

13   him with regard to his right to testify.

14           MR. RICCO:  Judge, can you do the allocution in the

15   morning?

16           THE COURT:  Yes.

17           MR. RICCO:  Okay.  Thank you.

18           THE COURT:  That's fine.  And I also received the

19   government's letter of September 29 and Mr. Ricco's proposed

20   instruction on the 404(b) evidence.

21           I have the government's proposal, I guess, in the

22   request to charge.  Does the government intend to respond to

23   the proposed instruction provided by Mr. Ricco this morning?

24           MR. KINDER:  Even though I've taken Mr. Mead's seat,

25   I'll let him handle that.

1              MR. RICCO:  And your Honor, we're not wedded to that

2    instruction.  The instruction just has the concepts around that

3    type of testimony.  So we're just suggesting language to those

4    concepts, but it doesn't have to be the language proposed.

5              THE COURT:  Sure.

6              MR. DONALDSON:  And I'm sorry.  Last thing.  I'm

7    sorry, Mr. Mead.  Just regarding the allocution of Mr. Darden,

8    we were talking about tomorrow morning, not today.

9              THE COURT:  Correct.  That's right.  Yes, Mr. Mead.

10             MR. MEAD:  Your Honor, we had been planning to --

11   well, I think the easiest way might be for us to send the court

12   our proposed instruction and discuss rather than have a letter

13   about it.

14             THE COURT:  That's fine.

15             MR. MEAD:  I think just to flag for the Court, I mean,

16   I think the two concerns we have with the defense's instruction

17   are, one, that it does not include *modus operandi*, the law in

18   the circuit is clear that if there's a distinctive signature

19   crime, you can introduce 404(b) for *modus operandi*.  The

20   defendant is impersonating the exact same person he did before.

21   So I think that's about as strong an MO case as it can get.

22             And then we'd probably tone down the defense language

23   just a little bit.  We agree with kind of the general

24   principles about the limitation, but we maybe don't need to say

25   it three times in the same instruction.

O9UJDAR1

1          MR. RICCO:  Judge, while we're toning it down, I want

2     the government to know that's actually the government

3     submission from another case.

4          THE COURT:  Okay.  And so I also got the government's

5     letter of September 29 in further support of the introduction

6     of the 404(b) evidence.  Is there anything additional that the

7     parties would like to add with regard to that?

8          MR. MEAD:  The government rests on our submission.

9     The only thing I'll say is just from a timing perspective, your

10    Honor, my understanding was that the plan was that we would

11    call Ms. Sebade tomorrow to put this piece of the case in.

12    That would give us time to figure out the limiting instruction.

13    And I think we're waiting for the defense on any proposed

14    redactions to the judgment as well.  So the idea is we do that

15    tomorrow.  I'm happy to address it now with the Court if the

16    defense wants to, or we could do it later in the day.

17         THE COURT:  We can do it later.  Obviously, the letter

18    was just sent to cross.  I will listen and get the testimony.

19    Obviously, I have the testimony referenced in the government's

20    letter.  But also my understanding Mr. Schmidt is going to

21    testify, is it today?

22         MR. MEAD:  Yes, your Honor, this morning.

23         THE COURT:  All right.  So I'll hear that testimony

24    and assess it.  Obviously I can rule on the proffer, but since

25    we're going to do this tomorrow, that's fine.  So I can figure

O9UJDAR1

1    out later in the day what makes sense.  Or perhaps tomorrow

2    morning we could even address it before the jury comes out.

3    All right?

4           Let me ask is there anything else that we should deal

5    with before we get the witness and the jury?

6           MR. MEAD:  Just two things, your Honor.  First up, the

7    defense case, this morning the defense mentioned

8    Mr. Dershowitz, Mr. Sienko, Mr. Paddock, and Mr. Slade.  The

9    two other names we've heard in the past have been Lorielle

10   Paulk, the defendant's sister, and potentially a paralegal.

11   I'm not sure if those people are still potential witnesses.  If

12   they are, you know, in addition to the 26.2 material we'd

13   obviously like any exhibits.  In particular if the paralegal is

14   putting in a chart, the earlier we can get that chart to make

15   sure it's accurate, is better.

16          THE COURT:  Yeah.  Let me ask Mr. Donaldson,

17   Ms. Paulk, is that you, Mr. Ricco?  Mr. Donaldson, Ms. Paulk

18   and the paralegal, do you have a sense, A, is Ms. Paulk no

19   longer someone who the defense is considering calling?  And, B,

20   what is the status of the legal assistant?

21          MR. RICCO:  So Judge, with respect to the chart, same

22   thing he said Friday afternoon applies today with the

23   paralegal.  It's from the testimony, so we have to wait till

24   the testimony is completed.  Summary chart based on things that

25   we're still waiting to hear.

O9UJDAR1

1          And then with respect to the calling of witnesses,

2   Judge, we've done our best to inform the government formally

3   and informally of the direction we're going in.  That

4   conversation was had this morning.  We prefer at this point not

5   to put on the record who we're calling or not calling because

6   we are still thinking that through, and it's part of the reason

7   we asked the Court to do the allocution of the defendant in the

8   morning.  But we have given the government what they need in

9   sufficient time period for them to be prepared should those

10  people testify.

11          THE COURT:  Well, I guess what I would say with regard

12  to -- and look, I don't -- doesn't have to be -- you need to

13  communicate with them.  So if Ms. Paulk is still someone you're

14  considering, I mean, you've mentioned or apparently

15  mentioned -- someone has mentioned in the past, you should just

16  communicate that with them.

17          MR. RICCO:  I did that this morning before we started,

18  Judge.

19          THE COURT:  Okay.  So with regard to 26.2 and the

20  exhibits, you know, I think I had indicated that today those

21  materials for defense witnesses should be supplied.  So they

22  should be turned over.  And if you decide not to call -- I just

23  don't want to delay here with regard to that.  And I understand

24  that there may be with regard to the legal assistant, however,

25  the summary chart, you mentioned the testimony, but is the

O9UJDAR1

1    summary chart a summary of, like, text messages and the like?

2         MR. RICCO:  Timelines about discrete time period

3    from -- won't cover more than three months, but what the

4    testimony was in that time period around text messages and

5    emails.  And we're expecting to get some of that this morning

6    from Mr. Smith.

7         MR. DONALDSON:  Judge, regarding the exhibits, the

8    defense exhibits and the Court's request order that we hand

9    them to the government by today, I did inform the government

10   via email this weekend that we did not have any Rule 26

11   information for the witnesses of Mr. Dershowitz, Mr. Sienko.

12   We don't have any for Mr. Kenyatta Slade.  I did tell them

13   that.

14         And as far as exhibits, I told them we don't have any

15   exhibits prepared at this point for either Sienko or

16   Dershowitz, but that I will endeavor today, if I'm going to use

17   some, I will give those to them.  But they're coming from the

18   government's exhibits that probably have already been admitted.

19   But I did not plan on using or admitting any exhibits for

20   Mr. Dershowitz.  But if that changes tonight, I will gladly

21   send them over.  But I told them that last night.

22         THE COURT:  And Mr. Slade, is there any --

23         MR. DONALDSON:  No, not that I'm aware of at this

24   time.  I did communicate with Mr. Slade this morning.  Of

25   course there's no -- not of course, but there's no Rule 26

O9UJDAR1

1    material from that at this moment.  I don't have any exhibits

2    based upon my communication this morning.

3        Again, that's fluid because this witness was developed

4    or my attempt related to this witness was developed actually

5    this morning.  So if there's something that I think we need

6    from exhibit purpose for Mr. Slade, again, I will get that to

7    the government as soon as I figure that out.  But as of right

8    now, the answer to that question is no.

9        THE COURT:  Okay.  Can we have Ms. Bronson and can we

10    bring the witness up and get the jury?

11        MR. DONALDSON:  One second.  How long is Ms. Bronson

12    going to be?

13        MR. KINDER:  Ms. Sebade.  20, 25 at most.

14        THE COURT:  Oh, I'm sorry.  Yes.

15        MR. DONALDSON:  Let me run to the little boy's room

16    before we get started.

17        (Pause)

18        MR. KINDER:  Should I get the witness?

19        THE COURT:  Yes, if we can.  Yes.

20        Counsel, at some point today during the break or at

21    the lunch break, I intend to mention to the jury that we're on

22    schedule and that in all likelihood they'll get the case this

23    week.  Is there any objection to that?

24        MR. MEAD:  Not from the government.

25        THE COURT:  From the defense.

O9UJDAR1

1          MR. DONALDSON:  No, your Honor.  Thank you.

2          THE COURT:  All right.  Thank you very much.

3          (Continued on next page)

```
 1                 (In open court; jurors present)
 2                 THE COURT:  Ladies and gentlemen, thank you for your
 3     patience.  I hope you had a relaxing weekend.
 4                 One of my college roommates came from in from out of
 5     town.  He got us all show tickets.  We went out with his family
 6     and saw Hell's Kitchen.  It was very good.  I'd recommend it to
 7     all.  On my blog I'll be indicating what my review is but you
 8     have my preliminary thoughts.
 9                 So we're going to continue with the testimony of
10     Ms. Sebade.  And ladies and gentlemen, by about the lunch
11     break, I'm going to provide you with an update of where things
12     stand with regard to the timing of when you may get the case
13     okay?  All right.
14                 You may inquire.
15     OLIVIA SEBADE, resumed.
16     DIRECT EXAMINATION CONTINUED
17     BY MR. KINDER:
18     Q   Good morning, Ms. Sebade.
19     A   Good morning.
20     Q   I'll like to review more text messages today, and we'll
21     start with a small portion of the last message we saw on
22     Friday.  Can we please publish 401-961 in evidence, and
23     page 10, please.
24                 Ms. Sebade, just to orient everyone again, the blue
25     message at the top, what is the phone number and name listed
```

09UJDAR1                          Sebade– Direct

1    there?

2    A    1-404-850-1779, Cal Darden, Jr.

3    Q    That's the "from" line?

4    A    Yes.

5    Q    And the green message below, what's the "from" line there?

6    A    1-713-898-6696 Charles (owner).

7    Q    I will read the blue messages from the 1779 Cal Darden, Jr.

8    number, and I would like you to read the green messages from

9    the Charles (owner) number.

10              Cal Darden, Jr. October 27, 2020.  What's good bro?

11   A    Nm what's up bro.

12   Q    Been on a call with WNBA because they had some questions

13   about the deck and how quickly we'd be able to execute.  Really

14   good call.  Now, I just got in front of my computer to start

15   working on this deal sheet for Dwight.  What up with the

16   bankers?

17   A    Cool and nothing much they keep talking about trying to

18   secure it with something I told them that won't work we need to

19   secure it with the Dream.  1-239-887-1238, Serge.  Jeff,

20   1-231-420-5924.  Call Jeff now.  He is available.

21   Q    He didn't answer.  Did you just speak to him?

22   A    What's up bro.  Got it bro.

23   Q    My man.

24   A    Let's get this done bro.

25   Q    Ball is your court now bro.  I've done all the heavy

1   lifting lol.

2   A   I got you bro.

3   Q   May my man how's it going?

4   A   Waiting on him to call me haven't spoken to him yet.

5   Q   Do you know if he left for vacation?

6   A   I don't think so.

7   Q   You feel good about talking to him?

8   A   Yes whenever I do.

9   Q   Bro great job with Dwight today.  I'm excited.  Sounds like

10  he'll probably do it.

11  A   Me too bro and I think so.

12  Q   What amount did you guys discuss?  Five or seven?  And did

13  he think it was too much?

14  A   Five and no.

15  Q   Okay cool.

16          Can we please publish 401-1000 in evidence.

17          Cal Darden, Jr., November 7, 2020.  Bro we need him at

18  seven?

19  A   I already know bro.  I was gone get that number anyway

20  because me and you both can use the money and we won't have to

21  go to anybody else to help us with this deal.  I hate going to

22  other people bro.  We keep everything in house.

23  Q   Can we please publish Government Exhibit 2407.

24          Ms. Sebade, that is an email?

25  A   Yes.

09UJDAR1                              Sebade– Direct

 1  Q   Who is it sent from?

 2  A   Calvin Darden calvin@dardenenterprises.com.

 3  Q   Who is it sent to?

 4  A   Calvin Darden, calvin@dardenenterprises.com.

 5  Q   What is the date?

 6  A   November 11, 2020.

 7  Q   And can you please read the text that appears after

 8  "attachments."

 9  A   Convertible promissory note agreement DSG-Howard.PDF,

10  convertible promissory note agreement DSG_Howard.PDF.

11  Q   Can we please scroll through the next page.

12          Ms. Sebade, you see there's a logo at the top left

13  that says "Darden Sports Group"?

14  A   Yes.

15  Q   What is the heading of the document?

16  A   Convertible promissory note financing of Darden Sports

17  Group.

18  Q   What is the date?

19  A   November 11, 2020.

20  Q   Scroll down, please.

21          Can you please read the heading and the first sentence

22  beginning with "Dear Dwight."

23  A   Dear Dwight, please see the following terms and conditions

24  of the convertible promissory note financing of Darden Sports

25  Group.

1          MR. KINDER:  And Mr. Ross, can you please scroll

2     through the rest of the document.  Now can you go back to the

3     top, please.  And Mr. Ross, can you bring this document up side

4     by side with the last text message we looked at, 401-1000.

5     Sorry, Mr. Ross, all the way to the top of the email.

6     Q   Ms. Sebade, the text messages on the left, what is the date

7     of those text messages?

8     A   November 7, 2020.

9     Q   And how does that compare to the date of the email on the

10    right?

11    A   It's about three days before, four days before.

12    Q   November 7 and November 11?

13    A   Yes.

14    Q   Can we please publish 401-1029, please, and we can make

15    that full screen.

16          Ms. Sebade, these are messages from the Cal Darden,

17    Jr. number to the Charles number?

18    A   Yes.

19    Q   I'll read the blue, you please read the green.

20          Cal Darden, Jr, November 18, 2020.  This is what I

21    just sent Serge.  Hi serge.  I spoke with Dwight and Charles

22    today and Dwight told me he authorized the wire to go out

23    yesterday.  When I spoke with you and Jeff yesterday, you said

24    it was probably too late for it to go out then, but would go

25    out today.  Nothing has hit yet.  Should I expect it by end of

09UJDAR1                       Sebade- Direct

1  day?

2  A    Cool oh, yeah were you able to do -- were you able to do

3  you call last night?

4  Q    They pushed it to tonight.  Also Serge called and told me

5  that he spoke to Dwight and told him they're setting up another

6  facility for him and that the wire probably wouldn't go out

7  until the beginning of next week.

8  A    Okay and that's probably because they didn't do what they

9  were supposed to do last week.

10  Q    Exactly.

11         401-1147, please.

12         Cal Darden, Jr., February 11, 2021.  BTW-not to keep

13  going back to the Dwight situation, but that's how we take care

14  of Chandler.  We need to keep Dwight calm and happy.  That

15  allows us time to do everything we need to do.

16         1177, please.

17         Ms. Sebade, please read the green messages from

18  Charles and identify the date of the first message.

19  A    February 24, 2021, thanks bro.  Lawrence Gottesdiener.  And

20  then he sends an attachment.

21  Q    Ms. Sebade, have you reviewed what that attachment is?

22  A    Yes.

23  Q    Can we please go to 401-1177A.  Can we scroll down, zoom

24  out a little bit.

25         And Ms. Sebade, what is the name underneath that

09UJDAR1                    Sebade- Direct

1   photograph?

2   A    Lawrence R. Gottesdiener.

3   Q    What is the title?

4   A    Founder and chairman.

5   Q    Can we go back to 1177.  Scroll down.  Scroll down.

6           Ms. Sebade, what is the next message from Charles?

7   A    It's another screenshot attachment.

8   Q    Did you review that attachment?

9   A    I did.

10  Q    Can we go to 1178A, zoom out a little bit.

11          Ms. Sebade, what is the text that appears above the

12  photograph?

13  A    Northland.

14  Q    And what is the name underneath the photograph?

15  A    Suzanne Abair.

16  Q    And what is the title?

17  A    President and chief operating officer.

18  Q    Can we go back to 1177, please.

19          And can you read the next green text message from

20  Charles.

21  A    Also I forgot to mention they have two properties in

22  Atlanta already.

23  Q    I'm familiar w them.

24  A    Bet.

25  Q    The project they want to do next requires city approval so

1  they want some help because they're based in Massachusetts.

2  A   Got you.  He seems like a big time businessman.  It may be

3  worth being in business with them in order to do some bigger

4  business later, especially since they basically just gave away

5  17 million.

6  Q   I agree.

7  A   That might be the move bro.

8  Q   BTW-Jeff Schmidt from BMO left my father a message today

9  just asking my father to give him a call if he gets the chance.

10 A   Jeannie came through clutch with that info and that's

11 crazy.  They are doing this on there on bro.  He didn't tell

12 them to reach out.

13 Q   I know bro just wanted to let you know.

14 A   Crazy.

15 Q   I told Brock we're going to do the deal with them.  We're

16 not going to be named in the deal though.  They want my

17 father's and the mayor's help in getting their new project

18 done.  You can also let Dwight know.

19 A   Cool and he is going to want to know what the deal is

20 exactly he doesn't care about who they name.

21 Q   Okay I'll call you soon.  But for all intents and purposes,

22 it's the same deal we laid out initially.  They will be

23 responsible for all game operations and the likes.  Out group

24 will provide all of the ancillary opportunities (content

25 production, podcast, new channel, etc.) and keep account

1   revenue from that.  At the end of three years our initial

2   investment will give ownership control to us (which is the

3   agreement we initially had with him in the beginning).  Hey bro

4   hit me when you can.  Hey bro, did everything work out with the

5   way you needed it to with your new house?

6            401-1202, please.

7            THE COURT:  Ms. Sebade, just to be clear, the two

8   photographs that we just looked at, what relationship do those

9   photographs have to the attachments you reviewed from those

10  text messages?

11           THE WITNESS:  The photographs are the attachments.

12           THE COURT:  Okay.  Go ahead.

13  BY MR. KINDER:

14  Q    401-1202.

15           Ms. Sebade, this first green message is a message from

16  the Charles number?

17  A    Yes.

18  Q    And who is it to?

19  A    1-404-850-1779, Cal Darden, Jr.

20  Q    That's the same Cal Darden, Jr. number in the messages

21  we've been reviewing?

22  A    Yes.

23  Q    And what is this first message from Charles?

24  A    It's another attachment.

25  Q    And have you reviewed that attachment?

09UJDAR1                        Sebade– Direct

1    A    I did.

2    Q    Can we go to 1202A.

3          Ms. Sebade, is this the attachment from the text

4    message we just saw in 1202?

5    A    It is.

6    Q    What is this?

7    A    It's a screenshot of an email.

8    Q    And what is the heading of the screenshot of the email?

9    A    Dwight Howard and Atlanta Dream.

10   Q    And I will read it.

11         Hi Charles, Jeff and I just spoke to Dwight.  He wants

12   his money back regarding the Atlanta Dream (since the ownership

13   structure has changed).  He asked that we reach out to you so

14   that you can immediately ask Cal Darden to get his funds back

15   ASAP.  Attorney John Goede is also copied on this email.

16   Dwight has asked Mr. Goede to step in if you are unsuccessful

17   at getting the funds back.  Please advise and thanks.  SE.

18         And the signature line is Serge Ecityan, CF AVP,

19   private wealth advisor, director, BMO Wealth Management, BMO

20   Private Bank.

21         Can we go back to 1202, please.

22         Ms. Sebade, what was the date that Charles sent this

23   to the 1779 Cal Darden, Jr. number?

24   A    March 26, 2021.

25   Q    Can we scroll down, please.

1          Cal Darden, Jr.  Hey bro let me know if you have a

2     sec.

3          Okay.  Can we please publish 404.  Go to page 2.  Can

4     we zoom out a little bit and scroll down.

5          Ms. Sebade, you see there's text sort of in the middle

6     of the page at the bottom of the gray box that says Charles

7     (owner)?

8     A    Yes.

9     Q    And what's the phone number above that?

10    A    1-713-898-6696.

11    Q    That's the same phone number from the green messages that

12    we've been looking at?

13    A    Yes.

14    Q    And so this set of text messages, the green are from the

15    Charles 669 number?

16    A    Yes.

17    Q    And who are they sent to?

18    A    1-347-850-5686, Cal Darden.

19    Q    Okay.  Can we please scroll down just a little bit.

20         Ms. Sebade, same thing, I'd like you to read the green

21    messages from Charles (owner), and I will read the blue

22    messages from the 5686 Cal Darden number.  Can you identify the

23    date of the first message, please.

24    A    April 18, 2016.  How is everything going with you?  Hope

25    all is well.

09UJDAR1                           Sebade- Direct

1    Q   Hey Charles all is well, thank you.  How's everything with

2    you?

3    A   Everything is good, business is going well still need

4    someone like you to be apart of the business.  Will you be in

5    Atlanta over the next few weeks?  Cal, how is everything with

6    you I just wanted to check in with you.

7    Q   Good morning, Charles.  All is well here.  How about

8    yourself?

9    A   I am good just working hard and wanted to circle back with

10   you to see if you still had interest in investing in an agency.

11   Hey, how is it going?  Are you still with Coca-Cola, if so, I

12   wanted to run something by you about my athletes that I

13   represent.

14   Q   Hi Charles, I'm no longer on Coke's board.  I'm on Target,

15   Cardinal Health, Aramark.

16              MR. KINDER:  We can stop there, Mr. Ross.  Please

17   scroll up a little bit so we see the blue message and the green

18   message above it.  Scroll up a little bit more, and can we put

19   this on the right side of the screen, and on the left bring up

20   2144A in evidence.  Mr. Ross, can we put that on the left side

21   of the screen and the text message on the right.

22   Q   Ms. Sebade, on the left of the screen is Exhibit 2144A,

23   page 4.  Do you see there's a name that appears in bold to the

24   right of the photograph?

25   A   I do.

1    Q   What's the name?

2    A   Cal Darden.

3    Q   Can you please read the text that appears below the name

4    "Cal Darden."

5    A   From loading UPS trailers to managing packaging centers to

6    introducing innovative industry-changing technology to being

7    being ranked eighth by *Forbes* on their list of the 50 most

8    powerful executives in corporate America to serving on the

9    boards of Aramark, Cardinal Health, Coca-Cola Enterprises,

10   Target, United Parcel Service, the Atlanta Police Foundation,

11   and National Urban League, and everything in the career of

12   Calvin Darden, Sr. makes him uniquely qualified to manage the

13   transition of the Atlanta Dream from a struggling franchise

14   disconnected from the community to a team engaged and embraced

15   by the city of Atlanta.

16   Q   You see there are a series of corporate logos at the top of

17   that page?

18   A   I do.

19   Q   Do you see a logo for Coca-Cola?

20   A   I do.

21   Q   Do you see a logo for Target?

22   A   Yes.

23   Q   Do you see a logo for Cardinal Health?

24   A   Yes.

25   Q   Do you see a logo for Aramark?

1    A    Yes.

2    Q    Are those companies the same companies that appear in the

3    blue message on the right side of the screen from the 5686 Cal

4    Darden number?

5    A    Yes.

6              MR. KINDER:  Ms. Ross, can we pull up on the left side

7    of the screen 1142 in evidence.

8    Q    Ms. Sebade, this is a summary chart we looked at on Friday,

9    right?

10   A    Yes.

11   Q    And it's a summary chart of information associated with the

12   phone number (347)850-5686.

13   A    Yes.

14   Q    Is that phone number the same phone number that appears in

15   the "from" line in the blue message on the right side of the

16   screen?

17   A    Yes.

18   Q    Focusing on the chart on the left, the information about

19   user column is information that came from records you reviewed,

20   right?

21   A    Yes.

22   Q    And the name that was associated with the 5686 number in

23   those records was either Calvin Darden or Calvin R. Darden?

24   A    Yes.

25   Q    Where those records had a birth date, what was the year of

1    birth?

2    A    1974.

3    Q    And you see that in the first three rows of the summary

4    chart?

5    A    Yes.

6    Q    As well as the last two rows of the summary chart?

7    A    Yes.

8    Q    And these records that are reflected on the summary chart,

9    were there any other birth dates associated with the name

10   Calvin Darden or Calvin R. Darden?

11   A    Not that I recall.

12   Q    Can we please scroll down to the second page on the summary

13   chart.

14           And Ms. Sebade, you see there's a driver's license at

15   the bottom?

16   A    I do.

17   Q    What is the name on the driver's license?

18   A    Calvin Ramarro Darden.

19   Q    And what is the year of birth?

20   A    1974.

21   Q    Does the birth date on the driver's license match the birth

22   dates that appeared in the records that you reviewed that are

23   summarized on the chart?

24   A    Yes.

25   Q    You can scroll up to the top there.

1          Just to be clear, the phone number that's the subject

2   of the chart on the left, how does it compare to the blue

3   message on the right?

4   A    It's the same phone number.

5   Q    Okay.  Let's bring up 404 full screen, please.  And go to

6   page 31.  We can go halfway down that page.

7          Ms. Sebade, like to do same thing.  I will read the

8   blue messages from the 5686 Cal Darden number, and I'd like you

9   to read the green messages from the Charles number.

10         5686, Cal Darden February 22, 2019.  Hey Charles, I

11  was speaking with a friend of my son about you today.  He's a

12  sports and entertainment attorney.  He represents the number

13  one ranked ESPN 100 player for 2019 from Memphis.  He's

14  starting a sports practice as well and I think there's synergy

15  with what you guys are doing.  In regards to my friend, I

16  mentioned yesterday, we traded phone calls but did not get the

17  chance to connect today.  I will continue to follow up until we

18  do.

19  A    Thanks and that's great and your son's friend has James

20  Wiseman that's awesome.  He is a big time player.

21  Q    Yes that's him.  My son will make the introduction for you.

22  A    Thanks.

23  Q    My pleasure.  I admire your hustle.

24  A    Thanks and thanks a lot for helping me.

25  Q    Of course.

1   A    It really does mean a lot to have your support and help.

2   Q    It really is a pleasure.  When I see young black

3   entrepreneurs I try to do what I can to help.  With young black

4   men I think about what I'd want someone to do for my son.  As a

5   matter of fact, the NBA tour I was doing a few years back was

6   all my son's doing.  I was essentially just the figurehead.  So

7   I appreciate your hustle because my son is the same type.

8   A    That's great to hear and sounds like your son is a great

9   guy.  I would love to meet him.

10  Q    I think that would be great also.

11  A    Me too.  Hey how are you?  I just wanted to circle back

12  with you.

13  Q    Good morning Charles.  My son will be with me this

14  afternoon.  It would be great for the two of you to speak and I

15  will have him introduce to you our family friend who represents

16  James Wiseman.

17  A    Okay thanks that sounds great.  Also, did you get a chance

18  to speak with your friend?

19  Q    We exchanged messages.  He's traveling until next week and

20  I'll speak to him then for sure.

21  A    Thanks.  Thanks again for everything.  I just spoke to your

22  son.

23  Q    Okay.  Ms. Sebade, what is the date of the last message you

24  just read from Charles?

25  A    February 27, 2019.

09UJDAR1                          Sebade- Direct

1    Q   Can we please publish for the witness only 401-002.

2            Ms. Sebade, have you seen this exhibit?

3    A   I have.

4    Q   What is it?

5    A   It's another text thread.

6    Q   And is it an accurate copy of text messages that you

7    reviewed that were contained in Government Exhibit 400?

8    A   It is.

9            MR. KINDER:  Government offers Exhibit 401-002.

10           THE COURT:  Any objection?

11           MR. KINDER:  401-002.

12           MR. DONALDSON:  Judge, I think it's mislabeled on the

13   computer.  That's the issue.

14           THE COURT:  Yes.  So it says 400-002 rather than 401.

15           MR. KINDER:  Judge, we'd ask that it be admitted as

16   401-002, and we can correct the label.

17           THE COURT:  All right.  Any objection?

18           MR. DONALDSON:  No, your Honor.

19           THE COURT:  Okay.  Government Exhibit 401-002 is

20   admitted in evidence.

21           And ladies and gentlemen, the government is going to

22   substitute that exhibit sticker for the one that you see on the

23   screen now -- well, that you will see in a moment.  You may

24   publish it.

25           (Government's Exhibit 401-002 received in evidence)

```
 1              MR. KINDER:  Yes, please publish.
 2    Q   Ms. Sebade, who are these blue messages from?
 3    A   1-404-850-1779, Cal Darden, Jr.
 4    Q   Who are they to?
 5    A   1-713-898-6696 Charles (owner).
 6    Q   And the 1779 Cal Darden, Jr. number, is that the same
 7    number that appeared in most of the text messages that we
 8    reviewed on Friday and then the first part of this morning?
 9    A   Yes.
10    Q   And the 6696 Charles number, that's the same number that
11    we've been reviewing in the green messages from Friday and this
12    morning, correct?
13    A   Yes.
14    Q   Including the very last set of text messages that we were
15    reviewing between the 6696 Charles number and the 5686 number,
16    right?
17    A   Yes.
18    Q   I'll read these two messages.
19              Cal Darden, Jr., February 27, 2019, hi Charles.  This
20    is Darden, Jr.  My father asked me to give you a call.
21              Can we please show this side by side with the last
22    page we were on of 404.  I believe it was 37.
23              Ms. Sebade, the second blue message on the right, what
24    was the date and time that that was sent?
25              Scroll down so we see the timestamp.
```

O9UJDAR1                          Schmidt - Direct

1    A   February 27, 2019 at 3:09 p.m.

2    Q   How does that compare to the date and time on the green

3    message on the left?

4    A   It's only about 30 minutes prior.

5    Q   Okay.  So 1779, Cal Darden, Jr. number texted, Charles, "my

6    father asked me to give you a call" about 30 minutes before

7    Charles on the left texted the 5686 Cal Darden number "thanks

8    again for everything I just spoke to your son."  Is that right?

9    A   Yes, that's correct.

10              MR. KINDER:  No further questions.

11              THE COURT:  Okay.  Thank you.  Cross-examination?

12              MR. DONALDSON:  No, your Honor.  Thank you.

13              THE COURT:  Okay.  All right.  Ms. Sebade, you may

14   step down.  Thank you very much.

15              (Witness excused)

16              THE COURT:  The government's next witness?

17              MR. THOMPSON:  Yes, your Honor.

18              The government calls Jeffrey Schmidt.

19              THE COURT:  Okay.  Thank you.

20   JEFFREY SCHMIDT,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23              THE COURT:  Okay.  You may inquire.

24   DIRECT EXAMINATION

25   BY MR. THOMPSON:

O9UJDAR1                        Schmidt - Direct

1    Q    Good morning, Mr. Schmidt.

2    A    Good morning.

3    Q    Please describe your educational background.

4    A    I have a bachelor's of science degree in business

5    administration from Lake Superior State College.  I am -- I

6    have a foundations of banking diploma from the American

7    Institute of Banking, and I'm a graduate of the Robert M. Perry

8    School of Banking.

9    Q    Please describe your professional background.

10   A    I graduated from college in May of 1982 on a Saturday

11   night.  I went to work the following morning in a bank, and 42

12   years later I'm still at it.  When I originally started in

13   banking, I was more of a special projects person.  In 1991, I

14   became a loan officer of -- mostly in commercial lending.

15              When I had an opportunity to join Marshall & Ilsley

16   Bank in 2008, I was a private banker, which in that position I

17   specialized in finding lending solutions for high net worth and

18   ultrahigh net worth individuals and also worked with -- to meet

19   their depository needs.  When Marshall & Ilsley was acquired by

20   the Bank of Montreal, I stayed on as a senior private banker,

21   again, as a subject matter expert in lending matters and

22   deposit matters.  When the Bank of Montreal -- I stayed on in

23   that position.  In November of 2021, I became a portfolio

24   banker, which is less client facing and more credit

25   administration, again, helping to structure credit for high net

O9UJDAR1                          Schmidt - Direct

1   worth and ultrahigh net worth individuals.

2   Q    Where do you currently work?

3   A    I have an office in Sarasota, Florida.

4   Q    For which company do you work?

5   A    I work for BMO Bank N.A.

6   Q    And is BMO Bank N.A. related to the Bank of Montreal?

7   A    It is.  BMO Bank N.A. is the US subsidiary.  There is also

8   a BMO Bank that is the Canadian subsidiary.  Both companies are

9   owned by BMO Financial Group, which is the parent company.

10  Q    Is BMO N.A., the company for which you work, insured by the

11  Federal Deposit Insurance Corporation?

12  A    Yes.

13  Q    What does it mean to be insured by the Federal Deposit

14  Insurance Corporation?

15  A    Participating banks -- the deposits of participating banks

16  are insured by the FDIC up to various limiteds depending on the

17  account ownership.  Their deposits are insured by the FDIC.

18  Q    Do you know the name Dwight Howard?

19  A    I do.

20  Q    Who is he?

21  A    Dwight Howard is a professional basketball player.  When we

22  met him, he was playing in the NBA for the LA Lakers.  He has

23  since retired.

24  Q    You used the word "we."  Who are you referring to?

25  A    I'm sorry.  We -- I'm referring to Serge Ecityan, who is a

O9UJDAR1                    Schmidt - Direct

1   colleague that works for BMO, and myself.

2   Q    Have you worked on a matter involving Dwight Howard?

3   A    Yes.

4   Q    Approximately when did that work begin?

5   A    In late July 2020, Serge Ecityan received a call from a

6   gentleman named Charles Briscoe.  Charles Briscoe was Dwight's

7   agent.  Charles came to Serge with a question about

8   potential -- about a potential need for Dwight Howard.

9   Q    And did there come a time when you spoke with Charles

10  Briscoe?

11  A    We did.

12  Q    When did you first communicate with Charles Briscoe?

13  A    It would also have been in late July.  So Serge had talked

14  to Charles Briscoe, and that resulted in a conversation between

15  Charles Briscoe, Serge Ecityan, and myself, in which Charles

16  identified that Dwight had an interest in buying a WNBA team

17  and that he needed financing to do so.

18  Q    How did this phone call between yourself, Mr. Ecityan, and

19  Mr. Briscoe end?

20  A    We discussed the potential financing and concluded that

21  there was the potential for BMO to provide financing.  So we

22  scheduled a followup call to add Dwight Howard to that

23  conversation.

24  Q    Did there come a time when a followup call including

25  Mr. Howard took place?

1   A    Yes.

2   Q    Approximately when did that followup call take place?

3   A    Later the same day.

4   Q    Who participated in this phone call?

5   A    It was Charles Briscoe, Dwight Howard, Serge Ecityan, and

6   myself.

7   Q    What did you say during this phone call?

8   A    During that phone call, we heard from Dwight and Charles

9   again about their interest in buying the Atlanta Dream, a WNBA

10  basketball team, and we discussed the various ways that a bank

11  might approach funding that.  Some are very complex, and others

12  are easier.  At the end of that call, the -- Dwight's

13  preference was to go the easier, faster route, which would have

14  involved providing a line of credit secured by an investment

15  portfolio owned by Dwight Howard.

16  Q    During this phone call, was the purchase price of the

17  Atlanta Dream discussed?

18  A    Yes.

19  Q    And what was that price?

20  A    $3 million.

21  Q    What, if anything, did you do after this call with respect

22  to the Dwight Howard matter?

23  A    I sent an email to Mr. Briscoe and Dwight Howard outlining

24  the information we would need to proceed with that request.

25  Q    And when you say "that request," what are you referring to?

O9UJDAR1                    Schmidt - Direct

1    A    A line of credit for $3 million.

2    Q    And what is a line of credit?

3    A    A line of credit is kind of like a credit card.  It is a

4    credit facility that provides money to a borrower should they

5    want to draw on it.

6    Q    And did there come a time when you worked out a line of

7    credit for Mr. Howard?

8    A    Yes.

9    Q    At the time that you were working on the line of credit for

10   Mr. Howard, had you heard the name Calvin Darden?

11   A    Yes.

12   Q    How?

13   A    In our original conversation, when we learned of Dwight's

14   interest in buying the Dream, we understood that the owners of

15   the team would consist of Dwight Howard, Charles Briscoe, and

16   Calvin Darden.

17   Q    What, if anything, did Mr. Briscoe say about who Calvin

18   Darden was?

19   A    Calvin Darden was a successful Atlanta businessman who

20   retired after a career with United Parcel Service and also had

21   board involvement in some large corporations which included

22   things like Coca-Cola.

23   Q    Did the Calvin Darden who was described to you have a Sr.

24   or a Jr. at the end of his name?

25   A    We didn't know at that point in time.  We just knew Calvin

O9UJDAR1                      Schmidt - Direct

1   Darden.

2   Q   Now, turning back to the line of credit for a moment, did

3   you submit an application to others in your bank for a line of

4   credit for Mr. Howard?

5   A   I did.

6   Q   What happened with respect to that application?

7   A   After we reviewed the information, we realized that -- and

8   understanding that a book of investments were going to be moved

9   over to BMO to serve as collateral, we found out that there was

10  already a line of credit secured by those investments.  So we

11  increased the amount of the credit line to provide for paying

12  off the prior credit line so that it could be moved.

13          So with the math we looked at $3 million to pay off

14  the prior encumbrance, $3 million to provide for buying the

15  Atlanta Dream, and we added a million and a half dollars for

16  potential working capital once the Atlanta Dream purchase was

17  completed.  So three plus three plus a million and a half, we

18  were working a line of credit with a credit limit of seven and

19  a half million dollars.

20  Q   You used the term "working capital" a moment ago.  What is

21  working capital?

22  A   I think of working capital as money that a business has in

23  its checking account that it uses to pay for salaries, the

24  light bill, office supplies, and general operational needs.

25  Q   Was the seven and a half million dollar line of credit

O9UJDAR1                          Schmidt - Direct

1    funded and made available for Mr. Howard's use?

2    A    It was.

3    Q    Approximately when did that happen?

4    A    The line of credit for seven and a half million dollars was

5    made available on August 14 of 2020.

6    Q    After the line of credit was made available, did

7    Mr. Briscoe contact you again?

8    A    Yes.

9    Q    When roughly did Mr. Briscoe contact you?

10   A    Can you give me more context for that?

11   Q    Yes.  So you testified, Mr. Schmidt, that the line of

12   credit was made available to Mr. Howard on August 14, 2020; is

13   that right?

14   A    Yes.

15   Q    After that time period, when did Mr. Briscoe next contact

16   you?

17   A    The next substantive conversation occurred in October of

18   2020.

19   Q    How did Mr. Briscoe contact you in October of 2020?

20   A    It would have been by telephone and email.

21   Q    With respect to the telephone, what did Mr. Briscoe tell

22   you during this phone call?

23   A    That there was an additional opportunity related to this,

24   and that was to fund $4 million to support a marketing -- the

25   formation of a marketing company that would have been used to

O9UJDAR1                          Schmidt - Direct

1     help promote the endeavor.

2     Q    So when you say "the endeavor," what are you referring to?

3     A    The Atlanta Dream women's basketball team.

4     Q    Did Mr. Briscoe tell you how much the marketing company to

5     promote the Atlanta Dream would cost to invest in?

6     A    Yes.

7     Q    What did he tell you?

8     A    $4 million.

9     Q    Did you review or see any materials pertaining to the

10    potential investment in the marketing company?

11    A    I did.

12         MR. THOMPSON:  Mr. Ross, could you please publish

13    Government Exhibit 2405, which is already in evidence.  And

14    this can also go to the jury, please.

15    Q    Who is the sender of this email?

16    A    Charles Briscoe.

17    Q    What's the date of this email?

18    A    October 22, 2020.

19    Q    Who are the recipients?

20    A    Serge Ecityan and myself.

21    Q    What does the subject line say?

22    A    Atlanta Dream vision plan-1.

23    Q    Are there any attachments?

24    A    Yes, the attachment is the Atlanta Dream vision plan.

25    Q    The body of this email says, Serge here is the deck for the

O9UJDAR1                         Schmidt - Direct

1    Atlanta Dream.

2              MR. THOMPSON:  Mr. Ross, you can take down that

3    exhibit.  Thank you.  And can you please publish Government

4    Exhibit 2119A, which is also already in evidence.  Mr. Ross,

5    could you please scroll slowly.

6    Q    Mr. Schmidt, do you recognize this document?

7    A    I do.

8    Q    Did someone provide you with this document?

9    A    Yes.

10   Q    Who provided you with this document?

11   A    Charles Briscoe.

12   Q    Was this document attached to the email that we just looked

13   at?

14   A    Yes.

15   Q    And did you review this document?

16   A    I did.

17   Q    What impression were you left with after reviewing this

18   vision plan?

19   A    I was impressed.  There was a lot of information.  It spoke

20   to Calvin Darden very positively, corporate involvements, and

21   the list of advisory board members was a who's who of

22   celebrities.

23             MR. THOMPSON:  Mr. Ross, you can take down that

24   exhibit.  Thank you.

25   Q    After you received the vision plan, did there come a time

O9UJDAR1                          Schmidt - Direct

1   when you communicated with Calvin Darden pertaining to this

2   investment?

3   A    Yes.

4   Q    During what time period was that?

5   A    That would have been late October 2020.

6   Q    How did you come to communicate with Calvin Darden?

7   A    Initial contact was by email.

8   Q    Did you communicate with him via any other ways other than

9   email?

10  A    There were also texts and there was a -- there were

11  telephonic conversations.

12          MR. THOMPSON:  Mr. Ross, can you please show what's

13  been marked for identification purposes as Government

14  Exhibit 317 to the witness and counsel.  Thank you.

15  Q    Do you recognize this document?

16  A    I do.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O9UBDAR2                         Schmidt – Direct

1   BY MR. THOMPSON:

2   Q.  What is it?

3   A.  It is an email between myself and Serge Ecityan.

4           MR. THOMPSON:  The government offers Government

5   Exhibit 317.

6           THE COURT:  Any objection?

7           MR. RICCO:  No, your Honor.

8           THE COURT:  Government Exhibit 317 is admitted in

9   evidence.

10          (Government's Exhibit 317 received in evidence)

11          MR. THOMPSON:  May I publish?

12          THE COURT:  You may.

13   BY MR. THOMPSON:

14   Q.  Again, Mr. Schmidt, what is this document?

15   A.  This is an email between Serge Ecityan and myself.

16   Q.  Who sent it?

17   A.  Serge Ecityan.

18   Q.  And who is the recipient?

19   A.  I'm sorry.  Let me correct myself.  I sent this email to

20   Serge Ecityan.

21   Q.  What does the subject line say?

22   A.  The subject is, Accepted Cal Darden Discovery call at 8:30

23   a.m.

24   Q.  What does the location say?

25   A.  The location says Serge/Jeff to call Cal at 404-850-1779.

O9UBDAR2                          Schmidt - Direct

1    Q.  Did this call take place?

2    A.  Yes.

3    Q.  With whom did you think that you and Mr. Ecityan were

4    speaking?

5    A.  Calvin Darden.

6    Q.  And based on what did you think that?

7    A.  Because we'd been given information about Calvin Darden and

8    were told that this was the phone number we would use to have a

9    conversation with him.

10           MR. THOMPSON:  Mr. Ross, if you can take that down.

11   Thank you.  Can you please show what's been marked for

12   identification purposes as Government Exhibit 323 to the

13   witness and to counsel.  Please zoom.

14   Q.  Do you recognize this document?

15   A.  I do.

16   Q.  What is it?

17   A.  This is an email from Serge Ecityan to myself.

18           MR. THOMPSON:  Your Honor, the government offers 323.

19           THE COURT:  Any objection?

20           MR. RICCO:  No, your Honor.

21           THE COURT:  Government Exhibit 323 is entered into

22   evidence.

23           (Government's Exhibit 323 received in evidence)

24           MR. THOMPSON:  May I publish?

25           THE COURT:  You may.

O9UBDAR2                          Schmidt – Direct

1   Q.  Again, Mr. Schmidt, what is this document?

2   A.  It it's an email between Serge Ecityan and myself.

3   Q.  Who sent it?

4   A.  Serge Ecityan.

5   Q.  What does the subject line say?

6   A.  Cal Darden follow-up discovery call at 8:00 a.m.

7   Q.  What does the location say?

8   A.  Serge/Jeff to call Cal at 404-850-1779.

9   Q.  Did this call take place?

10  A.  Yes.

11  Q.  With whom did you think you and Mr. Ecityan were speaking?

12  A.  Calvin Darden.

13  Q.  Based on what did you think that?

14  A.  It was a continuation of the conversation before with Cal

15  Darden.  We were calling the same number talking to the same

16  individual.

17          MR. THOMPSON:  Mr. Ross, you can take that down.

18  Thank you.

19  Q.  After you were made aware of the investment opportunity in

20  the marketing company, approximately how often did you

21  communicate with Calvin Darden?

22  A.  We had several conversations at the end of October which

23  were the things that you just posted.  We had additional

24  conversations in mid-November.

25  Q.  What topics were discussed during these conversations with

O9UBDAR2                         Schmidt – Direct

1    the person you thought was Calvin Darden?

2    A.  In the October conversations we discussed the purchase of

3    the Dream and the marketing company opportunity.  In the

4    discussions in November we talked more specifically about

5    potentially doing business with Mr. Darden.

6    Q.  Did you ever meet Calvin Darden in person?

7    A.  No.

8    Q.  Were any of the interactions that you had with Calvin

9    Darden via video call?

10   A.  No.

11   Q.  Do you know for certain that you were interacting with

12   Calvin Darden, Sr.?

13   A.  No.

14   Q.  If after the communications that you've described you learn

15   that the individual you were speaking to was Calvin Darden,

16   Jr., and not Calvin Darden, Sr., what effect, if any, would it

17   have had on you?

18             MR. RICCO:  Objection, Judge.

19             THE COURT:  I'll allow it.  Objection overruled.

20   A.  I would have referred to BMO's internal legal counsel for

21   direction on something as significant as that.

22             MR. THOMPSON:  Mr. Ross, can you please publish for

23   the witness and counsel what's been marked for identification

24   purposes as Government Exhibit 328.  If you could zoom, please.

25   Q.  Do you recognize this?

O9UBDAR2                          Schmidt - Direct

1   A.  I do.

2   Q.  What is it?

3   A.  This is a series of text messages between Calvin Darden

4   Serge Ecityan and myself.

5          MR. THOMPSON:  Your Honor, the government offers

6   Government Exhibit 328.

7          THE COURT:  Any objection?

8          MR. RICCO:  No objection.

9          THE COURT:  Government Exhibit 328 is admitted into

10  evidence.

11          (Government's Exhibit 328 received in evidence)

12          MR. THOMPSON:  May I publish?

13          THE COURT:  You may.

14  Q.  Again, Mr. Schmidt, what is this document?

15  A.  It is a series of text messages.

16  Q.  Who are the participants in this chat?

17  A.  Calvin Darden, Serge Ecityan and myself.

18  Q.  What number is listed next to the name Calvin Darden?

19  A.  1404-850-1779.

20  Q.  Directing your attention to the message at the bottom of

21  Government Exhibit 328, who sent this message?

22  A.  Serge Ecityan.

23  Q.  Can you please read this message?

24  A.  Sure.  Cal, following up from our earlier conversation.  In

25  addition to the most recent Fidelity statement, if applicable

O9UBDAR2                         Schmidt – Direct

1   can you also provide 10B5-1 agreements.

2   Q.  What is a 10B5-1 agreement?

3   A.  10B5-1, I'm not a tax accountant.  I am not an attorney.  I

4   am giving you this within the context of me seeing these in the

5   course of providing a banker in similar situations.  10B5-1 is

6   something that may apply to directors of large corporations in

7   which they detail their plans to potentially liquidate

8   holdings.  And by disclosing in advance those sales, it

9   hopefully removes them from any potential appearance of selling

10  stocks through insider information.

11  Q.  Did you receive 10B5-1 agreement from the person you

12  thought was Calvin Darden?

13  A.  We did not.

14  Q.  Did you receive any other financial documents?

15  A.  We did.

16          MR. THOMPSON:  You can take that down, Mr. Ross,

17  please.  Can you please show for the witness and counsel what's

18  been marked for identification purposes as Government Exhibit

19  376.  Please zoom.

20  Q.  Do you recognize this document?

21  A.  I do.

22  Q.  What is it?

23  A.  It is an email from Calvin Darden to myself.

24          MR. THOMPSON:  Your Honor, the government offers

25  Government Exhibit 376.

O9UBDAR2                          Schmidt - Direct

1             MR. RICCO:  Without objection.

2             THE COURT:  Government Exhibit 376 is admitted in

3    evidence.

4             (Government's Exhibit 376 received in evidence)

5             MR. THOMPSON:  May I publish?

6             THE COURT:  You may.

7    Q.  Who does this email say it's from?

8    A.  Calvin Darden.

9    Q.  What is the date?

10   A.  November 13, 2020.

11   Q.  Who is the recipient?

12   A.  I am.

13   Q.  I'm going to read the subject attachment lines and body of

14   the email:  Subject:  Partial statements.

15            Attachment:  Fidelity statements.pdf, untitled

16   attachment and Well's statement.pdf.  The email says.  Jeff,

17   please see attached statements.  Give me a call.  Thanks.

18   Best, Cal.

19            MR. THOMPSON:  Mr. Ross, you can take down this

20   exhibit.  Thank you.  Can you please publish for the witness

21   and counsel what's been marked for identification purposes as

22   Government Exhibit 377.

23   Q.  Do you recognize this document?

24   A.  I do.

25   Q.  What is it?

O9UBDAR2                        Schmidt – Direct

1   A.  This is a Fidelity statement for Calvin Darden.

2   Q.  And was this attached to the email we just looked at?

3   A.  Yes.

4           MR. THOMPSON:  The government offers Government

5   Exhibit 377.

6           MR. RICCO:  Without objection.

7           THE COURT:  Government Exhibit 377 is admitted in

8   evidence.

9           (Government's Exhibit 377 received in evidence)

10          MR. THOMPSON:  May I publish?

11          THE COURT:  You may.

12  Q.  Again now that it's before the jury, what is this document,

13  Mr. Schmidt?

14  A.  This is a recap of various holdings of Calvin Darden that

15  are held at Fidelity.

16  Q.  And did you look at this document?

17  A.  I did.

18  Q.  And who's financial statements of Fidelity are these?

19  A.  Calvin Darden.

20  Q.  Why did you think that?

21  A.  Because his name is on the statement.

22  Q.  Was this Fidelity financial statement consistent with the

23  individual shown in the vision plan?

24  A.  Yes.

25          MR. THOMPSON:  You can take down this exhibit,

O9UBDAR2                         Schmidt – Direct

1   Mr. Ross.  Thank you.  And can you please publish for the

2   witness and counsel what's been marked for identification

3   purposes as Government Exhibit 378.  Can you scroll please to

4   page two.

5   Q.  Do you recognize this document?

6   A.  I do.

7   Q.  What is it?

8   A.  It is a Wells Fargo investment statement recapping holdings

9   of Calvin Darden.

10  Q.  Was this also attached to the email that we looked at?

11  A.  Yes.

12          MR. THOMPSON:  The government offers Government

13  Exhibit 378.

14          THE COURT:  Any objection?

15          MR. RICCO:  No, your Honor.

16          THE COURT:  Government Exhibit 378 is admitted in

17  evidence.

18          (Government's Exhibit 378 received in evidence)

19          MR. THOMPSON:  May I publish?

20          THE COURT:  You may.

21  Q.  Mr. Schmidt, what is this document?

22  A.  It is a Wells Fargo investment statement recapping the

23  holdings of Calvin Darden.

24  Q.  Why do you think that this financial statement at Wells

25  Fargo reflects a financial holding of Calvin Darden?

O9UBDAR2                          Schmidt – Direct

1   A.  Because his name is on the statement.

2   Q.  Was this financial statement consistent with the individual

3   shown in the vision plan?

4   A.  Yes.

5         MR. THOMPSON:  You can take down this exhibit.  Thank

6   you, Mr. Ross.

7   Q.  Did Dwight Howard elect to pursue the investment in the

8   production company?

9   A.  He did.

10        MR. THOMPSON:  Mr. Ross, can you please publish what's

11  been marked for identification purposes as Government Exhibit

12  363 for the witness and for counsel.

13  Q.  Do you recognize the document that's been marked for

14  identification purposes as Government Exhibit 363?

15  A.  I do.

16  Q.  What is it?

17  A.  This is the recap of wire transfer details.

18  Q.  Was it a regular practice of BMO NA to make a record of

19  this kind?

20  A.  Yes.

21  Q.  Was this document that has been marked for identification

22  purposes as Government Exhibit 363 made and kept in the course

23  of BMO NA's regularly conducted business?

24  A.  Yes.

25        MR. THOMPSON:  Your Honor, the government offers

O9UBDAR2                          Schmidt - Direct

1   Government Exhibit 336.

2          MR. RICCO:  Without objection, your Honor.

3          THE COURT:  Government Exhibit 363 is admitted in

4   evidence and may be published to the jury.

5          (Government's Exhibit 363 received in evidence)

6   BY MR. THOMPSON:

7   Q.  Mr. Schmidt, can you explain what this document is?

8   A.  This document is used to recap all the key elements of a

9   wire transfer.

10  Q.  Do you see the name Dwight Howard on this document?

11  A.  I do in the upper-left hand corner, the name on the account

12  identifies the owner of this checking account as Dwight David

13  Howard, II.

14  Q.  And does the name Dwight Howard appear anywhere else?

15  A.  It does.  To the right of the account owner name it

16  identifies Dwight David Howard, II as the person requesting the

17  wire transfer.

18  Q.  And is Dwight David Howard, II, the Dwight Howard you knew

19  as your client?

20  A.  Yes.

21         MR. THOMPSON:  You can zoom out, Mr. Ross.  Thank you.

22  Q.  Was this wire in connection with the marketing company

23  associated with the Atlanta Dream that you had discussed with

24  Calvin Darden?

25  A.  Yes.

O9UBDAR2                          Schmidt - Direct

1    Q.  How much was this wire for?

2    A.  $4 million.

3          MR. THOMPSON:  Mr. Ross, if you could zoom in on the

4    middle.

5    Q.  When was this wire sent?

6    A.  On November 13, 2020.

7    Q.  Did Mr. Howard authorize this wire to be sent?

8    A.  Yes.

9    Q.  How do you know?

10   A.  Because I called him, ran through the details of the wire

11   and got his approval to remit it.

12   Q.  Directing your attention to the section entitled

13   beneficiary information, to whom was this wire sent?

14   A.  Legacy AC, LLC.

15   Q.  Were you provided with instructions pertaining to where

16   this $4 million should be sent?

17   A.  Yes.

18   Q.  Who provided you with these instructions?

19   A.  Charles Briscoe.

20         MR. THOMPSON:  Can you please publish what's been

21   marked for identification purposes as Government Exhibit 341

22   for the witness and for counsel.  Can you please scroll,

23   Mr. Ross, to the third page.

24   Q.  Do you recognize this document?

25   A.  I do.

O9UBDAR2                          Schmidt – Direct

1    Q.  What is it?

2    A.  This is an email from Charles Briscoe to myself.

3           MR. THOMPSON:  Your Honor, the government offers

4    Government Exhibit 341.

5           MR. RICCO:  Without objection.

6           THE COURT:  Government Exhibit 341 is admitted in

7    evidence and may be published to the jury.

8           (Government's Exhibit 341 received in evidence)

9    BY MR. THOMPSON:

10   Q.  Who is this email from?

11   A.  Charles Briscoe.

12   Q.  What is the date of this email?

13   A.  November 13, 2020.

14   Q.  Who's the recipient of this email?

15   A.  I am.

16   Q.  What does the subject of this email line say?

17   A.  Wire info.

18   Q.  Can you please read the information listed next to account

19   name in the body of this email?

20   A.  Legacy AC, LLC.

21   Q.  Is Legacy AC, LLC the entity to which Mr. Briscoe directed

22   you to direct the $4 million wire?

23   A.  Yes.

24   Q.  Did you know what Legacy AC, LLC was at this time?

25   A.  No.

O9UBDAR2                          Schmidt - Direct

1    Q.  To whom did you understand the $4 million wire was being

2    sent?

3    A.  Well, I understand beneficially that it was being sent for

4    the investment in the marketing company.

5    Q.  And the marketing company associated with what?

6    A.  Calvin Darden and Darden Sports Group.

7    Q.  And which team?

8    A.  The WNBA team the Atlanta Dream.

9            MR. THOMPSON:  Mr. Ross, please take down this

10   exhibit.

11   Q.  After Mr. Howard wired $4 million to Legacy AC to purchase

12   the marketing company, were there sufficient funds in a line of

13   credit to purchase the Atlanta Dream?

14   A.  No.

15   Q.  Did you bring this to Mr. Howard's attention?

16   A.  Yes.

17   Q.  What, if anything, did BMO NA do based on the $4 million

18   dollar depletion to Mr. Howard's line of credit?

19   A.  At that point we ran the math.  The $3 million advance to

20   pay off prior creditors, a $4 million advance to fund the

21   marketing company leaves us with a balance of $7 million.  He

22   needed an additional $3 million to buy the Atlanta Dream.

23           So we approached Dwight with the notion of increasing

24   his credit limit from 7.5 to $10 million so he would have

25   sufficient credit to complete the purchase of the Dream.

O9UBDAR2                         Schmidt – Direct

1   Q.  Was Mr. Howard's line of credit increased to $10 million?

2   A.  Yes.

3   Q.  Who authorized that?

4   A.  Well, Dwight approved the application for an increase.  The

5   actual increase was approved through BMO Bank NA credit

6   process.

7   Q.  And when did Mr. Howard's line of credit increase from 7.5

8   to $10 million?

9   A.  On November 30, 2020.

10  Q.  After Mr. Howard's line of credit was increase to $10

11  million, did there come a time when you heard again from

12  Mr. Briscoe pertaining to the purchase of the Atlanta Dream?

13  A.  Yes.

14  Q.  Approximately when was that?

15  A.  December 1.

16  Q.  Of what year?

17  A.  I'm sorry, December 1 of 2020.

18  Q.  What did Mr. Briscoe say to you?

19  A.  He said that the status of the sale was nearly ready and

20  that they wanted the $3 million advanced so that they could

21  fund that purchase as soon as it was ready to do so.

22  Q.  Were you provided with instructions with respect to where

23  the $3 million should be sent to purchase the Atlanta Dream?

24  A.  Yes.

25  Q.  Who provided you with these instructions?

O9UBDAR2                          Schmidt - Direct

1   A.  Charles Briscoe.

2   Q.  Where did Mr. Briscoe instruct you to send the $3 million

3   wire?

4   A.  To Legacy AC, LLC.

5   Q.  Showing you what's been marked for identification purposes

6   as Government Exhibit 301.

7           MR. THOMPSON:  Mr. Ross, again please just for the

8   witness and counsel.

9   Q.  Do you recognize the document that's been marked for

10  identification purposes as Government Exhibit 301?

11  A.  I do.

12  Q.  What is it?

13  A.  This is a detail or this is a recap of wire transfer

14  details.

15  Q.  Was it a regular practice of BMO NA to make such a record?

16  A.  Yes.

17  Q.  Was this document that's been marked for identification

18  purposes as Government Exhibit 301 made and kept in the course

19  of BMO NA's regularly conducted business?

20  A.  Yes.

21          MR. THOMPSON:  Your Honor, the government offers

22  Government Exhibit 301.

23          MR. RICCO:  Without objection.

24          THE COURT:  Government Exhibit 301 is admitted in

25  evidence and may be published for the jury.

O9UBDAR2                          Schmidt – Direct

1              (Government's Exhibit 301 received in evidence)

2    BY MR. THOMPSON:

3    Q.  Again, what is this document?

4    A.  We use this document to recap key elements of wire

5    transfers.

6    Q.  Do you see the name Dwight Howard on this document?

7    A.  I do.  It is identified in the upper-left hand corner of

8    the account.

9    Q.  Does Dwight Howard appear anywhere else on this document?

10   A.  Yes.

11   Q.  Where does it appear?

12   A.  To the right of the account owner's name, Dwight Howard is

13   identified as the individual requesting the wire transfer.

14   Q.  The name under name under account says Dwight Howard, II.

15   Is that right?

16   A.  Name on account Dwight David Howard, II.

17   Q.  Is that the same person as the name listed under name of

18   individual making request which is Dwight David Howard?

19   A.  Yes.  The person preparing this document omitted the second

20   notation following his name, but they are one and the same

21   individual.

22   Q.  How much was this wire for?

23   A.  $3 million.

24   Q.  Did Mr. Howard approve this wire being sent?

25   A.  Yes.

O9UBDAR2                          Schmidt – Direct

1   Q.  How do you know that?

2   A.  Because I called him and I reviewed the details of the wire

3   transfer and he authorized us to remit it.

4   Q.  What was this $3 million -- for what purpose was this $3

5   million wire being sent?

6   A.  To fund closing on the purchase of the Atlanta Dream.

7   Q.  What was that understanding based on?

8   A.  What we were told by Mr. Briscoe and Mr. Darden.

9   Q.  And you used "we" there, who are you referring to?

10  A.  I'm sorry.  It was Serge Ecityan and myself and Dwight

11  Howard.

12  Q.  Did you authorize the transmittal of this $3 million wire?

13  A.  I did.

14  Q.  When was this wire sent?

15  A.  On December 1, 2020.

16  Q.  To whom was this wire sent?

17  A.  Legacy AC, LLC.

18  Q.  And do you know that from this document?

19  A.  I do.

20  Q.  How do you know that?

21  A.  Toward the bottom left corner of the display, the

22  beneficiary's name is identified as Legacy AC, LLC.

23  Q.  Who directed you to send this $3 million wire to Legacy AC,

24  LLC?

25  A.  Charles Briscoe.

O9UBDAR2                          Schmidt - Direct

1    Q.  Did you know at this time what Legacy AC, LLC was?

2    A.  No.

3    Q.  To whom did you understand the $3 million wire was being

4    sent?

5    A.  Well, to Legacy AC, LLC beneficially to complete the

6    purchase of the Atlanta Dream.

7    Q.  And what was your understanding of who was going to

8    complete the purchase of Atlanta Dream?

9    A.  Well, the group that included Charles Briscoe, Calvin

10   Darden and Dwight Howard.

11              MR. THOMPSON:  You can take down this exhibit.  Thank

12   you, Mr. Ross.

13   Q.  What is your understanding of what was supposed to happen

14   after the $3 million wire was sent on Mr. Howard's behalf?

15   A.  The closing on the sale of the Dream would take place.

16   Q.  And what was your understanding of who would be the owner

17   of the team?

18   A.  Good question.  So our initial conversations that took

19   place in July of 2020 included Dwight Howard, Calvin Darden and

20   Charles Briscoe as owners of the Dream.  In the months that

21   past we learned that Dwight Howard was ineligible to be an

22   owner of the team because he was an active NBA players, and the

23   bylaws say that an active NBA cannot have an equity interest in

24   the team.

25              So the nature of Dwight's participation changed from

O9UBDAR2                          Schmidt - Direct

1  that of being an owner to that of being a creditor during the

2  time he was an active player for the NBA.

3  Q.  To your knowledge was the Dream acquired by any of the

4  individuals in the purchase group that you'd been communicating

5  with after the $3 million wire was sent?

6  A.  No.

7  Q.  What direction, if any, did Mr. Howard give you with

8  respect to his money after the wires had been sent?

9  A.  As time passed and the transaction did not close, Dwight

10  became anxious and asked Serge Ecityan to contact Mr. Darden

11  and request the money back.

12  Q.  Approximately when did Mr. Howard start making the request

13  that you just described?

14  A.  Well, the conversation started in January, but I believe

15  the actual request happened in early February 2021.

16           MR. THOMPSON:  Mr. Ross, could you please publish for

17  the witness and for counsel what's been marked for

18  identification purposes as Government Exhibit 360.

19  Q.  Do you recognize this document?

20  A.  Yes.

21  Q.  What is it?

22  A.  This is an email between several of the parties involved.

23  Q.  Are you on this email chain?

24  A.  Yes.

25           MR. THOMPSON:  Your Honor, the government offers

O9UBDAR2                          Schmidt – Direct

1   Government Exhibit 360.

2           MR. RICCO:  No objection.

3           THE COURT:  Government Exhibit 360 is admitted in

4   evidence.

5           (Government's Exhibit 360 received in evidence)

6           MR. THOMPSON:  May I publish?

7           THE COURT:  You may.

8           MR. THOMPSON:  Mr. Ross, if you could focus on the

9   second half of the bottom email for a moment.

10  Q.  Who's this email from?

11  A.  Serge Ecityan.

12  Q.  What's the date of this email?

13  A.  February 10, 2021.

14  Q.  Who is listed next to the "to" line?

15  A.  Calvin Darden, Sr.

16  Q.  Who's copied?

17  A.  Dwight Howard, Charles Briscoe, myself and attorney John

18  Goede.

19  Q.  Who is John C. Goede?

20  A.  John Goede is an attorney that was known to Serge Ecityan,

21  and Serge suggested to Dwight that given the efforts to collect

22  this money that John might be an appropriate person to enlist

23  in that effort should it become necessary.

24  Q.  What is the subject line of this?

25  A.  Email on behalf of Dwight Howard regarding Atlanta Dream

O9UBDAR2                        Schmidt - Direct

1      transaction.

2      Q.  I'm going to read this email:  Deal Cal.  Hope this email

3      finds you well.  We had a conference call with Dwight and

4      Charles today.  During the call, Charles gave us an update on

5      the Atlanta Dream transaction.  We were disappointed to hear

6      that the situation is changed and that there are further

7      delays.  As such, Dwight has instructed us to reach out to you

8      and request the return of his 7M.  Should the situation

9      changes, the opportunity can be revisited.  Please find

10     attached wire instructions that can be used for the return of

11     funds. Per our previous discussions if you would like to

12     continue the conversation of borrowing the money directly from

13     BMO, that possibility still exists.

14             MR. THOMPSON:  You can zoom out, Mr. Ross.  Thank you.

15     And can you focus on the top of Government Exhibit 360.

16     Q.  Who sent this email?

17     A.  Serge Ecityan.

18     Q.  What's the date of this email?

19     A.  February 19, 2021.

20     Q.  Who is listed next to the "to" line?

21     A.  Calvin Darden, Sr.

22     Q.  Who's copied?

23     A.  Dwight Howard, Charles Briscoe, myself and attorney John

24     Goede.

25     Q.  What's the subject line of this email?

O9UBDAR2                          Schmidt - Direct

1    A.  This is a forward of an email on behalf of Dwight Howard

2    regarding the Atlanta Dream transaction.

3    Q.  Is there text listed next to the attachment line?

4    A.  There is.

5    Q.  What does it say?

6    A.  It is a PDF attachment that included the wire transfer

7    instructions that would be needed to send the wire to Dwight

8    Howard's personal BMO checking account.

9    Q.  And this email says:  Hi, Cal.  Since we haven't heard back

10   from you, I wanted to re-forward my email below from Feb 10 and

11   check in and get an update from you on status of the return of

12   funds.  We look forward to hearing from you.  Best, SE.

13          Did you receive a response to this email?

14   A.  No.

15          MR. THOMPSON:  Mr. Ross, you can zoom out.  Could you

16   please publish for the witness and counsel what's been marked

17   for identification purposes as Government Exhibit 361.

18   Q.  Do you recognize the document that's been marked for

19   identification purposes as Government Exhibit 361?

20   A.  Yes.

21   Q.  What is it?

22   A.  This document provides the instructions that would be

23   necessary to a sender to send money to Dwight Howard for credit

24   to his personal BMO checking account.

25   Q.  And is this the attachment that was attached to the email

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9UBDAR2                          Schmidt – Direct

1  we just looked at?

2  A.  Yes.

3       MR. THOMPSON:  Your Honor, the government offers

4  Government Exhibit 361.

5       MR. RICCO:  Without objection.

6       THE COURT:  Government Exhibit 361 is admitted in

7  evidence.

8       (Government's Exhibit 361 received in evidence)

9       MR. THOMPSON:  May I publish?

10       THE COURT:  You may.

11  Q.  Again, Mr. Schmidt, what is this document?

12  A.  This is the document we provide to clients that they can

13  send to people who need to wire them money so that they have

14  the details to be able to do so.

15  Q.  And who's listed as the beneficiary on Government Exhibit

16  361?

17  A.  Dwight D. Howard, II.

18  Q.  What does that mean in the context of this document?

19  A.  These are the instructions to send Dwight Howard money to

20  his personal checking account.

21       MR. THOMPSON:  Mr. Ross, you can take down this

22  exhibit.

23       THE COURT:  Is now a good time for us to take our

24  morning break?

25       MR. THOMPSON:  That would be fine, your Honor, of

O9UBDAR2                          Schmidt - Direct

1  course. I have probably about two more minutes.

2          THE COURT:  Let's take our morning break.  All right.

3  Remember, do not discuss the case with one another.  You can

4  leave your pads on your chairs.  We'll see you in about 10, 15

5  minutes to continue the testimony.  I'll see you in a bit.

6  Relax.  We'll come get you when we're ready.

7          (Jury not present)

8          THE COURT:  Mr. Schmidt, you may step down.

9          (Witness exited the courtroom)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9UBDAR2                          Schmidt - Direct

 1                (Jury not present)

 2          THE COURT:  You may be seated.  One of the jurors had

 3     indicated that they needed a break, so that's why.  Otherwise,

 4     we would have completed the two minutes that you had left.

 5     Okay.  Mr. Ricco, how much -- I take it you're doing the cross

 6     of this witness?

 7          MR. RICCO:  Yes.  I'll try to get it in, in the

 8     morning.

 9          THE COURT:  All right.  Obviously take as much time as

10     you need, but I was just looking.

11          After Mr. Schmidt, Mr. Mead, what do we have?

12          MR. MEAD:  After Mr. Schmidt we have Stuart Duguid who

13     is the agent for Naomi Osaka.  Then we have Brandon Anthony who

14     is a representative of Tyler Perry and an employee of his

15     company.  Those are both fairly short witnesses.  The

16     cross-examination of Schmidt is short.  We expect to be done

17     pretty early today, your Honor.

18          THE COURT:  Okay.  So I know there was a mention of

19     possibly Serge Ecityan and Artis but I guess they're not on for

20     today?

21          MR. DONALDSON:  I thought he said tomorrow.

22          MR. MEAD:  So Mr. Donzaleigh Artis is James Wiseman's

23     mother. It's quite unlikely we will call her.  Serge Ecityan is

24     the other BMO banker.  We're still thinking about him.  It's

25     more likely than not that we don't call him.  But if we did, it

O9UBDAR2                        Schmidt – Direct

1   would be tomorrow as well, your Honor.

2            THE COURT:  And so we may end early today.  Is that

3   right?

4            MR. MEAD:  Exactly, your Honor.  And then tomorrow

5   morning we would put on Rosalind Brewer who's short as well.

6   She's an individual who was on the vision plan.  And then we

7   would recall Ms. Sebade to go through the transcript and the

8   judgment on the 404(b) evidence pending the Court's ruling of

9   course.  That is also going to be relatively short.  I think

10   we're likely to be done by 11:00 or perhaps even earlier

11   tomorrow morning.

12            THE COURT:  Okay.  And that's assuming that

13   Mr. Ecityan is not called tomorrow?

14            MR. MEAD:  That's correct, your Honor.

15            THE COURT:  Let me ask in terms of the defense case,

16   will you be ready to go in the afternoon?

17            MR. DONALDSON:  Yes.

18            THE COURT:  11:00 still leaves us time, but I assume

19   there may be an application at that point.  Let me think about

20   that cause 11 might be a little bit early for the jury to break

21   for lunch.  But will the defense be ready earlier than that or

22   you think in the afternoon is more likely?

23            MR. DONALDSON:  I think the afternoon is more likely.

24            THE COURT:  All right.  So what I intend to do is at

25   the lunch break just to let the jury know that at some point

O9UBDAR2                              Schmidt – Direct

1    this week they're going to get the case.  And I think that that

2    is almost a sure thing, so that's what I will do.  Let me ask,

3    is there anything else we should deal with before we take our

4    break from the government?

5             MR. MEAD:  Not before this break, your Honor.

6             THE COURT:  From the defense?

7             MR. DONALDSON:  Not before the break, your Honor.

8    Thank you.

9             THE COURT:  Okay.  I'll see everybody, why don't we

10   say by 12:10.  Thank you.

11            (Recess)

12            THE COURT:  You may be seated.  Can we get the

13   witness?

14            MR. THOMPSON:  He's on his way.

15            THE COURT:  Can we get the jury?

16            MR. DONALDSON:  Yes.

17            THE COURT:  All right.  Mr. Schmidt, I just ask that

18   you remain standing.  You can have a seat, but you rise when

19   the jury comes in.

20            THE WITNESS:  Okay.  Thank you.

21            (Continued on next page)

22

23

24

25

O9UBDAR2                        Schmidt – Direct

1            (Jury present)

2            THE COURT:  You may be seated.  Ladies and gentlemen,

3    I hope you had a relaxing break.  We're going to continue with

4    the testimony of Mr. Schmidt.  You may inquire.

5            MR. THOMPSON:  Thank you, your Honor.

6    BY MR. THOMPSON:

7    Q.  Mr. Schmidt, do you recall testifying about a $4 million

8    wire that was sent on behalf of Mr. Howard before the break?

9    A.  Yes.

10            MR. THOMPSON:  Mr. Ross, could you please publish

11    Government Exhibit 363 which is in evidence.

12    Q.  Mr. Schmidt, what was the $4 million wire for?

13    A.  It was to fund the marketing company for the Atlanta Dream.

14    Q.  Did you speak with anyone about whether the $4 million wire

15    for -- the $4 million for the marketing company had to be sent

16    all at once?

17    A.  I did.

18    Q.  With whom did you speak?

19    A.  Calvin Darden.

20    Q.  What did you say?

21    A.  I had a conversation in which I questioned the need to send

22    all $4 million at once because it seem to me that it would not

23    all be needed immediately and suggested that perhaps it would

24    be better to send it in increments as it was needed.

25    Q.  What did he say?

O9UBDAR2                         Schmidt – Direct

1    A.  He said that the money was all needed at once.

2    Q.  Did he provide any explanation or rationale for why it was

3    all needed at once?

4    A.  Not that I recall.

5            MR. THOMPSON:  Mr. Ross, you can take this exhibit

6    down, please.  Thank you.  Can you publish for the witness and

7    for counsel what's been marked for identification purposes as

8    Government Exhibit 364.

9    Q.  Do you recognize this document?

10   A.  I do.

11   Q.  What is this document?

12   A.  This is an email involving Charles Briscoe, Serge Ecityan,

13   myself and Dwight Howard and John Geode.

14           MR. THOMPSON:  The government offers Government

15   Exhibit 364.

16           MR. RICCO:  Without objection.

17           THE COURT:  Government Exhibit 364 is admitted in

18   evidence.

19           (Government's Exhibit 364 received in evidence)

20   BY MR. THOMPSON:

21   Q.  Mr. Schmidt, before the break you were testifying about

22   efforts that Mr. Howard -- excuse me -- Mr. Howard's request

23   that you and others make efforts to return his funds.  Is that

24   right?

25   A.  That's right.

O9UBDAR2                    Schmidt – Direct

1          MR. THOMPSON:  Could you please publish.  And,

2    Mr. Ross, could you focus on the second email, the second email

3    in this chain.

4    Q.  Who sent this email?

5    A.  Serge Ecityan.

6    Q.  When was this email sent?

7    A.  March 26, 2021.

8    Q.  I'm going to read this email.  Hi, Charles.  Jeff and I

9    just spoke to Dwight.  He wants his money back regarding the

10   Atlanta Dream since the ownership structure has changed.  He

11   asked that we reach out to you so that you can immediately ask

12   Cal Darden to get his funds back ASAP. Attorney John Geode is

13   also copied on this email.  Dwight has asked Mr. Geode to step

14   in if you are unsuccessful at getting the funds back.  Please

15   advise and thanks.  SE.

16         MR. THOMPSON:  Mr. Ross, can you zoom out, and if you

17   can focus on the top of this email.

18   Q.  Who sent this email?

19   A.  Charles Briscoe.

20   Q.  What's the date?

21   A.  March 26, 2021.

22   Q.  Who's the recipient?

23   A.  Serge Ecityan.

24   Q.  Is anyone copied?

25   A.  Yes, I am copied.  Dwight Howard is copied and attorney

O9UBDAR2                          Schmidt – Direct

1   John Geode is copied.

2   Q.  What's the subject?

3   A.  Dwight Howard and Atlanta Dream.

4   Q.  And this email says:  Okay.  I will reach out.  John, I

5   will advise if you need to step in if it's not done in a timely

6   manner.

7        MR. THOMPSON:  You can exit this document, Mr. Ross.

8   Q.  Did there come a time in February of 2021 when you and

9   Charles Briscoe spoke?

10  A.  Yes.

11  Q.  Roughly when in the month did that happen?

12  A.  It was late in February.  After the actual sale of the

13  Dream had been announced, it was widely picked up in the press,

14  and it announced that the sale of the Dream had taken place and

15  that the purchaser was a gentleman named Larry Gottesdiener.

16  Q.  When you spoke with Mr. Briscoe, did you contact him or did

17  he contact you?

18  A.  He called me.

19  Q.  And what did Mr. Briscoe say to you during this call?

20  A.  Among other things he said that the Darden Howard Briscoe

21  Group was part of the purchasing group for the Atlanta Dream.

22  They were still in.

23  Q.  Did Charles Briscoe tell you where Mr. Howard's money that

24  he had sent to purchase the Dream had gone?

25  A.  In that conversation before he suggested a purchase price,

O9UBDAR2                         Schmidt - Direct

1   I said if Larry Gottesdiener let a group purchase the team and

2   the purchase price was $3 million, then you don't need all of

3   Dwight's money anymore.  Can we expect some of that money to be

4   returned?

5        And Charles said to me, well, actually, the purchase

6   price was higher so we needed all of that money to fund our

7   part.

8   Q.  During this conversation did Mr. Briscoe explain what

9   happened with respect to the $4 million that Mr. Howard had

10  paid in connection with the marketing company?

11  A.  He did not.

12  Q.  Was Mr. Howard successful in recovering the money that he

13  paid in connection with the Atlanta Dream?

14  A.  No.

15  Q.  How do you know that?

16  A.  In the time that passed after that we became very familiar

17  with all of Dwight Howard's personal finances to the extent we

18  got checking and investment statements on all of his accounts.

19  And if there had been a recovery, it would have shown up in one

20  of those accounts and we would have known about it.

21        MR. THOMPSON:  Your Honor, may I have a moment?

22        THE COURT:  You may.

23        MR. THOMPSON:  Nothing further.

24        THE COURT:  Okay.  Cross-examination.

25  CROSS-EXAMINATION

O9UBDAR2                        Schmidt - Cross

1   BY MR. RICCO:

2   Q.  Good afternoon, sir.

3   A.  Good afternoon.

4   Q.  I'd like to start where you left off if you don't mind.

5   You said in March -- withdrawn.

6          You said that you found out that the sale had taken

7   place.  You heard about it on a public announcement, right?

8   A.  Yes.

9   Q.  And you said thereafter you had a telephone conversation

10  with Mr. Briscoe, and Mr. Briscoe told you that the Darden

11  Howard Briscoe Group was apart of the deal that purchased the

12  Dream, right?

13  A.  Yes.

14  Q.  And that was in March, right?

15  A.  No, that call took place in late February, the day the sale

16  became public.

17  Q.  Okay.  But you had known months before that that Mr. Howard

18  could not have been apart of the sale of the team because he

19  was prohibited from doing so by the rules of the NBA and the

20  WNBA, correct?

21  A.  I'm not sure how to answer that because arguably he was

22  part of the group that bought it, but not through an equity

23  interest, but as a creditor interest.

24  Q.  Okay.  Let's talk about that.  Good answer.  Let's talk

25  about that.

O9UBDAR2                        Schmidt - Cross

```
 1              Were you aware that an NBA player could not have an
 2   equity credit interest in a WNBA team, were you aware of it,
 3   yes or no?
 4   A.  No.
 5   Q.  And had you been aware of that, in response to the
 6   questions that the government asked you, you would have
 7   reported that to your legal department, correct?
 8   A.  I would have.
 9   Q.  I want to go to -- let's go to the beginning.
10              Mr. Howard's portfolio of investments were being
11   handled by Morgan Stanley before you, correct?
12   A.  That is correct.
13   Q.  Now, Mr. Howard came to BMO.  BMO didn't go looking for
14   Mr. Howard; isn't that correct?
15   A.  That is correct.
16   Q.  And Mr. Howard said he wanted to purchase this basketball
17   team, women's basketball team, right?
18   A.  Yes.
19   Q.  And your background and expertise is in lending, right?
20   A.  It is.
21   Q.  I think you told us high net worth individuals, right?
22   A.  Correct.
23   Q.  And Mr. Howard was considered one of those type of
24   individuals, right?
25   A.  Yes.
```

1    Q.  And one of the ways lending can happen, now that you told

2    the jury already, is through a line of credit, right?

3    A.  Yes.

4    Q.  Now, here in order for that to have happened, Mr. Howard

5    would have had to transfer or end his relationship with Morgan

6    Stanley and then begin a relationship with BMO, correct?

7    A.  Yes.

8    Q.  And he voluntarily chose to do that, no pressure by you,

9    right?

10   A.  Correct.

11   Q.  And he was dissatisfied with his relationship with Morgan

12   Stanley, correct?

13   A.  Yes.

14   Q.  And I think you had an opportunity to look at the rates he

15   was paying, and you felt that he could do much better when BMO,

16   correct?

17   A.  Yes.

18   Q.  But the answer is yes, right?

19   A.  Correct.

20   Q.  But in order for that transference to take place, one thing

21   that had to happen is that the existing line of credit that he

22   had with Morgan Stanley had to be paid, correct?

23   A.  That is correct.

24   Q.  And it was paid off?

25   A.  Yes.

O9UBDAR2                        Schmidt - Cross

1    Q.  $3 million?

2    A.  Yes.

3    Q.  And the cost of that was gonna be picked up in his new line

4    of credit with BMO, right?

5    A.  Yes.

6    Q.  Now, I think you said -- and I don't want to belabor the

7    point, at some point you found out that there was a problem

8    with an NBA professional ballplayer being involved with the

9    ownership of a WNBA team, correct?

10   A.  Correct.

11   Q.  Can you tell us when you found that out?

12            Was it at the beginning?  Was it at before? Was it at

13   the end?

14   A.  Our first conversation was in early July, and we had

15   additional conversations in mid-October.  The requirement that

16   active NBA players could not have an equity interest in an NBA

17   team came to light probably in mid-September.

18   Q.  Certainly before the monies went out in November and then

19   later in December, right?

20   A.  Correct.

21   Q.  I'd like to put up on the screen -- no.  Withdrawn.

22            When Mr. Howard first came to you, it was like, time

23   is of the essence, and your sense was this was something that

24   he wanted to happen like right now, right?

25   A.  Yes.

O9UBDAR2                         Schmidt – Cross

1   Q.  And I'm sure as a banker you're always concerned with the

2   "right now" deals, right?

3   A.  Yes.

4   Q.  Because it doesn't give you an opportunity to really do the

5   type of research checking of credit sources and things like

6   that that you would be more comfortable with, right?

7   A.  I would disagree with that.

8   Q.  Okay.  You can.  All right.  But in this situation, would

9   you agree with me that Mr. Howard wanted to do this now, right?

10  A.  Yes.

11  Q.  But it didn't happen now, correct?  There were delays?

12  A.  I think we would clarify it.  I think that BMO was prompt

13  in providing the line of credit which was urgent, and we

14  stepped up and answered that part of it closing on this

15  $3 million sale was a hurry up and wait, did not happen within

16  the timeframe originally expected.

17  Q.  Totally agree.

18  A.  Okay.

19  Q.  Your part work was done.  Credit is available.  The delay

20  was on the other end, and that is with the closing of the

21  purchase of the team, correct?

22          THE COURT:  Mr. Ricco, questions.  The fact that you

23  agree or disagree is not --

24          MR. RICCO:  Got you, Judge.

25          THE COURT:  Okay.  I apologize.

O9UBDAR2                        Schmidt - Cross

1          MR. RICCO:  You don't have to, Judge.

2          THE COURT:  If you could repeat your last question.

3          MR. RICCO:  I can.  Sorry, Judge.

4          THE COURT:  Do you want me to read it?

5          MR. RICCO:  No, it's okay, Judge.

6   Q.  The delay was not on BMO's end of the responsibility,

7   correct?

8   A.  Correct.

9   Q.  The delay was in getting the purchase and the closing on

10  the purchase, right?

11  A.  Correct.

12  Q.  Now, at some point I think Mr. Briscoe said to you that,

13  well, the delay had to do with one of the present owners

14  wanting to wait until an election cycle to be complete,

15  correct?

16  A.  That is correct.

17  Q.  And that's something he said to you, right?

18  A.  It was.

19  Q.  And that slowed down the process of the purchase and

20  closing point of the team, correct?

21  A.  Correct.

22  Q.  Mr. Howard was a little uneasy with that, correct?

23  A.  I think that Mr. Howard was not uneasy during the

24  September, October, November, December timeframe.  I think the

25  angst came in January and February.

1    Q.  Can we say that his angst got louder in time?

2    A.  In January and February, yes.

3    Q.  All right.  And and I think you said to us that when the

4    sale was made or became public -- withdrawn.

5          Before the sale was announced, Mr. Howard was

6    requesting that action be taken to get his money back, right?

7    A.  Right.

8    Q.  And I think you said to us on February 10 and on February

9    19, emails were sent saying return the money with instructions

10   on how to do it, correct?

11   A.  Correct.

12   Q.  And these emails that you've been telling us about and

13   these text messages that you've been telling us about, those

14   are documents and records that are kept in the course of the

15   business of BMO, right?

16   A.  I'm not sure I understand if there are legal implications

17   to that.  We sent emails.  We have a record of those emails.

18   Their legal standing goes beyond my expertise.

19   Q.  My question is you keep them, right?

20   A.  Yes.

21   Q.  And they help you later on give testimony like you're doing

22   here today, right?

23   A.  Apparently.

24   Q.  That's with the accuracy, right?

25   A.  Yes.

O9UBDAR2                          Schmidt – Cross

1   Q.  All right.  Let's put on the screen Government Exhibit 359

2   for the benefit of the witness.

3            MR. MEAD:  What was the number, Mr. Ricco?

4            MR. RICCO:  359.

5   Q.  Do you recognize this document?

6   A.  I do.

7   Q.  And that's what they call it, group chat.  I'm not sure

8   about that.  But there's several participants in this

9   communication, correct?

10  A.  Correct.

11  Q.  One of those people are you, right?

12  A.  I'm here.

13  Q.  Is that a yes?

14  A.  Yes.

15  Q.  All right.

16  A.  Yes.

17  Q.  That's all right.  And the other is Mr. Briscoe, right?

18  A.  Yes.

19  Q.  And the other one is Mr. Ecityan, right?

20  A.  Yes.

21  Q.  Have you seen this before?

22  A.  I have.

23  Q.  Is this one of the records that is maintained by BMO with

24  yourself, right?

25  A.  No, because these are texts that were made on a cell phone,

O9UBDAR2                        Schmidt - Cross

1   and BMO does not maintain these records.  So other steps had to

2   be taken to retrieve this information.

3   Q.  All right.  Does the text you have before you accurately

4   reflect what was said during that text messaging?

5   A.  Yes.

6          MR. RICCO:  Your Honor, I'd like to move Government

7   359 into evidence.

8          MR. THOMPSON:  Objection.

9          THE COURT:  Okay.  Foundation?

10          MR. THOMPSON:  Hearsay.

11          THE COURT:  Is this the entirety of the document?

12          MR. RICCO:  Yes.

13          THE COURT:  Objection overruled.  Government Exhibit

14   359 is admitted in evidence.

15          (Government's Exhibit 359 received in evidence)

16          MR. RICCO:  Yes, Judge.

17   Q.  And I like to read it, okay.  And I'll ask you a question

18   while I'm reading it.

19          It says:  Charles, we may need to get funds back

20   sooner than later.  Dwight has a large IRS bill, and we would

21   rather not have to liquidate the investment accounts.  Can you

22   please follow-up with Cal.

23          Did I read that accurately?

24   A.  Yes.

25   Q.  How much was that IRS bill?

1    A.  I don't recall.

2              THE COURT:  Mr. Ricco.

3              MR. RICCO:  I'm sorry, Judge.

4              THE COURT:  Podium if you could.

5              MR. RICCO:  Sure.

6    Q.  I want to talk about the promissory note if you don't mind,

7    sir.

8    A.  Fine.

9    Q.  A promissory note is simply an agreement between

10   individuals using not a lending institution with a promise to

11   pay a specific designated person on a specific designated date,

12   a maturity date, or on demand, correct?

13   A.  Correct.

14   Q.  It's a record of the borrower's promise to pay a loan,

15   right?

16   A.  Yes.

17   Q.  And the money that went to the Darden Group here wasn't a

18   grant.  It was a loan, right?

19   A.  Yes.

20   Q.  And a loan means has to be paid back, correct -- well,

21   withdrawn.  I'll rephrase the question.

22             A loan means the money is supposed to be paid back

23   generally, right?

24   A.  Yes.

25   Q.  The note, promissory note, ensures that both the lender and

1    the borrower understand the amount and details of the loan as

2    well as the repayment terms and a payment schedule, correct?

3    A.   That sounds like you're asking me for a legal opinion.

4    Q.   I'm not asking you for it.  I'm asking your opinion about

5    lending in the context of a promissory note which is something

6    that you've seen in your expertise with the banks, right?

7    A.   Many times.

8    Q.   All right.  So Dwight Howard had a promissory note from

9    DSG, correct?

10   A.   I don't know who that is.

11   Q.   Oh, I'm sorry.  You're right.  The Darden Sports Group?

12   A.   Oh, yep.  Sorry.

13   Q.   Is that a yes?

14   A.   Yes.

15   Q.   All right.  And in this particular case --

16          MR. RICCO:  Sorry, Judge.

17          THE COURT:  That's okay.  Don't go toward talking out

18   the window.  Go ahead.

19   Q.   And in this particular case, Dwight Howard had something

20   called a convertible promissory note, correct?

21   A.   Correct.

22   Q.   And a convertible promissory note is a little different

23   than a regular promissory note, right?

24   A.   I don't know.  I'm unfamiliar with convertible promissory

25   notes.

1  Q.  Did you see the promissory note that Mr. Darden -- I mean

2  that Mr. Howard signed in this case?

3  A.  I did.

4  Q.  And you are now handling his financial affairs, right?

5  A.  I am.

6  Q.  And when you saw that he had a document that says

7  convertible promissory note, did you take any measures to find

8  out what that meant?

9  A.  The steps that I took went beyond the concept of a

10  convertible promissory note.  When we read the promissory note,

11  there were things that weren't in it such as a call for

12  periodic interest payments.  And we suggested that -- we being

13  Serge Ecityan and myself -- suggested to Dwight Howard that

14  perhaps it would be better in everyone's interest, Mr. Darden

15  and Mr. Howard's, that the promissory note be reviewed by an

16  attorney to strengthen areas that might be lacking.  That was

17  our suggestion.

18  Q.  And, by the way, at the time you made that suggestion,

19  Mr. Howard didn't take you up on it, did he?

20  A.  He did not.

21  Q.  I want to come back to that, but I do want to go back to

22  the issue of the convertible promissory note.  You looked at

23  the promissory note certainly.  You just told us that because

24  you said there were certain deficiencies in this.  And one of

25  the things that struck you was that the promissory note made no

O9UBDAR2                         Schmidt - Cross

1    mention of the Atlanta Dream, correct?

2    A.   That is correct.

3    Q.   It made no mention of purchasing an WNBA team, correct?

4    A.   Correct.

5    Q.   And the other thing that struck you was that there was no

6    schedule for the payment of interest rates which is something

7    that you would have expected and have seen, correct?

8    A.   That's true.

9    Q.   And I think you already told us that you were so concerned

10   about the deficiencies of this that you recommended that they

11   see -- that Mr. Howard engage the services of John Geode,

12   correct?

13   A.   I'm not sure I expressed it with the enthusiasm that you

14   just did, and I thought that it would be prudent to look into

15   those and to modify the document just as a prudent business

16   practice.

17   Q.   All right.  So if we take out the enthusiasm, which we

18   could do, you recommended that he have a lawyer take a look at

19   it, right?

20   A.   I did.

21   Q.   Are you still handling the financial affairs of Mr. Howard?

22   A.   Largely no.

23   Q.   Things changed?

24   A.   Yes.

25   Q.   Are you -- you had said -- well, withdrawn.

1          I don't want to phrase the question that way.  This

2     conversation that we're talking about now when you're looking

3     over the promissory note, is it fair to say that those

4     conversations took place around that February 10 and February

5     16 time when emails went out saying, hey, Mr. Howard wants his

6     money back?

7     A.  No.  I believe that we received copies of the note after

8     the second wire transfer on December 1st, but in early

9     December.  And so after reviewing the document, we made that

10    suggestion to Dwight in December of 2020.

11    Q.  Okay.  Thank you.

12         THE COURT:  Mr. Ricco, I don't know -- it's 12:45,

13    12:46.

14         MR. RICCO:  I don't mind taking a break.  I think I

15    only have ten minutes left.

16         THE COURT:  Ladies and gentlemen -- ten minutes or so.

17         MR. RICCO:  Judge, if I can, I'd like to break and

18    condense it down.

19         THE COURT:  So we're going to take our lunch break

20    now, ladies and gentlemen.  Remember, do not discuss the case.

21    Have a good lunch break.  You can leave your pads on your

22    chairs.  We'll take them and leave them in the back, and we'll

23    see you at -- why don't we say 2:05.  Thank you very much.  See

24    you in the bit.

25         (Continued on next page)

O9UBDAR2                         Schmidt - Cross

1                  (Jury not present)

2                  THE COURT:  Mr. Schmidt, you may step down.

3     Mr. Schmidt, only thing I will say, during the break you're not

4     to have substantive conversations with the government about

5     your examination.  Obviously you're free to speak to Mr. Solton

6     who I understand is representing you.  That's fine, and we'll

7     see you after the lunch break.

8                  THE WITNESS:  Thank you, your Honor.

9                  (Witness temporarily excused)

10                 THE COURT:  Okay.  You may be seated.  So Mr. Ricco

11    indicated he had about ten more minutes.  How much do we think

12    we'll have in redirect at this stage?

13                 MR. THOMPSON:  Ten minutes.

14                 THE COURT:  Okay.  All right.  Obviously not to hold

15    you to that.  So then we'll have Mr. Duguid and then

16    Mr. Anthony, and my understanding is that would be it for

17    today?

18                 MR. MEAD:  That's right, your Honor.  So we're

19    probably looking at 3:00 or 3:30.

20                 THE COURT:  I know I said I was going to do it before

21    lunch, but I forgot.  I'll do it when the jury comes back.

22    I'll indicate first that they will get the case this week, and

23    second that we're going to be breaking early today, earlier

24    than the 5:30 timeframe.  Any objections to that?

25                 MR. MEAD:  No, your Honor.

O9UBDAR2                          Schmidt - Cross

1          THE COURT:  Any objections from the defense?

2          MR. DONALDSON:  No.

3          THE COURT:  I'll see everybody at 2:05.  Thank you

4     very much.  We'll stand adjourned.

5          (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9UJDAR3

                        AFTERNOON SESSION

                           2:15 p.m.

 1        (In open court; jury not present)

 2        THE COURT:  Okay.  So I received the government's

 3   letter with regard to the issue of the promissory note.  I

 4   haven't read it cover to cover, so I'll take a look at that and

 5   we can discuss it at a later point in time.  I got the

 6   government's suggested proposed jury charge, so the defense

 7   should take a look at that.  And obviously if there's an

 8   objection, just let me know so I can make a ruling.

 9        With regard to the jury, when the jury comes in, I'm

10   going to inform them that it looks as if that today we will

11   break early and that they will be getting the case this week.

12   Let me ask what I was -- well, it's entirely up to the

13   government.  I don't know whether the government intended to

14   rest today or not.

15        The only thing I would say is -- and this is what I

16   typically tell folks -- is that you should make sure that all

17   of the exhibits you believe are in are, in fact, in.  Mr. Mead

18   is shaking his head because I think I may have said this in a

19   trial I had with him previously.  So there isn't any issue

20   about reopening the case just to admit an exhibit that I may

21   not have intoned the magic words that they're admitted that we

22   just overlooked.

23        So I guess what I'm saying is I don't have a problem

O9UJDAR3

1    with us ending today and the government resting tomorrow.  It's

2    up to the government.  But if the government -- what I may want

3    to do -- is there going to be a motion at the conclusion of the

4    government's case?

5              MR. RICCO:  Yes.

6              THE COURT:  I'm just trying to -- in terms of timing.

7              MR. RICCO:  It will be an oral motion, Judge.

8              THE COURT:  All right.  So maybe what makes sense is

9    I'll confirm tomorrow morning that the government intends to

10   rest.  We can get that argument done in advance of officially

11   telling the jury that the government rests.  I don't think --

12   well, the government should check whether or not there's a

13   legal problem with that or not.  And so we would start a little

14   bit earlier tomorrow at about 9:30 I would think, Mr. Mead.

15             MR. MEAD:  I want to make sure the Court remembered

16   we're going to call Ms. Brewer and Ms. Sebade tomorrow morning.

17             THE COURT:  All right.  Good.  So you're right.  I did

18   forget that.  I'm jumping the gun.  So that's fine.

19             What I'd ask then is overnight if can you go through

20   your offers of proof and your exhibits list to make sure that

21   the exhibits that you believe have come in are actually in so

22   that we can seamlessly go from there.  You can rest.  We can do

23   the argument, and then the defense can start their case in the

24   afternoon.

25             MR. MEAD:  That's exactly what we were thinking, your

1      Honor, yes.

2                 THE COURT:  Mr. Donaldson?

3                 MR. DONALDSON:  Just one issue on scheduling the

4      defense case, rather an update.  So we did hear back from

5      Mr. Sienko within the last hour actually.  He informed us that

6      based upon his understanding with the government, that he would

7      not be needed past last week.  So therefore he informed us that

8      he is not available to be in New York City at all this week.

9                 We did send him a subpoena anyway for I think tomorrow

10     and Wednesday morning.  And we'll keep the Court up to date as

11     to what happens with that.  Just want to give the Court an

12     update on what just happened.

13                THE COURT:  And I can't remember was Mr. Sienko, is he

14     represented?

15                MR. MEAD:  No, your Honor.

16                THE COURT:  Okay.  All right.  Well, do you know what

17     the nature of his obligations were --

18                MR. DONALDSON:  I don't.

19                THE COURT:  -- such that he couldn't --

20                MR. DONALDSON:  I don't.  He said to me -- said in the

21     email that they were personal and professional in nature that

22     he planned for this week, and therefore he could not be here.

23                THE COURT:  Look, I think --

24                MR. DONALDSON:  But one more thing, if I could add to

25     that, in the interest of efficiency and the other E word, we

O9UJDAR3

1    spoke to the government about a possible stipulation.  If we

2    could work that out, we may -- if we can work it out, we may be

3    able to -- we may not need Mr. Sienko.  So we're working on

4    that as well.

5         THE COURT:  In other words, a stipulation about if

6    called as a witness, he would testify as follows, something

7    like that?

8         MR. DONALDSON:  Yes.

9         THE COURT:  I would ask the parties to work on that.

10   Couple of things, first, the government -- in informing the

11   witness that the government wouldn't need the witness is a

12   separate issue.  In other words, the fact that the witness was

13   unaware until I think -- Mr. Donaldson, you started reaching

14   out maybe last week or maybe over the weekend; am I correct?

15   The witness was unaware that the defense might call him until

16   recently?

17        MR. DONALDSON:  That's correct.  Yes, we didn't reach

18   out to him until we, of course, were aware that he wasn't going

19   to be a witness, I think Thursday afternoon.

20        THE COURT:  I guess what this means -- because I'm a

21   little hesitant to say to the jury that they're going to get

22   the case this week, if Mr. Sienko is going to be a defense

23   witness.  I mean, I would do my best to get him here, but I

24   have to also understand he is not a party.  Although he has a

25   subpoena, he's just becoming aware of this.  So let me ask do

O9UJDAR3

1    you have a sense of how long his testimony would be?

2            MR. DONALDSON:  Very short.  And I understand the

3    Court's considering, we're working diligently to try to make

4    this happen, but his testimony would likely be extremely short,

5    very pointed with the questioning and hopefully the answers.

6    So hopefully he'll call me, we can talk about that, we can work

7    this out.

8            THE COURT:  So maybe what I'll say to the jury is

9    we're working diligently to get the case to them this week, at

10   the latest Monday of next week.

11           MR. DONALDSON:  I think that's appropriate.  I want to

12   give the Court that information for this very reason, but we

13   are trying to get him --

14           THE COURT:  I don't want to promise something to the

15   jury.  It's the worst thing that could possibly happen if I

16   promise the jury that something is going to happen this week

17   and it doesn't happen.  I'll take that heat.  In other words, I

18   wouldn't ascribe any blame to one side or the other.  I would

19   say it's because of something that I needed to handle.

20           But I think if we extend it to Monday, I think we

21   should be fine.  But we need to -- and obviously I don't -- if

22   I need to get involved with Mr. Sienko, I will.  But be advised

23   that I would also be very sympathetic to hearing what the

24   issues are for him.  And it may be that the next person you

25   speak with will be a lawyer because once the subpoena is

O9UJDAR3

1    issued, obviously that may change his thought process about

2    whether or not he should be handling all this himself.

3              MR. DONALDSON:  I understand, Judge.  Thank you.

4              THE COURT:  All right.  Is there anything we need to

5    do before we bring Mr. Schmidt back and we continue the

6    cross-examination?

7              MR. MEAD:  I think a couple things we'd like to take

8    up at the end of the day, but it makes sense to go forward with

9    the jury now.

10             THE COURT:  Including closing the loop on the 404(b)

11   ruling and the like, although I don't think -- or did I get the

12   government's suggested language?  I have this language that's

13   in the jury charge, but I don't know if I've gotten anything on

14   the other.

15             MR. MEAD:  You're right about that, your Honor.  Let

16   me think if we can get you something while the jury is here or

17   not, since we previously thought about this.

18             THE COURT:  All right.  So if we can get Mr. Schmidt,

19   thank you.  And we can get the jury.

20                  (Continued on next page)

21

22

23

24

25

1            (In open court; jurors present)

2            THE COURT:  So ladies and gentlemen, I apologize for

3    the delay.  That was my doing.  So I do have some news for you,

4    though.  So with regard to today, we do have the testimony of

5    some more witnesses today, but in all likelihood we're going to

6    be ending early today, in other words, before 5:30.

7            Secondly, it appears that you will be getting the case

8    at the latest Monday, all right?  And so with regard to today,

9    I think I may have heard, I'm thinking the snack is going to

10   arrive.  So we'll see how far we get.  But one way or the

11   other, you're going to get those cookies, because I certainly

12   don't need them.  So I just wanted to provide you with that

13   update.

14           So we're going to continue with the cross-examination

15   of Mr. Schmidt.  Mr. Ricco, you may continue.

16   BY MR. RICCO:

17   Q   Good afternoon, Mr. Schmidt.

18   A   Good afternoon.

19   Q   Really just have a few questions, like to get through them

20   if we can.

21   A   Great.

22   Q   Just to take a slight step back, something we talked about,

23   and that was that at some point Dwight Howard was aware that he

24   wasn't able to to purchase the team.  We talked about that,

25   correct?

1  A   As an equity owner, correct.

2  Q   Okay.  Now question, it was your understanding, though,

3  that Howard wanted the initial funding to be structured as debt

4  that could be converted into equity when Dwight Howard retired

5  and was eligible to participate in ownership; isn't that

6  correct?

7  A   That is correct.

8  Q   Okay.  Are you familiar with the term "voluntary

9  conversion" and "involuntary conversion"?

10 A   I'm really not.

11 Q   Okay.  That's why I asked.

12 A   I'm sorry.

13 Q   You don't have to be.

14 A   Too late.

15 Q   It's okay.

16         MR. RICCO:  Mr. Legon, can we put up Government

17 Exhibit in evidence 2407, page 3, for the witness and the jury,

18 I think it's in evidence.

19 Q   And if we went to the first page, this is the promissory

20 note.  Why don't you show it to Mr. Schmidt, the first page.

21 This is the government's exhibit that's in evidence, and a part

22 of this exhibit is the promissory note.  Okay?

23 A   Okay, yes.

24 Q   So we can go to page 3?

25 A   I'm with you.

1   Q   Okay, stop.  Okay.  What we do know is that this promissory

2   note says the following:  Involuntary conversion at the

3   maturity date.  Next sentence, in the event of default and the

4   note has not been paid on or by the maturity date, the note

5   will convert to majority ownership of the company and its

6   assets.  That's what it says, right?

7   A   I see that yes.

8   Q   Thank you.

9           And then next, it says voluntary conversion at the

10  maturity date.  It says if the note has not been previously

11  converted pursuant to the retirement of the investor -- and I'm

12  going to say in this instance the investor is Dwight Howard,

13  correct?

14  A   Correct.

15  Q   Then effective upon the maturity date, the company may

16  elect to convert the note into a majority ownership of the

17  company and its assets.  You see that?

18  A   I do see that.

19  Q   Okay.  Do you know whether or not Mr. Howard exercised any

20  of the options that were available to him under the provisions

21  of this lending agreement?

22  A   I do not know.

23  Q   Okay.  Fair enough.

24          All right.  Do you know whether or not Mr. Howard ever

25  sued for breach of contract in a separate civil proceeding?

O9UJDAR3                        Schmidt - Cross

```
 1   A    Relative to what?

 2   Q    The recovery of the $7 million.

 3   A    Not that I'm aware of.

 4   Q    Okay.  If he had sued and if he had recovered — and I'm

 5   asking you with your expertise — would there be a way that he

 6   could get value from that judgment against any tax debt that he

 7   had, if you're aware?

 8           MR. THOMPSON:  Objection.

 9           THE COURT:  If you could rephrase it, but I'm not

10   exactly sure what the question is.  Objection sustained.

11   Q    Is it unfair for me to ask you questions about tax

12   consequences?

13   A    With all due respect, you're asking me a tax matter

14   question and I'm a banker.  That would not be within my

15   expertise.

16   Q    I won't ask you a question.  But can you tell us whether or

17   not a lender can get tax value from recovering a bad debt?

18           MR. THOMPSON:  Objection.

19   Q    If you know.

20           THE COURT:  I'll allow that.  Overruled.

21   A    Again, you're asking me a question that's outside my area

22   of expertise.

23   Q    Okay, that's fine.  I accept your answer.  Thank you.

24           THE COURT:  Well --

25           MR. RICCO:  Strike that.  Forgive me.  I'm sorry, your
```

1  Honor.

2          THE COURT:  That's all right.

3          MR. RICCO:  I'll just ask the next question.

4  Q   Maybe two or three more questions.  I think one is ground

5  we covered, and that is I think you told us in December,

6  certainly in January and early February, Mr. Howard was aware

7  that the Dream had not been purchased as he anticipated,

8  correct?

9  A   That is correct.

10 Q   Thank you.

11         THE COURT:  That's okay.  You can thank him, but --

12 you know.

13 Q   Okay.  So this question is really directed about

14 Mr. Howard.  You've told us about interactions that you had

15 with Mr. Howard.  Some were by text?

16 A   Yes.

17 Q   Some were by email?

18 A   Yes.

19 Q   Some were phone calls, right?

20 A   Yes.

21 Q   Did you ever meet with him personally back then?

22 A   Dwight Howard?

23 Q   Yes.

24 A   Within the time that we talked about, we did not meet in

25 person.  In addition to the three examples that you gave, we

O9UJDAR3                         Schmidt – Redirect

1   also had one FaceTime call because we felt in that situation it

2   was important that we verified that the person we were talking

3   to was, in fact, Dwight Howard.

4   Q   And you did it?

5   A   And we did it.

6           MR. RICCO:   Thank you.   No further questions.   And

7   your Honor, I hope I came in under my ten minutes.

8           THE COURT:   Well, it's fine.   As I mentioned, you can

9   take as much time as you like.

10          Redirect?

11          MR. THOMPSON:   Thank you, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. THOMPSON:

14  Q   Did Dwight Howard tell you why he wanted to purchase the

15  Atlanta Dream?

16  A   He did.

17  Q   What did he say?

18  A   He felt that it was an opportunity for him to help women in

19  the sport advance themselves in their profession and

20  financially.

21  Q   Was the rule prohibiting NBA players from owning or being

22  equity owner in a WNBA team hidden from you at any point,

23  Mr. Schmidt?

24  A   Not that I know of.

25          MR. THOMPSON:   Now, Mr. Ross, could you publish

1    Government Exhibit 2407, which is in evidence, and if you could

2    scroll to the second page, please.

3            Now, that is the promissory note that you were asked

4    about on cross-examination; is that right?

5    A    It is.

6    Q    You saw this promissory note for the first time after both

7    of Mr. Howard's wires had already been sent; is that right?

8    A    That is right.

9    Q    And you testified on cross-examination that when you saw

10   this promissory note for the first time you thought it was

11   deficient; is that correct?

12   A    Yes.

13   Q    Now, do you recall being asked questions about your

14   suggestion that a lawyer get involved regarding the promissory

15   note on cross-examination?

16   A    I'm a bit fuzzy.  This has been a busy day and my head is

17   spinning, and so I believe so.  I hope the death penalty

18   doesn't apply to wrong answers.

19   Q    Let me ask you when you saw the promissory note, you

20   testified --

21           THE COURT:  The answer to that is no, just to be

22   clear.  I don't want to leave that hanging.

23           But go ahead, counsel.  Sorry for interrupting.

24           MR. RICCO:  That's okay.

25   Q    You testified on cross-examination that when you first saw

O9UJDAR3                          Schmidt - Redirect

1    the promissory note, you thought it was deficient; is that
2    right?
3    A    I said that.
4    Q    What did you do when you first saw the promissory note?
5    What suggestions, if any, did you make?
6    A    I read the promissory note.  I found some things that I
7    thought could be improved, but I felt that those areas would
8    best be addressed by legal counsel.  So Serge Ecityan and
9    myself went to -- had a telephone conversation with Dwight
10   Howard and suggested that an attorney look this over, both for
11   the protection of Mr. Darden and for Dwight, to make this a
12   stronger document.
13   Q    And what did Mr. Howard say in response to your
14   recommendation?
15   A    He was open to that.
16   Q    Did you make the recommendation that a lawyer get involved
17   with respect to the promissory note to anyone besides Dwight
18   Howard?
19   A    So Serge Ecityan and I, in the conversation with Dwight
20   Howard, recommended an attorney by the name of John Goede for
21   that person.
22   Q    Did I cut you off?
23   A    No.
24   Q    Did you also recommend to Mr. Briscoe that a lawyer get
25   involved with respect to --

O9UJDAR3                         Schmidt – Redirect

1    A    Yes.  I apologize.  The recommendation was to them both.

2    Q    What did Mr. Briscoe say with respect to your

3    recommendation that a lawyer get involved regarding the

4    promissory note?

5    A    As I recall, they were both in agreement with that

6    suggestion.

7    Q    Did you ever see a revised version of the promissory note?

8    A    No.

9             MR. THOMPSON:  Okay.  Mr. Ross, could you please zoom

10   in on the "use of proceeds" section of this promissory note.

11   Q    This says the company intends to use the proceeds of this

12   offering for the company operating expenses of 2.5M/YR,

13   expansion of its lines of business specifically, the addition

14   of a production company (2.5M/YR) OTT channel (1M/YR) and

15   associated costs and expenses.

16            Can you zoom in again please.

17            Was the text in the "use of proceeds" section of this

18   promissory note consistent with your understanding of how

19   Mr. Howard's funds would be used?

20   A    It is not.

21   Q    What was your understanding of how the money that

22   Mr. Howard wired would be used?

23   A    4 million of it would be used for the marketing company and

24   3 million of it would be used to purchase the Dream.

25            MR. THOMPSON:  You can zoom out of that, Mr. Ross.

1    Thank you.  And can you focus on the maturity provision of the

2    promissory note.

3    Q   Before we do that, the promissory note is dated

4    November 22, 2020; is that right?

5    A   Yes.

6    Q   Okay.  Now, please zoom in on the maturity provision.

7             Now, the maturity provision says unless earlier

8    converted, the entire balance under this note shall be due and

9    payable 36 months from the initial closing.

10            36 months is three years; is that right, Mr. Schmidt?

11   A   Yes.

12   Q   Are you aware of anything happening with respect to this

13   note 36 months after its signing?

14   A   No.

15            MR. THOMPSON:  Okay.  You can zoom out, Mr. Ross.  And

16   can you please zoom in on the interest section of the

17   promissory note.

18   Q   This says seven percent per annum based on a 365-day year.

19            Are you aware of any interest payments pursuant to the

20   promissory note being made to Mr. Howard?

21   A   I'm not aware of any payments.

22            MR. THOMPSON:  Your Honor, if I could just have one

23   moment.

24            THE COURT:  Sure.

25            MR. THOMPSON:  Nothing further, your Honor.

1           THE COURT:  Okay.

2    RECROSS EXAMINATION

3    BY MR. RICCO:

4    Q   Mr. Schmidt?

5    A   Yes.

6    Q   You told us that Mr. Howard's goal was to help women in

7    sports, right?

8    A   Yes.

9    Q   In the promissory note that we just looked at, it doesn't

10   say anything about women's sports, does it?

11   A   That is correct.

12   Q   And the government just showed us the use of proceeds

13   section, right?

14   A   That's right.

15   Q   It's not even consistent with what your understanding was

16   of what the transactions were for, correct?

17   A   That is correct.

18   Q   A lender can always take action, if they choose, related to

19   the failure to perform pursuant to a contract, correct?

20           MR. THOMPSON:  Objection.

21           THE COURT:  Yes.  If you could --

22           MR. RICCO:  I'll rephrase it, Judge.

23           THE COURT:  Yes, please do.

24   Q   You're unaware of any objection that Mr. Howard took during

25   the period of maturity?

O9UJDAR3                      Duguid - Direct

1   A    That is correct.

2   Q    None that you're aware of?

3   A    I'm not aware of any action.

4              MR. RICCO:  Thank you very much, sir.

5              THE WITNESS:  You're welcome.

6              MR. THOMPSON:  No redirect.

7              THE COURT:  Thank you, Mr. Schmidt.  You may step

8   down.

9              THE WITNESS:  Thank you.

10             (Witness excused)

11             THE COURT:  Okay.  The government's next witness.

12             MR. KINDER:  The government calls Stuart Duguid.

13  STUART DUGUID,

14       called as a witness by the Government,

15       having been duly sworn, testified as follows:

16             THE COURT:  Okay.  You may inquire.

17  DIRECT EXAMINATION

18  BY MR. KINDER:

19  Q    Good afternoon, Mr. Duguid.

20  A    Hi.

21  Q    Can you please describe your educational background for us.

22  A    I'm from Scotland in the UK.  Was a corporate attorney in

23  London.  My early 20s, came to the U.S., did a year at law

24  school as a master's here, and since then been working as a

25  tennis agent.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9UJDAR3                          Duguid - Direct

1    Q   Where did you get your master's in law?

2    A   Duke University.

3    Q   And how long have you been working as a tennis agent?

4    A   About 14, 15 years now.

5    Q   Do you have your own firm?

6    A   I do now, yes.

7    Q   About how many clients do you represent?

8    A   Eight clients.

9    Q   All tennis players?

10   A   Yes.

11   Q   As a sports agent to tennis players, what are your

12   responsibilities generally?

13   A   Wide array of responsibilities.  Unlike team sport, if

14   you're a basketball or NFL agent, the team will predominantly

15   take care of travel, hiring/firing coaches.  Tennis, we don't

16   have that, and so that's part of the job.  And then largely,

17   the meat of the job is in endorsements, managing endorsements,

18   all the business opportunities that flow from being a

19   commercially successful athlete.

20   Q   Is one of your clients Naomi Osaka?

21   A   Yes.

22   Q   Who is she?

23   A   She's a tennis player, won four Grand Slams representing

24   Japan, grew up in the U.S., one of the stars of tennis

25   probably.

O9UJDAR3                          Duguid - Direct

1    Q    What is the highest world ranking that Ms. Osaka has ever

2    achieved?

3    A    Number one.

4    Q    About when was she ranked number one?

5    A    2019.

6         MR. KINDER:  Can we please publish what's in evidence

7    as Government Exhibit 2144A.

8    Q    Mr. Duguid, on the screen before you is a document.

9         MR. KINDER:  Mr. Ross, can you please scroll through

10   slowly to page 8.

11   Q    And as we're going, Mr. Duguid, before preparing your

12   testimony in this case, had you ever seen this document?

13   A    No.

14   Q    Stop there.

15        Mr. Duguid, do you see your client Naomi Osaka on the

16   page here?

17   A    Yes.

18        MR. KINDER:  Mr. Ross, can we zoom in on Ms. Osaka's

19   photograph.

20   Q    Mr. Duguid, have you seen this photograph of Ms. Osaka

21   before?

22   A    I've seen the photograph, yes.

23   Q    Is it a publically available photograph?

24   A    Yeah, it's from the WTA website.  They conduct a series of

25   shoots once a year, and then they become publically available

1   on their internet website.

2   Q   Can you describe in a little more detail your professional

3   relationship with Ms. Osaka.

4   A   Yeah.  I've been working with her or signed her as a client

5   when she was 18.  I think she's 26, about to be 27, so it's

6   been about nine years now.  Started primarily as her agent.

7   More recently probably say we're still agent/client, but also

8   business partners in that we make a number of investments and

9   started a couple of companies together.

10  Q   So Ms. Osaka has business projects outside of tennis?

11  A   Yes.

12  Q   And what responsibilities do you have with respect to

13  Ms. Osaka's non-tennis business endeavors?

14  A   I would say I probably act as something akin to like the

15  quarterback of the team.  So she'll have an accountant that

16  manages her money.  She has someone that works with her on --

17  any time she makes an investment, anything that's private

18  equity, sometimes it's her own cash, sometimes she gets equity

19  in exchange for services, so that's reviewed by probably a team

20  of three, including myself, probably which I oversee that.

21  Q   And what role do you have in evaluating business

22  partnerships between Ms. Osaka and another company or person?

23  A   Yeah, that's probably my primary job.

24  Q   And so when a company or person wants to engage in a

25  partnership with Ms. Osaka, who do they talk to?

1    A    Me.

2    Q    Can we please go back to page 2 of this document.

3              Mr. Duguid, there's a logo at the top that reads

4    "Darden Sports Group," and I'm going to read the first sentence

5    of text on the page.  Darden Sports Group, DSG, led by

6    prominent Atlanta businessman Cal Darden, Jr., is proud to have

7    an opportunity to become the next owner of the WNBA's Atlanta

8    Dream.

9              Before preparing to testify in this case, had you ever

10   heard of the Darden Sports Group?

11   A    No.

12   Q    Had you ever heard of a person named Calvin Darden, Sr.?

13   A    No.

14   Q    Or Cal Darden, Sr.?

15   A    No.

16   Q    Before preparing to testify in this case, had you ever

17   heard of the Atlanta Dream?

18   A    No.

19   Q    Can we go to page 8, please.

20             This is the page we were looking at, the heading here

21   reads "advisory board."  The first sentence reads, Darden

22   Sports Group has assembled a world-class advisory board

23   comprised of superstar leaders within the areas of music,

24   television, film, professional sports, business, and community.

25   Each board member has committed to using their ideas, voices,

1    platforms, resources, relationships, and influence to support

2    the Atlanta Dream in its various initiatives.

3              Mr. Duguid, did the Darden Sports Group ever approach

4    you about having Ms. Osaka be on an advisory board related to

5    the Atlanta Dream?

6    A    No.

7    Q    Did Ms. Osaka ever tell you about a request from the Darden

8    Sports Group for her to be on an advisory board?

9    A    No.

10   Q    Did Ms. Osaka ever tell about any request from the Darden

11   Sports Group?

12   A    No.

13   Q    Did you ever learn from any other source about a request

14   for Ms. Osaka to be on an advisory board for the Darden Sports

15   Group?

16   A    No.

17   Q    If Ms. Osaka had agreed to be on an advisory board for the

18   Darden Sports Group is that something you would have known

19   about?

20   A    Yes.

21   Q    Are there other people who work for Ms. Osaka other than

22   you?

23   A    Yes.

24   Q    And you mentioned a few of them, but what types of roles

25   generally?

1    A    Specifically, there is a personal assistant, which we

2    share.  Her assistant also works for me as an assistant.  And

3    she has a business manager.  As I said, it's more like managing

4    her bills, paying taxes, invoicing, etc.  And then she has

5    another guy who manages probably -- he handles all the private

6    equity.  So as I said, anything where she's investing money or

7    receiving equity, he has a background that oversees that.

8    Q    Do any of those individuals have authority to agree on

9    Ms. Osaka's behalf for her to be a part of an advisory board?

10   A    No.

11   Q    Did anyone who works for Ms. Osaka talk to you about her

12   being on an advisory board for the Darden Sports Group?

13   A    No.

14          MR. KINDER:  Can we please publish Government

15   Exhibit 2119A in evidence, please.  Mr. Ross, I'll ask you to

16   scroll through this slowly.

17   Q    Mr. Duguid, before preparing your testimony in this case,

18   had you ever seen this document?

19   A    No.

20   Q    Okay.  We can take that down.

21          Mr. Duguid, do you know a person named Dwight Howard?

22   A    I know of him, yes.

23   Q    Have you ever met him?

24   A    No.

25   Q    Have you ever had any business dealings with him?

O9UJDAR3                          Duguid - Direct

1    A    No.

2    Q    Has Naomi Osaka ever had business dealings with Dwight

3    Howard?

4    A    Not to my knowledge.

5    Q    Do you know a person named Charles Briscoe?

6    A    No.

7    Q    Ever had any business dealings with a person named Charles

8    Briscoe?

9    A    No.

10   Q    Has Naomi Osaka ever had business dealings with a person

11   named Charles Briscoe?

12   A    Not to my knowledge.

13   Q    Turning back to Cal Darden, Sr., you testified you had not

14   heard of him.  To your knowledge, has Naomi Osaka ever had

15   business dealings with a person named Cal Darden, Sr.?

16   A    No.

17   Q    Do you know a person names Calvin Darden, Jr.?

18   A    No.

19   Q    Have you ever had any business dealings with a person named

20   Calvin Darden, Jr.?

21   A    No.

22   Q    Has Naomi Osaka ever had business dealings with a person

23   named Calvin Darden, Jr.?

24   A    Not to my knowledge.

25           MR. KINDER:  One moment, your Honor.

1              THE COURT:  Yes.

2              MR. KINDER:  No further questions.

3              THE COURT:  Okay.  Cross-examination?

4              MR. DONALDSON:  No, your Honor.  Thank you very much.

5    Thank you.

6              THE COURT:  All right.  Thank you.  You may step down.

7    Thank you very much.

8              (Witness excused)

9              THE COURT:  Okay.  The government's next witness?

10             MR. KINDER:  The government calls Brannon Anthony.

11   BRANNON ANTHONY,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE COURT:  Okay.  You may inquire.

15   DIRECT EXAMINATION

16   BY MR. KINDER:

17   Q   Good afternoon, Mr. Anthony.  Can you describe your

18   educational background, please.

19   A   Yes.  I have an undergraduate degree from Auburn University

20   and graduated law school in 1993 from Cumberland Law School at

21   Samford University in Birmingham.

22   Q   After you graduated from law school, did you practice as a

23   lawyer?

24   A   I did.  I practiced the first part of my career in

25   Birmingham and then moved to Atlanta around 2000 and have been

1    in Atlanta since them practicing.

2    Q    And since you've been a lawyer, what has been your primary

3    focus?

4    A    Mostly commercial transactions, business organizations, and

5    the latter part of my practice has been in the entertainment

6    and media space.

7    Q    And are you working now?

8    A    I am working now.

9    Q    What do you do?

10   A    I'm the general counsel for the Tyler Perry Studios

11   enterprise.

12   Q    What is Tyler Perry Studios?

13   A    Tyler Perry Studios is a collection of a number of entities

14   with a primary focus on the creation of television and thematic

15   long-form movie content, as well as operating a 360-or-so acre

16   studio facility in Atlanta.

17   Q    Who is the owner of Tyler Perry Studios?

18   A    Ultimately it's Tyler Perry.

19   Q    Who is Tyler Perry?

20   A    Tyler Perry is an African American producer, director,

21   filmmaker, writer.

22   Q    Can you give just a few examples of some of the works that

23   Tyler Perry has been involved in?

24   A    So Mr. Perry's most -- probably most famous for his *Madea*

25   franchise series of movies.  *House of Payne* is a long-running

1    television series.  We currently have a number of episodic

2    television series on BET and BET+.

3    Q    And how long have you worked at Tyler Perry Studios?

4    A    Started in June of 2015, so it's a little bit over nine

5    years.

6    Q    Have you held any titles at the Tyler Perry Studios other

7    than general counsel?

8    A    I have not.

9    Q    You've been general counsel the entire time you've worked

10   there?

11   A    That's correct.

12   Q    How many lawyers are in the legal department at Tyler Perry

13   Studios?

14   A    Currently I have three lawyers in the legal department and

15   two nonlawyer legal professionals.

16   Q    And can you describe your responsibilities as general

17   counsel.

18   A    So as general counsel for the enterprise, I'm the -- I

19   guess the senior legal officer in the corporation, so I have

20   ultimate responsibility for legal risk.  I'm also part of the

21   executive team for strategic decisions on the direction of the

22   enterprise and across all of its businesses, also manage and

23   responsible for our outside counsel.

24   Q    Can you give us a sense of some of the types of legal

25   issues that arise in your work.

O9UJDAR3                        Anthony - Direct

1    A    Well, so there's a number of issues that come up on the

2    creation of television and thematic or long-form content.  So

3    some of those are agreements that you enter into with the

4    talent, enter into with the producers.  Then we have

5    distributions deals where the content that we create and own is

6    distributed across a platform.  I'm also responsible for all of

7    our HR issues, the litigation that we have.

8          I'm also responsible ultimately for licensing the

9    space at our studio.  We've got 12 sound stages, and at any

10   time we may have two or three different third-party productions

11   coming in.  We also provide them with gear, lighting, camera

12   equipment.  So it's really all of the business issues, the

13   issues encountered in our business, including our litigation,

14   including our HR.

15   Q    Can we please publish what's in evidence as 2144A.  And

16   let's scroll through a couple of the first pages.

17         Mr. Anthony, before preparing to testify in this case,

18   had you ever seen this document?

19   A    No.

20   Q    Can we please go to page 22.

21         The heading at the top, Mr. Anthony, has a few logos

22   and reads Darden Sports Group plus Tyler Perry Studios equals

23   Dream Productions.  Do your responsibilities at Tyler Perry

24   Studios include work with respect to partnerships that Tyler

25   Perry Studios may enter into?

1    A    It could, yes.

2    Q    What kind of work is that?

3    A    So any time you're creating a production, it's not

4    necessarily a partnership.  We usually own the production, but

5    we will enter into an agreement with a different platform or

6    distributor.  Right now I think it's been publically known that

7    we have these kinds of deals with Netflix, Amazon, Viacom,

8    which is BET and BET+.

9        So entering into partnerships, me personally or

10   somebody on my team would be involved in an initial phase,

11   which almost always includes a nondisclosure agreement whenever

12   we enter into business discussions with someone.  There

13   typically would be a strategic analysis, which would include

14   legal diligence, as well as financial, and so I would be a

15   contributor to that.

16       And then of course, when we enter into the agreement,

17   the actual written agreement for a partnership or a

18   distribution deal or something like this, I would either be

19   primary draftsman or working with our outside counsel to

20   negotiate and draft ultimately the written agreement.

21   Q    The first sentence of text beneath the heading reads,

22   Darden Sports Group and Tyler Perry Studios have agreed to form

23   a joint venture production company to create, develop, and

24   distribute original content showcasing powerful, impactful,

25   intelligent, and influential women.

1          Mr. Anthony, did Tyler Perry Studios ever agree with

2     the Darden Sports Group to form a joint venture production

3     company?

4     A    No, not to my knowledge.

5     Q    If Tyler Perry Studios had entered into such an agreement,

6     is that something you would have known about?

7          MR. DONALDSON:  Objection.  Form of the question,

8     Judge.

9          THE COURT:  If you could rephrase the question.

10    Q    If an entity wanted to form a joint venture production

11    company with Tyler Perry Studios, who would they talk to?

12    A    Ultimately, I would be involved at a number of different

13    levels for a deal like that on the front end for the

14    nondisclosure agreement, and then of course negotiating

15    financial and business terms and then ultimately the agreement

16    of the written document itself.  So yes, I would have been

17    aware of something like this.

18    Q    And did you ever become aware of a proposal by the Darden

19    Sports Group to form a joint venture production company with

20    Tyler Perry Studios?

21    A    No, I did not.

22    Q    Before preparing your testimony in this case, had you ever

23    heard of the Darden Sports Group?

24    A    I had not.

25    Q    Had you every heard of Dream Productions?

1   A   No, I had not heard of Dream Productions.

2   Q   Can we go to page 18, please.

3           The heading of this page is corporate affiliations.

4   And the bottom half of the page has the text that reads, DSG's

5   corporate partners include.  And then Mr. Anthony, do you see

6   the Tyler Perry Studios logo on the page?

7   A   Yes, sir, I do.

8   Q   Can you describe where it is.

9   A   It's on the lower line.  It's the second from the right.

10  Q   The black cross with Tyler Perry Studios underneath?

11  A   Yes.

12  Q   Did Tyler Perry Studios ever enter into a corporate

13  partnership with Darden Sports Group?

14  A   No.

15  Q   The first sentence of the third paragraph reads, DSG has

16  had preliminary discussions with each of its corporate partners

17  in regards to marketing and sponsorship investment

18  opportunities with the new Atlanta Dream.

19          Did Tyler Perry Studios ever have preliminary

20  discussions with the Darden Sports Group?

21  A   No.

22  Q   The second sentence reads, DSG's corporate partners

23  understand the value of women's sports, and are committed to

24  investing in and across the Dream's various platforms and

25  properties immediately upon the closing of DSG's proposed

O9UJDAR3                          Anthony - Direct

1   acquisition.

2            Did Tyler Perry Studios ever commit to investing in

3   and across the Atlanta Dream's various platforms and

4   properties?

5   A    No.

6   Q    Page 26, please.

7            The heading of this page reads We Dream TV.  And then

8   the first sentence of the last paragraph reads, DSG's newly

9   formed partnership with Tyler Perry Studios will provide We

10  Dream TV with expanded access to the top streaming and OTT

11  platforms.

12           Did Tyler Perry Studios ever form a partnership with

13  DSG or Darden Sports Group relating to something called We

14  Dream TV?

15  A    No.  No.

16  Q    Before preparing to testify in this case, had you ever

17  heard of We Dream TV?

18  A    No, I had not.

19  Q    Page 27, please.

20           The heading is, We Dream TV.  And the bottom half of

21  the page includes a number of corporate logos.  Says, key

22  sponsors for We Dream TV include, and then you see the Tyler

23  Perry Studios logo?

24  A    I do, yes.

25  Q    Did Tyler Perry Studios ever agree to sponsor We Dream TV?

O9UJDAR3                          Anthony - Direct

1   A    No.

2   Q    Page 8, please.

3             This page is titled advisory board.  I'll read the

4   first sentence.  Darden Sports Group has assembled a world

5   class advisory board comprised of superstar leaders within the

6   areas of music, television, film, professional sports,

7   business, and community.  Second sentence, each board member

8   has committed to using their ideas, voices, platforms,

9   resources, relationships, and influence to support the Atlanta

10  Dream and its various initiatives.

11            Do you see Tyler Perry pictured here?

12  A    I do.

13  Q    Where is he on the page?

14  A    He's the second one down on the right-hand column.

15  Q    Have you seen this photograph of Tyler Perry before.

16  A    I've seen this photograph occasionally.

17  Q    Where have you seen it?

18  A    So we have stock photographs that we use to release

19  approved PR involving Mr. Perry.  And so this is one of the

20  photographs that I believe we've used from time to time in the

21  past.

22  Q    Okay.  Is this photograph publically available on the

23  internet?

24  A    I would suspect that it is, yes.  It's associated with

25  publically-facing PR in approved situations.

1   Q   Do your responsibilities as general counsel include work

2   related to advisory boards that Tyler Perry's considering being

3   a part of?

4   A   I do.  My work involves advisory boards that any of our

5   executives are wanting to be engaged with.

6   Q   What kind of work do you do in that respect?

7   A   So we typically do a conflicts analysis.  We do a financial

8   analysis.  Attaching yourself as an advisor to a particular

9   group has certain public-facing implications, so there's a fair

10  amount of diligence that goes into it.  And to serve as an

11  advisor on a board, our employees are required to get

12  pre-approval.

13  Q   And why does Tyler Perry Studios conduct diligence with

14  respect to Tyler Perry's involvement in advisory boards in

15  particular?

16  A   His name is on the building, and so our sense here is

17  actually heightened so that we want to make sure that

18  publically-facing attachments like this are properly thought

19  through and properly vetted.

20  Q   Did you ever become aware of a request for Tyler Perry to

21  join an advisory board related to the Darden Sports Group?

22  A   No.

23  Q   Ever become aware of any request for Tyler Perry to join an

24  advisory board related to the Atlanta Dream?

25  A   I did not, no.

O9UJDAR3                         Anthony - Direct

1   Q   Did Tyler Perry Studios ever authorize that this photograph

2   be used in a presentation relating to the Darden Sports Group?

3   A   No.

4          MR. KINDER:  Can we publish 2119A in evidence.

5   Mr. Ross, can you please scroll through the first several pages

6   of this document.

7   Q   Mr. Anthony, before preparing your testimony in this case,

8   had you ever seen this document before?

9   A   No.

10  Q   We can take that down.

11         Do you know a person named Calvin Darden, Jr.?

12  A   I do not.

13  Q   Has Tyler Perry Studios ever had business dealings with a

14  person named Calvin Darden, Jr.?

15  A   No, not that I'm aware of.

16         MR. KINDER:  One moment.  No further questions.

17         THE COURT:  All right.  Cross-examination?

18         MR. DONALDSON:  No, your Honor.  Thank you.

19         THE COURT:  Okay.  All right.  Thank you very much.

20  You may step down, Mr. Anthony.

21         (Witness excused)

22         THE COURT:  So ladies and gentlemen, I had mentioned

23  earlier, and I think I'm correct, that we were going to break

24  early today.  And I think now is that time, correct?  So we're

25  going to break for the day, ladies and gentlemen.  We're going

O9UJDAR3                           Anthony – Direct

1    to continue the testimony from the government, its case in

2    chief tomorrow at 10:00.

3            Please remember do not discuss the case.  You can

4    leave your pads on your chairs or you can put them in the back,

5    but you cannot take them with you.  So don't discuss the case

6    with one another or anyone else, no research and the like.  I

7    have no idea when *Dancing with the Stars* is on, but whenever

8    it's on, don't watch it.  And we'll see you tomorrow morning at

9    10:00 all right?  Go back.  Eat the cookies.  Go back and have

10   your snack and feel free to stay as long as you like and we'll

11   see you tomorrow morning at 10:00, okay?

12           (Continued on next page)

O9UJDAR3

1          (In open court; jury not present)

2          THE COURT:  So I know I still need to get the

3     government's curative instruction and instruction relating to

4     the 404(b) evidence, but does it make sense to close the loop

5     on the argument at least this afternoon?

6          MR. MEAD:  I think it does, your Honor.  I also, while

7     the witnesses were testifying, emailed the Court and Ms. Folly

8     a copy of a proposed instruction.

9          THE COURT:  So is there anything additional --

10    obviously you can -- I'll allow you time to look at the

11    proposed instruction that the government just sent over, but

12    putting aside the instruction itself, is there additional

13    argument that either side believes is appropriate with regard

14    to the government's motion?

15         MS. REED:  Your Honor, if I could submit something in

16    writing in response, I'm planning to do that this afternoon.

17         THE COURT:  In response --

18         MS. REED:  To the government's letter.  They submitted

19    a letter in further support of their application to include

20    this transcript from the plea proffer, and I'd like to respond

21    in writing for your Honor to consider today.

22         THE COURT:  Okay.  All right.  So what this means is

23    I'll close the loop then tomorrow morning.  We should meet at

24    9:30, and I'll make a ruling with regard to the 404(b)

25    information.

O9UJDAR3

1              So let me ask -- so tomorrow, as I understand it, we

2     have Ms. Brewer and then Ms. Sebade will be recalled?

3              MR. MEAD:  Correct, your Honor.

4              THE COURT:  All right.  And again, I'm not -- that's

5     the intention.  I mean, I haven't made my ruling yet on the --

6     right, Ms. Sebade is being called with regard to the judgment

7     and the testimony; is that correct?

8              MR. MEAD:  That's correct, your Honor.

9              And my understanding is that most of the prior

10    transcript is uncontroversial and not objected to, so she will

11    testify regardless.  The question is whether she will testify

12    to the impersonation as well.

13             THE COURT:  And am I correct that the intention of the

14    government is to read the prior testimony into the record?

15             MR. MEAD:  Exactly, your Honor.

16             THE COURT:  Okay.  Do you have a sense of how long

17    that may take?

18             MR. KINDER:  I think it's 15 minutes tops.

19             THE COURT:  Okay.  For all the testimony including --

20             MR. KINDER:  Yes, the transcript that we have marked

21    as an exhibit is heavily redacted to only the relevant

22    portions.  It runs 27 pages, but most of the pages are heavily

23    redacted, so there are only portions of text on each of those

24    pages.

25             (Continued on next page)

O9UBDAR4

1          THE COURT:  Okay.  And with regard to Ms. Brewer's

2     testimony, do you have a sense of how long her testimony?

3          MR. KINDER:  I would say approximately 15 to 20

4     minutes.

5          THE COURT:  Okay.  All right.  So just in terms of the

6     schedule tomorrow.  So we'll meet at 9:30.  I'll read through

7     the submission I get from defense, the written submission.  See

8     if there's any additional argument, and make the ruling on the

9     404(b) issue.  I'll take a look at the proposed language for

10     the curative instruction and make a ruling on that so that we

11     have that instruction.  Let me ask, to the extent that I grant

12     the government's motion for a 404(b), do the parties have a

13     preference with regard to giving a curative instruction before

14     the jury hears the evidence or after the jury hears the

15     evidence?  I don't have strong feelings one way or the other.

16     I just want to solicit the parties' views?

17          MR. MEAD:  Whatever the defense prefers.

18          MS. REED:  Certainly before, please.

19          THE COURT:  Before.  Okay. That's fine.  To the extent

20     I rule the testimony can come in, I will give the instruction.

21     And probably with the preface, ladies and gentlemen you're

22     about to hear, and then carry it through or something like

23     that.  And okay.  So in terms of scheduling.  As I was

24     mentioning, 9:30 to deal with the 404(b) issue.  We'll have the

25     testimony of Ms. Brewer and Ms. Sebade, whatever that may

O9UBDAR4

1    include, if I include the 404(b) evidence, if I make that

2    ruling.  And then my understanding is -- well, let me ask.

3    Will that be the government's last witness or are there other

4    witnesses?

5         MR. MEAD:  That will be the government's last witness.

6    We may move in some emails as well pursuant to the

7    certification, things that are on our exhibit list. I think

8    there is still a very small chance that we would call

9    Mr. Ecityan whose testimony will be relatively brief.  I think

10   that's very unlikely, and we'll certainly hammer that out this

11   evening and inform the defense.

12        THE COURT:  Yes.  Obviously if you can let the defense

13   know.  I don't necessarily need to know this evening, but the

14   defense obviously so that they'll be prepared tomorrow if they

15   need to be prepared for cross-examination.  Then we'll break

16   once the testimony is done, and the government rest.  I will

17   hear any oral application motion at that time from the defense,

18   hear from the government, make a ruling.  And again, typically

19   if it goes that way, and then we'll have the defense case in

20   the afternoon beginning with, who would be the first witness?

21        MR. DONALDSON:  Likely Mr. Dershowitz.

22        THE COURT:  Do we have anyone else slotted for

23   tomorrow?

24        MR. DONALDSON:  We are trying, but that may be all we

25   can get for tomorrow afternoon.

O9UBDAR4

1          THE COURT:  Okay.  What does that mean, Mr. Donaldson?

2     I know that at least with regard to one witness that the

3     witness has indicated that he is unavailable this week and

4     you're working on that, but is that who you are referring to,

5     or you were referring to somebody else?

6          MR. DONALDSON:  Actually, I'm getting updates as the

7     day is going regarding Mr. Sienko, so we may have him here.

8          MS. REED:  He's going to be here Wednesday morning.

9          MR. DONALDSON:  Mr. Sienko has now agreed to be here

10    Wednesday morning.

11         MS. REED:  He's confirmed.  He's coming from

12    Connecticut.  He's made arrangements to be here Wednesday

13    morning.

14         THE COURT:  And, Ms. Reed, when you say Wednesday

15    morning, 10:00?

16         MS. REED:  Yes, and we anticipate he will be a very

17    short witness at 10:00.

18         THE COURT:  Will you be handling the examination?

19         MR. DONALDSON:  I think Ms. Reed will be handling that

20    examination.  Oh, no, she won't.  I'll be taking care of that.

21         THE COURT:  That's why I asked because we want to make

22    sure we're on the same page.  Because if you get there and you

23    look over and Ms. Reed isn't around.  That's fine.

24         MS. REED:  Yes, your Honor.  I have to travel back to

25    Washington D.C. for a personal family matter.

O9UBDAR4

1          THE COURT:  That's perfectly fine.  Okay.  So Tuesday

2   we will have -- I apologize.  Who is the defense calling on

3   Tuesday?

4          MR. DONALDSON:  Mr. Dershowitz should be coming

5   prepared to testify in the afternoon.

6          THE COURT:  Okay.  All right.  And any chance we'll be

7   able to get someone, understanding that Mr. Sienko will now --

8   and thank you for facilitating that so we won't have too much

9   of a break, but anyone else Tuesday afternoon?

10          MR. DONALDSON:  One second.

11          THE COURT:  Yes.

12          (Counsel conferred)

13          MR. DONALDSON:  I don't think so, Judge.  Again, I'm

14   trying to fill up some space with possibly the paralegal, but

15   that may not happen, so we're still working on that.

16   Mr. Dershowitz may be the only person we have for Tuesday

17   afternoon.

18          THE COURT:  Let me see.  I'm going to try and get you

19   the charge, so maybe we could do the charging conference

20   Tuesday afternoon at some point, and that way we're occupying

21   the time efficiently. I was thinking Mr. Sienko will be

22   Wednesday morning.

23          MR. DONALDSON:  Yes.

24          THE COURT:  And tomorrow morning I'll allocute

25   Mr. Darden concerning his right to testify.  So just a brief

O9UBDAR4

preview of what that will consist of.  I will indicate that

Mr. Darden has the right to testify or not testify, but the

decision is entirely his.  Now, having said that, entirely your

decision, Mr. Darden, but after you receive counsel from your

attorneys.  But in the end of the day, whatever that counsel

is, the decision is up to you.  So I'll ask you questions that

go towards that and ask you whether you've made a decision to

testify or not.  And also indicate that although I anticipate a

response, but that you have the ability up until the time your

lawyers rest their case to change your mind.  But I do expect

for you to have communicated.  And I'll ask if you had

sufficient time to communicate with your lawyers about that

decision, and I'll similarly ask your attorneys if they had

enough time to speak with you about that decision.  So we'll do

that tomorrow morning also and before we bring the jury out.

          So I guess what we're looking at, so Mr. Sienko will

be Wednesday morning.  I'm thinking if we're able to do the

charging conference tomorrow, I'm thinking that we can get to

summations on Wednesday. Well, and I know this is -- who from

the government is going to be doing summation?

          MR. THOMPSON:  I am, your Honor.

          THE COURT:  You have a sense of how long it will be

right now?

          MR. THOMPSON:  Roughly 90 minutes.

          THE COURT:  Okay.  And Mr. Donaldson, who from the

O9UBDAR4

defense team will be handling the summation?

MR. DONALDSON:  Before we get to that.

THE COURT:  Oh, at this stage obviously the defense hasn't put on a case, but knowing the witnesses, is there going to be a rebuttal case or you just don't know at this stage?

MR. MEAD:  It's tough to know.  Our guess is that if the witnesses are just Mr. Dershowitz and Mr. Sienko, probably not.  My hesitation is if the defendant were to testify, I think then there'd be a substantial chance for a rebuttal case.

THE COURT:  All bets are off in terms of timing of that.  And what about Mr. Kenyatta Slade?

MR. DONALDSON:  That's what I was about to say. Mr. Sienko will definitely be here according to him on Wednesday morning.  We have, like I said, this morning I have spoken to Mr. Slade.  He may very well be here on Wednesday as well, testifying as well.  Again, I don't have any 26 to give the government, nor do I have any exhibits at this time, but I did inform him that he may be testifying on Wednesday as well. So if that does occur, my suggestion would be that we do the summations Thursday morning rather than starting Wednesday midday.

THE COURT:  Well, look, I guess what I'd like to hear -- I just don't want significant gaps.  Obviously it does appear since Mr. Sienko is going to testify on Wednesday that we're going to get that done this week.  So with regard to

O9UBDAR4

Mr. Slade, has Mr. Slade received a subpoena?

MR. DONALDSON:  He has not received a subpoena, but again I have spoken with him personally, and he has informed me that he can be here on Wednesday.

THE COURT:  Okay.  But the subpoena as --

MR. DONALDSON:  We'll get him one today.

THE COURT:  Just because, to quote one of my former trial partners, it's not exactly a party invitation, right.  And again, obviously he is a third party.  He's not a party, but the only recourse that I have and that you would have is that if he has a subpoena.  And obviously if there's some reason why he can't appear, obviously I'll hear that.  And so I'm just asking so that we can move the case along.  But if he does have some professional personal obligation that he needs to deal with, I'll hear that.

MS. REED:  We'll get him a subpoena today, and he's based in New York so we don't anticipate any issues.

THE COURT:  Okay.  Fantastic.  And let me ask.  I don't need to know the specifics, but is he being called in any way as a character witness or anything like that?

MR. DONALDSON:  No, your Honor.

THE COURT:  Cause then I need to get a sense of what that testimony will be.

MR. DONALDSON:  No, he's not being called as a character witness.

O9UBDAR4

1    THE COURT:  All right.  So with regard to summations.
2    It's a little up in the air.  Why don't we say this so that
3    everybody has some clarity so I'm not going to have people ring
4    their hands and figure things out.  We're going to do
5    summations Thursday morning.  So everybody needs to be prepared
6    towards that.  It's ample time to get that done.  It allows
7    time that if there happens to be a government rebuttal case
8    that we can get that in even if summations are pushed a little
9    bit later in the day.  Who from the defense is got -- okay.
10   Mr. Ricco's pointing in your direction.  Could be Ms. Reed.
11   Seems like he was doing more so Mr. Donaldson.

12        Do you have a sense of how long?  And again, part of
13   this is because jury instructions take a fair amount of time.
14   What I'd like to do though is to have, if we can get started on
15   Thursday have all of the summations in the morning before
16   lunch, so an hour and a half -- well, we'll see.  I don't want
17   the jury to be in the jury box and hungry.  But at least the
18   main summations will be done before lunch.  That's my plan.

19        MR. DONALDSON:  Judge, I can say that I plan on going
20   about 90 minutes as well.  So if the government's going 90
21   minutes and I'm going to 90 minutes, I don't know if we can be
22   finished by 12:45.

23        THE COURT:  I would tell the jury that they should
24   come in earlier and we can start at 9:00 if they can make it.
25   Obviously the jurors have to travel in, so we can have that

O9UBDAR4

1    time to get that done.  The jury will take lunch around the

2    time they usually do.  We'll come back with rebuttal summation

3    and then have the jury charged which is going to take a certain

4    amount of time.

5            MR. DONALDSON:  They don't have to do rebuttal

6    summation if they don't want to.  They could just not do that.

7            THE COURT:  It all depends on what you say.  So you're

8    right, the government doesn't have to do that, but in my time

9    as a lawyer I've never seen the government not do a rebuttal

10   summation.  Okay.

11           Anything else we need to take up at this stage?  So

12   9:30 we're going to come in to deal with the 404(b) issue and

13   the argument for Mr. Darden.

14           MR. MEAD:  Just a couple of things, your Honor.

15           THE COURT:  Go ahead.

16           MR. MEAD:  One is we're still hoping to get some more

17   clarity on whether there are possibly additional witnesses

18   other than the folks we've mentioned.  In particular the

19   paralegal.  If there's going to be any sort of chart, it's been

20   mentioned for about a week now, and we haven't seen a draft or

21   anything like that.  Obviously we want time to make sure it's

22   accurate before it gets thrown up in front of a jury.

23           THE COURT:  Let me just ask the defense.  Putting

24   aside the chart, which I understand may be in preparation, will

25   you be calling a paralegal in connection -- because the

O9UBDAR4

1    testimony is now come in with regard to or exhibits have come

2    in with regard to text and other things.  I assume if it's a

3    summary, that the paralegal is going to be a summary witness of

4    some sort.  Is that still the defense's intention?

5              MR. RICCO:  Sure it is, Judge.  And I know Mr. Mead

6    loves to make this application, and he's made it several times

7    during the trial, and he may even make it again.  But we've

8    been sitting here today.  Once we have an opportunity not to be

9    sitting here, we'll finish off the transcript, make the chart

10    and send it to him.  And I hope to have him so happy about this

11    small chart that he's going to receive.

12              THE COURT:  Let me say this as a general matter, both

13    sides have got of lot of lawyers and a lot of legal talent on

14    both sides, right.

15              MR. RICCO:  Right.

16              THE COURT:  So there is the ability to divide and

17    conquer.  Understood because Mr. Ricco you did handle one

18    witness today, the only thing I don't want to have is a delay.

19              MR. RICCO:  Judge, you're not going to have a delay.

20    It's not going to happen.

21              THE COURT:  Well --

22              MR. RICCO:  It won't happen because of the paralegal

23    and the chart.  It's impossible for it to happen.  It's just so

24    narrow.

25              THE COURT:  The proof is in the pudding, but that's

O9UBDAR4

1   fine.  And the schedule is -- oh, so, Mr. Ricco, Mr. Dershowitz

2   will be tomorrow afternoon, when would the paralegal be

3   testifying?

4         MR. RICCO:  After Mr. Dershowitz, but we can

5   anticipate his testimony from the 3500 material as it relates

6   to -- I just saw a little quizzical look.  To the extent that

7   Mr. Dershowitz' testimony will relate to that chart, to the

8   extent that it does, that's something that we can anticipate

9   from the 3500 material.  So that won't slow down the completion

10  of the chart which the government wants.  And we'll get them

11  the chart this evening as soon as I can get it.  And, Judge, so

12  you know, we have been dividing up the different

13  responsibilities and been working very hard at accomplishing

14  it.

15        THE COURT:  By my comments I wasn't suggesting that

16  you weren't working hard.  It's just that everybody's been

17  here, and so I completely understand that.  That's good.  We'll

18  have, after Mr. Dershowitz, the paralegal, assuming there's no

19  speed bumps, but I could take up issues with regard to the

20  chart.  But prior to me taking up issues with the chart, I'd

21  like the parties to meet and confer.  For example, there may be

22  something that you see that -- and this is entirely up to you

23  how you want to handle it.  You look at the chart and you say

24  there's a mistake or something like that, you can decide not to

25  do anything, and the mistake will come out during the

O9UBDAR4

cross-examination.  But if there's an objection to the chart in
something that it says, obviously I can deal with that.  In
other words, not if there's some narrative in there or
something like that that's objectionable as a demonstrable
exhibit, or if the exhibit is going to come in or there's an
objection because it's not technically a summary.  I'll hear
those objections tomorrow morning.  And so I guess what I would
ask, if I could get a copy of the proposed demonstrative when
you send it to the government that would be great if you can
copy us.

          MR. RICCO:  Will do, Judge.

          THE COURT:  Understanding that if there's something
that happens -- well, let me ask.  So I take it the paralegal
will be available after Mr. Dershowitz.  If for some unforeseen
reason that testimony has to spill over, that we would spill it
over -- well, I want to get it done on Wednesday, so let's make
that happen.

          MR. RICCO:  So do we, Judge.

          THE COURT:  Okay.  Mr. Mead.

          MR. MEAD:  There's also been mention of Ms. Paulk the
defendant's sister.  I'm not sure if that's still up in the
air.  Also to the extent that there are going to be exhibits,
new exhibits introduced through Mr. Dershowitz or Mr. Sienko,
obviously we'd like to know what they are even if they are on
our exhibit list.

O9UBDAR4

1          THE COURT:  That's fair.  And so that should be

2    communicated this evening.  If there are exhibits, even if

3    they're government exhibits, that you advise the government of

4    what exhibits those are.  And with regard to Ms. Paulk, and I

5    think there was also reference to the gentleman that did the, I

6    want to say landscaping, but other work Good Homes, or I can't

7    remember the name of it.  So first, Ms. Paulk, is Ms. Paulk

8    going to be a witness?

9          MR. RICCO:  Judge, we have the same response at this

10   hour at 4:00 in the afternoon to the same request that was made

11   this morning at 10:00.  We will notify the government of the

12   position.  I told them before court what it was.  I've also

13   said earlier I didn't want to put it on the record for reasons

14   that I don't want to put on the record.  I informed them of

15   that situation.  And Mr. Mead is -- he has to be satisfied with

16   it.  He can't make the same application three, four times a

17   day.  We're still sitting here.  The answer is, there's no

18   additional 26 information.  There are no additional exhibits.

19   There's none, none, none.  The answer will be the same if

20   Mr. Mead decides to get up at 4:30 and make the same

21   application.

22         THE COURT:  What I would say is the following: If you

23   believe that I should be looped in as to what the sticking

24   point is, you can file something under seal.  And I say that to

25   both sides.  Cause, let me ask, the way you said it, Mr. Ricco,

O9UBDAR4

1  I take it you've communicated whatever the issue is to the

2  government.  Is that correct?

3        MR. RICCO:  I've communicated to the government who we

4  believe will be the actual witnesses, and I don't want to say

5  more than that on the record for reasons -- I have reasons to

6  not put it on the record.

7        THE COURT:  Look --

8        MR. RICCO:  But at the same time, they're my

9  colleagues, and I want them to know what they need to know.

10  All they have to do is ask us.

11        THE COURT:  Here's the bottom line, right.  I'm the

12  person who's in charge of making sure the trains run on time

13  here.  And so I'm not sure what the hold up is about -- and

14  obviously defense doesn't need to put on anybody.

15        MR. RICCO:  Exactly, Judge.

16        THE COURT:  But there has been mention -- I just don't

17  want a situation -- well, what I would suggest to the

18  government is, you should treat it as Ms. Paulk is going to

19  testify.  If there are steps that you're going to take in

20  advance of her testifying, you should take those steps.  And so

21  with regard to, there was I thought one other possibility which

22  is the --

23        MR. DONALDSON:  Mindful Homes.

24        THE COURT:  Is that the person from the company?

25        MR. DONALDSON:  Yes, Mr. Ryan Paddock is the owner of

O9UBDAR4

1   Mindful Homes.  I think one of the agents talked about that

2   extensively regarding the pictures in the house and stuff.  We

3   have been communicating with the government as the Court wanted

4   us to do.  I reached out to Mr. Paddock with the information

5   that they gave me.  I emailed him.  I also called him and left

6   him several messages.  We just got that contact information

7   this morning or late this afternoon.  I reached out to him, and

8   I'm waiting for him to call me back.  We also talked about the

9   stipulation, the language of that.

10        I draft some language to that effect, gave it to the

11  government.  We just need to confirm something with Mr. Paddock

12  about that language.  If he says yes, then I'll let the

13  government know he says yes.  If he says no, then I'll let them

14  know he says no.  We are working to try to get that done.

15        THE COURT:  All right. I understand that he may have

16  to review, because if it's a testimonial stipulation, you have

17  to get the witness say so.  Might I suggest, if he hasn't

18  returned your call or otherwise communicated with you when you

19  get back to your office that you -- again, this is entirely --

20  I don't want to dictate this, but serve him with a subpoena,

21  that might get him to be responsive.

22        MR. DONALDSON:  Yes, we generally do that after we've

23  tried to call and reach out to him first, and if he doesn't

24  respond then.

25        THE COURT:  It's just that we have a shorter window

O9UBDAR4

1    here.  And so I just want to make sure, A, to the extent he's

2    got -- for all I know he could be on vacation this week.  So I

3    don't know.  I just want to line that up so that if there's an

4    issue, we can address it.

5              MR. DONALDSON:  I'm working on it, Judge.

6              THE COURT:  Yes, Mr. Mead, you look like you were

7    about to rise.

8              MR. MEAD:  So summation on Thursday?

9              THE COURT:  Correct.

10             MR. MEAD:  And we previously talked about potentially

11   a stip for Mr. Sienko.  I'm not sure if that's something the

12   defense is still interested in, entirely up to the defense.  My

13   only thinking is that I think there's a world in which we could

14   avoid having the jury come in for 20 or 30 minutes on Wednesday

15   if they're only going to hear brief testimony from someone.  If

16   that doesn't work out, of course I understand.  I just wanted

17   to throw it out as a possibility.

18             THE COURT:  Sure.  What I suggest is you folks speak

19   and give me a sense of where that stands having the jury come

20   in for 20 minutes or so on Wednesday, might make more sense to

21   have them in early, 9:00, and get that testimony done.  But

22   again, whatever works, and obviously the stipulation is

23   entirely up to the parties if you're able to reach agreement on

24   any stipulation with regard to any of the remaining witnesses.

25             MR. DONALDSON:  We did discuss that.  I told Mr. Mead

O9UBDAR4

1    that I will be discussing that as well with him for a week.

2    We've had those conversations.

3         MR. MEAD:  On the government's case, the defense had

4    mentioned possibly wanting to redact part of the judgment which

5    we plan to introduce with Ms. Sebade tomorrow.  I'm not sure if

6    that's something the defense is still thinking about.

7    Obviously we're going to introduce it tomorrow obviously we're

8    at the end now.

9         THE COURT:  Mr. Mead, the copy of the judgment you

10   provided was it just the judgment as is or were there already

11   redactions made to portions of that?

12        MR. MEAD:  There were not redactions made.

13        THE COURT:  Ms. Reed.

14        MS. REED:  Yes, your Honor.  And we touched on this

15   when we last argued about this.  There are references in the

16   judgment to the actual sentencing supervised release, things

17   that are not with the purview of the jury's decision making.

18   So we would certainly move to have those details redacted from

19   the judgment.  There's also monetary figures within the

20   judgment, things that we would submit are not necessary for

21   what the government's trying to accomplish there.

22        THE COURT:  Could I, and I apologize if it's an

23   exhibit, could you tell me what exhibit the judgment is, and

24   that way I can take a look at it.  But I expect tomorrow

25   morning for the parties to have communicated and to have an

O9UBDAR4

1    understanding of which specific redactions the defense is

2    proposing.  And if there's no objection, that's fine.  But if

3    there's an objection, I can hear it tomorrow morning just so

4    that we can have that taken care of.

5         MS. REED:  I think we might be able to reach an

6    agreement on that hopefully.

7         MR. MEAD:  It's Government Exhibit 1002 for the

8    government's reference.

9         THE COURT:  Thank you. I'll take a look at that and

10   give my own thought to it before I hear from the parties.

11        MR. MEAD:  And just while we're on the subject.  I

12   think we would have no objection to redacting the term of

13   imprisonment.  I think we do think that the terms of the

14   supervised release and the conditions of supervised release are

15   somewhat relevant here, and that they are, one, explanations to

16   why the defendant concealed the funds he was receiving on the

17   financial penalties.  I'm not sure we fully thought that

18   through yet.

19        THE COURT:  Let me ask, do the terms of supervised

20   release concern any opening of lines of credit and other

21   disclosures and willing to turn over documents when requested?

22        MR. MEAD:  We looked at this about a week ago.  My

23   recollection was that he was supposed to turn over financial

24   information if requested.

25        THE COURT:  So it sounds like that's where the dispute

O9UBDAR4

1    may arise with regard to certain of the terms of supervised

2    release.  And, Mr. Mead, what about the financial things?  I

3    don't know whether that's the fine or forfeiture or something

4    else?

5            MR. MEAD:  I assume it's the forfeiture and

6    restitution.  I'm not sure we thought that through yet, so we

7    can think about that quickly and take a position.

8            THE COURT:  At least we can maybe take care of the

9    special assessment, right?

10            MR. MEAD:  I think so, your Honor.

11            THE COURT:  All right.  So we can talk about it

12    tomorrow morning.  And sounds like largely there'll be

13    agreement maybe on the margins of some of the supervised

14    release.  Let me ask, because I haven't gone back and looked.

15    Had Mr. Darden completed his supervised release prior to -- in

16    other words, I didn't go back to see whether there was a letter

17    to me about supervised release and transferring.  Was there a

18    violation on supervised release, that's what I should ask?

19            MR. MEAD:  He requested and received early termination

20    of supervised release in the middle of the charged period, your

21    Honor.

22            THE COURT:  All right.

23            MR. MEAD:  Last thing before I turn to my colleague to

24    make sure it's actually the last thing.  The charge conference

25    sounds like actually Tuesday or Wednesday.  The Court is still

O9UBDAR4

1   working through the timing.

2          THE COURT:  Correct.  I think I plan on getting the

3   charge this evening and that we do the charge conference

4   tomorrow afternoon.

5          MR. MEAD:  That would be great from the government's

6   perspective.  I don't know if the Court wants a responsive

7   letter from the defense on our jury instruction letter.  I

8   don't know if the defense objects to our jury instruction or

9   not, but obviously that may be one of the Court's issues should

10  deal with at the charge conference.

11         THE COURT:  That's part and parcel of the 404(b).  I

12  expect that if there is an objection to the proposal that we'll

13  hear.  Is that what you're referring to?

14         MR. MEAD:  No, your Honor.  The contractual language,

15  your Honor.

16         THE COURT:  So everybody should be prepared to talk

17  about that at the charging conference.  And if there is a

18  written submission, the defense should get it to me in advance

19  of the charging conference tomorrow afternoon.  Yes,

20  Mr. Donaldson.

21         MR. DONALDSON:  I just want to say thank you.  We'll

22  be prepared to argue or discuss that last request by the

23  government related to the contractual language for the jury

24  instructions.

25         THE COURT:  Anything else from the government?

O9UBDAR4

MR. MEAD:  I think now we're finally done, your Honor.

THE COURT:  Never over until it's over.

MR. DONALDSON:  Is that a song?

THE COURT:  I thought sort of -- this just occurred to me that maybe I should start having things that are like Yogi Berra.  I could have different sayings that people can use -- you don't know even know.  There are like blank stares. You don't even know who Yogi Berra is.

MR. DONALDSON:  He lives around the corner for me.

THE COURT:  Mr. Ritchin raises his hand.  Your homework tonight is to figure out Yogi Berra and why talking about Yogi Berra and his Yogi Berisms so to speak. Yes, Mr. Donaldson.

MR. DONALDSON:  Nothing about Yogi Berra. Nothing.

THE COURT:  All right.  That's just me prattling on. So we're good to go.  We'll see everybody at 9:30.  Deal with the 404(b) and any other issues, and we'll be prepared to do the charging conference tomorrow afternoon.  Okay.  Thank you very much.  We'll stand adjourned.

(Adjourned to October 1, 2024, at 9:30 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    OLIVIA SEBADE

 4    Direct By Mr. Kinder . . . . . . . . . . . . 748

 5    JEFFREY SCHMIDT

 6    Direct By Mr. Thompson . . . . . . . . . . . 767

 7    Cross By Mr. Ricco . . . . . . . . . . . . . 811

 8    Redirect By Mr. Thompson . . . . . . . . . . 838

 9    Recross By Mr. Ricco . . . . . . . . . . . . 843

10    STUART DUGUID

11    Direct By Mr. Kinder . . . . . . . . . . . . 844

12    BRANNON ANTHONY

13    Direct By Mr. Kinder . . . . . . . . . . . . 852

14                        GOVERNMENT EXHIBITS

15    Exhibit No.                              Received

16    401-002  . . . . . . . . . . . . . . . . . . 765

17    317  . . . . . . . . . . . . . . . . . . . . 778

18    323  . . . . . . . . . . . . . . . . . . . . 779

19    328  . . . . . . . . . . . . . . . . . . . . 782

20    376  . . . . . . . . . . . . . . . . . . . . 784

21    377  . . . . . . . . . . . . . . . . . . . . 785

22    378  . . . . . . . . . . . . . . . . . . . . 786

23    363  . . . . . . . . . . . . . . . . . . . . 788

24    341  . . . . . . . . . . . . . . . . . . . . 790

25    301  . . . . . . . . . . . . . . . . . . . . 794
```

360 . . . . . . . . . . . . . . . . . . . 798

361 . . . . . . . . . . . . . . . . . . . 801

364 . . . . . . . . . . . . . . . . . . . 807

359 . . . . . . . . . . . . . . . . . . . 819