OA1BDAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                        23 Cr. 134 (VSB)

5   CALVIN DARDEN, JR.,

6                                       Trial
                Defendant.
7   ------------------------------x

8                                       New York, N.Y.
9                                       October 1, 2024
                                        9:45 a.m.
10

11  Before:

12                    HON. VERNON S. BRODERICK,

13                                      District Judge
                                        -and Jury-
14                       APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    KEVIN MEAD
17  STEPHEN J. RITCHIN
    WILLIAM C. KINDER
18  BRANDON C. THOMPSON
         Assistant United States Attorneys
19
    DONALDSON CHILLIEST & MCDANIEL LLP
20  BY:  XAVIER R. DONALDSON
         -and-
21  ANTHONY RICCO
    STEVEN Z. LEGON
22  ERICA A. REED
         Attorneys for Defendant
23
    Also Present:
24  Alexander Ross, Paralegal
    Arjun Ahuja, Paralegal
25  Melissa Baccari, FBI Special Agent

OA1BDAR1

1             (Trial resumed; jury not present)

2             THE COURT:  Okay.  So there are a couple of issues to

3    take up.  The first issue I want to deal with is the issue of

4    the 404(b) evidence.  I received a letter that was filed on the

5    docket last night from Ms. Reed in further opposition to the

6    government's request to admit principally the testimony.  Is

7    there anything else that the parties wish to add with regard to

8    the 404(b) evidence?  I'll hear that now.  First from the

9    government's since it's their application, and I'll hear from

10   Ms. Reed if there's anything else.

11            MR. MEAD:  Very briefly, your Honor.  I think there's

12   overwhelming evidence that this phone impersonation as set

13   forth in the government's letter.  The defense letter doesn't

14   really engage with any of that evidence or contest any of it.

15   Walking through the four points the defense letter makes.  We

16   do not contest -- we do not disagree that Calvin Darden, Sr.,

17   had one or two real conversations with people connected to the

18   Atlanta Dream.  That of course does not mean that he was not

19   also impersonated.

20            THE COURT:  That's right.

21            MR. MEAD:  As to number two, sufficient similarity.

22   This is the defendant impersonating literally the same person

23   that he did in the prior fraud.  I can't imagine a crime that

24   is more similar.  As to number three, premature introduction.

25   This is going to be the very, very last thing in the

OA1BDAR1

1    government's case.  There's no rule saying we have to wait to
2    see if the defense puts on a case before we introduce something
3    like that.  Knowledge and intent have not been disclaimed.
4    They would have needed to be disclaimed I think in the opening,
5    and certainly by now.

6         And as to prejudicial impact.  We're introducing
7    evidence that the defendant did the exact same thing that he
8    did in this case.  I don't understand how it could be more
9    prejudicial than the current allegations since it's the same
10   crime essentially.  Happy to answer any other questions from
11   the Court.

12        THE COURT:  Ms. Reed, anything else from the defense?
13        MS. REED:  Yes, your Honor.  So I will address the
14   bullet points in the government's it submission.  It's
15   certainly not the exact same thing.  The bullet points that
16   they listed all pertain to communications between Mr. Darden
17   and the alleged co-conspirator, which is certainly not the case
18   that was described in the testimony in the proffer in which
19   Mr. Darden cooperated.

20        THE COURT:  But isn't it here both Mr. Briscoe, but
21   also Mr. Schmidt?

22        MS. REED:  And Mr. Schmidt testified that at no point
23   did he think that he was talking to anyone other than Calvin
24   Darden, Sr.

25        THE COURT:  But isn't that the point?  In other words,

1    if the point of the impersonation is to get someone to believe

2    that you are in fact the person you're claiming to be, to lull

3    them, to be able to suggest to them certain things that

4    perhaps, I guess the inference is, that the father would be

5    unwilling to say.  So I understand exactly what you're saying,

6    but the idea that before the government could offer the

7    evidence that someone has to be on alert sort of turns it on

8    its head because it would mean that to testimony that someone

9    could impersonate somebody.  But unless the people against

10   whom -- unless it was a bad job and failed, you couldn't offer

11   that evidence.

12            MS. REED:  I think the issue that I'm having with

13   seeing it that way is the government hasn't presented any

14   testimony other than the government that says they think that

15   he's impersonating.  The only piece of evidence that the

16   government has submitted is a telephone number that they allege

17   the defendant controls.  That's it.  That's their basis.

18            THE COURT:  And why isn't that sufficient, and why

19   then doesn't it go to the weight?  In other words, is there any

20   evidence that that phone was connected to the Calvin Darden,

21   Sr., any evidence in the record?  Is the defense going to put

22   on any evidence that it was connected to senior?

23            MS. REED:  Well, unfortunately Mr. Senior can't

24   testify, so there's that.

25            THE COURT:  Have you pulled his telephone records?

1    Did you know what his cell phone number was?  Do you know what

2    his hard line was cause he's of a certain age that probably he

3    has a hard line.

4            MS. REED:  I'll say this, your Honor.  If Mr. Darden

5    had decided to take the stand or would decide to take the

6    stand, I'm confident that would come out.  But for that, all

7    we're dealing with is a phone record, right, and the

8    government's theory that is based upon this prior conviction

9    from ten years ago.  And with such a loose connection to any of

10   the facts that have actually come out, it's wildly prejudicial.

11   The jury will sit up here and hear for 15 minutes testimony

12   that is really focused on this theory of impersonation that

13   hasn't been fully developed by the government.

14           THE COURT:  What would that look like?  Because the

15   impersonation that came out in the --

16           MS. REED:  -- the cooperation proffer.

17           THE COURT:  In connection with that came from

18   Mr. Darden's mouth itself.  Was there any other evidence in

19   that case that supported that he was impersonating someone?

20           MS. REED:  We don't know.

21           THE COURT:  So the very nature of the -- sort of the

22   clandestine nature of an impersonation, means that you're

23   probably not going to have direct evidence where someone is

24   caught necessarily redhanded.  And so what you have is -- and I

25   guess you could argue that the actual -- and I don't remember

1    all the connections, but that the phone numbers being connected

2    to Mr. Darden, Jr., that is direct evidence of those phone

3    numbers.  And the government is going to argue the inference

4    since he used it before and that he was using it in this

5    context.  In other words, my understanding is that for some of

6    the phones -- well, let me ask the government this question.  I

7    just don't remember.  Is it one phone that is exclusively used

8    in the impersonation and is not used by Mr. Darden, Jr. in

9    connection with other communications?

10           MR. MEAD:  No.  So there are two phone numbers, and he

11    uses both phone numbers for both purposes.  So to Briscoe he

12    uses one phone number to impersonate, and one phone number as

13    himself, and then he flips it for BMO.

14           THE COURT:  Go ahead, Ms. Reed.

15           MS. REED:  I didn't hear testimony from anyone on the

16    stand that speaks to that.  That is purely the government's

17    characterization of the use of telephone numbers.  I also have

18    not heard from anyone on the stand that that was the way in

19    which this alleged fraud was carried out.  It's been quite the

20    opposite.  There's been testimony that directly, directly

21    alleges a mix allegation about Mr. Darden.  There's been

22    nothing that focuses on that being the *Modus operandi* of how

23    this was carried out.  It's certainly not even necessary.  They

24    have put forth witnesses that have provided testimony that has

25    nothing to do with an allegation that he impersonated anyone to

1    make their case a fraud.  It's just piling on something that

2    hasn't been established in fact, will put him in a position

3    where he certainly will not have a fair trial.  As soon as the

4    jury hears this very detailed testimony and this proffer about

5    him admitting to impersonating his father, there's amounts

6    provided, there's names, there's ways in which he has done

7    that, that is exactly the inference.  That's the connection.

8    That will make that point for the government.  They don't have

9    to put on any testimony or evidence other than that.  It's

10   proving it. It's not showing intent.  It's showing, yes, this

11   is what happened, connect that dot based on what happened ten

12   years ago that he took responsibility for, admitted and was

13   punished for.

14             THE COURT:  Okay.  First of all with regard to a fair

15   trial, I entirely disagree.  I think Mr. Darden has gotten an

16   eminently fair trial.  I think that knowledge and intent was

17   never taken off the table.  Although Mr. Ricco opened in a way

18   that didn't inject knowledge and intent, there certainly was

19   cross-examination of various witnesses that at one point sort

20   of the argument could be made that Briscoe was doing this on

21   his own; that suggested that Howard is at fault because he

22   signed this agreement, that suggested that Darden, Sr. was

23   somehow involved in this.  And so I think knowledge and intent

24   regardless of what the argument is going to be in summation has

25   clearly been put in play.

1          With regard to *Modus operandi*, the issue is, using

2     someone's name who has credibility in the private sphere and in

3     the public, that was done in the pitch book and continued

4     throughout.  So the pitch book has a big picture of Darden, Sr.

5     It's got his whole bio.  The entity that was created was

6     created around Darden, Sr., all to get the Dream.  And so the

7     reason I think the argument would be is that there was

8     impersonation is because the use of that name was integral to

9     the fraud into making it work and for Mr. Howard to be on

10    board, for the WNBA to be on board at least in part.

11         So I think that for those reasons -- and I had

12    previously outlined sort of the underlying law with regard to

13    404(b), and I would adopt what I had previously said.  But here

14    as I indicated, knowledge and intent have not been taken off

15    the table; and if anything are squarely before the jury even if

16    there's no argument to that effect, there's cross-examination

17    with regard to that.  The evidence that the government has put

18    forth with regard to the telephone numbers I believe is

19    sufficient for the government to argue the inference.  The

20    telephone numbers that are used based upon the text appear to

21    be Mr. Darden, Jr. at certain points and Mr. Darden, Sr. at

22    other points.  From the text it's fairly clear because at one

23    point there's a reference to a stroke, and at another point

24    it's reference to son.  So I think that that is sufficient for

25    the government to make the argument.  And I don't believe that

1    it has to be, as I indicated earlier, that any witness has to

2    testify that they suspected what was going on.  Had

3    Mr. Schmidt -- I imagine that if anyone thought that there was

4    someone impersonating someone else in connection with the deal,

5    Mr. Schmidt said that he would have gone internally to the

6    lawyer.  So I'm going to allow the government to admit the

7    judgment.  As I understand it, because I'm not sure if there's

8    been communication or whatever the redactions are, and we can

9    talk about that in a moment, as well as the testimony from the

10   prior trial on the issues of knowledge, intent, lack of mistake

11   and *Modus operandi* among other things.  Thank you.

12          Obviously in making my comments that the defense is

13   free to argue sort of counter-inferences that there's

14   information that Darden, Sr. was clearly involved in certain

15   ways.  There was video calls and things like that.  And to

16   suggest that, no, it was in fact Darden, Sr. who was on those

17   calls.  Obviously my ruling I'm not at all precluding any

18   arguments in that regard with regard to the defense.  Any

19   questions with regard to that?

20          MS. REED:  No, your Honor.

21          THE COURT:  Thank you.  Next I want to deal with the

22   issue related to the defense case.  Because I think some of the

23   other things deal with the charge and can deal with that; in

24   other words, the promissory note issue.  Let's talk about --

25   and Mr. Legon, I think you may be taking the lead on this.

OA1BDAR1

1    There are four issues referenced in the letter from Mr. Ricco

2    of earlier this morning.  The first is that up to the year of

3    2020 to 2021 during the relevant time period of the crimes,

4    Dwight Howard had $240, $245 million in salary earnings from

5    his contract in the NBA.  So my first question is how is that

6    relevant?

7             MR. LEGON:  Your Honor, it goes to his wherewithal,

8    his financial wherewithal to have the ability to purchase the

9    Dream in the first instance, and it also goes to -- there was

10   testimony here about a big tax debt, a large tax debt, and we

11   think that showing that he had these immense earnings bolster

12   our argument that basically show that we can connect it up that

13   this is relevant because it really goes to his underlying

14   ability and what was really going on here which is going to be

15   part of the defense case.  Also in terms of the numbers.  I

16   think that it's important for the jury to understand who he is

17   and the amount of earnings that he had during his career.

18            THE COURT:  Why is that latter part -- why is it

19   important for the jury to hear that, other than to perhaps

20   suggest to the jury, ah, you know, he earn so much money, why

21   is this a big deal?

22            MR. LEGON:  That's not our argument, your Honor.

23            THE COURT:  That doesn't necessarily have to be your

24   argument, but the suggestion is that you want the jury to know

25   who he is.  I don't know what that means.

OA1BDAR1

1          MR. LEGON:  We talked about net worth.  And the bottom

2     line is that he answered questions in such a way that in both

3     direct and cross-examination that I think that the fact that he

4     has earned and signed all these multiple contracts that gave

5     him this wealth, essentially that it's relevant and it's also

6     relevant to the large tax bill he had.  And was he really in

7     the position to have the financial wherewithal to purchase

8     this.  How did it affect his decisions about how to go about

9     this transaction.  There was testimony from Mr. Schmidt that

10    there were many different vehicles and many different ways, but

11    he chose the easiest way.  And I think that his underlying

12    financial situation is very relevant to the testimony.

13         THE COURT:  Let me ask, hasn't it already come in

14    through him that during his career, I think the testimony was,

15    that he's earned more than $200 million?

16         MR. LEGON:  No, your Honor.  He didn't answer the

17    question.

18         THE COURT:  All right.  Well, I'll check that I guess.

19         MR. LEGON:  He said he didn't know I believe.

20         THE COURT:  Okay.  So what exactly is the argument

21    that you intend to make?  In other words, that he had the

22    financial wherewithal to purchase the Dream?

23         MR. LEGON:  It completes the defense's narrative.

24    Essentially it completes the defense's narrative about what the

25    underlying circumstances are, what his intentions were and what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OA1BDAR1

1    was going on with this transaction and the purpose of this

2    transaction.  I think it's for those particular reasons.

3            THE COURT:  I'm just not really sure what that

4    narrative is.  There was a question of Mr. Schmidt about the

5    tax liability and could he get the money back.  This is when

6    the deal has basically started to go south if not already gone

7    south, could he get the money back.  Is it possible to get it

8    back sooner rather than later because he had this tax bill.

9    That never happened.  There's no testimony about what that tax

10   liability is, and it seems contra to suggest that he earns all

11   this money, but then he has this tax liability.

12           MR. LEGON:  That's not the argument, your Honor.  I'm

13   sorry, your Honor.

14           THE COURT:  Please articulate what the argument is.

15           MR. LEGON:  I think that the argument is that it

16   completes the defense's narrative.

17           THE COURT:  Why don't we do this, take a moment.  You

18   guys speak amongst each other, and then we can deal with this

19   issue and we'll come back to it.

20           MR. LEGON:  Thank you, your Honor.

21           THE COURT:  So now the next issue is the judgment in

22   the amount of 8.6 million and change and then the breakdown.

23   How is that relevant to the criminal charges here?

24           MR. LEGON:  The judgment relates to the government's

25   theory that he paid in this money and he got nothing in return.

OA1BDAR1

1    He got nothing for his investment.

2              THE COURT:  Has he collected any money?  Has

3    Mr. Darden or the enterprise paid any money?

4              MR. LEGON:  No, your Honor.

5              THE COURT:  So what did he get?

6              MR. LEGON:  He got a judgment.

7              THE COURT:  Do you know how much he paid in legal fees

8    in order to get that judgment?

9              MR. LEGON:  Yes, your Honor.

10             THE COURT:  Go ahead.

11             MR. LEGON:  There was a judgment for attorneys fees in

12   the amount of $7,627.25 as part of the total judgment.

13             THE COURT:  How is that that's something he got?  In

14   other words, it's something he had to basically hire a lawyer

15   in order to sort of get that.  So I'm not sure.  How is that

16   relevant to the criminal charges and how is it relevant to a

17   defense?

18             MR. LEGON:  It's a debt of the Darden Sports Group,

19   and he holds a judgment which he can pursue.  He has the legal

20   ability to pursue this through collections and through the

21   courts to try to ascertain whether or not there's anything he

22   could collect, any value, any assets, and so that's the

23   argument there.  It goes also to the narrative that he does

24   have something.  He has a paper judgment, and he can do what he

25   has to do with that judgment in order to try to collect.

1          THE COURT:  But why is that relevant to this jury

2     about whether a crime was committed as opposed to relevant to

3     me if there's a conviction and then there's restitution or

4     something along those lines?  In other words, why doesn't that

5     go to an aspect of punishment?

6          MR. LEGON:  I think because it's inaccurate to make

7     the argument that he got nothing because he actually did get

8     something.  He got a judgment and the ability to try and

9     collect.  And whether or not he has made any attempts to

10    collect, that's not the issue.  He has a paper judgment that's

11    legally enforceable.

12         THE COURT:  How is that a defense?

13         MR. LEGON:  It's not a defense.  It's just part of a

14    narrative.

15         THE COURT:  Well, I think the issue becomes I think

16    whether, as that narrative, whether there's -- well, I'll hear

17    from the government before I talk about the other issues.  Is

18    there an issue with regard to the date of Mr. Darden's arrest

19    in this case?

20         MR. MEAD:  There's not.  It's actually already in the

21    record, your Honor.  Mr. Cromer's testimony at page 325 of the

22    transcript, he identifies March 23, 2023, as the date that he

23    arrested Mr. Darden.

24         THE COURT:  Is that sufficient?

25         MR. LEGON:  Yes, your Honor.

OA1BDAR1

1          THE COURT:  Now with regard to the bylaws it is just

2     Article 3, Mr. Legon, that will be referenced or are there

3     other portions?

4          MR. LEGON:  Yes, just Article 3, your Honor.

5          THE COURT:  And is that going to be through

6     Mr. Dershowitz?

7          MR. LEGON:  Yes, your Honor.

8          THE COURT:  Let me ask the government, is there an

9     objection to that portion of the constitution and bylaws

10    Article 3 coming in evidence?

11         MR. MEAD:  There is, your Honor, a couple of issues.

12    One is, there's been testimony in this case about the WNBA

13    rules.  There hasn't been any testimony about the NBA rules.

14    If they were trying to introduce the WNBA rules, it might be a

15    little bit different.  But I'm not quite sure why the NBA rules

16    are relevant. They are proposing to introduce the wrong version

17    of the NBA rules.  I only heard about this morning at four in

18    the morning.  I found at least a 2019 version online.  It

19    appears to be materially similar at to this point, but they

20    should introduce the right version.  And I think they're also

21    misreading the documents.

22         The language talks about representatives of an owner.

23    Player is separately defined in that document.  And, in fact, I

24    think two subsections earlier in the conflict of interest

25    section, there's a reference to player.  And so the section

OA1BDAR1

1    that they're proposing to introduce doesn't actually govern NBA

2    players like Dwight Howard at all.  I think it's also a little

3    bit -- I mean, Mr. Derskowitz is a lawyer, but he hasn't been

4    provided expert notice.  I think the idea of having

5    Mr. Derskowitz interpret the NBA bylaws and what do they mean

6    doesn't make a lot of sense either.  So for all those reasons,

7    your Honor, we don't think this should come in.

8         MR. RICCO:  Judge, if I may.  Judge, we're not looking

9    to introduce a section.  It's like the complaint.  We're really

10   just giving a heads up that there's going to be testimony about

11   these provisions that relate to the conflict.  Several

12   witnesses have testified at this trial that there's a conflict,

13   and that conflict was communicated to Mr. Howard that he could

14   not purchase an WNBA contract directly or indirectly.  And so

15   this is just provided -- not that we're going to introduce,

16   Judge, into the record a copy of this section; but there's

17   going to be questioning of Mr. Dershowitz about -- he's going

18   to testify about it.  And what we want to get is, one person

19   said, for example, Mr. Schmidt said he's not allowed to have an

20   equity interest in a team.  Mr. Dershowitz is going to testify

21   about, well, what precisely is it that he isn't allowed to do.

22   And are there rules and regulations in the NBA's bylaws and

23   constitution and tell us what those are.  So that's what we're

24   doing. It's the same testimony that came out in the

25   government's case, it's just a little more accurate.  So that's

OA1BDAR1

1       it.

2              THE COURT:  I guess what I would say is, it sort of

3       depends upon what was communicated to the witnesses in

4       particular, what the individuals involved understood.  While

5       you're absolutely correct there's been testimony about a

6       prohibition.  It is unclear -- because I think my recollection

7       is the testimony was, well, initially they looked to the WNBA,

8       but the WNBA doesn't have exactly something on point, and so

9       they sort of looked to the NBA.  And they sort of decided,

10      well, if you're an NBA player that you can't have an interest.

11      In any event, at least this provision that's been provided --

12      and I don't know what the player provision says, but it just

13      says that it has to be disclosed and it could be approved.

14             MR. RICCO:  Yes, if it's one percent or less.  Judge,

15      just to be clear, we're not looking to introduce any aspect of

16      the bylaws and constitution.  What we are going to do is ask

17      Mr. Dershowitz the same questions that the government asked of

18      its witnesses.  And that is, was this information communicated

19      to Mr. Howard; was it communicated to him or his agent by you?

20      And what is it that you were referring to?  Can you tell us

21      what that is?  What is that prohibition?  That's it.  Those

22      very same questions were asked of the government's witnesses

23      because it was relevant to that person's conduct.  We just want

24      it to be accurate as to what it is.

25             THE COURT:  Okay.

OA1BDAR1

1           MR. RICCO:  Judge, I would just say this.

2     Mr. Dershowitz was one of the individuals that communicated

3     that.

4           THE COURT:  There are several things going on here.

5     There's obviously Mr. Dershowitz was directly involved in the

6     communication with Mr. Howard or Mr. Briscoe or someone else,

7     and that information made it to Mr. Howard.  Then, yeah, we'll

8     hear what he has to say about what exactly was communicated.  I

9     don't know in the end of the day, and that's for the parties to

10    decide in their arguments.  I think there's an argument to be

11    made on the one hand that the inference is that Darden, Briscoe

12    and Howard sort of devise this way to have Howard in the

13    background so that there could be this ownership interest.

14          So the first question is to the extent there's going

15    to be reference to constitution and the bylaws, we probably

16    need the one from that timeframe.  So, Mr. Mead, if you have

17    that -- cause, again, I don't know what Mr. Dershowitz is going

18    to say.  He may say, I don't know exactly what it was back in

19    2019.  I remember having communication where I said X, Y or Z.

20    I just don't know whether we're going to need it or not.  If I

21    could see the provision that describes player versus -- and

22    here it's owner or director, officer, manager, coach, agent

23    representative and owner.  So I just want to see the player

24    part of it.

25          MR. DONALDSON:  Your Honor, before you continue with

OA1BDAR1

1    that line of thought.  My colleague is going to continue with

2    this point.  I want to make sure Mr. Dershowitz is outside.

3    Can I check and see if he's out there?

4         THE COURT:  That's fine.  What I was planning on doing

5    is just to give you a sense is to do the government's two

6    witnesses.  We still need to talk about the judgment, but do

7    the government's two witnesses, and that Mr. Dershowitz would

8    be -- we then have any motion or applications by the defense.

9    Argument with regard to that and I'd rule on it.  And if we can

10   get Mr. Dershowitz after that in the morning before the lunch

11   break, that's fine.

12        MS. REED:  I think that would be ideal.  His counsel

13   here from the NBA has indicated that he's available this

14   morning.  I think he has afternoon commitments.  So if we could

15   get him in, I don't know if the government would agree.

16        THE COURT:  I think if the jury is here, we can get

17   started.  My sense of the testimony from the two witnesses that

18   the government has is going to be 20 minutes or something like

19   that?

20        MR. MEAD:  More like half an hour total probably, but

21   we're totally with the defense.  I think if we can get

22   Mr. Dershowitz in and done before lunch so the jury doesn't

23   have to stick around pass the lunch break that sounds great to

24   the government.

25        THE COURT:  We can take him out of order.  I don't

1    know if that's what the parties are proposing.

2              MR. MEAD:  Depending on when we start with the other

3    witnesses.

4              THE COURT:  I would propose starting right away.

5              MR. MEAD:  Correct. Of course, your Honor, after we

6    deal with a couple of other issues.  That's half an hour. The

7    Rule 29 motion is I suspect less than half an hour. I think

8    they have said Mr. Dershowitz's direct examination is going to

9    be very brief.  Our cross-examination maybe longer, not hugely

10   long. So I think all of that timeline, I think probably works

11   out before lunch, or maybe we push lunch 15 minutes or

12   something like that.

13             THE COURT:  Okay.  That's fine.  All right.  So let me

14   ask, what portion of the judgment -- have the parties reached

15   agreement as to what portions of the judgment are going to be

16   redacted?

17             MR. MEAD:  We had a slight snafu last night, your

18   Honor. We pulled a version of the judgment off the docket when

19   we initially made the exhibit production.  We then got a

20   certified copy, replaced the original judgment with that

21   document.  It turns out that when we scanned in the certified

22   copy, we missed the kind of key page on supervised release.  We

23   got a new certified copy this morning, which we have, and I

24   think we have a hard copy version of.  We would propose -- and

25   I can kind of draw on the redactions right now and hand them to

OA1BDAR1

1    the defense and to the Court.  We would propose to keep in the

2    stuff about the financial conditions requiring him to kind of

3    provide information.  We'd also propose to keep in the

4    restitution amount which I think is about $4 million.  Our view

5    is, one, it explains why the probation department had these

6    conditions in part.  Part of the reason is to ensure that if

7    the defendant has assets, he's paying his restitution judgment.

8    It also goes to show that the defendant had a debt.  I think

9    there's some chance that the defendant's parents may have in

10   fact paid the debt.  I'm not sure we're going to be able to

11   elicit that unless the defendant testifies, but there are

12   substantial payments to the defendant's mother with the fraud

13   proceeds that may in fact be repaying the restitution judgment.

14   For all those reasons, I think that the restitution judgment

15   does make sense to keep in.  We apologize for not having

16   provided a copy to the defense, but we can do that very quickly

17   right now.

18            THE COURT:  Specifically is the argument that with

19   regard to -- let me ask.  Are any of the deposits made of the

20   monies that alleged from the, I'll say, the Howard fund, made

21   directly into a personal bank account of Mr. Darden, Jr.?

22            MR. MEAD:  Our view, your Honor, is that the Legacy AC

23   account gets created I think in 2017 when the defendant is on

24   supervised release.  That is the account.  And Trevor Baldwin

25   is put as the only signatory on the account.  Our argument is

1    that the defendant controls that account.  He received money

2    from Chandler Parsons into the account and from Dwight Howard

3    into that account.  And one of our arguments is going to be

4    that the reason he put Trevor Baldwin on that account, the

5    reason he didn't want to be on it is because he wanted to hide

6    it potentially from the probation office because he was going

7    to receive fraud proceeds there.  If it was his own account in

8    his own name, it would receive $7 million from Dwight Howard,

9    $1 million from Chandler Parsons, whatever it is, obviously

10    that's the kind of thing that a probation officer might look

11    at.  We have a money laundering charge here.  I think one of

12    the reasons he did this, he was concealing his ownership of the

13    account.  This was one of his motives for concealing his

14    ownership of the Legacy AC account.

15             THE COURT:  Yes.

16             MS. REED:  I'm not seeing any link between the

17    restitution and the judgment and what Mr. Mead just explained.

18    It's just there's nothing in evidence to support that.  That is

19    something that he's just -- it's an argument for how he's

20    interpreting.

21             THE COURT:  Let's split out the two issues, at least

22    two issues.  One is the conditions of reporting and the turning

23    over of information as part of the supervised release.  So

24    that's one.  The other is the restitution and the restitution

25    amount.  So, Mr. Mead, let me hear from you.  Why is the

OA1BDAR1

restitution -- I understand the argument with regard to the

disclosure and the desire to keep -- the argument that the

government would make to keep the payments under the radar

screen by creating different entities for the monies to flow

through.  Putting aside the other possibility that it's just

more difficult to trace, but that it's more likely that the

probation if they asked, let's see your accounts in your name

that -- or if they got a subpoena that that would come to fore

that LLC wouldn't necessarily pop up Mr. Darden's name.  What

about the restitution amount?

MR. MEAD:  Look, your Honor, I think at the outset the

supervised release conditions are more important to the

government's theory than the restitution.  As to the

restitution though.  The restitution explains, one, why these

conditions exist, right.  Like, one of the primary reasons that

the probation office has access to financial information is

because they see the defendant has a whole bunch of money, they

say, uh-huh, this is restitution money that you should be

paying.  And one of the reasons the defendant may want to keep

his assets secret is to avoid paying that restitution payment

and instead buy his $3.7 million house for example.  It also

shows that the defendant has a debt that he may need to repay

in terms of the restitution judgment itself.  We also have some

understanding unlikely to be able to show at trial absent the

defendant's testimony that the defendant's parents may have

OA1BDAR1

1    paid off some or all of this restitution judgment.

2            THE COURT:  I saw something in the docket of the other

3    case that there was some discussion with prior counsel about a

4    civil, some sort of civil thing, and there was a discussion

5    about will that alleviate restitution or is the restitution

6    still valid.  But I guess the question, is it relevant as to

7    what -- while I understand the argument the fact that there is

8    a restitution explain why there are these conditions.  Although

9    the conditions could be standalone.  The jury doesn't know one

10   way or the other the basis for that.  Is it relevant as to what

11   the amount was?  And secondly, was any of the money used here

12   to pay off any of that restitution?

13           MR. MEAD:  This is the last question.  Certainly not,

14   your Honor, of course kept account money, with the caveat that

15   money went to mom, maybe that was a repayment for something

16   else.  I think my understanding is we often introduce evidence

17   as to kind of large preexisting debt as motivation for

18   defendants to commit these kind of frauds.  I think it goes to

19   that as well.

20           THE COURT:  Okay.  All right.  Ms. Reed.

21           MS. REED:  I just think that it opens the door to

22   anything that the government could come up as to a connection

23   as to why the restitution is relevant.  I just don't see that

24   meeting any standard of connection at all.  This is again

25   within your Honor's purview as to restitution.  I stand in our

OA1BDAR1

1    argument that it's not relevant and it's speculative that the

2    mom got the money and maybe was to hide it and to pay this.

3    I'm not seeing the relevancy.

4            THE COURT:  Yeah, I guess what I would say, there are

5    two separate things.  I think the conditions of supervised

6    release should come in, and they do relate to the money

7    laundering charges and relate to that; and the idea that there

8    may have been a reason why the personal bank accounts and other

9    things and why the money was funneled the way it was.  And so

10   that I think will come in.

11           With regard to the restitution.  I'm not so sanguine

12   about that.  I understand that theory about the motivation, but

13   that's not the motivation here.  I guess if there were

14   testimony that this was hanging over his head and he was very

15   concerned about having this and that some of the money was

16   funneled to do that to pay it off, that's one thing.  So the

17   restitution should be redacted, but the other conditions can

18   come in.  So you should, if you can mark up a judgment

19   indicating what stuff is going to be redacted, what stuff is

20   going to be in -- let me ask, does the judgment have

21   Mr. Darden's address at the top?  In other words, is there

22   personal identifying information, and is any of it relevant?

23   It may not.  It probably is the statement of reasons, yeah.  So

24   it's not something that's part of the judgment that gets filed.

25           MR. MEAD:  All I see is his name on it, your Honor.

OA1BDAR1

1              THE COURT:  Okay.  All right.  So what I'd ask the

2     parties is to just take a look at that, and perhaps we can

3     start the initial witness.  And then you can share with the

4     defense at this stage sort of the markup, and then create a

5     redacted version so that when Ms. Sebade testifies, everyone is

6     in agreement as to what comes in.

7              MR. MEAD:  That makes sense to the government.  There

8     are some issues with the defense case, but I think we can take

9     that up after the government's case.

10             THE COURT:  You mean with regard to some of the

11    other -- that's fine.

12             MR. MEAD:  The only issue with regard to the

13    government's case is there is still outstanding limiting

14    instruction that the Court will given when the transcript is

15    put in.

16             THE COURT:  I don't think there's a material

17    difference between the two proposals that have been put forth.

18    The government's proposal is more closely to the language to

19    the jury instruction, so I intend to read the following before

20    the evidence comes in with regard to the prior fraud schemes.

21    It will be:  You're about to hear evidence that the defendant

22    engaged in prior fraud schemes.  The defendant is not on trial

23    for committing those acts.  Accordingly, you may not consider

24    that the evidence of those prior fraud schemes as a substitute

25    for proof that the defendant committed the crimes with which he

OA1BDAR1

is charged here it, nor may you consider that evidence as proof
that the defendant has a criminal personality or bad character.
The evidence was admitted for limited purposes, and you may
consider it for those purposes alone.  More specifically, you
may consider the evidence you have heard regarding the
defendant's prior fraud scheme as to the defendant's knowledge,
intent, identity, *Modus operandi* and absence of mistake.

And *Modus operandi* means –– hold on two seconds
because I actually went to Black Law dictionary because I think
it makes sense to have a definition for the jury.  Hold on one
second.  And *Modus operandi* means, method of operation for
doing things.  And I pulled that off of Black Law dictionary
the 5th edition.  I actually have the book.  I don't know what
book they're up to now.  I think most people look it up online.
That's what I intend to give.  And that's a similar instruction
I will give to the jury in the jury charge.  Okay.  So I will
do that before that evidence comes in.

And then we can take up the other issue of the defense
case and round that out.  Oh, I think we've discussed though,
with regard to Mr. Dershowitz, is there going to be any effort
to ask Mr. Dershowitz about any of Mr. Howard's judgment or how
much he earned or the like?  I'm asking the defense.

MR. MEAD:  We have several other Dershowitz related
issues.  So if we're going to do Dershowitz stuff, we'd also
just ask ––

OA1BDAR1

1            THE COURT:  So why don't we do the government's

2    witness, and then we'll need to take a break and then I'll hear

3    from you on Mr. Dershowitz.

4            MR. RICCO:  Your Honor, before we get started, can we

5    just take no more than a five-minute break.

6            THE COURT:  Five minutes.

7            MR. RICCO:  We'll just be right outside the door,

8    Judge.

9            THE COURT:  I should mention before you go, so

10   Ms. Maringer, who I understand is counsel at the NBA, we were

11   in the U.S. Attorney's office together.  In fact she was in the

12   unit that I supervised.  That was a long time ago, and so I

13   don't -- I'm just informing the parties.  I don't think there's

14   any issue, but I just wanted to the parties to know.

15           MR. RICCO:  There's no issue, your Honor.  We were

16   aware of that.

17           THE COURT:  All right.  Five minutes.

18           (Recess)

19           THE COURT:  Just before we get the witness on the

20   stand, I'd like to allocute Mr. Darden on his right to testify.

21   Mr. Darden, I want to make sure that you understand that you do

22   not have to put on any evidence in this trial, because it is

23   the government's burden to prove you guilty of the charges

24   contained in the indictment beyond a reasonable doubt.

25           Do you understand that?

OA1BDAR1

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  However, you have the right to testify in

3   your defense if you so choose.  Do you understand that?

4           THE DEFENDANT:  Yes, your Honor.

5           THE COURT:  You also have the right not to testify.

6   Do you understand?

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  In this regard, I will instruct the jury

9   that if you do not testify, they may not draw any inference of

10  guilt against you based upon your decision not to testify, and

11  the fact that you did not testify.  And that fact may not enter

12  into their deliberations in any way.  So I want to make sure

13  that you know the decision not to testify is yours.  You are

14  obviously entitled to the best advice of your attorneys in

15  making that decision.  But at the end of the day, it is your

16  decision to make.  Do you understand that?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Let me ask, Mr. Donaldson, Mr. Ricco,

19  Ms. Reed and Mr. Legon, have you discussed the issue of

20  Mr. Darden's decision whether or not to testify with

21  Mr. Darden?

22          MR. RICCO:  Yes, your Honor.

23          THE COURT:  And have you had enough time to discuss

24  this issue with him?

25          MR. RICCO:  Yes, your Honor.

OA1BDAR1

1            THE COURT:  Mr. Darden, have you had sufficient time

2     to discuss with your attorneys your decision concerning whether

3     or not to testify?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Do you understand that that decision

6     whether to testify is entirely up to you?

7            THE DEFENDANT:  Yes, your Honor.

8            THE COURT:  As you stand here today, do you intend to

9     testify?

10           THE DEFENDANT:  I'm unsure at the moment, your Honor.

11           THE COURT:  Now, you should know, and I think I

12    mentioned this yesterday -- you can sit down.  You should know

13    that you can change your mind.  In other words, you have up

14    until the time that your attorney indicate that they've

15    concluded the presentation of evidence on your behalf.  In

16    other words, until your attorneys indicate that you rest your

17    case.  Do you understand that?

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  So I'm going to ask you again at the

20    conclusion of the government's case, and I'm going to ask you

21    again after the other witnesses have testified whether you

22    intend to testify.  Let me ask, if Mr. Darden does testify, are

23    there any exhibits that the defendant would offer through

24    Mr. Darden if he testifies?

25           MR. RICCO:  No, Judge.

OA1BDAR1

1          THE COURT:  All right.  So let me ask just another --

2     I take it Mr. Slade is not testifying.

3          MR. DONALDSON:  Judge, I don't think that's absolutely

4     accurate.  I believe he was --

5          THE COURT:  It's either he's testifying or he's not

6     testifying.

7          MR. DONALDSON:  Yes, Judge, he is.  He's scheduled to

8     be here tomorrow morning.

9          THE COURT:  And with regard to Mr. Darden's sister, is

10    she testifying or not testifying?

11         MR. DONALDSON:  She's not testifying.

12         THE COURT:  And with regard to the gentleman who owns

13    the home improvement?

14         MR. DONALDSON:  Mr. Paddock, he is not testifying, and

15    we have not been able to work out a stipulation.  I have

16    discussed those matters with him.  And what I thought he was

17    able to stipulate to, he cannot, so we will not be offering a

18    stipulation.

19         THE COURT:  So as I understand the defense case will

20    be Mr. Dershowitz today?

21         MR. DONALDSON:  That's correct.

22         THE COURT:  Is the paralegal testifying?

23         MR. RICCO:  Judge, it depends on the ruling that you

24    ultimately make with respect --

25         THE COURT:  I'm sorry, what?

OA1BDAR1

1            MR. RICCO:  Right now no.  Right now the answer is no.

2            THE COURT:  If you could use the microphone,

3       Mr. Ricco.

4            MR. RICCO:  Forgive me.

5            THE COURT:  It's unclear to me what ruling might be

6       outstanding that I need to make in order to assist you in

7       making the final decision with regard to that.

8            MR. RICCO:  Judge, the paralegal was just going to

9       testify with respect to a timeline of events with like bullet

10      points in between.  We don't need to do it.  As we sit here

11      today now, we are not going to do it.

12            THE COURT:  Okay.

13            MR. RICCO:  Were that to change, we would rush to the

14      Court, rush to the government and let them know.  As of right

15      now, he's not going to testify.

16            THE COURT:  Okay.  I just want to be clear, I'm not in

17      anything I said precluding you from doing it.  It's entirely up

18      to you.  If it's something that you think you need it in order

19      to put in front of the jury, or are it may be things already in

20      evidence that you can use on argument or to create a

21      demonstrative.

22            MR. RICCO:  Judge, I appreciate what you're saying.

23      We certainly understand that, but we also are very interested

24      in moving forward in a responsible way in accomplishing what we

25      want to accomplish.  We know we have no time restriction.  I'm

OA1BDAR1

1   not trying to imply that.  I'm just being very clear with the

2   Court.  On the defense side, we just don't do what we don't

3   need, so we've come to that conclusion.  We're ready to move

4   on.

5               THE COURT:  Fantastic.  Okay.  Let me ask in terms of

6   the government, is it Ms. Brewer first?

7               MR. KINDER:  Ms. Brewer first, your Honor.

8               THE COURT:  Can we get the jury.  We're going to get

9   the jury.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OA1BDAR1                         Brewer- Direct

1            (Jury present)

2            THE COURT:  Ladies and gentlemen, I'm sorry for the

3    delay.  However, it doesn't alter what I said yesterday.  We're

4    still on track.  You're going to get the case at some point

5    this week.  We're going to continue with the government's case.

6    The government's next witness.

7            MR. KINDER:  The government calls Rosalind Brewer.

8            THE COURT:  Ms. Brewer, if you could step on up.  My

9    deputy clerk Ms. Disla is going to administer the oath.

10   ROSALIND BREWER,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13           THE COURT:  You may have a seat.  Make yourself

14   comfortable.  I ask if you could state your name and spell it

15   for the record.

16           THE WITNESS:  Rosalind Gates Brewer; Rosalind,

17   R-O-S-A-L-I-N-D; Gates G-A-T-E-S, Brewer, B-R-E-W-E-R.

18           THE COURT:  You may inquire.

19   DIRECT EXAMINATION

20   BY MR. KINDER:

21   Q.  Good morning, Ms. Brewer.

22   A.  Good morning.

23   Q.  Can you please describe your educational background?

24   A.  I have a BS degree in chemistry from Spellman College, and

25   I have attended the advance management program at the Wharton

1  School of Business.

2  Q.  Can you please describe your work history?

3  A.  I joined Kimberly-Clark upon my graduation from Spellman

4  College as a research scientist, and I worked as a research

5  scientist for about five years.  And then the company promoted

6  me to mergers and acquisitions position, so I moved over to the

7  business side of Kimberly-Clark.

8  Q.  What is Kimberly-Clark?

9  A.  Kimberly-Clark is a personal care company that sells

10  Huggies, diapers and Kleenex tissues as an example.

11  Q.  How long did you work at Kimberly-Clark?

12  A.  I was there for 22 years.

13  Q.  And what other roles did you hold that you haven't yet

14  described?

15  A.  I also worked in manufacturing operations for

16  Kimberly-Clark, and I managed their global operations for

17  diapers, feminine care products and health care products around

18  the world, so I manage manufacturing and operations in the U.S.

19  and around the world.

20  Q.  What other companies have you worked for after

21  Kimberly-Clark?

22  A.  I left Kimberly-Clark and I joined Walmart stores.  I was

23  with Walmart stores for ten years.  I started off in store

24  operations in the Southeast, and then I was made CEO of Sam's

25  Club while I was with the Walmart company.

OA1BDAR1                          Brewer- Direct

1    Q.   Is Sam's Club apart of Walmart?

2    A.   Sam's Club is a division of Walmart stores.

3    Q.   How long were you CEO of Sam's Club of Walmart?

4    A.   Five years.

5    Q.   What did you do after that?

6    A.   I left Walmart and I joined the board of Starbucks coffee

7    company, and then I became a chief operating officer for

8    Starbucks coffee company.

9    Q.   What years did you work at Starbucks?

10   A.   I worked at Starbucks from 2017 to 2021.

11   Q.   And what did you do after Starbucks?

12   A.   I left Starbucks to join Walgreens, and I was a CEO of

13   Walgreens from March of '21 until August 31, '23.

14   Q.   Are you working now?

15   A.   I am working now.

16   Q.   What are you doing?

17   A.   I'm on the board of United Airlines, and I'm on the board

18   of Kipps School K through 12 charter program.

19   Q.   Other than your work for the United Airlines board and the

20   Kipps school board, have you had other board service in your

21   career?

22   A.   Yes, I have.  I was on the board of Molson Coors Brewing

23   company, and then I joined the Lockheed Martin defense company

24   board.  I was on the board of Amazon.  And when I was made the

25   CEO of Walgreens, I was actually a board member as well as CEO

1    of the company.

2    Q.  Have you served on the board of any educational

3    institutions?

4    A.  Yes, I have.  I was the chairman of the board of Spellman

5    College my alma mater for 12 years, but I served on the board

6    for 17, 12 of those as chair.

7            MR. KINDER:  Can we please publish what's in evidence

8    as Government Exhibit 2144A, please.  Mr. Ross, can you scroll

9    through the first few pages of this document.

10   Q.  Ms. Brewer, before preparing for your testimony in this

11   case, have you ever seen this document?

12   A.  No, I have not.

13           MR. KINDER:  Can we go to page two, please.

14   Q.  The first sentence of text on this page reads:  Darden

15   Sports Group, DSG, led by prominent Atlanta businessman, Cal

16   Darden, Sr., is proud to have an opportunity to become the next

17   owner of the WNBA's Atlanta Dream.

18           Before preparing for your testimony in this case,

19   Ms. Brewer, had you ever heard of the Darden Sports Group?

20   A.  No.

21   Q.  Do you know a person named Calvin Darden, Sr.?

22   A.  Yes.

23   Q.  Who is he?

24   A.  Calvin Darden, Sr., was a friend of mine that worked for

25   United Parcel Service in Atlanta.  He was also on the board of

OA1BDAR1                        Brewer– Direct

1    Target Corporation and helped me decide on my career.  He was a

2    mentor to me.

3    Q.  When did you first meet him?

4    A.  In the early 2000s.

5    Q.  And how did that meeting occur?

6    A.  That meeting occurred, I reached out to Mr. Darden and

7    introduced myself to him.  He was on the board of Target

8    Stores, and I was contemplating leaving Kimberly–Clark and

9    joining Walmart, and I needed the advice from him.

10   Q.  When was the last time you saw Cal Darden, Sr.?

11   A.  At least 12 years ago.

12   Q.  And when was the last time you communicated with Cal

13   Darden, Sr.?

14   A.  At least 12 years ago.

15   Q.  Have you changed your personal phone number or email or

16   address since you last communicated with Cal Darden, Sr.?

17   A.  I have not.

18   Q.  So if he wanted to get in touch with you during the last 12

19   years, he would have been able to do that?

20           MR. DONALDSON:  Objection, form of the question.

21           THE COURT:  If you could rephrase the question.  Well,

22   prior to 12 years ago, did Mr. Darden, Sr., did he have your

23   contact information?

24           THE WITNESS:  Yes, he did.

25           THE COURT:  And does that include your telephone

OA1BDAR1                        Brewer- Direct

1    number?

2            THE WITNESS:  Yes.

3            THE COURT:  Your email address?

4            THE WITNESS:  Yes.

5            THE COURT:  Does that include a work email address, do

6    you remember?

7            THE WITNESS:  I don't recall because of the change in

8    my jobs.

9            THE COURT:  But did he have your personal email?

10           THE WITNESS:  Yes, he did.

11           THE COURT:  Okay.  Next question.

12           MR. KINDER:  Can we please go to page four, please.

13           THE COURT:  Had you communicated with him prior to 12

14   years ago using your email address and your phone and the like?

15           THE WITNESS:  Correct.

16           THE COURT:  And did you have his telephone number in

17   your phone as part of your contact for him if you remember?

18           THE WITNESS:  Yes.

19           THE COURT:  Do you still have, do you know?

20           THE WITNESS:  I don't know that I still have that.

21           THE COURT:  I know.

22           Ladies and gentlemen, I still have a iPhone 6S.  Yeah,

23   I know.  I'm sure everybody else has moved on from there.  I'm

24   sorry.  Go ahead.

25   BY MR. KINDER:

OA1BDAR1                        Brewer- Direct

1   Q.  Ms. Brewer, who is depicted on the screen now?

2   A.  Calvin Darden, Sr.

3   Q.  Did Calvin Darden, Sr., ever communicate with you about the

4   Darden Sports Group?

5   A.  No.

6   Q.  Did he ever communicate with you about the Atlanta Dream?

7   A.  No.

8   Q.  Did you ever hear about Calvin Darden, Sr., attempting to

9   purchase the Atlanta Dream?

10  A.  No.

11          MR. KINDER:  Can we go to page eight, please.

12  Q.  The title of this page is advisory board.  I'll read the

13  text.  Darden Sports Group has assembled a world-class advisory

14  board comprised of super-star leaders within the areas of

15  music, television, film, professional sports, business and

16  community.  Each board member has committed to using their

17  ideas, voices, platforms, resources, relationships and

18  influence to support the Atlanta Dream and its various

19  initiatives.

20          Ms. Brewer, do you see yourself pictured on this page?

21  A.  Yes.

22  Q.  Where is that on the page?

23  A.  The left column second photograph.

24          MR. KINDER:  Can we zoom in on that photograph,

25  please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

OA1BDAR1                        Brewer– Direct

1   Q.  Do you recognize this particular photo of yourself?

2   A.  I do.

3   Q.  What is it?

4   A.  It was my headshot when I became chief operating officer

5   for Starbucks.

6   Q.  Is it a photograph that's publicly available?

7   A.  Yes, it is.

8          MR. KINDER:  If we can zoom out there.

9   Q.  Ms. Brewer, did you ever agree to be a member of an

10  advisory board for the Darden Sports Group?

11  A.  No, I did not.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. KINDER:

2    Q    Did you ever authorize your name to be used in this

3    document?

4    A    No, I have not.

5    Q    Did you ever authorize your photograph to be used in this

6    document?

7    A    No, I did not.

8    Q    When you were working at Starbucks, was anyone else who

9    worked with you authorized to agree on your behalf for you to

10   be a member of an advisory board for Darden Sports Group?

11   A    No.

12   Q    Or for your photograph to be used in this document?

13   A    No.

14            THE COURT:  Let me ask, Ms. Brewer, was there a

15   process that you have to go through at Starbucks in order to be

16   a member of an advisory board?

17            THE WITNESS:  Yes, sir.  In my capacity at Starbucks,

18   I'm a Section 16, which is a Securities and Exchange Commission

19   officer.  Because of that, any outside organizations must be

20   approved by the board of directors of that company.

21            THE COURT:  Okay.  All right.  I'm sorry.  Go ahead.

22   BY MR. KINDER:

23   Q    Did you ever go through that process with respect to the

24   Darden Sports Group?

25   A    I did not.

1    Q   Page 18, please.

2            The title of this page is corporate affiliations.  And

3    Ms. Brewer, you see there are a number of corporate logos at

4    the bottom of the screen?

5    A   Yes.

6    Q   And the text just before that reads "DSG's corporate

7    partners include," and do you see the Starbucks logo?

8    A   Yes.

9    Q   Where is that located on the page?

10   A   Left-hand side, bottom corner.

11   Q   Ms. Brewer, I believe you said you worked at Starbucks from

12   2017 to 2021; is that right?

13   A   Correct.

14   Q   In 2020, what was your position at Starbucks?

15   A   Chief operating officer.

16   Q   Can you describe for the jury what your responsibilities

17   generally were as chief operating officer?

18   A   I reported to the chief executive officer of the company.

19   I ran operations for all stores globally.  I managed

20   innovation, beverage development, resourcing, supply chain,

21   marketing, talent, and legal.

22   Q   Who are the people at Starbucks who would have been

23   involved in evaluating corporate partnerships like the one

24   described on this page.

25   A   There's a marketing organization that would set up

OA1JDAR2                          Brewer - Direct

1    relationships like this.

2    Q    And once the marketing organization set up relationships

3    like this, what would happen next?

4    A    Depending on the size of the spend, it would come to my

5    office for approval.

6    Q    While you were working at Starbucks, did Starbucks ever

7    enter a corporate partnership with the Darden Sports Group?

8    A    Not to my knowledge.

9    Q    While you were working at Starbucks, were you ever informed

10   about a proposed partnership with the Darden Sports Group?

11   A    No.

12   Q    I'm going to read the second sentence of the third

13   paragraph.

14        DSG's corporate partners understand the value of

15   women's sports and are committed to investing in and across the

16   Dream's various platforms and properties immediately upon the

17   closing of DSG's proposed acquisition.

18        Ms. Brewer, while you were working at Starbucks, did

19   the company commit to investing in and across the Dream's

20   various platforms and properties?

21   A    Not to my knowledge.

22   Q    In your position at Starbucks, is that a commitment you

23   would have known about?

24   A    I likely would have known about this.

25   Q    Page 26, please.

1          The heading on this page is We Dream TV.  I'm going to

2     read the first sentence.  The Atlanta Dream platform will be

3     enhanced by a new network of concepts We Dream TV.

4          Now can we go to page 27, please.

5          The last piece of text above the logos on the bottom

6     of the screen reads key sponsors for We Dream TV include, and

7     then do you see the Starbucks logo?

8     A    Yes, I do.

9     Q    While you were working at Starbucks, did Starbucks ever

10    sponsor We Dream TV?

11    A    No.

12    Q    Were you ever informed about a proposed sponsorship by

13    Starbucks of We Dream TV?

14    A    No.

15    Q    Before preparing for your testimony in this case, had you

16    ever heard of We Dream TV?

17    A    Never.

18    Q    Can we please publish 2119A in evidence.  And let's scroll

19    through a few of the pages.

20         Ms. Brewer, before preparing for your testimony in

21    this case, had you ever seen this document?

22    A    No.

23    Q    We can take that down.

24         Ms. Brewer, do you know of a person named Charles

25    Briscoe?

1    A    No.

2    Q    Have you ever met a person named Charles Briscoe?

3    A    No.

4    Q    Have you ever spoken to a person named Charles Briscoe?

5    A    No.

6    Q    Do you know of a person named Calvin Darden, Jr.?

7    A    No.

8    Q    Have you ever met Calvin Darden, Jr.?

9    A    No.

10   Q    Have you ever communicated with Calvin Darden, Jr. about

11   the Darden Sports Group?

12   A    No.

13   Q    Have you ever communicated with Calvin Darden, Jr. about

14   the Atlanta Dream?

15   A    No.

16   Q    Have you ever communicated with Calvin Darden, Jr. about

17   anything?

18   A    No.

19            MR. KINDER:  One moment, your Honor.

20            THE COURT:  Yes.

21            MR. KINDER:  No further questions.

22            THE COURT:  Okay.  Cross-examination?

23            MR. DONALDSON:  No, Judge.  Thank you.

24            THE COURT:  Okay.  Thank you, Ms. Brewer.  You may

25   step down.

1          (Witness excused)

2          THE COURT:  Okay.  Government's next witness?

3          MR. MEAD:  The government offers into evidence,

4    pursuant to the certification at 2000-Z, the following

5    exhibits, 2106, 2111, 2112, 2147, 2502, and 2509.

6          THE COURT:  Any objection?

7          MR. RICCO:  No, your Honor.  That's without objection.

8          THE COURT:  Okay.  So Government Exhibits 2106, 2111,

9    2112, 2147, 2502, and 2509 are admitted in evidence.

10         (Government's Exhibit 2106, 2111, 2112, 2147, 2502,

11   2509 received in evidence)

12         THE COURT:  Okay.  The government's next witness?

13         MR. KINDER:  The government calls Olivia Sebade.

14         THE COURT:  Okay.  Thank you.

15   OLIVIA SEBADE, recalled.

16         THE COURT:  Before we begin with the direct

17   examination, ladies and gentlemen, you are about to hear

18   evidence that the defendant engaged in prior fraud schemes.

19   The defendant is not on trial for committing those acts.

20   Accordingly, you may not consider that evidence of those prior

21   fraud schemes as a substitute for proof that the defendant

22   committed the crimes with which he is charged here.  Nor may

23   you consider that evidence as proof that the defendant has a

24   criminal personality or bad character.

25         The evidence will be admitted for a limited purpose,

OA1JDAR2                          Sebade – Direct

1   and you may consider it for those purposes alone.  More

2   specifically, you may consider the evidence you are about to

3   hear regarding the defendant's prior fraud schemes as relevant

4   to the defendant's knowledge, intent, identity, *modus operandi*

5   and the absence of mistake.  *Modus operandi* means method of

6   operation or doing things.  Okay.

7            All right.  You may proceed.

8   DIRECT EXAMINATION

9   BY MR. KINDER:

10  Q   Ms. Sebade, before we look at some documents can you just

11  remind everyone where you work.

12  A   The U.S. Attorney's Office in the Southern District of

13  New York.

14  Q   What's your title?

15  A   Paralegal.

16  Q   And what are your responsibilities?

17  A   I help the lawyers in my office with administrative tasks.

18           MR. KINDER:  At this point, the government offers into

19  evidence Government Exhibits 1001 and 1002, self-authenticating

20  documents, pursuant to the certifications on those documents.

21           THE COURT:  Okay.  Any objection?

22           MR. RICCO:  None other than that that have been

23  previously raised.

24           THE COURT:  1001 and 1002 are admitted in evidence

25  subject to objection, which we had previously dealt with.  So

1    the objections are reserved.  You may proceed.

2              (Government's Exhibit 1001 and 1002 received in

3    evidence)

4              MR. KINDER:  Mr. Ross, can you please publish

5    Government Exhibit 1002.  Scroll down just ever so slightly.

6    Back up to the very top.

7    Q    Ms. Sebade, you see there's a large heading, United States

8    District Court.  Underneath is Southern District of New York?

9    A    Yes.

10   Q    Can you read the case caption that appears below that to

11   the left?

12   A    *United States of America v. Calvin R. Darden Jr.*

13   Q    And on the right there's the bold heading "judgment in a

14   criminal case."  Can you read the case number that appears

15   below that.

16   A    S1 14 CR 534-01 (JSR).

17   Q    Slightly below that, on the left side of the page, can you

18   please read the two lines of text that begin "the defendant."

19   A    Pleaded guilty to counts one, two, three.

20   Q    Scroll down a little bit more.  A little bit more please.

21             You see the text in the middle of the page that's now

22   sort of near the top of the screen "the defendant is

23   adjudicated"?

24   A    Yes.

25   Q    Can you read that along with the three rows that appear

OA1JDAR2                         Sebade – Direct

1    under title and section, nature of offense, offense ended, and

2    count.

3    A    The defendant is adjudicated guilty of these offenses:

4    Title and section, 18 U.S.C. Section 1343; nature of offense,

5    wire fraud; offense ended, February 28, 2014; count one.  Title

6    and section, 18 U.S.C. Section 1343; nature of offense, wire

7    fraud; offense ended, February 11, 2014; Count Two.  Section --

8               MR. RICCO:  Your Honor, I hate to interrupt, but can

9    we have just a brief sidebar?

10              THE COURT:  Okay.

11              (Continued on next page)

1              (At sidebar)

2              MR. RICCO:  Sorry for the interruption, Judge.

3     They're getting ready to read stuff about sentencing, and the

4     jury's going to hear stuff about sentencing.  And I'm sorry to

5     do this in this way, but it just occurs to me that there has to

6     be a serious cautioning about jurors getting information about

7     sentencing.

8              THE COURT:  Well, let me ask, though, is the sentence

9     itself redacted?

10              MR. KINDER:  It is.

11              THE COURT:  Okay.  I have no problem with basically a

12     curative instruction that, as I previously told them, that the

13     issue of punishment is not their --

14              MR. RICCO:  That's fine, Judge.

15              THE COURT:  -- not their issue, and I will repeat that

16     again.

17              MR. RICCO:  Also, Judge — and Ms. Reed reminds me is

18     that the transcript also speaks of amounts of restitution.

19              MR. KINDER:  I think it speaks about amounts of loss

20     that related to fraud, not in terms of restitution.

21              MR. RICCO:  All right.  Okay.  Sorry about that.

22              MR. KINDER:  Just to be clear, my plan was when we get

23     to the second page, which was imprisonment, I was going to have

24     her read the heading imprisonment and sentence is redacted.

25              THE COURT:  Why is that relevant?

OA1JDAR2                        Sebade - Direct

1              MR. KINDER:  I want to orient them in the document.

2              THE COURT:  That's okay.  The document is in evidence.

3    There's no need to draw attention to -- and there will be both

4    an instruction on redactions and an instruction with regard to

5    punishment.  Once you're done with the document, I'll turn to

6    the jury and say, ladies and gentlemen, this document also

7    should not be considered with regard to any punishment one way

8    or the other.

9              MR. RICCO:  Judge, there has been a lot of reading of

10   stuff in evidence, and we haven't objected to it, but I'm

11   troubled by the imprisonment and sentencing.  There's no reason

12   for that witness to be reading that.

13             THE COURT:  And there won't be.  I think that there's

14   no need to orient them to that part of the document.

15             MR. KINDER:  Very good.

16             MR. RICCO:  Thank you, Judge.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jurors present)

2    BY MR. KINDER:

3    Q    Ms. Sebade, picking up where we left off, can you please

4    begin reading the second row that appears under the defendant

5    is adjudicated guilty of these offenses.

6    A    Title and section, 18 U.S.C. Section 1343; nature of

7    offense, wire fraud; offense ended, February 11, 2014; Count

8    Two.  Title and section, 18 U.S.C. Section 1343; nature of

9    offense, wire fraud; offense ended, February 11, 2014; Count

10   Three.

11   Q    Scroll down a little bit.

12            Ms. Sebade, do you see the line for date of imposition

13   of judgment?

14   A    Yes.

15   Q    What is the date?

16   A    July 18, 2016.

17   Q    And can you read the name and title of judge that appears

18   below that.

19   A    Honorable Jed S. Rakoff, USDJ.

20   Q    Please go to page 3.

21            The heading of this page reads supervised release.

22   Can you please read the first two lines of text underneath

23   that.

24   A    Upon release from imprisonment, the defendant shall be on

25   supervised release for a term of, on counts one, two, and

OA1JDAR2                              Sebade – Direct

1    three, three years to run concurrent.

2    Q    And can you please read the sentence that appears below

3    that.

4    A    The defendant must report to the probation office and the

5    district to which the defendant is released within 72 hours of

6    release from the custody of the bureau of prisons.

7    Q    Can we go to page 4, please.

8           The heading of this page is special conditions of

9    supervision.  Can you please read numbers one and two that

10   appear on this page?

11   A    The defendant shall provide the probation officer with

12   access to any requested financial information.  The defendant

13   shall not incur any new credit charges or open additional lines

14   of credit with the approval of the probation officer unless the

15   defendant is in compliance with the installment payment plan.

16          MR. KINDER:  Okay.  We can take that down and let's

17   publish Government Exhibit 1001 in evidence.

18          THE COURT:  So ladies and gentlemen, this is just to

19   remind you, I think I mentioned this in my opening remarks that

20   the issue of punishment is none of your concern.  That is

21   something that I would deal with.  So the issue of punishment

22   is none of your concern, and the document that was just

23   admitted in evidence that there was just testimony about should

24   not be considered by you in connection with any punishment that

25   may be imposed in this case.  Okay?  All right.  Go ahead.

1    BY MR. KINDER:

2    Q    Ms. Sebade, can you please read the case caption that

3    appears at the top of this page of Government Exhibit 1001.

4    A    *United States of America v. Harvey Newkirk*, defendant.

5    Q    What is the case number that appears on the right?

6    A    14 CR 534 (JSR).

7    Q    And what is the location and date that appear below that?

8    A    New York, New York, November 24, 2015.

9    Q    And who is the judge that is identified in the middle of

10   the page?

11   A    Honorable Jed S. Rakoff, district judge.

12            MR. KINDER:  Can you go to page 2, please.  And I

13   should say page 2 here corresponds to page 835 of the

14   transcript in the upper right hand corner.

15            Ms. Sebade, I am going to read the text of the

16   individuals who are not the witness in this document, and I'd

17   ask that you please read answers to questions from the witness.

18   We'll start just with this first page, line 9.  (Reading)

19            "MR. ADAMS:  Thank you.  Your Honor, the government

20   calls Calvin Ramarro Darden.

21   "CALVIN RAMARRO DARDEN,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24            "THE DEPUTY CLERK:  Please be seated.  State your name

25   and spell it slowly for the record.

OA1JDAR2                         "Darden"

1              "THE WITNESS:  It's Calvin Ramarro Darden,

2      C-a-l-v-i-n, Ramarro, R-a-m-a-r-r-o, Darden, D-a-r-d-e-n.

3              "MR. ADAMS:  Your Honor, may I?

4              "THE COURT:  Counsel.

5      "DIRECT EXAMINATION

6      "BY MR. ADAMS:

7      "Q   Good morning, Mr. Darden.

8      "A   Good morning.

9      "Q   How old are you?

10     "A   41."

11             MR. KINDER:  Can we please go to page 12, which is

12     page 941 in the transcript.  Beginning at line 16, Ms. Sebade,

13     I will read the questions, you please read the answers.

14     (Reading)

15     "Q   Mr. Darden, approximately when did you plead guilty in

16     connection with the Maxim fraud?

17     "A   I believe it was February 13, 2014.

18     "Q   I direct you to the first page of this document where it

19     refers to a professional basketball exhibition game in Taiwan.

20     "A   Yes.

21     "Q   Can you briefly describe the crime that you pled to in

22     that count.

23     "A   Sure.  I was negotiating with a gentleman in Taiwan about

24     bringing a basketball game or having a professional basketball

25     game in Taiwan, and I got him to basically send the money up

1    from before the game had occurred, if that is sufficient.

2    "Q    Did you impersonate your father in connection with that?

3    "A    I did.

4    "Q    And in addition to that exhibition of the basketball game,

5    did you also take part in an attempt to organize a business

6    venture relating to the National Basketball Association?

7    "A    Yes, I did.

8    "Q    Did you impersonate your father in connection with that

9    venture?

10   "A    I did.

11   "Q    Did you successful close any deal in connection with that

12   venture?

13   "A    I did not.

14   "Q    Are those the only lies that you admitted to in your

15   conversations with the government?

16   "A    They are not."

17         MR. KINDER:  Page 14, please, which is page 944 of the

18   transcript.  Line 7.  (Reading)

19   "Q    You just told the jury that in addition to the lies you

20   talked about right now, there were other lies that you told the

21   government about?

22   "A    Yes, ma'am.

23   "Q    In fact, there were lots of other lies you told as part of

24   this fraud, correct?

25   "A    I don't know about lots, but I told them, yes.

OA1JDAR2                         "Darden"

| | |
|---|---|
| 1 | MR. KINDER:  Page 18, please, which is page 1015 in |
| 2 | the transcript, line 2.  (Reading) |
| 3 | "Q   All the lies that you told since you got out of jail for |
| 4 | the frauds you've been committing have also been for money, |
| 5 | right? |
| 6 | "A   That's correct." |
| 7 | MR. KINDER:  Page 3, please, which is page 838 of the |
| 8 | transcript, line 10.  (Reading) |
| 9 | "Q   In general, what was the purpose of your introduction to |
| 10 | Mr. Newkirk? |
| 11 | "A   Oh, we were talking about a potential boxing match between |
| 12 | Floyd Mayweather and Manny Pacquiao. |
| 13 | "Q   What was the name of the business under which you were |
| 14 | operating at that time? |
| 15 | "A   The Reign Entertainment Group LLC. |
| 16 | "Q   Who controls Reign Entertainment Group? |
| 17 | "A   I did.  I did. |
| 18 | "Q   I'll just refer to it as Reign going forward.  Has your |
| 19 | father ever held any formal position at Reign? |
| 20 | "A   No, he hasn't." |
| 21 | MR. KINDER:  Page 4, please.  (Reading) |
| 22 | "Q   Has your father ever discussed with you the possibility of |
| 23 | holding an informal position at Reign? |
| 24 | "A   Yes, he has. |
| 25 | "Q   Can you describe what that position was. |

OA1JDAR2                        "Darden"

1   "A    So, in the event that one of the deals closed, you know,

2   that I was going after I had spoken to him about, then he would

3   consider coming on as chairman or in some sort of advisory

4   capacity.

5   "Q    What financing, if any, has your father ever provided for

6   Reign's different business ventures?

7   "A    None.

8   "Q    And what kind of nonfinancial assistance has your father

9   provided to Reign?

10  "A    I would say a lot, you know, so any -- he would provide me

11  with advice or manage -- anything kind of in his warehouse.  He

12  was a manager for a lot of years, so managerial advice, things

13  like that.

14  "Q    Has your father participated in meetings involving Reign's

15  business?

16  "A    He has.

17  "Q    Has he participated on telephone calls involving Reign's

18  business?

19  "A    He has.

20  "Q    For what purpose would your father join in those telephone

21  calls or meetings?

22  "A    Really to provide credibility to whatever it is that we

23  were talking about at the time.

24  "Q    Have you ever used your father's name on contracts

25  associated with Reign's business?

OA1JDAR2                         "Darden"

1    "A    I have.

2    "Q    Was that with or without his authorization?

3    "A    That was without.

4    "Q    Was that with or without his knowledge?

5    "A    Without."

6              MR. KINDER:  Page 6, please, which is page 850 of the

7    transcript, line 3.  (Reading)

8    "Q    Mr. Darden, in 2011, what was your primary telephone

9    number?

10   "A    (347)850-5686.

11   "Q    Was that still your primary phone number in February of

12   2014?

13   "A    Yes, sir.

14   "Q    Can we please publish Government Exhibit 902 in evidence,

15   page 2.  Mr. Darden do you recognize the number (404)227-4067?

16   "A    I do.

17   "Q    What is?

18   "A    That is another telephone number that I had.

19   "Q    And did you also use that number in 2013 and 2014?

20   "A    I did.

21   "Q    Can we please go to page 1 of the same exhibit.  The

22   address listed here, Mr. Darden, the Father Capodanno

23   Boulevard, whose address was that?

24   "A    That was my address at the time.

25   "Q    Have you ever impersonated your father using the 4067

OA1JDAR2                          "Darden"

1   number?

2   "A   I have."

3            MR. KINDER:  Next page, please.  This is page 7 of the

4   exhibit, page 864 of the transcript, line 12.  (Reading)

5   "Q   Did your father participate in any in way in discussions

6   or meetings regarding Maxim Magazine?

7   "A   He did.

8   "Q   What were the purpose of those discussions in meetings?

9   "A   Again, initially was to gain credibility.  We also had,

10  you know, meetings with the people -- the managers of Maxim."

11           MR. KINDER:  Line 21.  (Reading)

12  "Q   Mr. Darden, did your father also participate in the

13  telephone calls regarding Maxim Magazine?

14  "A   Yes, he did."

15           MR. KINDER:  Page 8, please, page 866 of the

16  transcript, line 7.  (Reading)

17  "Q   What role, if any, had you asked your father to play at

18  Maxim in the event that your purchase was successful?

19  "A   I asked him to be the chairman.

20  "Q   Prior to the purchase of Maxim, what role, if any, did

21  your father have with respect to the attempted purchase?

22  "A   He didn't.  Well, he had an advisory capacity."

23           MR. KINDER:  Page 9, please, which is page 899 of the

24  transcript, line 21.  (Reading)

25  "Q   Did you have any discussions with Mr. Newkirk regarding

OA1JDAR2                              "Darden"

1    the conversation you had with Comvest as yourself?

2    "A    I did.

3    "Q    Can you describe that conversation.

4    "Q    Yes, he told me that they weren't comfortable with me in

5    the deal and that it had to be -- in order for them to move

6    forward, it had to be my father.

7    "Q    Following the signing of the letter of intent, did you

8    have another conversation over the phone with Comvest

9    representatives?

10   "A    I did.

11   "Q    And at that time, did you speak as yourself or as your

12   father?

13   "A    As my father.

14   "Q    And why did you do that?

15   "A    Because they had just said that they didn't want me

16   involved in the deal and that they wanted my father to speak or

17   they wanted, you know, my father on the phone.

18   "Q    Who else was on the call that you were talking to?

19   "A    The Comvest individuals, the broker that brought us to

20   Comvest, Harvey.  There were several people on that call.

21   "Q    And during that telephone call, did you alter your voice

22   in any way?

23   "A    I didn't.

24   "Q    Was that the only time during the Maxim deal that you

25   impersonated your father on phone?

OA1JDAR2                        "Darden"

1    "A    It was not.

2    "Q    To whom else did you impersonate your father over the

3    phone?

4    "A    A gentleman named Shaul Greenwald or Shaul.  I'm not sure

5    how to pronounce it.

6    "Q    Is Mr. Greenwald the only other person you did that to?

7    "A    No, he's the one that comes to mind right now, though.

8              MR. KINDER:  Page 19, please, which is page 1045 of

9    the transcript, line 6.  (Reading)

10   "Q    I want to talk to you about the basketball fraud that you

11   pled guilty to in connection with your testimony today.

12   "A    Okay.

13   "Q    Isn't it a fact that at the same time that you were

14   running this Maxim fraud you were also running your basketball

15   fraud?

16   "A    I believe the basketball thing was before, but it could

17   very well be at the same time.  It sounds about right.

18   "Q    And in the NBA fraud -- is it okay if I call it the NBA

19   fraud?

20   "A    Of course.

21   "Q    You were impersonating your father, right?

22   "A    I was."

23             MR. KINDER:  Line 20.  (Reading)

24   "Q    You were calling people and pretending to be your father?

25   "A    The NBA fraud, at times probably.

OA1JDAR2                    "Darden"

1   "Q    That's the guy in Taiwan, Melvin, correct?

2   "A    Yes, ma'am."

3           MR. KINDER:  Next page, please, which is 1046 of the

4   transcript, page 20 of this government exhibit, Line 5.

5   "Q    You testified that this was all done without the knowledge

6   of your father, right?

7   "A    That -- I testified that what exactly was done without the

8   knowledge of my father?

9   "Q    Impersonating him.

10  "A    Yes, that was done without his knowledge."

11          MR. KINDER:  Page 21, please, which is page 1146 of

12  the transcript, line 2.  (Reading)

13  "Q    Mr. Darden, last week you testified about a 404 phone

14  number that you had so you could pretend to be your father,

15  correct?

16  "A    Yes.

17  "Q    404 is the area code for Atlanta?

18  "A    It is.

19  "Q    You were not living in Atlanta?

20  "A    I was not.

21  "Q    You opened this phone number and this account in May of

22  2013, correct?

23  "A    I did.

24  "Q    And you did it so that you could call people and pretend

25  to be your father, correct?

OA1JDAR2                          "Darden"

1    "A   Correct.

2    "Q   You did, in fact, use this phone number and pretend to be

3    your father, correct?

4    "A   Yes, ma'am."

5          MR. KINDER:   Page 22, please, which is 1156 of the

6    transcript, line 13.   (Reading)

7    "Q   After that meeting, you called Mr. Greenwald pretending to

8    be your father, right?

9    "A   I did.

10   "Q   And you lied to him on that deal because you were

11   pretending to be your father, right?

12   "A   I did.

13   "Q   You testified that you used your real voice, right?

14   "A   I did.

15   "Q   That you didn't bother changing it?

16   "A   I did not.

17   "Q   That's the same voice you are using right now?

18   "A   That's correct.

19   "Q   The same intonation you are using right now?

20   "A   Same intonation.  I probably spoke slower, right, made

21   maybe a point not to use any slang or young slang.  Intonation,

22   I mean, I'm not certain.

23   "Q   You didn't deepen your voice did you?

24   "A   Deepen my voice, no.

25   "Q   Did you use the same voice tone that you're using with the

OA1JDAR2                          Sebade – Cross

1    jury right now?

2    "A    I would say for the most part.

3    "Q    And you agree that you were lying to Shaul Greenwald on

4    the phone?

5    "A    I was."

6                MR. KINDER:  Line 23.  (Reading)

7    "Q    From the NBA deal, which was a fraud, you took $500,000

8    from this person Melvin, right?

9    "A    Yes.

10   "Q    And you also took $175,000 from Richard Lauck, right?

11   "A    Yes."

12               MR. KINDER:  Take that down.  No further questions.

13               THE COURT:  Okay.  Cross-examination?

14               MR. RICCO:  Yes, Judge.

15   CROSS-EXAMINATION

16   BY MR. RICCO:

17   Q    Good morning.

18   A    Good morning.

19   Q    Can we put the exhibit -- let's first start with 1002,

20   page 1.

21               Okay.  So in this exhibit we see a judgment in a

22   criminal case, right?

23   A    Yes.

24   Q    And the defendant there is Calvin R. Darden Jr., right?

25   A    Yes.

1    Q   And what the exhibit shows is that he pleaded guilty to

2    three counts, right?

3    A   Yes.

4    Q   And that box is checked, so it's not that he was found

5    guilty after a trial, anything like that.  The box that's

6    checked is that he pleaded guilty to those counts, correct?

7    A   That's correct.

8    Q   And that was *United States v. Calvin Darden, Jr.*, right?

9    A   Yes.

10   Q   Okay.  Can we put up 1001, please.  First page.

11           Now, you read from a transcript, a trial.  And that

12   was a proceeding involving a person, according to the document,

13   of Harvey Newkirk, correct?

14   A   Yes.

15   Q   Can we go to the very next page.  All right.

16           And you read from the transcript about many times in

17   which Mr. Darden admitted to impersonating, correct?

18   A   Yes.

19   Q   Lying, right?

20   A   Yes.

21   Q   Being involved with frauds?

22   A   Yes.

23   Q   Involved in the NBA, right?

24   A   Yes.

25   Q   Kind of doing things that his father didn't know about,

OA1JDAR2                              Sebade - Cross

1    right?

2    A    Yes.

3    Q    And this was a case where -- this is a transcript where

4    Mr. Darden is called as a government witness, correct?

5    A    Yes.

6    Q    And we see that right in front of us, right?

7    A    Yes.

8    Q    And before he gives his testimony, he has to put his hand

9    up and swear that what he testifies to is the truth, right?

10   A    Yes.

11   Q    And that happens?

12   A    Yes.

13   Q    And having sworn to tell the truth under oath, Mr. Darden

14   gave truthful answers -- well, withdrawn.

15         Mr. Darden gave answers in connection with his

16   testimony, having been called as a government witness in that

17   other criminal case, correct?

18   A    Yes.

19   Q    And so as you're reading to us the statements, the things

20   about lying and impersonating and taking, he's doing that under

21   oath, right?

22   A    Yes.

23   Q    And he's doing that as a witness that's called by the

24   United States Government, correct?

25   A    That's correct.

OA1JDAR2                            Sebade - Cross

1              MR. RICCO:  No further questions.  Thank you.

2              THE COURT:  Any redirect?

3              MR. KINDER:  No, Judge.

4              THE COURT:  Okay.  Just to be clear, Ms. Sebade,

5    you're just reading the transcript, right?

6              THE WITNESS:  Yes, that's correct.

7              THE COURT:  You had no personal knowledge of the

8    underlying facts in that case?

9              THE WITNESS:  That's correct.

10             THE COURT:  Okay.  All right.  Thank you very much.

11   You may step down.

12             (Witness excused)

13             THE COURT:  Okay.  The government's next witness.

14             MR. MEAD:  Your Honor, the government rests.

15             THE COURT:  Okay.  All right.  So ladies and

16   gentlemen, the government has rested its case.  You don't have

17   the case yet, all right?  There's still more to come, but we're

18   going to take a break right now and then pick up with the

19   remainder of the trial.  All right.

20             Remember do not discuss the case.  Again, you don't

21   have the case yet.  Go back, relax, and we'll come and get you

22   when we're ready for the next phase of the case.  You can leave

23   your pads on your chair or you can take them back with you.

24   Thank you.

25             (Continued on next page)

OA1JDAR2

1                    (In open court; jury not present)

2            THE COURT:  Okay.  You may be seated.  All right.

3    Now, as I indicated, I was going to revisit the issue with

4    Mr. Darden of his right to testify after the government rested

5    its case.

6            So Mr. Darden, let me ask -- and with those prior

7    questions I asked you in mind, as you stand here today, do you

8    intend on testifying?

9            THE DEFENDANT:  I'm unsure, your Honor.  But I guess

10   the question -- actually, the question is for my attorneys.

11           THE COURT:  Yes.  So why don't you take -- we're going

12   to take -- should we do the argument?  You can be seated

13   Mr. Darden.

14           Okay.  Mr. Ricco, do you have an application?

15           MR. RICCO:  I do, Judge.  And my application is

16   pursuant to Rule 29, and we are requesting a motion for

17   judgment of acquittal under five counts, each of the five

18   counts, on the grounds that the government has not presented

19   sufficient evidence to -- that's sufficient to sustain a

20   conviction under Counts One, under Counts Two, Count Three,

21   Four, or Five.  And I rest on the evidence that has been

22   presented in connection with that.

23           And hold on, Mr. Donaldson has something he wanted to

24   say.

25           And your Honor, with respect to those counts, the

OA1JDAR2

1    elements that we believe are insufficient are those that go to

2    knowledge and intent.

3        THE COURT:  Okay.  I understand.  I appreciate that.

4    Let me hear from the government.

5        MR. THOMPSON:  Thank you, your Honor.

6        There has been ample and abundant evidence making

7    clear that the government has put forth sufficient evidence for

8    a jury to find the defendant guilty on all five counts.

9        Throughout the course of this trial, you've seen text

10   and emails between the defendant and his co-conspirator setting

11   forth the specific steps and documents that were sent to both

12   of the key victims, Chandler Parsons and Dwight Howard.

13       Specifically there was discussion about promissory

14   notes to be paid to Chandler Parsons to extract a million

15   dollars from him.  You heard extensive testimony about the

16   vision plan.  You saw documents from the defendant, to the

17   defendant with the vision plan that was eventually sent to

18   Dwight Howard and employees at BMO that was all part of the

19   fraud to extract $7 million from Dwight Howard.

20       You heard testimony about the lies that were in that

21   vision plan.  You heard testimony from Issa Rae.  You heard

22   testimony from Rosalind Brewer.  You heard testimony from

23   representatives of Tyler Perry Studios and Aflac all saying

24   that they did not know — and Jennifer Baltimore — excuse me,

25   your Honor.

OA1JDAR2

1          All of those witnesses said that at no point did they

2     agree to be on this advisory board associated with the Darden

3     Sports Group.  The majority of those witnesses also said they

4     had no knowledge of who Calvin Darden, Jr. was.  You heard that

5     each of those lies is material.  You heard that Dwight Howard

6     said that after he saw this vision plan, he was even more

7     inclined to purchase the Dream, and he thought that this group

8     was the one to make it happen for him.

9          You heard testimony from John Brock indicating that

10    after he saw this vision plan and, in particular, the

11    individuals on the advisory board, the corporate sponsors, his

12    view that this was a group that could be successful if they

13    acquired the team.  And you also heard testimony from

14    Mr. Schmidt, the banker at BMO N.A. who said he found the

15    vision plan impressive.

16         Your Honor also saw extensive evidence and heard

17    testimony about the financials in this case.  You saw that the

18    money from Mr. Parsons or at least over half of it went to

19    Legacy AC LLC.  You saw that the money from Mr. Howard, both of

20    the two wires, went to Legacy AC LLC.  Your Honor saw documents

21    making clear that while Trevor Baldwin, a co-conspirator, was a

22    name on the account, the account was under the defendant's

23    control.

24         There were documents that listed Legacy AC LLC

25    associated with two of the defendant's addresses, his address

1    in Atlanta and his previous address in Staten Island.  You also

2    saw that after the defendant received these fraud proceeds to

3    Legacy AC LLC, he laundered it through at least six accounts

4    under his control or otherwise in his name.  And he also sent

5    proceeds of those frauds to his co-conspirators, to Mr. Baldwin

6    and to Mr. Briscoe.

7         So your Honor, the evidence has been certainly

8    sufficient for a jury to find the defendant guilty.

9         THE COURT:  Okay.  I think at this stage, the evidence

10   presented is more than ample for this case to go to the jury

11   for the reasons the government mentioned.  I mean, there have

12   been emails, texts, and testimony about Mr. Howard's desire to

13   be an owner of a WNBA team.  There are texts and emails and the

14   like between he and Mr. Briscoe and Mr. Darden, Jr. and

15   Mr. Briscoe and Mr. Darden, Jr. and Mr. Howard.

16        In addition, as indicated, the vision plan was I

17   believe a creation that Mr. Darden provided to Mr. Briscoe and

18   to Mr. Howard.  That vision plan -- I believe, there's going to

19   be testimony from the defense, it sounds as if Mr. Slade may

20   have participated in sort of putting that together as a

21   logistical matter, but the inference is that the words, the

22   representations in that document were those made and were --

23   the inferences that were provided basically by Mr. Darden, Jr.

24        There's no evidence in the record that anybody on the

25   advisory board gave permission for the utilization of their

1    name or likeness in connection with that.  In fact, there's

2    strong evidence to the opposite.  Certain of those folks would

3    have had to go through various approvals and other things in

4    order to have their name utilized in that way.  There's also no

5    evidence that – I'll say "corporate sponsors" were actually

6    legitimately included in that document.

7         So that document was utilized to entice – the argument

8    would be to entice Mr. Howard, Mr. Brock, Mr. Schmidt, and

9    others that this was a deal that was heavily supported in a way

10   that – I think Mr. Brock testified in a way that was sort of

11   unique in terms the sort of the WNBA team.  So I think there's

12   more than ample evidence of that.

13        And similarly, with regard to Chandler Parsons, there

14   are emails and texts and other things, but on the back end,

15   putting aside this -- well, Mr. Howard got nothing, all right,

16   Mr. Parsons got nothing, other than the loss of the $7 million,

17   again, based upon the evidence that has come in.

18        In fact, the letter of intent was 3 million and

19   3.5 million.  There's no evidence in the record that I'm aware

20   of that the Darden Group or any other iteration involved in the

21   Darden Group ever offered $7 million for the WNBA team, the

22   Dream.  That price was paid apparently by another group.  And

23   there's no evidence that any of the money was utilized in

24   connection with what was contained in the promissory note,

25   right?

1          $7 million came in.  I think the testimony or the

2    evidence indicated that five-point-whatever was spent on

3    various things that were largely personal in nature and not

4    business related.

5          So I think there's ample evidence, so I'm going to

6    deny the motion under Rule 29 with leave to revisit the issue

7    after the defense case.

8          Any questions with regard to the ruling?

9          MR. DONALDSON:  No, your Honor.

10         THE COURT:  Okay.  All right.  So let's talk about

11   Mr. Dershowitz.  Are there certain issues that we need to

12   resolve before he takes the witness stand?

13         MR. THOMPSON:  Your Honor, there's one matter from the

14   government's perspective.  Yesterday afternoon I sent an email

15   intended for the trial team.  I copied two of my trial

16   colleagues, and instead of adding the third, I accidentally

17   included Mr. Dershowitz.

18         That email had five bullet points of just general

19   topics I intended to or the government intended to inquire of

20   Mr. Dershowitz if he testified.  One of my colleagues brought

21   this to my attention about 18 minutes after I had sent it.  I

22   replied to all and said this was an error, please disregard.  I

23   then called Mr. Dershowitz's lawyer and explained what happened

24   and asked her to call him and instruct him not to look at that

25   email.

OA1JDAR2

1          My understanding is that he did open the email and did

2     read it.  But my understanding is also that his lawyer told him

3     to delete it and disregard it.

4          THE COURT:  Okay.  All right.  Did you advise the

5     defense of this issue even if you may not have advised them

6     of -- even if you hadn't provided them with the email?

7          MR. THOMPSON:  This is the first I'm bringing it to

8     the Court and the defense's attention.

9          THE COURT:  Okay.  All right.  I don't know what the

10    defense reaction is one way or the other.  Yes?

11         MR. DONALDSON:  Judge, my only two questions is we

12    haven't seen it, so I'd like to see those -- whatever was

13    inadvertently provided to Mr. Dershowitz.  We'd like to see it

14    first so I can comment on it, but I would like to see whatever

15    Mr. Dershowitz has seen and opened up prior to us doing any

16    direct of him or them doing any cross of him.  So I think we

17    should start there.

18         THE COURT:  Yes.

19         MR. THOMPSON:  Your Honor, this is work product, so of

20    course happy to furnish a copy to the Court.

21         THE COURT:  Okay.  Just give me a moment.

22         MR. THOMPSON:  And --

23         THE COURT:  This is the email, the followup email that

24    says this was sent in error, please disregard.

25         MR. THOMPSON:  That's right, your Honor.

OA1JDAR2

1         THE COURT:  Okay.  So I understand that it's work

2    product, but it was shared.  So work product is a little bit

3    different than privilege, but it was shared with a third party,

4    albeit inadvertently, and so I think in order also for me, in

5    terms of the management of the testimony, for me to hear from

6    the defense -- I mean, look, ordinarily, obviously I wouldn't

7    know what your potential cross-examination is.  But my

8    understanding is that there's 3500 material for Mr. Dershowitz;

9    is that correct?

10        MR. THOMPSON:  That's right, your Honor.

11        THE COURT:  And I take it that in some way, shape, or

12   form, these bullet points were formulated based upon -- well, I

13   don't need to ask that.

14        So I guess I would say that you should provide it to

15   the defense so I can hear argument about what, if anything,

16   they intend to do so that I can basically rule on that.  So if

17   you could provide a copy of the email.

18        And who is doing the cross-examination of

19   Mr. Dershowitz?

20        MR. DONALDSON:  Direct.

21        THE COURT:  Direct examination, yes.

22        MR. DONALDSON:  I am.

23        THE COURT:  So I'll give you a few moments to look at

24   that.

25        MR. RICCO:  Judge, it's fine.

OA1JDAR2

1          THE COURT:  Okay.  Well, when you say it's fine --
2          MR. RICCO:  I mean to say that we accept the
3    government's representation and just looking at it amongst
4    counsel without trying to study it or anything, we've been
5    informed of that.  That does not affect us in any way.  We
6    don't think that anything was done improper here.
7          THE COURT:  Let me ask sort of the -- I'm sorry.  Go
8    ahead, finish.
9          MR. RICCO:  It seems like the points are from the 3500
10   material, Judge.
11         THE COURT:  But let me ask is there any intention to
12   basically say to the witness, did you receive an email last
13   night from the government?
14         MR. RICCO:  No, Judge.
15         THE COURT:  Okay.  All right.  Yes?
16         MR. THOMPSON:  Nothing, your Honor.
17         THE COURT:  Okay.  All right.  So is there anything
18   else we need to take up with regard to Mr. Dershowitz or with
19   regard to -- are there any other witnesses here today for the
20   defense or would Mr. Dershowitz be it today?
21         MR. DONALDSON:  No, your Honor, that will be it.
22         THE COURT:  Yes?
23         MR. MEAD:  Two points, your Honor.  One is I don't
24   think the Court had necessarily made a final determination as
25   to the points in Mr. Ricco's letter.  I'm not sure what they're

OA1JDAR2

1    planning to do with Mr. Dershowitz, but I assume the NBA bylaws

2    is at least within the universe of things.

3         THE COURT:  Well, let me ask, other than the bylaws,

4    which I'll make a ruling on right now, were any of the other

5    points raised in Mr. Ricco's letter of earlier this morning

6    things that were raised with Mr. Dershowitz?

7         MR. RICCO:  No, your Honor.

8         THE COURT:  Okay.  So with regard to the bylaws,

9    there's already been testimony about whether or not Mr. Howard

10   could own a WNBA team.  Mr. Dershowitz has personal

11   knowledge -- it sounds as if Mr. Dershowitz has personal

12   knowledge concerning what was communicated either to

13   Mr. Howard, either directly or indirectly, through Mr. Briscoe.

14   I don't specifically know.  So obviously he'll be permitted to

15   testify about that and what the basis of whatever comments he

16   may have relayed that indicated — and again, I'm just assuming

17   this is going to be part of the testimony — that indicated that

18   Mr. Howard could not own or whatever the parameters were

19   concerning the limitations, if any, concerning NBA players and

20   Mr. Howard in particular not being able to own a WNBA team.

21        To the extent there is explicit reference to the

22   constitution or bylaws or to particular articles, we should use

23   the one that was in place at the time.  I don't know whether

24   the witness can testify about exactly what the language was

25   back then.  It may be that that is not going to be an issue.

1    But I will allow him to testify based upon his position at the

2    NBA concerning what his -- right, he's at the NBA?

3              MR. RICCO:  Yes, Judge.

4              THE COURT:  What his communications were, either with

5    Mr. Howard or whomever -- I just don't remember if they were

6    directly with Mr. Howard or Mr. Howard through Mr. Briscoe or

7    through Mr. Brock.  I just don't remember.  So if he was -- he

8    can obviously testify about that and what the underlying basis

9    for his comments were.

10             MR. DONALDSON:  Right.

11             THE COURT:  Okay.

12             MR. DONALDSON:  Thank you.

13             THE COURT:  Is there anything else before we bring

14   Mr. Dershowitz?

15             MR. MEAD:  So two things, your Honor, one is

16   Mr. Donaldson also sent us a list of emails he plans to

17   introduce I think in the defense case generally.  I'm not sure

18   if any of those are through Mr. Dershowitz or separate from

19   Mr. Dershowitz.

20             MR. DONALDSON:  I can take care of those during the

21   witness, but those that the government is objecting to, I'll

22   set the proper foundation.  If the government objects to it,

23   then that's fine.

24             THE COURT:  Let me ask are these emails that

25   Mr. Dershowitz was on?

1          MR. DONALDSON:  Yes.

2          THE COURT:  Okay.  And so what was the nature of the

3    objections?  In other words, assuming the foundation is laid,

4    what is -- in other words, this is his email address and he

5    received emails and -- but what's the objection?

6          MR. MEAD:  There's no authenticity objections.  These

7    are all documents that have been authenticated through a

8    certification and, in fact, were on the Government's Exhibit

9    list, but not introduced.  The objection is generally hearsay.

10         Most of them are email chains with multiple emails in

11   them.  I think there are emails involving the defendant, emails

12   from the defendant, emails from Mr. Briscoe.  I don't recall

13   exactly what's in all of them.  But obviously statements by

14   Mr. Briscoe are admissible when we introduce them as

15   co-conspirator statements.  Emails from Mr. Darden, Jr. are

16   admissible when we introduce them as statements from the

17   defendant.  They're not admissible generally because they're

18   hearsay when they're attempted to be introduced by the defense.

19         THE COURT:  All right.  So let me hear from the

20   defense with regard to what is in the hearsay objection in

21   particular, the basis for their admission.

22         MR. DONALDSON:  I think the basis for most of them

23   will be state of mind, your Honor.  They go directly to

24   Mr. Dershowitz's state of mind of what he did when he got the

25   emails.

OA1JDAR2

1          THE COURT:  So they're not being admitted for the

2     truth?

3          MR. DONALDSON:  That's correct.

4          THE COURT:  They're just solely being admitted to show

5     Mr. Dershowitz's state of mind?

6          MR. DONALDSON:  That's correct.

7          THE COURT:  And the impact of the emails on him.

8          MR. DONALDSON:  That is correct, your Honor.

9          THE COURT:  Okay.  All right.  Mr. Mead?

10         MR. MEAD:  Mr. Dershowitz's state of mind is generally

11    not super relevant in this case.  And obviously there's a

12    concern that the jury looks at an email from the defendant and,

13    despite whatever instruction, takes it for the truth.  If it

14    was about the state of mind of the defendants, I would be more

15    sympathetic, but Mr. Dershowitz, his state of mind just isn't

16    that significant here.

17         THE COURT:  State of mind with regard to what though?

18    With regard to, in other words, why he took certain actions

19    that he did?

20         MR. DONALDSON:  That is exactly correct, your Honor.

21    It relates to certain actions that he took, why he took them,

22    why he jumped on certain Zoom calls, why he made certain

23    decisions about what he told to Mr. Howard, Mr. Brock, etc.  So

24    those state of minds are important to those emails.

25         THE COURT:  Okay.  So I'll allow them for the purpose

OA1JDAR2

1    of showing state of mind.  I'll instruct the jury -- are they

2    marked as an exhibit?

3         MR. DONALDSON:  They are marked as government

4    exhibits.  They are government exhibits in the 2100 section.

5         THE COURT:  Okay.  So over the government's objection,

6    I'll allow the documents in, but not for their truth.  They're

7    being admitted for the purpose of showing their impact on Mr.

8    Dershowitz, specifically on his state of mind.  Be forewarned,

9    if there's any argument that I think crosses the line in terms

10   of summations suggesting that in some way the statements in the

11   emails should be read for their truth --

12        MR. DONALDSON:  I understand, Judge.

13        THE COURT:  I may *sua sponte* cut you off.

14        MR. DONALDSON:  I understand, Judge.

15        THE COURT:  Or I wouldn't cut you off.  What I would

16   say is I would interject and say, ladies and gentlemen you may

17   recall that the exhibit that is being discussed was not

18   admitted for their truth, but only for its impact on

19   Mr. Dershowitz's state of mind.

20        MR. DONALDSON:  Very good.

21        MR. MEAD:  Last thing.  How long is the -- I think

22   there's a good chance we can finish Mr. Dershowitz, and it

23   might require us to push 15 minutes further.  I wanted to get a

24   sense of timing on the direct.

25        MR. DONALDSON:  About 30 minutes.

OA1JDAR2

```
1              THE COURT:  Okay.  All right.  So I can talk about the
2      lineup tomorrow in terms of defense witnesses, and specifically
3      I'm going to ask how much time will those witnesses take just
4      because some of these jurors are traveling a fair amount of
5      time, and to have them travel more time than there will be
6      testimony is something I'd like to try and avoid.  But it
7      sounds like we're going to have Mr. Slade --
8              MR. DONALDSON:  Mr. Sienko.
9              THE COURT:  -- and Mr. Sienko tomorrow.  So they're
10     still on?
11             MR. DONALDSON:  Yes.
12             THE COURT:  All right.  And Mr. Slade will be here in
13     the morning and -- Mr. Sienko and Mr. Slade will be here in the
14     morning?
15             MR. DONALDSON:  Yes.
16             THE COURT:  Okay.  All right.  So what I will tell the
17     jury is that -- so why don't we come back in ten minutes, and I
18     will let the jury know that we want to complete the witness,
19     and so we may go a little bit over into their lunch break.  And
20     this is for the parties, I'd like to tell them that once that
21     witness is done, we're going to break for the day and they're
22     free to go.
23             MR. DONALDSON:  Very good.
24             MR. RICCO:  Yes, Judge.
25             THE COURT:  Is there anything else we need to do
```

1    before we take our break?

2                MR. RICCO:  No, your Honor.

3                MR. MEAD:  No, your Honor.

4                THE COURT:  Okay.  If the parties have suggested

5    language for a curative instruction with regard to -- I mean, I

6    could do it off the cuff, but basically the exhibit that has

7    been received in evidence is not being admitted for the truth.

8    But if there's anything the parties would like me to mention in

9    that regard, certainly for the charge, we should focus on --

10   since there has been other evidence that's come in, we should

11   think about whether to specify exactly what that was during the

12   trial.  But I can just handle it in terms of right now.  All

13   right?

14               MR. RICCO:  That's fine, Judge.  Thank you.

15               THE COURT:  Okay.  Thank you very much.  I'll see you

16   in ten minutes.

17               (Recess)

18               (Continued on next page)

19

20

21

22

23

24

25

OA1BDAR3

1    THE COURT:  Let me ask, first, is there anything that

2    we need to take up prior to the jury coming out?

3    MR. DONALDSON:  Yes.  On Exhibit 2301 that defense ask

4    to be admitted, the Court granted that request over the

5    government's objection.  I am withdrawing that.  I did misspeak

6    to that specific exhibit.  That one did not go directly to

7    Mr. Dershowitz' email, so I wanted to correct that.  We're

8    going to withdraw that if that's possible.

9    THE COURT:  Okay.  I don't remember.  So, I'm sorry.

10   Are there other exhibits?

11   MR. DONALDSON:  The other exhibits that we spoke about

12   before the break, we had the argument, those were admitted.  I

13   said that all those emails went directly to Mr. Dershowitz.

14   I'm telling the Court now I was incorrect about one of those,

15   that was 2301, and I wanted to withdraw that request for

16   admission for that particular exhibit.

17   THE COURT:  That's fine.  If you don't offer it,

18   obviously that's fine.  So let me ask, anything else with

19   regard to Mr. Dershowitz?

20   MR. DONALDSON:  Not from the defense.

21   THE COURT:  Mr. Slade and Mr. Sienko, how long is

22   there testimony going to be tomorrow?

23   MR. DONALDSON:  I anticipate Mr. Slade being between

24   20 and 30 minutes.

25   MS. REED:  Maybe 30 minutes, 45 minutes.

OA1BDAR3

1          MR. DONALDSON:  30, 45 minutes.  And Mr. Sienko, back

2     end of it, 30, 45 minutes.

3          THE COURT:  All right.  Look, in an ideal world I

4     would not necessarily have the jury come in for that.  Let me

5     just say, that testimony is the defense.  Well, I'm going to

6     ask at the end of this session after Mr. Dershowitz testifies,

7     I'm going to inquire of -- well, I'll wait until tomorrow

8     morning, but unless you're telling me that the testimony of

9     Sienko and -- well, I'll wait until tomorrow morning to inquire

10     again of Mr. Darden with regard to his testifying.

11          MR. DONALDSON:  Very good.  Thank you.

12          THE COURT:  All right.  Okay.  Shall we get

13     Mr. Dershowitz.  So what I intend to tell the jury is that

14     we're going to be able to break early.  We might go a little

15     bit longer past 12:45.  But once we're done with

16     Mr. Dershowitz, we're going to break for the day.  Is there any

17     objection to that?

18          MR. DONALDSON:  No, your Honor.

19          THE COURT:  Let's get the jury.

20          (Continued on next page)

21

22

23

24

25

OA1BDAR3

1          (Jury present)

2          THE COURT:  Thank you for your patience, ladies and

3    gentlemen.  There were certain issues that I needed to take up

4    with the lawyers.  We're going to begin the defense case now.

5    Now that means we're going to go a little bit into the lunch

6    time.  But once we're done with this witness, I'm going to

7    release you for the day, and we're going to come back tomorrow

8    at 10 o'clock for additional testimony, additional parts of the

9    defense case.  And we'll complete that testimony.  I anticipate

10   that you will have the case at some point on Thursday.  Okay.

11   All right.  The defense's first witness.

12         MR. DONALDSON:  Defense calls Mr. Dershowitz to the

13   stand.

14         THE COURT:  Mr. Dershowitz, step up, please.  My

15   deputy clerk Ms. Disla will administer the oath.

16   JAMIN DERSHOWITZ,

17        called as a witness by the Defendant,

18        having been duly sworn, testified as follows:

19         THE COURT:  If you could have a seat.  Make yourself

20   comfortable.  I just ask that you state your name and spell it

21   for the record.

22         THE WITNESS:  Jamin Dershowitz, J-A-M-I-N,

23   D-E-R-S-H-O-W-I-T-Z.

24         THE COURT:  You may inquire.

25         MR. DONALDSON:  Thank you, your Honor.

1    DIRECT EXAMINATION

2    BY MR. DONALDSON:

3    Q.   Good afternoon, Mr. Dershowitz.

4    A.   Good afternoon.

5    Q.   How are you?

6    A.   Good.

7    Q.   I'm going to -- let's start with, could you tell us a

8    little bit about your educational background, please?

9    A.   I'm a lawyer.  I went to Penn Undergrad and Yale Law

10   School.

11   Q.   And where are you presently employed?

12   A.   I am the general counsel of the Women's National Basketball

13   Association.

14   Q.   And how long have you been the general counsel of the

15   Women's National Basketball Association?

16   A.   Since it started, so that's about 27, 28 years at this

17   point.

18   Q.   Is there any relationship between the National Basketball

19   Association and the Women's National Basketball Association or

20   the WNBA and the NBA?

21   A.   There is.

22   Q.   What is that relationship?

23   A.   The NBA owns a percentage of the WNBA, and we also have

24   some shared services.  We function out of the same building,

25   back of house services like finance and things like that are

1    shared between the two leagues.

2    Q.  When you say the NBA owns a percentage of the WNBA, does

3    that mean the NBA owns most of it?  Is it the owner of the WNBA

4    or?

5    A.  No.  The NBA owns 42 percent of the WNBA.

6    Q.  Do the WNBA and the NBA share rules and regulations or

7    guidelines?

8    A.  No.

9    Q.  Are you familiar with the -- do you have any relationship

10   to the NBA or the NBA G League or anything like that?

11   A.  I do.  I am also the general counsel of the NBA G League

12   which is the NBA's minor league, a men's league.

13   Q.  Does the NBA G League's guidelines, are they similar to the

14   NBA's guidelines, regulations?

15   A.  They are more similar, the NBA G League has its own rules,

16   but, for instance, they use the same playing rules on the court

17   as the National Basketball Association.

18   Q.  Are you familiar with the bylaws of the WNBA?

19   A.  We don't have bylaws.

20   Q.  Are you familiar with the bylaws for the NBA?

21   A.  I have a familiarity with them, yeah.

22   Q.  Do you have any understanding of -- strike that.

23           You were the general counsel of the WNBA in 2020,

24   would that be fair to say?

25   A.  Yes.

OA1BDAR3                    Dershowitz- Direct

1   Q.  And in that capacity as the general counsel of the WNBA in

2   2020, were you part of a process if a team were to be sold, if

3   a WNBA were to be sold?

4   A.  Yes.

5   Q.  Are you familiar with or were you familiar with the sale of

6   the Atlanta Dream in 2020?

7   A.  I don't believe it was sold in 2020.

8   Q.  Are you familiar with the sale of the Atlanta Dream in

9   2021?

10  A.  Yes.

11  Q.  Are you familiar with the process leading up to the sale of

12  the Atlanta Dream in 2021?

13  A.  Some aspects of that.

14  Q.  Do you know a person named Mr. Brock from the Atlanta

15  Dream?

16  A.  I do.

17  Q.  In January of 2020, were you contacted by Mr. Brock related

18  to the sale of the Atlanta Dream?

19  A.  I don't recall any specific contact in that timeframe.

20  Q.  You don't recall any specific contact with Mr. Brock period

21  in 2020 related to the sale of Atlanta Dream?

22  A.  I thought you said January of 2020.

23  Q.  I did.  January of 2020?

24  A.  I don't recall specific something happening in January of

25  2020.

1    Q.  Are you familiar with Dwight Howard?

2    A.  Yes.

3    Q.  Do you recall Dwight Howard participating in a process to

4    purchase the Atlanta Dream in 2020?

5    A.  I recall conversations about potential purchase by Dwight

6    Howard in 2020 of the Atlanta Dream.

7    Q.  Let me go back.  When an WNBA team is being sold, does the

8    WNBA board of governors have to approve the sale of that

9    specific team?

10   A.  Yes.

11   Q.  Now, going back to the sale of the Atlanta Dream in 2021,

12   going back further, would you consider the process of selling

13   the Atlanta Dream in 2020 and 2021 a high profile situation?

14   A.  You're asking for my opinion?

15   Q.  Yes.  Your opinion on whether or not you consider the sale

16   of the Atlanta Dream in 2020, 2021 a high profile situation?

17            MR. THOMPSON:  Objection.

18            THE COURT:  Sustained.  You can rephrase the question.

19   Q.  When did you first hear about the Atlanta Dream being for

20   sale in 2020?

21   A.  I don't recall any specific date or any specific

22   conversation.

23   Q.  How did you hear about the Atlanta Dream being sold or

24   potentially being sold in 2020?

25   A.  I'm not certain.

1    Q.  What role, if any, did you play in the Atlanta Dream being

2    sold in 2020?

3    A.  The league is essentially the gatekeeper when a current

4    team owner wants to sale a team, so we would provide various

5    services in connection with potentially teeing the sale up for

6    the board of governors to make a decision.

7    Q.  So in that capacity in 2020, did you have any role and

8    responsibility related to actually the sale of the Atlanta

9    Dream to potential purchasers?

10   A.  So at one point closer to 2021 there was a purchase

11   agreement that was signed, and we did some due diligence and we

12   teed it up for approval by the board of governors.

13   Q.  Earlier you mentioned you that know -- you recall, you have

14   familiarity with Mr. Brock.  Who exactly was Mr. Brock to you

15   in 2020?  What was his relationship to you in 2020?

16   A.  The owners of the Atlanta Dream back then, one of them, her

17   name is Mary Brock, and John Brock is her husband.

18   Q.  And what role, if any, was Mr. Brock playing in the sale of

19   the Atlanta Dream in 2020?

20   A.  He was leading the process on behalf of his wife and her

21   co-owner at the time.  He was leading the process to sell the

22   team.

23   Q.  As part of that process that he was leading to sell the

24   team, was Mr. Dwight Howard part of that process as well?

25   A.  There came a time when Mr. Brock brought to the league's

OA1BDAR3                    Dershowitz- Direct

1    attention the interest of Dwight Howard in purchasing the team.

2    Q.  Are you familiar with someone named Calvin Darden, Sr., or

3    have you heard the name Calvin Darden, Sr., before?

4    A.  I've heard the name, yes.

5    Q.  Have you heard the name Calvin Darden, Jr., before?

6    A.  I have.

7    Q.  Have you heard the name Charles Briscoe before?

8    A.  I have.

9    Q.  Do you recall in who -- how you do recall the name Calvin

10   Darden, Sr.?

11   A.  There was a zoom call in the summer of 2020 that I was on

12   that he was on as well.

13   Q.  In that zoom call was Calvin Darden, Jr., on the zoom call

14   as well?

15   A.  I believe so, yes.

16   Q.  On July 10, 2020, you received an email from Mr. Brock

17   introducing you and Ms. Engelbert to Mr. Briscoe.  Do you

18   recall that or did that happen?

19   A.  I don't have a recollection of that particular email,

20   sorry.

21            MR. DONALDSON:  Could you put up Exhibit 2103.  I

22   believe this is in evidence already, Judge.

23            THE COURT:  Okay.  All right.

24            MR. DONALDSON:  Put up 2103 for witness only.

25            THE COURT:  Okay.  This is 2103 for identification?

1          MR. DONALDSON:  Yes.

2          THE COURT:  Okay.  Go ahead.

3    Q.  Mr. Dershowitz, do you see what's on the screen in front of

4    you 2103?

5    A.  Yes, I do.

6    Q.  And this is an email, correct?

7    A.  Yes.

8    Q.  Do you recognize your name as being CC'd on that email?

9    A.  Yes.

10   Q.  And this is July 10, 2020?

11   A.  Yes.

12          MR. DONALDSON:  I'd like to admit this into evidence

13   as Government Exhibit 2103.

14          THE COURT:  The email address, at the time was that

15   your email address?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Yes.

18          MR. THOMPSON:  Your Honor, request voir dire of the

19   witness with respect to this document.

20          THE COURT:  Sure.  Go ahead.

21   VOIR DIRE EXAMINATION

22   BY MR. THOMPSON:

23   Q.  Mr. Dershowitz, do you now recall having read this document

24   sitting here today, do you have a present recollection of

25   having read it?

1   A.  Not in 2020, no.

2          MR. THOMPSON:  The government objects to its

3   submission.

4          THE COURT:  I'm going to allow the admission to the

5   document.  Since that time, have you seen this email?

6          THE WITNESS:  I have.

7          THE COURT:  So I'm going to allow the admission of

8   this document.  But, ladies and gentlemen, so this Government

9   Exhibit 2103 is not being admitted for the truth.  It's being

10  admitted for a limited purpose, and that limited purpose is to

11  show the email's impact on what's discussed in the email on

12  Mr. Dershowitz at the time.  In other words, his state of mind,

13  but it's not being offered for the truth of the matters stated

14  in the email.  Go ahead, Mr. Donaldson.

15          (Government's Exhibit 2103 received in evidence)

16  BY MR. DONALDSON:

17  Q.  Looking at 2103 in evidence, second paragraph reads:  Hello

18  Kathy and -- sorry, how do you pronounce your name?

19  A.  Jamin.

20  Q.  Would you prefer I call you Jamin or Mr. Dershowitz?

21  A.  Jamin is fine.

22  Q.  It says, hello Kathy and Jamin.  Jamin is you, correct?

23  A.  Yes.

24  Q.  As John stated, we are seriously interested in acquiring

25  the Atlanta Dream.  Dwight along with the rest of the group

1    have many ideas to continue the progression of the Atlanta

2    Dream and the WNBA.  We thank you for your time and look

3    forward to the opportunity to discuss our plans in hopes of

4    acquiring the team.

5            You were on that email, correct?

6    A.  That's what it says, and I have no reason to dispute that.

7    Q.  You testified earlier back in July it was brought to your

8    attention that Dwight Howard wanted to participate in buying

9    the Atlanta Dream; is that correct?

10   A.  I don't know that I said it was necessarily July, but it

11   was brought to my attention at some point, yes.

12   Q.  After it was brought to your attention that Mr. Howard --

13   did you know who Mr. Howard was an active member of the NBA at

14   that time?

15   A.  I knew he was an NBA player.  I wasn't certain that he was

16   still active.  I know he was toward the end of his career.

17           MR. DONALDSON:  Could we please put up 2104 please for

18   the witness only.

19   Q.  Showing you what's been marked what's Government Exhibit

20   2104, just for your eyes only.

21           Do you see that in front of you?

22   A.  Yes.

23   Q.  And do you see your email address on this as well?

24   A.  Yes.

25   Q.  And that's the same email address you used back in July

OA1BDAR3                      Dershowitz- Direct

1    2020?

2    A.  Yes.

3              MR. DONALDSON:  Your Honor, I'd like to move this into

4    evidence as Government Exhibit 2104.

5              THE COURT:  Voir dire?

6              MR. THOMPSON:  Yes, your Honor.

7    VOIR DIRE EXAMINATION

8    BY MR. THOMPSON:

9    Q.  Mr. Dershowitz, do you sitting here today have a

10   recollection of having read this document?

11   A.  Not in 2020, no.

12   Q.  You don't have a recollection of having read it?

13   A.  Not back then, no.

14   Q.  And do you have any recollection of whether this document

15   or email had any effect on you?

16   A.  I don't.

17             MR. THOMPSON:  The government objects to the admission

18   of this exhibit.

19             THE COURT:  I'm going to allow the exhibit in evidence

20   2104, and allow defense to probe that issue.  And I can revisit

21   its admission once I've heard the testimony.  So Government

22   Exhibit 2104 is admitted into evidence.

23             (Government's Exhibit 2104 received in evidence).

24             THE COURT:  Ladies and gentlemen, the same curative

25   instruction, the instruction I gave you before on the law and

 1    the purpose for the admission of the exhibit also applies to
 2    this one.  So it's not being admitted for the truth, it's being
 3    admitted to show any impact it may have had on Mr. Dershowitz
 4    at the time of its sending, but it's not being admitted for the
 5    truth.  So it's being admitted for a limited purpose.
 6            Go ahead, Mr. Donaldson.
 7    BY MR. DONALDSON:
 8    Q.  Mr. Dershowitz, you indicated that in July you got on a
 9    zoom call.  Do you recall that?
10    A.  Yes.
11    Q.  And on the zoom call I believe you said contained
12    Mr. Darden, Sr., Darden, Jr., and possibly Briscoe as well?
13    A.  I'm not sure I said that.
14    Q.  Did you get on a zoom call in July of 2020 related to the
15    sale of the Atlanta Dream?
16    A.  I do remember a zoom call with Dwight Howard and Calvin
17    Darden, Sr., and Calvin Darden, Jr. I believe Briscoe was on.
18    I don't have a strong recollection of him being on the call.
19    Q.  And prior to getting on that zoom call -- well, the zoom
20    call, what was the zoom call?  What was the purpose of the zoom
21    call if you recall?
22    A.  I think it was introductory in nature.  I believe the
23    ownership group led by John Brock at the time was interested in
24    introducing them to the league.
25    Q.  And the email that's in front of you now, 2104, that's an

OA1BDAR3                        Dershowitz- Direct

1    email from -- well, from Ms. Engelbert, and Ms. Engelbert is

2    the commissioner of the WNBA, correct?

3    A.  Yes.

4    Q.  Or she was back in 2020, correct?

5    A.  Yes.

6    Q.  In this email it says on, July 11.  Thank you for your

7    interest.  Jamin and I are happy to get on a call at your

8    convenience.  Please let us know time that work for you over

9    the next few days.  Do you see that?

10   A.  I do.

11   Q.  And the date of this email is July 11, 2020, correct?

12   A.  Yes.

13           MR. DONALDSON:  Can we put up 2109, please, for

14   witness only.

15           THE COURT:  Is this already in evidence?

16           MR. DONALDSON:  No, just for the witness only.

17           THE COURT:  Okay.  All right.

18   Q.  Now, Mr. Dershowitz, looking at Government Exhibit 2109,

19   that has your email up there as well, correct?

20   A.  Yes.

21   Q.  And that's the same email from the two prior emails,

22   correct, two prior government exhibits, correct?

23   A.  Yes.

24   Q.  And that's from 2020 when you were still GC of the WNBA,

25   correct?

OA1BDAR3                         Dershowitz- Direct

1    A.   Correct.

2    Q.   And this email is from commissioner Ms. Engelbert related

3    to the zoom call, correct?

4    A.   Yes.

5    Q.   And that's on July 12, correct?

6    A.   It appears to be an invitation for a zoom call on July 12,

7    yes.

8    Q.   And that would be after the July 11 email where you say you

9    and Ms. Engelbert say you're going to have a follow-up call,

10   correct?

11   A.   Based on the emails, yes.

12            MR. DONALDSON:  I'd like to move this into evidence as

13   Government Exhibit 2109.

14            THE COURT:  Okay.

15            MR. THOMPSON:  No objection.

16            THE COURT:  Okay.  Government Exhibit 2109 is admitted

17   in evidence.

18            (Government's Exhibit 2109 received in evidence)

19   BY MR. DONALDSON:

20   Q.   Now, Mr. Dershowitz, this is the zoom call that you related

21   to when you said that you, Mr. Darden, Sr. and Mr. Darden, Jr.,

22   and Charles Briscoe talked about the introductory part of the

23   Atlanta Dream, correct?

24   A.   Again, I don't think you're characterizing it exactly

25   precisely.

1    Q.  This is the zoom call that occurred in July of 2020 with

2    you, Ms. Engelbert, Mr. Darden, Sr., Mr. Darden, Jr., and

3    Mr. Briscoe, and I believe you said Mr. Howard, correct?

4    A.  I think I said I wasn't as certain Mr. Briscoe was on the

5    call as I was the others.  It would be guesswork on my part to

6    say that this necessarily was that zoom call.  It would be

7    guesswork.

8              MR. DONALDSON:  Could you put up 3500, Section 3518-1

9    for witness only, please.  Could you scroll down a page.  Right

10   there.

11   Q.  Now, before we get to this, before that zoom call, before

12   the zoom call that occurred, you did research on the persons

13   that you thought would be on the zoom call; would that be fair

14   to say?

15   A.  I did with respect to people on the zoom call whom I didn't

16   know, yes.

17   Q.  And the persons you didn't know were Darden, Jr., Darden,

18   Sr., is that correct?

19   A.  Yeah, I only recall either myself or a colleague doing --

20   looking up Darden, Jr. It's certainly possible that I also

21   looked up senior.

22   Q.  And based upon that research on Darden, Jr., what did you

23   find out about Darden, Jr. if you recall?

24   A.  I saw that Darden, Jr. had been convicted of a crime.

25   Q.  Okay.  And before that zoom call happened, you also did

1  research on Mr. Howard, correct, Dwight Howard, correct?

2  A.  I don't recall that.

3  Q.  You don't recall whether you did research on Dwight Howard?

4  A.  I don't.

5  Q.  When you attended the zoom call -- strike that.

6         Before you attended the zoom call, did you contact

7  Mr. Brock related to what you found out about Mr. Darden?

8         THE COURT:  Darden, Jr.

9  Q.  Darden, Jr. my apologies.

10 A.  I have no recollection of speaking with Mr. Brock between

11 the time I learned of Darden, Jr.'s issue in the zoom call.

12 That doesn't resonate.  I don't recall that.

13 Q.  And as far as the participation, you don't recall whether

14 or not Mr. Briscoe was on the phone call, correct?

15 A.  I just don't have a strong recollection as I do of, it's a

16 zoom call.  I definitely remember seeing Dwight Howard.  I

17 definitely remember focusing on senior and junior.  Those are

18 in my mind.  I just don't have that specific a recollection of

19 Briscoe.

20 Q.  And when you got on the zoom, while you were on the zoom

21 call, did you announce to the persons on the zoom call that

22 Mr. Darden, Jr. had a criminal record?

23 A.  I don't think so.

24        MR. DONALDSON:  Could we scroll down, please.  Scroll

25 back up.

1    Q.  I'm going to show you 3518-1 to see if that refreshes your

2    recollection.  Look at page --

3              MR. DONALDSON:  Give me one second please, Judge.

4              THE COURT:  Okay.

5              MR. DONALDSON:  Can you scroll up some, scroll up a

6    little bit more, scroll up a little bit more.  I'm sorry about

7    that.  My apologies.

8    Q.  Mr. Dershowitz, if you could, could you read the final

9    bullet point on the top of page one, that section, to see if

10   that refreshes your recollection as to whether or not you

11   mentioned the information about Mr. Darden, Jr. on that zoom

12   call?

13   A.  Can you describe what bullet you want me to read?

14   Q.  The eighth bullet point down, that section starts there

15   where it says "believe."

16   A.  All the sub-bullets in that as well?

17   Q.  Yes, please.

18   A.  Okay.

19   Q.  You see it?

20   A.  Yes.

21             MR. DONALDSON:  Could you scroll down a little bit

22   more, please.

23   Q.  You see that second bullet point that starts with believe,

24   could you read that as well to see if that refreshes your

25   recollection.

1    A.  Along with the sub-bullets as well?

2    Q.  Yes.

3    A.  Okay.

4    Q.  Does that refresh your recollection as to whether you said

5    on that zoom call that Mr. Darden, Jr. had a criminal

6    conviction?

7    A.  It doesn't.

8        MR. DONALDSON:  Could you scroll up, I'm sorry, down a

9    little bit more.

10   Q.  Please read the sixth open bullet point, top of page two.

11   A.  Okay.

12   Q.  Now, does that refresh your recollection where it says JD

13   focused on facts --

14       MR. THOMPSON:  Objection.

15       THE COURT:  Where in this document are you referring

16   to?  Okay.  I see it.

17       MR. DONALDSON:  For point of context for

18   Mr. Dershowitz.

19       THE COURT:  What was the question?

20       MR. DONALDSON:  The question was whether or not

21   Mr. Dershowitz on that zoom call informed the other parts on

22   that zoom call that Darden, Jr. had a criminal conviction.

23       THE COURT:  You already asked the question whether or

24   not the prior thing refreshed Mr. Dershowitz' recollection.  So

25   having looked at the bullet points that counsel just directed

1    you, does that refresh your recollection concerning whether or

2    not you communicated on the zoom call the fact of Mr. Darden,

3    Jr.'s conviction?

4            THE WITNESS:  It does not.

5            THE COURT:  Okay.  Go ahead.

6    BY MR. DONALDSON:

7    Q.  On March 7, 2023, you did speak to the government, correct,

8    the document in front of you?

9    A.  I haven't read any dates on this.  I'm sorry.

10   Q.  Do you recall meeting with the government on March 7, 2023

11   related to this case?

12   A.  I got a phone call from the government in 2023 about this.

13   Q.  And when you had that phone call with the government about

14   this issue, you were asked questions related to the zoom call

15   of July 12, 2020, correct?

16   A.  Yes.

17   Q.  And one of the questions they asked you was whether or not

18   you --

19           THE COURT:  Go ahead.

20   Q.  -- informed the persons on the zoom call that Mr. Darden,

21   Jr. had a felony conviction?

22   A.  I don't recall that question.

23   Q.  I'm showing you notes from March 7, 2023.  Look at that

24   portion starting with bullet point zoom call and going down to

25   see if that refreshes your recollection as to whether or not

1  you told the government on March 7, 2023 that you focused on

2  the fact that the son was a felon?

3  A.  It appears to me to be two questions.  Did I focus on it or

4  did I say it?

5       THE COURT:  No.  The issue is reading from the bullet

6  point on page one at the bottom where it says, zoom call, down

7  through the sub-bullet points that end, don't remember.  If you

8  could take a look at that.

9       And so then the question is, does that refresh your

10 recollection concerning whether you told the government back in

11 March of 2023 that you raise the issue of Darden, Jr.'s

12 criminal conviction on the zoom call, whether you during that

13 March conversation, does that refresh your recollection?

14      THE WITNESS:  It doesn't.

15 Q.  Regarding Mr. Howard, would it be fair to say, not would it

16 be fair so say.

17      Did you have conversations with Mr. Brock related to

18 Mr. Howard not being able to purchase the Atlanta Dream?

19 A.  I don't recall a specific conversation, no.

20 Q.  Well, not a specific conversation, did you have a

21 conversation with Mr. Brock related to Mr. Howard not being

22 able to purchase a WNBA team?

23 A.  It's very likely that I did, but I don't recall a specific

24 conversation.

25 Q.  Why is it very likely that you did have a conversation with

1    Mr. Brock saying that Mr. Howard could not purchase an NBA

2    team?

3            THE COURT:  WNBA.

4    Q.  WNBA.  My apologies, Judge.

5    A.  So as my role as a gatekeeper, one of the things that we

6    would do is, we would enforce any rules regarding ownership.

7    And under current rules, under the rules, these are NBA rules,

8    NBA players, current NBA players were not permitted to purchase

9    WNBA teams.

10   Q.  You also -- not also.  Did you also have a conversation

11   with Mr. Brock that Mr. Howard could not buy it and give it to

12   someone else and run it from behind the scenes?

13   A.  I don't recall that.

14   Q.  Going back to your March 7, 2023 interview with the

15   government, do you recall being asked whether or not you

16   informed Mr. Brock that Mr. Howard could not own a WNBA team

17   and own one from behind the scenes?

18   A.  I don't have a recollection of that specific conversation,

19   no.

20           MR. DONALDSON:  Judge, can I have a second, please?

21           THE COURT:  Yes.

22   Q.  I want to direct your attention back to what's on your

23   screen 3518-1, March 7, 2023 interview.

24           MR. DONALDSON:  Could you go up to page one, please.

25   Can we slide up a little bit, please.

1   Q.  Mr. Dershowitz, I'm going to ask you to look at the sixth

2   and seventh subpoints on page one.  Read that.  See if that

3   refreshes your recollection as to whether or not on March 7,

4   2023, you told the government that Mr. Howard could not own the

5   team.  And that if another group buys it, Mr. Howard couldn't

6   have an option to buy it as well once he retires.

7           Could you please look at that to see if that refreshes

8   your recollection as to whether you told the government that on

9   March 7, 2023?

10  A.  I believe I did with respect to the option, yes.

11  Q.  I'm sorry.

12  A.  Yes, it does refresh my recollection.

13  Q.  So back in March 7, 2023, just so I'm clear, you did inform

14  the government that Mr. Howard, if another group buys,

15  Mr. Howard could not have an option to buy it once he retires,

16  correct?

17  A.  Yes.

18  Q.  Because that would be the same as owning it, correct?

19  A.  The WNBA treats options the same way as they do ownership

20  outright.  So if there is an option to purchase, we would do

21  the same approval process as for that option as we would for

22  ownership.

23  Q.  And that was communicated to Mr. Brock by you, correct?

24  A.  Again, very likely, but I don't have a specific

25  recollection.

OA1BDAR3                        Dershowitz- Direct

1    Q.  Could a player, could an active NBA player directly or

2    indirectly own a WNBA team back in 2020?

3    A.  No.

4    Q.  Back in 2020 could a person with a felony conviction own a

5    WNBA team?

6    A.  That's -- it's not impossible.

7    Q.  But in order to do that, the person with the felony

8    conviction would have to get special permission from the board

9    of governors, correct, if you know?

10                MR. THOMPSON:  Objection.

11                THE COURT:  Sustained.  If someone was convicted of a

12   felony, you said it's not impossible.  What would the process

13   be that someone would have to undergo if they wanted to

14   purchase a WNBA team at the time in 2020 if they had been

15   convicted of a felony?

16                THE WITNESS:  So we do a full background check of any

17   potential owners which includes a criminal background check.

18   And if there are matters of concern, we would raise that to the

19   attention of the board of governors.  And while it would be

20   very unlikely that someone with a felony conviction could ever

21   be approved by the board of governors, it's a different process

22   by which it's not a bar.  It's not a definitive bar.  It's

23   something that we would point out and the board of governors

24   would have to make that decision.

25                THE COURT:  All right.  Next question.

OA1BDAR3                          Dershowitz- Direct

1          MR. DONALDSON:  Could you put up 21144A I believe

2     that's in evidence, Judge.

3          THE COURT:  Okay.

4          MR. DONALDSON:  Right now just for the witness 2144A.

5     Could you scroll down, please, a few pages for me, please.

6     Keep going.  You can put that for everybody, please.  I believe

7     it's in evidence.

8     Q.  Now, Mr. Dershowitz, do you recall seeing this presentation

9     back in 2020?

10    A.  I recall seeing this page that's in front of me now, yes.

11    Q.  When you saw this, would it be fair to say -- in your

12    capacity or your responsibilities as general counsel, would it

13    be fair to say is it common for the potential buyers to have

14    celebrity list like this?

15         MR. THOMPSON:  Objection.

16         THE COURT:  If you could rephrase the question cause

17    you said --

18         MR. DONALDSON:  I did, Judge.

19         THE COURT:  You said celebrity list like this.  That's

20    not exactly what the document --

21         MR. DONALDSON:  Right.

22    Q.  Is it common for potential buyers to have a list like this

23    in their pitch deck?

24    A.  I don't typically see pitch decks when a team is being sold

25    by another to a potential buyer.

OA1BDAR3                          Dershowitz– Direct

1    Q.  When you saw this particular list, I'm sorry.  You said you

2    don't normally see -- what's your last answer?

3              THE COURT:  I can read it back.  I don't typically see

4    pitch decks when a team is being sold by another to a potential

5    buyer.

6    Q.  When you saw this particular list, did it move you in any

7    way related to Howard or Darden owning the team?

8              MR. THOMPSON:  Objection.

9              THE COURT:  Well, objection overruled.  Do you recall

10   your reaction at the time when you saw this list of folks under

11   the title advisory board in this document?

12             THE WITNESS:  I do.

13             THE COURT:  Okay.  And what was your reaction?

14             THE WITNESS:  Sort an eye roll I guess would be the

15   best way to describe it.

16   Q.  I'm sorry.

17   A.  Sort of an eye roll would be the best way to describe it.

18   Q.  Eye roll in that it did not impress you, correct?

19             MR. THOMPSON:  Objection.

20   A.  Correct.

21             THE COURT:  I'll allow it.

22   A.  Correct.

23             MR. DONALDSON:  Could you scroll down one page.

24   Scroll down one more.  Go down the corporate list, to the

25   corporate list.  Thank you.  Right there.

OA1BDAR3                        Dershowitz- Direct

1  Q.  Did you see this as well back in 2020 if you recall?

2  A.  I do have a recollection of this seeing this, yes.

3  Q.  And when you saw this one --

4          THE COURT:  Just to be clear, it's a document.  It's

5  part of the same exhibit.  At the top it says corporate

6  affiliations.  I don't know, it doesn't have a -- I don't know

7  what the page number is, but it's got corporate affiliations.

8          MR. DONALDSON:  I think it's page 18.

9  Q.  I'm showing you what's page 18 of 2144A titled corporate

10 affiliations.  You said you remember seeing this back in 2020,

11 correct?

12 A.  Yes.

13 Q.  And when you saw this back in 2020, did this have any

14 effect on you related to Howard or Darden purchasing the Dream?

15 A.  No.

16 Q.  And the list of the persons that we saw earlier that was on

17 2144, did that have an effect on you whether Mr. Darden and

18 Mr. Howard could purchase the Dream?

19         THE COURT:  When you're saying -- let's have some

20 clarity.  Darden, Jr., Darden, Sr.

21         MR. DONALDSON:  Darden, Sr.

22 A.  Can you repeat the question.

23 Q.  The list that we showed you previously --

24         MR. DONALDSON:  If you can go back up to the list

25 Mr. Ross please.

1  Q.  Did this list have any effect on whether or not Mr. Darden,

2  Sr., or Mr. Howard could purchase the Atlanta Dream?

3  A.  No.

4          MR. DONALDSON:  I don't have anything further.

5          THE COURT:  Okay.  Cross-examination.

6  CROSS-EXAMINATION

7          MR. THOMPSON:  May I proceed, your Honor.

8          THE COURT:  You may.

9  BY MR. THOMPSON:

10 Q.  Good afternoon, Mr. Dershowitz.

11 A.  Good afternoon.

12 Q.  Do you recall being asked questions about the vision plan

13 Government Exhibit 2144A on cross-examination?

14 A.  Just now?

15 Q.  Yes.

16 A.  Yes.

17 Q.  Excuse me.  On direct examination.  Forgive me.

18          Now, you described your role as GC of the WNBA as a

19 gatekeeper.  Is that right?

20 A.  Yes.

21 Q.  Fair to say in that capacity you collect materials relevant

22 to potential purchasers buying a team, right?

23 A.  Yes.  Once it's presented to the league, we would do that

24 due diligence, yes.

25 Q.  And once the due diligence is completed and you've

1    collected materials, you give the materials to the board of

2    governors.  Is that right?

3    A.   Not the materials themselves, no.

4    Q.   You present the board of governors with information to

5    allow them to decide whether a team should be sold.  Is that

6    fair?

7    A.   If it gets to that point, we would present the information

8    to the board of governors for them to make a decision.

9    Q.   On direct examination you were asked questions about the

10   individuals listed on an advisory board; is that right?

11   A.   Yes.

12   Q.   And you testified that it caused you to do an eye roll.  Is

13   that right?

14   A.   That's how I described it, yes.

15   Q.   But respectfully your view of that advisory board had no

16   view as to whether the board of governors would actually sell

17   the Atlanta Dream to Mr. Darden's Group.  Isn't that right?

18   A.   Can you repeat the question.

19   Q.   Your view of the advisory board and the vision plan had no

20   impact on whether the board of governors was responsible for

21   the sale of the WNBA teams would actually sale the team to

22   Mr. Darden's group; isn't that right?

23   A.   Just that the board of governors doesn't sell the team.

24   Q.   Approve the transaction.  I'll restate the question again.

25            Your view of the advisory board and the vision plan

1    had no impact on whether the board of governors would approve

2    the transaction to sell the team to Mr. Darden's group, right?

3    A.  That's accurate, yes.

4    Q.  And your view of the corporate sponsors in the vision plan

5    that similarly had no view -- no impact on whether the board of

6    governors would approve the transaction to sell the team to

7    Mr. Darden's group, right?

8    A.  That's accurate.

9    Q.  And your view of the vision plan writ large in total had no

10   impact on whether the board of governors would sell the Atlanta

11   Dream to Mr. Darden's group?

12   A.  Can you repeat question because the board of governors

13   doesn't do the sale.

14   Q.  Thank you. Your view on the vision plan in general had no

15   impact on whether the board of governors would approve a

16   transaction to sell the team to Mr. Darden's group, right?

17   A.  I believe that's accurate, yes.

18             MR. THOMPSON:  Nothing further.  Thank you.

19             THE COURT:  Okay.  Any direct?

20             MR. DONALDSON:  No.

21             THE COURT:  Okay.  Thank you very much.  You may step

22   down.

23             THE WITNESS:  Thank you.

24             (Witness excused)

25             THE COURT:  Okay.  So, ladies and gentlemen, as I

OA1BDAR3                         Dershowitz – Cross

1    mentioned that will conclude the testimony for today.  We're

2    going to continue the defense case tomorrow at 10 o'clock.  All

3    right.  Remember, do not discuss the case with one another.  Go

4    home, relax, or whatever you have planned for this afternoon.

5    And you can leave your pads either on your chairs or in the

6    back.  All right.  Thank you very much.

7              (Continued on next page)

1    (Jury not present)

2         THE COURT:  You may be seated.  So I'd like to do

3    several things later on this afternoon after we take the lunch

4    break.  One is complete the discussion concerning Mr. Ricco's

5    letter from earlier this morning concerning the items numbered

6    one and two.  I think we've already had -- the other issues

7    have been resolved, and next to do the charging conference.  So

8    just to let the parties know, typically what I do at the

9    charging conference, everyone should a copy of the charge that

10   was circulated last night.  I will ask who has the first

11   comment and we'll go through it in essence page by page until I

12   have all the comments from both sides concerning the charge,

13   and we can talk about making revisions, things like that.

14        So to the extent there are objections, that is the

15   time to raise them.  Is there anything else other than those

16   things?  I know that there are going to be at least two defense

17   witnesses tomorrow.  I will allocute Mr. Darden, and the

18   government should proceed as if he were going to testify and be

19   prepared to go from whomever it is, either Mr. Slade or Sienko,

20   whoever is the last witness before Mr. Darden after his direct

21   to proceed with cross-examination.

22        MR. MEAD:  That makes sense, your Honor.  And I assume

23   this is the Court's plan that the defense will rest at the end

24   of the day tomorrow such that we wouldn't have a surprise of

25   Mr. Darden's testimony on Thursday morning?

1          THE COURT:  No. No. Tomorrow I find out one way or the

2     other. Fish or cut can bait as they say I guess whether or

3     not -- in other words, I'm not going to hold in abeyance the

4     defense resting until Thursday.  The defense will rest

5     tomorrow.  Obviously if Mr. Darden and his testimony goes over

6     into Thursday, that's a separate matter, but I suspect that we

7     may not use -- well, if Mr. Darden testifies it may take up

8     more of the day tomorrow than I anticipate right now with just

9     the two defense witnesses which have been estimated at about 30

10    or 40 minutes each, and then redirect.  So we'll get through

11    the substantial part of the morning, but there's no reason to

12    hold in abeyance that decision until Thursday, cause as I

13    indicated, we're going to do summation on Thursday.  Again,

14    assuming that the defense case is done.

15          Any questions with regard to that?

16          MR. MEAD:  No, your Honor.

17          THE COURT:  From the defense?

18          MR. DONALDSON:  No, your Honor.  Thank you.

19          THE COURT:  All right.  So why don't we come back at

20    about 2:45 to complete the discussion of items one and two in

21    Mr. Ricco's letter, and then we'll have the charge conference.

22    Are folks going to be able to get -- we can have copies printed

23    of the charge if you're not going back to your office.  Do you

24    have a copy of the charge?

25          MR. RICCO:  We have it on our computers, but if we can

OA1BDAR3                    Dershowitz - Cross

1   have a copy, it would be helpful.

2           THE COURT:  We could make it.  We'll make one copy.

3   And does the government wish us to print out a copy?

4           MR. MEAD:  We're all set, your Honor.

5           THE COURT:  We're going to come back at 2:45.  And if

6   there are any other issues to be taken up, we can always take

7   them up at that point.  Mr. Donaldson and the defense team,

8   make sure that you have -- again, I'm going to ask that you

9   this evening make sure that you have the exhibits you

10  anticipate getting that they're in just so that there's not an

11  issue when you decide that you're going to rest the case.  And

12  I'll hear from you concerning any obligations or motions after

13  the close of the defense case.

14          MR. RICCO:  So, Judge, based on Mr. Dershowitz's

15  testimony, there is one exhibit that we may seek to introduce.

16  I have to look at it during the lunch hour, and I'll report

17  back to the Court, but that document is in the 3500 material.

18  It's not a new document.

19          THE COURT:  But, wait, it's in 3500 material?

20          MR. RICCO:  Not the 3500.  I want to take a look at

21  it.  It's something I thought I saw, and I just want to make

22  sure.  If it is something we intend to offer, I'll let them

23  know.

24          THE COURT:  Please do, and then we can discuss it

25  after the lunch break.

OA1BDAR3                        Dershowitz – Cross

1              MR. RICCO:  Thank you.

2              THE COURT:  Anything before we take our lunch break?

3              MR. DONALDSON:  No.

4              MR. THOMPSON:  No, your Honor.

5              THE COURT:  Thank you.  I'll see everybody at 2:45.

6    Thank you very much.

7              (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OA1JDAR4

```
 1                      AFTERNOON SESSION

 2                         2:45 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  My plan was to first discuss items one and

 5   two from Mr. Ricco's letter, and then to discuss any issues

 6   that the parties want to discuss and then to do the charge.

 7          Okay.  So first, with regard to item one, we had some

 8   discussion.  First, I guess my one question I do have that I

 9   had not asked earlier is how does this information come in?  In

10   other words, is there a document of some sort?  I thought that

11   there were two contracts of Mr. Howard's that came in evidence,

12   but am I incorrect about that?

13          MR. DONALDSON:  No, you're correct.  I believe they

14   were Government Exhibits 349 and maybe 351.

15          MR. MEAD:  394 and 399 I want to say.

16          THE COURT:  So is that where this information comes

17   from?  Where does this information come from?

18          MR. LEGON:  Your Honor, the contracts have to be filed

19   with the NBA main office and the NBA by the commissioner.  And

20   the contracts are essentially -- one of the roles of the NBA is

21   to look over every single player's contract and make sure that

22   it conforms.  A player cannot play, for instance, unless that

23   contract conforms to the requirements of the NBA.  And there's

24   so many different areas that it's relevant to.  For instance,

25   the salary cap, they have league minimum salaries --
```

OA1JDAR4

1          THE COURT:  I guess before you get there, is there a

2    document you intend to offer?  Is there testimony that someone

3    is going to say, this is what Mr. Howard earned in 2020 and

4    2021?

5          MR. LEGON:  Yes, your Honor.

6          THE COURT:  Who is that?

7          MR. LEGON:  Your Honor, perhaps we can discuss it with

8    the government and do it through a stip.  This is not in

9    controversy.  This is a filed contract.  These are filed

10   accounts and they --

11         THE COURT:  I just don't know.  Do the contracts that

12   are already in evidence, what period of time do they cover?

13         MR. LEGON:  They only cover two periods.  They don't

14   cover his entire career and his entire career earnings.  So

15   what we would do is these are publically recorded, and what we

16   would do is perhaps a chart through our paralegal or a stip

17   that these are his career earnings, and we have those career

18   earnings.

19         THE COURT:  Okay.  But now let's return to what is the

20   relevancy of the fact that Mr. Howard, that up to the

21   2020/2021, I guess, season or whatever, that he earned a total

22   of between 240 and $245 million in salary?

23         MR. LEGON:  So once again, I think it goes to whether

24   or not he had the financial wherewithal to purchase a team and

25   be involved here.  And also I think it relates to the questions

OA1JDAR4

1    that were asked of him and answered regarding a tax bill that

2    he had, a large tax bill that he had and whether or not -- what

3    the interrelationship between his current financial situation

4    and what he was trying to do, whether that was supported by his

5    net assets that he had earned over the course of his career.

6            THE COURT:  My recollection is that Mr. Howard was

7    never asked about tax --

8            MR. LEGON:  Withdrawn, your Honor.

9            I meant Mr. Schmidt discussed the tax bill.

10           THE COURT:  Okay.  But I don't believe there was a

11   specific quantification of what that tax liability was.

12           MR. LEGON:  You're correct, your Honor.

13           THE COURT:  And so again, I just return to the fact

14   that he was able to come up with a line of credit for

15   $7 million and that he had no difficulty basically -- in other

16   words, coming up with that.  In other words, I'm not sure what

17   the financial wherewithal of Mr. Howard -- I don't think that's

18   in dispute.

19           In other words, I don't know exactly whether he earned

20   $50 million, $10 million.  He was able to, through the

21   testimony of Mr. Schmidt, able to arrange for financing such

22   that he came up with $7 million.  So I'm not sure -- again,

23   I --

24           MR. LEGON:  Your Honor, if that is the case, your

25   Honor, what's the prejudice here?  It doesn't seem that this

1    information coming in --

2            THE COURT:  Because you don't want to paint the guy as

3    a rich guy who the jury shouldn't care about.

4            MR. LEGON:  That's not what we're --

5            THE COURT:  That may not be the argument, but unless

6    there's some relevance, the 403 balancing test would, I think,

7    outweigh any relevance of this.  So I guess I'm just trying

8    to figure out exactly -- because the delta -- because you're

9    saying, well, it doesn't really matter because he was able to

10   come up with $7 million.  And so while it's -- so there's no

11   issue, at least as far as I know, in the record that -- well,

12   A, that is some sort of a pipe dream.  And even if it was a

13   pipe dream, it's still out -- so I just don't -- and I

14   apologize because maybe I'm missing why it's relevant, the

15   total amount of money he earned during that time period to

16   either a particular defense issue or argument that is going to

17   be made, as opposed to just sort of rounding out the picture or

18   what have you.

19           I mean, is there a particular argument that defense

20   intends to make?  And you want to make it at sidebar, you can

21   come make it at sidebar, if you don't want to reveal it.  But

22   I'm trying to figure out what the relevance is so I can do what

23   I suspect — although I haven't heard from the government yet —

24   is an argument that the prejudicial nature would outweigh any

25   relevance here.  And again, that's without getting into the

OA1JDAR4

1    specifics of the particular documents that are used to

2    aggregate his salary.

3              MR. RICCO:  Your Honor, can we have one moment?

4              THE COURT:  Yeah.  Absolutely.  Go right ahead.

5              (Pause)

6              MR. RICCO:  Judge, we would like to just make the

7    point at the sidebar.

8              MR. BRUSH:  This is Pete Brush from *Law360*.  I'm a

9    reporter with the in-house press and SDNY.  I would ask that I

10   can attend the sidebar or object to a sidebar at this

11   particular juncture because I don't see any reason why these

12   discussions should be either secret or quasi secret.

13             THE COURT:  Well, there is a legal reason.  They're

14   not required to disclose what their arguments are to the

15   government at this time.  So it may be that at a certain point

16   in time, certainly when they do arguments, assuming it's

17   admitted, that it will come out.  Now, I don't have a problem

18   with you being at sidebar, but I would have a problem with you

19   then writing about it in advance of the defense being able to

20   make their argument.

21             MR. BRUSH:  Then I would request if there is a ruling

22   that it be stated in open court so I know what it was.

23             THE COURT:  Yes, I will say whether the information --

24   so it's item number one.  I don't know whether -- Mr. Ricco, if

25   you could do me a favor because I don't believe your letter was

OA1JDAR4

1    filed.

2              MR. RICCO:  No, we're going to file it, Judge.

3              MR. BRUSH:  I don't believe it's in the docket.

4              THE COURT:  Just so you know, this is what item number

5    one reads as follows:  That up to the year 2020-2021, during

6    the relevant time period of the crimes charged, Dwight Howard

7    had a total of between 240 to $245 million in salary earnings

8    from his contracts in the.

9              NBA.  And that document will be filed --

10             MR. RICCO:  Right now, judge.

11             THE COURT:  Being filed right now.

12             And then there's a second item, but you'll see that

13   second one.  We'll discuss that also.  I'm not sure if I'm

14   going to need to have a sidebar with regard to that.  So I

15   don't want -- see, the problem with you hearing it is I

16   can't -- I guess I could direct the government not to read

17   *Law360*.  But let me hear from the defense.  Because -- but the

18   bottom line is I rule it out, then let me think about whether I

19   just -- the transcript can be made available in due course or

20   whether you get access to it because the argument won't be

21   made.  In other words, if I rule that the information is not

22   coming in, it wouldn't be a problem with everybody knowing

23   exactly what was said at sidebar.  Is that --

24             MR. RICCO:  Yes, Judge.  And I appreciate the Court's

25   step-by-step approach.

OA1JDAR4

1          THE COURT:  Yeah.  And so it may be -- we'll see where

2     it ends up that it may be an issue that is going to be out

3     there, and you can get access to the transcript or I can just

4     sort of -- yeah.

5          MR. BRUSH:  I appreciate it.  While I would observe

6     it's out there anyway from all the arguments this morning.

7          THE COURT:  But I suspect — and I don't know — I

8     suspect there's going to be something different that I'm going

9     to hear at sidebar than I've heard so far, but I don't know

10    that.  And if I don't, I'll let you know if nothing was added

11    from my perspective from the argument we had this morning.

12         MR. BRUSH:  Appreciate it and I apologize for the

13    disruption.

14         THE COURT:  It's fine.  If we can come to sidebar.

15         (Pages 1018-1022 SEALED)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Okay.  So before I make a ruling, I'd like

3     to hear from the government with regard to item one.  I've

4     heard the arguments in open court, and I've also heard the

5     argument at sidebar.  Okay.

6          MR. MEAD:  Just briefly, your Honor, I think the Court

7     has touched on most of the relevant points.  I don't see any

8     basis at all for relevance here.  There was testimony that

9     Dwight Howard had a set of stocks.  He moved them over from

10    Morgan Stanley to BMO, and they secured the line of credit.  He

11    was able to obtain a line of credit.  He in fact, sent the

12    money that he thought was to buy the Atlanta Dream, so he

13    clearly had the financial wherewithal to buy the team because

14    he sent the wire to buy the team.

15          There's a serious, serious 403 problem here.  I think

16    regardless of the defense's intent, I think there's a huge risk

17    of the jury hearing Dwight Howard made $250 million.  This is a

18    drop in the bucket.  Are we really going to send someone to

19    jail for stealing two percent of this guy's money?

20          Similarly, the defense has talked about the IRS tax

21    lien.  Again, regardless of the intent of the defense, there's

22    a great risk that the jury looks at Mr. Howard and says, that

23    guy's a tax cheat.  Am I really going to be worried about

24    someone who stole from him as well?  So there's a relevance

25    problem, there's a 403 problem.

OA1JDAR4

1          I think that I understand the letter to say something

2   different than what it literally says.  I mean, it talks about

3   his earnings in 2020 and 2021.  Those are the veteran's

4   minimum.  I understand the defense to be talking about his

5   lifetime earning probably.

6          THE COURT:  So it's up to that year.

7          MR. MEAD:  Those have really minimum, not huge

8   probative value about how much money he actually had, right.

9   They're not proposing to introduce evidence about debts he had,

10  how much money he had, anything like that.

11         And then there's an admissibility problem.  You know,

12  the defense is presumably known about this for a long time.

13  They sent this letter last night.  They don't have a plan to

14  get this evidence in unless we just agree to it, which we're

15  not particularly inclined to do.

16         And then obviously we're in a difficult spot with the

17  Court hearing a relevance proffer at sidebar.  We don't know

18  what the relevance proffer is.  If the Court were to rule

19  against this, I think we'd object to there being a relevance

20  proffer at sidebar.  The government's case is closed.  This is

21  not three weeks before trial where the defense gets to keep all

22  their ammunition reserved.  When the witnesses are on, they're

23  done.

24         So for all those reasons, we think this evidence

25  should be excluded.

1          THE COURT:  Okay.

2          MR. RICCO:  Your Honor, I just want to say this, as

3     the Court knows, all of those reasons that the government

4     advanced as to why we wanted to utilize this evidence is not

5     what we discussed at all, and we accept the Court's ultimate

6     determination on that issue.

7          Mr. Mead's view of when the defense presents argument

8     like it's a surprise and taken unfair advantage, that's not the

9     case here.  That application, as your Honor knows based upon

10    the testimony that came out or didn't come out at trial and the

11    Court's assessment of whether or not the use of the additional

12    information as applied to the trail testimony would be excluded

13    under 403.

14         Your Honor's made a ruling on that.  We appreciate the

15    Court's insight on that.  But I just want the record to be

16    clear this was not no last-minute surprise of something that we

17    knew we were going to do for months.  That's not the case.  And

18    those other things that the government talked about, how we

19    intended to use that evidence, it's not so.  The record

20    reflects that.  At the moment it's closed, and we would like

21    for it to stay that way because it does reveal our strategy and

22    what it is we plan to do.

23         THE COURT:  Well, what I'll say is the following:  You

24    know, I don't think I need to reach the issue of how the

25    evidence was going to come in at this stage.  I haven't seen

1    any of the contracts.  I presume it was sort of an aggregation

2    over the time of the filed contract, but I don't know.  So I'm

3    assuming that the 240 to $245 million is an accurate one.

4         But I'm going to exclude that evidence.  I'm assuming

5    that they would be able to lay a foundation and to get those

6    in, although I will note that the government has indicated

7    basically that it wouldn't be through a stipulation.

8         And I think there's ample evidence in the record for

9    the defense to make whatever arguments it intends to make with

10   regard to this issue, so I'm going to exclude the -- I guess it

11   would be the contracts or --

12        MR. RICCO:  The contracts.

13        THE COURT:  The contracts or an aggregation or summary

14   chart of those contracts adding up the amounts that Mr. Howard

15   would have earned up to the 2020/2021 timeframe.

16        Okay.  So next is the judgment issue.  So my

17   understanding — let me just confirm, Mr. Ricco and defense

18   counsel, that there's -- or Mr. Legon, that there's no

19   additional argument you intend to make with regard to that?

20        MR. LEGON:  None, your Honor.

21        THE COURT:  Okay.  All right.  So let me hear from the

22   government with regard to item two, which just for purposes of

23   the record states as follows:  That Dwight Howard obtained a

24   judgment against Darden Enterprises LLC — I think it's ABA

25   Darden Sports Group — in the amount of $8,682,973.43 as

OA1JDAR4

follows:  One, 7 million principle unpaid on note; two,

$1,675,346.18 accrued interest on note; and, three, attorneys'

fees in the amount of $7,627.25.

        And then there's a footnote that I don't believe is

necessarily relevant.

        So it indicates that it was filed.  There was a

judgment filed on the record in Santa Rosa County Clerk's

Office and issued by a Judge Clifton A. Drake on March 11,

2024.

        So let me hear from the government with regard to this

evidence, the judgment.

        MR. MEAD:  Just briefly, your Honor, we again don't

see any basis at all for relevance here.  The proffered basis

by the defense earlier this morning was that Dwight Howard got

something.  We think that's actively misleading.  He was asked

on the witness stand whether he recovered any money on this

judgment, if there was one, and he said no.  It creates a

misimpression in the jury's mind that perhaps he may have been

made hole --

        THE COURT:  I'm not sure.  Because I don't think he

understood what a judgment was.  But my recollection is that he

indicated he hadn't gotten any money back.  I think that's

generally, I thought, what he said.

        MR. MEAD:  I agree.

        THE COURT:  In any form.

OA1JDAR4

1          MR. MEAD:  I agree with the Court.  I agree with that

2     description.

3          And just to be clear, even if he had gotten the money

4     back, it would be irrelevant.  If he sued to get the money back

5     that was stolen from him, that wouldn't matter either.  So I

6     think this should be excluded as both irrelevant and

7     prejudicial, and it could confuse the jury.

8          THE COURT:  Okay.  All right.  Here again, in

9     balancing the relevance, I don't actually -- I'm not sure --

10    well, I don't see the relevance.  Or to the extent there is any

11    relevance, I believe it would be minimal for the judgment to

12    come in.

13          I mean, the idea that Mr. Howard got something, I

14    don't quite understand.  He got a piece of paper that he could

15    then try and enforce by chasing around assets and the like of

16    an entity — because I think the judgment was actually against

17    an entity — an entity that may not even exist any longer, as

18    far as I know.  I don't know.

19          So I think the idea of injecting the amount of money

20    that the judgment -- and it also -- the jury may not know what

21    a judgment is and understand that, and so require us to go down

22    a path where I would have to explain or have to be explained to

23    the jury, you know, what a judgment is, is something that I

24    think would be a detour that it would be unnecessary here.

25          So in balancing it and figuring under 403, in other

OA1JDAR4

1    words, the prejudice from admitting this, I just find that the

2    prejudice far outweighs any relevance that this information

3    might have for the jury.  So those are the two rulings.

4          Was there anything -- I think we already -- the issue

5    of number five has already been dealt with.  Mr. Dershowitz

6    testified.

7          MR. RICCO:  Agreed, your Honor.

8          THE COURT:  And I think there's already evidence in

9    the record about the arrest date.  I don't know whether --

10          MR. RICCO:  We were told.

11          THE COURT:  Is that sufficient?

12          MR. RICCO:  That is sufficient, Judge.

13          THE COURT:  Okay.  All right.  So I think that

14    resolves the letter.  So before we turn to the jury

15    instructions, let me hear if there are any other issues.

16          Now, as I understand it, just to recap, tomorrow

17    morning I will allocute Mr. Darden on his right to testify.

18    And I will then do so also right before the defense closes its

19    case, just to close that loop.

20          My understanding is tomorrow there will be Mr. Slade

21    and I apologize --

22          MR. DONALDSON:  Mr. Sienko.

23          THE COURT:  Mr. Sienko.  Is it Sienko and then Slade?

24    Is that the order they're going to be called in?

25          MR. DONALDSON:  I'm thinking Slade, Sienko, but --

OA1JDAR4

1          THE COURT:  All right.  I just don't know -- I mean,

2     you've had communications with Mr. Sienko or his counsel.  I

3     don't know what their relative schedules are.  Doesn't matter

4     to me.  So assuming Mr. Darden does not testify, would the

5     defense be resting after the testimony of Mr. Sienko?

6          MR. DONALDSON:  That will be true, yes.

7          THE COURT:  Okay.  All right.  So let me hear whether

8     there are any issues we should take up before me move into the

9     charge conference.

10          MR. MEAD:  A couple things, your Honor.

11          One, I want to confirm from the defense that there are

12     no other witnesses on the table other than Slade, Sienko, and

13     potentially Mr. Darden himself.

14          THE COURT:  So I know there were certain people in the

15     mix yesterday, but I think I confirmed that certain of them --

16     right?  Are there any other witnesses?

17          MR. DONALDSON:  No.

18          THE COURT:  Okay.

19          MR. RICCO:  And Judge, I think he just asked us were

20     we resting after Mr. Sienko, and the answer was yes.  That's

21     what that means.  I don't know what that means other than that.

22          THE COURT:  Okay.  All right.

23          Yes, Mr. Mead?

24          MR. MEAD:  Same question with exhibits for the two

25     witnesses tomorrow.

OA1JDAR4

1          MR. RICCO:  Judge, I'm not -- you know, Judge, at some

2     point I think what we said was we were going to be resting

3     after that and any exhibits that they were going to get.  This

4     question is asked every day, all day long.  We're going to make

5     sure that they have whatever they have.  If they don't have it

6     in sufficient time, they'll move to preclude and we won't

7     get --

8          THE COURT:  What I'd say is if they don't have it by

9     7:00 tonight, what the exhibits are, I would seriously consider

10     precluding it.  You have these witnesses and you know them, so

11     if they're government exhibits, just identify the exhibit

12     numbers.  If there are other things, you should produce it.

13          MR. DONALDSON:  Very good, Judge.  Thank you.

14          THE COURT:  So by 7:00 tonight.

15          MR. MEAD:  Two issues if the defendant testifies

16     tomorrow which I think we previously raised, one of which is

17     the Court may remember that there was a post-arrest statement

18     made.  The defense moved to exclude it.  The government filed a

19     brief letter saying we're not going to use it, but reserve the

20     right to use it if the defendant testifies.  And I forget the

21     Second Circuit case, but there's a Second Circuit case saying

22     we can do that to impeach.

23          On a similar note, we submitted a Rule 609(b) letter.

24     That is the defendant's third criminal case.  The second

25     criminal case came in as 404(b).  The first criminal case has

OA1JDAR4

1     not come in, but we would propose to cross-examine the

2     defendant about it if he were to testify.

3              THE COURT:  Okay.  But let me just make sure I know

4     the sequence.  Is the first criminal case different -- was the

5     first criminal case in this district?

6              MR. MEAD:  The first criminal case was a state case in

7     Manhattan.

8              THE COURT:  Okay.  All right.  So in the district, but

9     not by the federal government.

10              Because my recollection is that Mr. Darden had pled

11     guilty to two counts initially before Judge Rakoff, and that

12     ended up before sentencing changed to a cooperation agreement —

13     and maybe I'm wrong about this — a cooperation agreement where

14     he repled to the two counts and then pled to a third count

15     pursuant to a cooperation agreement.

16              MR. KINDER:  I think that's right, your Honor.

17              And the 2005 convictions that Mr. Mead is referring to

18     are Manhattan DA's Office convictions relating to fraud and

19     four counts of grand larceny relating to two separate fraud

20     schemes in total.

21              THE COURT:  Okay.  And because I may have gotten a

22     letter on this, but I don't know if I've gotten actually

23     documentation with regard to -- in other words, is it just

24     going to be cross-examination of him or --

25              MR. KINDER:  Your Honor, I think it would be primarily

OA1JDAR4

1    cross-examination.  But we also would likely move in a copy of

2    the certified judgment.

3         THE COURT:  Okay.  So I'd like to see a copy of that

4    if you have it.  And also, has that been shared with the

5    defense?  I know notices have been provided, but has it been

6    shared with the defense?

7         MR. KINDER:  The judgment I have sitting on my desk in

8    my office.  We've not shared it with them.  It's the state

9    court judgment, but it relates to -- I think it's one count of

10   grand larceny in the first degree, three counts of grand

11   larceny in the second degree, and the state fraud statute.  So

12   we will provide that both to defense and to the Court as soon

13   as we're done here.

14        THE COURT:  All right.  So Mr. Darden, that's

15   something that you can discuss with your lawyers, something for

16   you to take into account as you think about whether or not you

17   want to testify.

18        So if you could, when you get back to your office, if

19   you could send a copy of the judgment to defense counsel so

20   that they have it, to the extent they're going to have any

21   additional conversations with Mr. Darden this evening or

22   tomorrow morning.

23        Okay.  So anything else, Mr. Mead?

24        MR. MEAD:  Last thing I think, your Honor.  I think we

25   raised this at the end of last week, the issue about whether

OA1JDAR4

1    the defense would be able to make arguments based on Calvin

2    Darden, Sr. not testifying in this case.  I wanted to

3    understand -- I mean, given that they moved to preclude him,

4    wanted to understand what the Court's ruling on that was so

5    that we can potentially do something with rebuttal if we

6    decided we wanted to.

7         THE COURT:  I guess what I would say is, from my

8    perspective and — then I'll hear from the defense — despite all

9    the things that have been submitted, I've never met him.  I've

10   never conducted an evaluation of it.  There are certain medical

11   records that have been submitted.  So I don't know -- well, let

12   me ask is there going to be an argument that he is --

13        MR. RICCO:  You know, Judge --

14        THE COURT:  Because it's going to be a missing witness

15   charge anyway.

16        MR. RICCO:  You know, Judge, I've tried a lot of cases

17   in this district, other districts.  I've never been in a case

18   where a prosecutor is just really finger pointing at the

19   defense about things.  Judge, we know what to argue and we know

20   what the rules are.  And we read your ruling, and we said we're

21   going to comply with that.  And at this juncture, Judge, that's

22   my response to Mr. Mead.

23        THE COURT:  Yeah.  So I guess what I would say is the

24   following:  If you want to put it in a rebuttal case that

25   includes -- you should think about that.  It doesn't sound like

OA1JDAR4

1    there's going to be an argument in that regard, but there's

2    certainly sort of hanging over the case is that he would be one

3    of the people that the missing witness general charge would be

4    applicable to because he was somebody mentioned and the like.

5         And it was, I think there's sufficient -- even

6    though -- there's sufficient information done in the

7    cross-examination that I think it would be -- obviously I'll

8    hear from the defense, if the government decides to do this.

9    It seems like the issue has been raised, even if not argued

10   necessarily, that the government, if they wanted to — the

11   defense has put on a case — they could put on a rebuttal case.

12        Obviously I don't know what that information would be,

13   and it would have to be obviously admissible, but I don't know.

14   So I mean, I'll leave it at that, and the parties sort of

15   discuss that or you should think about that, I guess.  The

16   government should give that thought.

17        Okay.  Is there anything from the defense that we

18   should talk about before we move to the jury instructions?

19        MR. DONALDSON:  Not from the defense related to what

20   the Court just talked about, no.

21        THE COURT:  Okay.  So let's turn to the jury

22   instructions.  What is the first page that the -- I'll first

23   ask the government, and then I'll ask the defense, and we'll

24   turn to the first page that there's a comment on.

25        MR. MEAD:  Page 8 from the government.

1            THE COURT:  Anything before page 8, Mr. Donaldson?

2    Mr. Ricco?

3            MR. RICCO:  No, your Honor.

4            THE COURT:  All right.  So Mr. Mead, was this with

5    regard to the questions I had for the parties?

6            MR. MEAD:  Yes, your Honor.

7            THE COURT:  Okay.  Are there going to be any

8    stipulations?  I don't recall whether there are any.  I don't

9    think so yet.

10            MR. MEAD:  There haven't been any yet, and we don't

11    expect there to be any, your Honor.

12            THE COURT:  Okay.  I could leave it in, but if there

13    are no stipulations -- I mean, I could leave it in or take it

14    out.  And by "it," I mean the reference to stipulations of the

15    parties.

16            MR. MEAD:  Shorter is often better.  I think we prefer

17    to keep it out if there are no stipulations.  I think there's

18    also a substantive jury charge on stipulations later on, and we

19    propose taking that out as well.

20            THE COURT:  Any objection to that?

21            MR. RICCO:  None, Judge.

22            THE COURT:  Okay.  So what we're going to do is I'm

23    going to strike "and the stipulations of the parties."  And so

24    that sentence will end at "evidence."  So the second sentence

25    of instruction six will read, "The evidence in this case is the

OA1JDAR4

1   sworn testimony of the witnesses," and then I'll add an "and".

2   "And the exhibits received in evidence."  Okay.

3           And now a little bit further down there's a reference

4   to demonstratives.  Will there be demonstratives during

5   summations?

6           MR. MEAD:  I think there is at least a good chance

7   that there will be.  I'm doing the rebuttal, and I think

8   there's a good chance it will have a rebuttal demonstrative.

9           THE COURT:  Okay.  All right.

10          MR. RICCO:  Yes.

11          THE COURT:  That's what I figured.  The only thing I

12  would request is that in advance of the summations that you

13  share the demonstratives so that if there are objections, we

14  can deal with those objections.

15          MR. RICCO:  We agree, your Honor.

16          THE COURT:  So that's page 8.

17          What's the next item where there's a comment to the

18  instruction?

19          MR. MEAD:  The next thing we have is just the Court's

20  highlighted language on page 15 about the defendant's testimony

21  or lack thereof.

22          THE COURT:  Anything in between 8 and 15 from the

23  defense?

24          MR. RICCO:  No, your Honor.  Thank you.

25          THE COURT:  So I think by tomorrow we will know this.

OA1JDAR4

1    So what will happen is -- well, Mr. Mead, were you just

2    pointing out that there was highlighting or was it just

3    pointing out the highlighting or --

4              MR. MEAD:  We think the Court's language in either

5    situation is appropriate.

6              THE COURT:  Anything with regard to the language?

7              MR. RICCO:  No.  Language is fine.

8              THE COURT:  So depending upon if Mr. Darden testifies,

9    obviously I'll use the portion that talks about that Mr. Darden

10   testified and vice versa.  So we can take care of that and make

11   that change.

12             Now, the next thing is instruction 16, which is

13   defendant's reputation.  Is Mr. Slade -- because I don't think

14   Mr. Sienko knows, other than through this matter, Mr. Darden.

15   But my understanding is Mr. Slade does know Mr. Darden in

16   context other than the assistance that Mr. Slade may have

17   provided to Mr. Darden in this -- with regard to the -- I think

18   it's the vision plan, but I don't know.

19             So is there going to be any testimony about character,

20   reputation, anything like that?

21             MR. RICCO:  No, your Honor.

22             THE COURT:  Okay.  So I would propose taking that out.

23   Any objection?

24             MR. MEAD:  No, your Honor.

25             THE COURT:  Okay.  So that will come out.  That's

OA1JDAR4

1     instruction 16.

2             All right.  The next comment from the government, and

3     then we'll see if the defense has something.

4             MR. MEAD:  Page 17 on instruction number 19, your

5     Honor.

6             THE COURT:  Anything with regard to instruction 18

7     from the defense?

8             MR. RICCO:  No, Judge.

9             THE COURT:  All right.  So instruction 19 deals with

10    the use of evidence obtained pursuant to searches.  Mr. Mead,

11    what do you have a proposal or what's the issue?

12            MR. MEAD:  So the instruction as written is limited to

13    email accounts and electronic devices.  There was evidence

14    about a search of a house.  We can, I think, add "and premises"

15    or "and homes or houses" or something like that at the end of

16    the first sentence.

17            And then again where it says "searches of online

18    accounts and electronic devices," adding in something about

19    homes or premises, as well, in that sentence.

20            THE COURT:  So it would be at the end of the first

21    sentence, the sentence will read as follows, subject to hearing

22    from the defense:  "You have heard testimony about evidence

23    seized pursuant to search warrants signed by a judge from email

24    accounts, electronic devices, and premises or homes."  I could

25    do either one.  Or residences?

OA1JDAR4

1         MR. MEAD:  What about "and a home," your Honor?

2         THE COURT:  And a home, is that --

3         MR. RICCO:  That's fine, Judge.

4         THE COURT:  "And a home."  Okay.

5         And I'm sorry, Mr. Mead, where was the other place?

6         MR. MEAD:  Two sentences later, the sentence beginning

7    "searches of online accounts."

8         THE COURT:  "Searches of online accounts, electronic

9    devices, and homes are entirely appropriate."  Okay.  Or should

10   I say "and a home"?  Because it seems more general, so I would

11   just say "and homes"?

12        MR. MEAD:  That's our proposal, your Honor.

13        THE COURT:  Any objection to that?

14        MR. RICCO:  No, sir.

15        THE COURT:  Okay.  So that sentence will read

16   "searches of online accounts, electronic devices, and homes are

17   entirely appropriate law enforcement actions."  Okay?

18        Next?

19        MR. MEAD:  The highlighted instruction number 20 on

20   page 18, your Honor.

21        THE COURT:  Yes.  So 20 is particular investigative

22   techniques not required.

23        MR. RICCO:  Your Honor, we're not going to be

24   presenting any arguments whatsoever about investigative

25   techniques in this case.

OA1JDAR4

| 1 | THE COURT:  So I'll strike it for now, and I take it |

1          THE COURT:  So I'll strike it for now, and I take it

2     the government -- are there going to be any issues relating to

3     that from the government's perspective?

4          MR. MEAD:  I don't think so, your Honor.  We typically

5     ask for it to be kept in, even if there are no arguments about

6     it at all.  Obviously the jury may think, why is there no DNA,

7     why is there no whatever?  I don't see much downside in keep it

8     in --

9          MR. DONALDSON:  We would object to keeping it in if

10     there's not going to be any argument about it.  Because the

11     first sentence is "you have heard reference to certain

12     investigative techniques."  If there has not been any reference

13     to certain investigative techniques, then that should not be in

14     there, in my opinion.

15          THE COURT:  I mean, I think there is some indication

16     that there were searches conducted.

17          MR. DONALDSON:  Judge, I just --

18          THE COURT:  But not other techniques.

19          MR. DONALDSON:  I guess what my concern is with

20     responding to what the government just said, which is -- I

21     guess in my opinion it's incorrect, first sentence says "you

22     have heard reference to certain investigative techniques that

23     were used or not used by the government in this case."  If that

24     seems to relate to something that defense would say in their

25     argument to the jury about whether or not certain investigative

OA1JDAR4

```
 1    techniques were used, why they weren't used, it's a traditional
 2    response by the government to say that, I get that.  But if
 3    there's not going to be any reference to that in our argument,
 4    then that would seem to make this particular paragraph
 5    irrelevant, but inapplicable.  As it says, not applicable.
 6              THE COURT:  What I think I will do is I'll strike that
 7    first sentence and include the rest of it, which I think
 8    doesn't reference "you've heard or testimony" or anything like
 9    that.
10              I've already given a preliminary instruction about
11    this very issue.  And so I don't think there's any prejudice to
12    just reiterating what I had said in my preliminary remarks to
13    the jury without that first sentence.  So if there is any
14    confusion, then the jury starts thinking, did I miss something?
15    Or what have you.  All right.
16              I'll go to the defense now.  Mr. Donaldson, Mr. Legon,
17    Mr. Ricco, what would be your next comment?
18              MR. DONALDSON:  One second, your Honor.
19              THE COURT:  And while you're looking, I'll ask what's
20    the government's next comment?
21              MR. MEAD:  Highlighted instructions on page 20, your
22    Honor.
23              THE COURT:  Okay.  So anything from the defense before
24    page 20?
25              MR. RICCO:  No.
```

OA1JDAR4

1          THE COURT:  So the first one is prior consistent

2     statements.  I don't recall anything like that, but there may

3     have been something.  I just don't remember.

4          MR. MEAD:  I think Mr. Schmidt testified about

5     previous statements that Mr. Howard made about why he purchased

6     the team and that he loved women's basketball and wanted to buy

7     it for that purpose.  And there was cross-examination from the

8     defense on that exact subject, the real reason that they

9     thought that he had decided to buy the team.

10         MR. DONALDSON:  I think, again, Judge just regarding

11    the prosecutor's response to that, that wouldn't be appropriate

12    for this particular instruction because it relates to testimony

13    given by the same person as the first sentence, or at least I

14    think it says that.  "You have heard evidence during the trial

15    that before testifying in this trial that at least one witness

16    made statements that was the same as or similar to the

17    testimony that he or she gave on the witness stand."  So I

18    don't know whether or not Mr. Schmidt giving testimony that

19    would be consistent with Mr. Howard's testimony relates to this

20    particular instruction.

21         THE COURT:  I think that the point is well taken.  A

22    classic prior consistent statements are not sort of a witness

23    corroborate what somebody else says.  It doesn't preclude the

24    argument that -- I think that this particular statement goes to

25    the witness who is on the stand and who then says that on a

OA1JDAR4

1    prior occasion they gave a consistent statement.

2           So I guess there may be an instruction that relates to

3    consistent statements between different witnesses, but I think

4    this is not applicable to that situation, Mr. Mead.  In other

5    words, I've never seen the prior consistent statements where

6    it's another witness testifying, as opposed to another -- like,

7    a document where they've given a sworn testimony or something

8    like that that comes in where the witness him or herself is the

9    same person who testified to this statement at the trial.

10          MR. MEAD:  I'm not going to belabor the point too much

11   because I think it's not a particularly critical instruction

12   with the government here.  I do think that a prior consistent

13   statement can come in through the witness himself or from

14   someone who heard the witness say that statement, and I think

15   the language in this instruction covers both.  That being said,

16   if it's the Court's ruling that this is coming out, again, it's

17   not particularly significant.

18          THE COURT:  Again, I'll take a look at it, but my

19   initial reaction is that it will come out.  And obviously,

20   you're free to argue that Mr. Howard or any other witness said

21   you know what he said on the stand was corroborated by other

22   people to whom he made statements back at the time.

23          MR. DONALDSON:  Judge, just to button that up, the

24   last sentence of this particular instruction, number 24, again,

25   specifically relates -- well, says the same, witness making

OA1JDAR4

1    statements before that were similar to what they said before,

2    so it directly says --

3                 THE COURT:  I guess what I would say — and we're going

4    to take this out — Mr. Mead, if there's language that you would

5    propose that modifies that another -- in particular, if another

6    judge has given an instruction like that, obviously I would

7    hear from you with regard to that.

8                 MR. MEAD:  Understood, your Honor.

9                 THE COURT:  Next is the stipulations.  My

10   understanding is the parties agree that there aren't any

11   stipulations, so that can come out.  All right.

12                MR. DONALDSON:  Yes, Judge.

13                THE COURT:  Okay.  And then what is the next item the

14   government has?

15                MR. MEAD:  I think the next thing we have, your Honor,

16   is page 36.

17                THE COURT:  Okay.  Does the defense have any comment

18   before page 36?

19                MR. RICCO:  One second, your Honor.

20                THE COURT:  Sure.

21                MR. RICCO:  The answer is no.  And I'm just double

22   checking back through the notes.

23                MR. DONALDSON:  One second.

24                MR. RICCO:  I'm sorry, Judge.  Can we have a moment?

25                THE COURT:  Uh-huh.

OA1JDAR4

1          MR. RICCO:  Judge, we have nothing up to instruction

2    number 42.  Nothing, that's on page 36, Judge.

3          THE COURT:  Okay.  Mr. Mead, where on page 36 does the

4    government have a comment?

5          MR. MEAD:  The Court highlighted a potential conscious

6    avoidance charge at the very bottom and the top of 37, your

7    Honor.

8          THE COURT:  Yes.

9          MR. MEAD:  And the government does not intend to

10   proceed on a conscious avoidance theory, and so that could be

11   stricken.

12         MR. RICCO:  We agree.

13         THE COURT:  And I think there's a later separate

14   standalone conscious avoidance charge that can also be stricken

15   that we might as well address right now.  Oh, so it's

16   instruction 50.  So do the parties agree that instruction 50

17   can come out also?

18         MR. MEAD:  Yes, your Honor.

19         THE COURT:  Defense?

20         MR. RICCO:  Yes.

21         MR. DONALDSON:  Yes.

22         THE COURT:  So 50 is out.

23         And so let's go back to page 36 or 36 to 37.  What is

24   the next item that the government -- oh, Mr. Ricco, you said

25   nothing before 42.  Was that what you were referring to?

OA1JDAR4

1           MR. RICCO:  Same issue that Mr. Mead raised.

2           THE COURT:  What's the next comment after instruction

3    42?

4           MR. MEAD:  Our next thing is page 47, instruction 49,

5    your Honor.

6           THE COURT:  Okay.  Does the defense have any comments

7    prior to instruction 49, which is co-conspirator statements?

8           MR. RICCO:  No, your Honor.  Oh, wait, hold on one

9    second.  I'm sorry.

10           MR. DONALDSON:  No, Judge.  We're fine.  Thank you.

11           THE COURT:  Okay.  Yes, Mr. Mead?

12           MR. MEAD:  So we're on page 47 instruction 49.

13           I think there's a stray reference to "the defendants"

14    plural in the line close to the bottom that begins "factual

15    issues before you."

16           THE COURT:  Okay.  "Defendant."  "You may consider

17    against the defendant any acts."  Okay.  I'll strike the "S."

18           MR. MEAD:  And then very similarly, on page 48,

19    instruction 51, your Honor, the first line, I think it should

20    be "the defendant" rather than "a defendant."

21           THE COURT:  Any objection to that?

22           MR. RICCO:  No, Judge.

23           THE COURT:  Okay.  All right.  That change will be

24    made.

25           MR. MEAD:  And then our last thing, your Honor,

```
 1   page 51.
 2              THE COURT:  Yes.
 3              MR. MEAD:  Instruction 54.  The second line refers to
 4   the essential elements.  We would consent to striking the word
 5   "essential" if the defense wanted that.  If the defense wants
 6   to leave in "essential," though, we're willing to leave it in.
 7              THE COURT:  Oh, I see.  It's the second sentence, "the
 8   government to prevail must prove the essential elements --"
 9              MR. RICCO:  I think Mr. Mead is right.  It should say
10   just "elements."
11              THE COURT:  So we'll take out "essential"?
12              MR. RICCO:  Uh-huh.
13              THE COURT:  And that was it from the government?
14              MR. MEAD:  Yes, your Honor.
15         There's a related issue with the verdict form, but
16   that's it for these jury instructions.
17              THE COURT:  And we'll turn to -- any additional
18   comments from the defense?
19              MR. DONALDSON:  I do not at this time, your Honor, no.
20              THE COURT:  Okay.  All right.  So my process is a
21   couple of things.  Well, let me raise something because I do
22   not send a copy of the indictment and I don't provide it to the
23   jury and I don't send it back.
24         In other cases, if needed, I've actually copied and
25   pasted sections of the indictment, to the extent it was
```

OA1JDAR4

1    necessary to explain the charges.  Here neither party has

2    suggested it, and I don't believe it's necessary here to do

3    that.  Otherwise they're not going to have the indictment.

4         So if you want to think about that -- and I know

5    judges differ, I think, in whether they do that.  My practice

6    is just whatever is -- so in recounting, you know, Count Five

7    states whatever, and then I have the language from the

8    indictment.  So there's no -- we can insert that if the parties

9    want or if one party thinks there's a reason for it.

10         I mean, you can think about it.  It's just something

11   that I sort of notice.  I wanted to just let the parties know.

12   Because in other cases I have had those sections, but I'm not

13   sure -- and it would literally just be whatever the language

14   is, maybe changed a little bit because - am I correct it was a

15   superseding indictment with just Mr. Darden?

16         MR. MEAD:  You are, your Honor.

17         THE COURT:  Okay.  So I raise it, the only thing I ask

18   is that you let us know by tomorrow morning whether that's

19   something that you think is something that we should address in

20   some way.  The other thing is, as you see in the instructions,

21   I provide a copy -- every juror gets their own copy of the

22   instructions and the verdict sheet.

23         Obviously the verdict sheet is only filled out by the

24   foreperson.  There's a slight discrepancy.  We can talk about

25   this in a moment when we get to the verdict sheet.  I think in

OA1JDAR4

1    my instructions, I may say, signed by each of the jurors.  I've

2    done it -- I've seen it done both ways.  I think on my last

3    trial, I think I just had the foreperson.

4            I think where I did do it was a difficult circumstance

5    with my death penalty case where I think there were reasons

6    that certainly defense would want to have the tally for each of

7    the jurors.  And again, there's no magic here, so if the

8    parties are okay just having the foreperson, we can modify the

9    language in the current instructions.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OA1BDAR5

1          MR. MEAD:  We don't have a strong view either way,

2     your Honor.

3          THE COURT:  Does the defense?

4          MR. RICCO:  No strong view, Judge.

5          THE COURT:  In all likelihood it won't clutter up the

6     verdict sheet.  We'll have the foreperson sign.  Here's my

7     practice anyway to poll the jury.  Either I or Ms. Disla will

8     poll the jury at the conclusion when they have reached a

9     verdict, assuming they reach a verdict.  The foreperson will

10    pass the sheet to Ms. Disla who will pass it to me.  I will

11    look at it to make sure it's filled out appropriately, and then

12    hand it back to Ms. Disla, rather than the foreperson will read

13    the verdict sheet.  And then once the verdict sheet is read,

14    I'll ask Ms. Disla to poll the jury, and she'll go through one

15    through 12.

16         With regard to the alternates, you may have seen my

17    practices other than my death penalty case, I don't keep the

18    alternates here in the courthouse, but I tell them that they're

19    not yet done with their jury service.  So they can go home, but

20    they're not to discuss the case.  Basically same instructions

21    just in case we lose one of the 12, one of the alternates would

22    have to come back, and the jury would have to start their

23    deliberations from the beginning.  So again, is there any

24    objection to approaching the alternates in that fashion?

25         MR. MEAD:  Maybe for the alternates, not from the

OA1BDAR5

1    government, your Honor.

2              MR. RICCO:  No, your Honor.

3              THE COURT:  Okay.  So should we move on to the verdict

4    sheet.  Is there anything else in regard to the instructions?

5              MR. MEAD:  No, your Honor.

6              THE COURT:  Anything else from the defense.

7              MR. RICCO:  No, your Honor.  Thank you.

8              THE COURT:  So I guess I have two questions.  So the

9    government's proposed instructions are fairly straightforward

10   and I've seen it done that way.  My question though with regard

11   to the defense suggestion is that, first, it breaks out the two

12   I guess schemes for lack of -- one, with respect to

13   Mr. Parsons.  The other with respect to Mr. Howard.  So my

14   first question is -- well, first, does the government have an

15   objection to breaking it out?  I just have not done that

16   before.

17             MR. MEAD:  I think we certainly have an objection to

18   the principle both for caution aiding and abetting breaking

19   out.  I think also on Count Three which is the bank fraud, that

20   is only charged against Mr. Howard's side of the case because

21   of the involvement of BMO.  I think that should clearly come

22   out.  Just one second on the kind of broader question, your

23   Honor.

24             THE COURT:  Any objection on Count Three since it's

25   just the one?  Putting aside what theory of liability, but to

OA1BDAR5

1    removing the Chandler Parsons, and then we'll address the

2    theory of liability in a moment.

3              MR. RICCO:  None, Judge.

4              THE COURT:  All right.

5              MR. MEAD:  As to breaking it out between Chandler

6    Parsons, Dwight Howard on Counts One and Two, we will leave it

7    to the Court, although we want it to be clear to the jury that

8    they could mark I guess either.

9              THE COURT:  That it can be either or, or both?

10             MR. MEAD:  Exactly, Judge.

11             THE COURT:  Let me ask with regard, but they need to

12   be unanimous with regard to which scheme?

13             MR. MEAD:  Correct, your Honor.  They should reach

14   both questions.

15             THE COURT:  Correct.  So there may need to be some --

16   do we need to have some interlinear instructions in the verdict

17   form?  In other words indicating, for example, on Count One the

18   charge of conspiracy to commit wire fraud or bank fraud, we the

19   jury find the defendant -- well, I think in the charge I do

20   say -- I can't remember whether it's broken out.  I guess we

21   could put here check one that the options are you can check --

22   well, they have to fill out both, right.  That they have to

23   address both, but they have to be unanimous as to the

24   particular scheme.

25             MR. MEAD:  That makes sense, your Honor.  I think if

OA1BDAR5

1  the Court could perhaps send us a version by the end of

2  tomorrow night so we can all make sure we're on the same page.

3           THE COURT:  Now you're giving me homework assignments.

4           MR. RICCO:  You see what happens, Judge.

5           THE COURT:  You can't talk you sending emails at three

6  in the morning, so I think, whatever, it's trial.  And I get

7  it.  It's fine.

8           MR. RICCO:  Judge, when you told us break that work up

9  and get it done, I took it to heart.

10           THE COURT:  You saw that I responded.

11           MR. RICCO:  I did, at 3:30, Judge.

12           THE COURT:  Yes.  We'll make modifications.  And

13  absolutely I want to get sign off from the parties before we

14  present this to the jury.  But reach both and unanimous with

15  regard to each.  So that would be for Count One, Count two and

16  that's it.  Count One and two.  Before we get the what theory

17  of liability, any objection to what we just discussed with

18  regard to Count One and Two indicating to the jury that they

19  need to answer both questions.  And they need to be unanimous

20  with regard to which.  And I don't know whether scheme it's or

21  which regard to either Mr. Parsons or Mr. Howard.

22           MR. RICCO:  Agreed.

23           MR. DONALDSON:  No objection to that.

24           THE COURT:  So we'll come up with some language.

25  There's no magic here, and the parties can feel free to suggest

(212) 805-0300

OA1BDAR5

1    modifications.  Let me ask with regard to the theory of

2    liability.  Is there case law, number one, that would require

3    the jury be unanimous as to the theory of liability versus the

4    guilt?  I have never seen -- so the aiding and abetting is

5    often charged and I have never seen it broken out, or at least

6    I don't recall ever breaking it out verdict form in prior

7    cases.

8        So my first question is, is there case law about when

9    giving an instruction with regard to the different theories of

10   liability whether a jury has to be unanimous as to that theory

11   of liability?  Because I think that impacts whether or not this

12   is something that would be necessary and would lead to

13   confusion.  Yes, Mr. Donaldson, Mr. Ricco?

14       MR. DONALDSON:  I guess the quick answer to the

15   question is no.  I've never seen case law that says what the

16   Court just asked.  I have not seen that, but I could check.

17       THE COURT:  And I there are cases where the issue of

18   principle, certainly aiding and abetting, and the issue of

19   principle and then different causation.  Absent case law that

20   breaks it out -- well, let me ask the government.  I just

21   haven't seen it broken out.  I know what the law is, and I

22   don't recall in discussing aiding and abetting liability, I

23   don't think the instruction says, you all have to agree that

24   it's aiding and abetting versus principle.  And if you want to

25   talk to the Appellate folks -- Mr. Ritchin's been around for a

OA1BDAR5

1    while.  You have a thought on this?  I don't know.  I've never

2    seen it broke out that way.  Because of that, I just tend to

3    think it's probably something that's not necessary.

4            MR. RITCHIN:  I agree, your Honor.  I haven't seen it

5    broken out this way.  And I think there's a theoretical problem

6    with doing so.  So, for example, on wire fraud, you can

7    willfully cause a wire to be sent, but be responsible as a

8    principle on the mens rea, so it would cause confusion.

9            THE COURT:  I think it is a potential for confusion in

10   that regard.  I guess what I would say is, absent examples of

11   where one of my colleagues or a judge in another district has

12   done this and supported by some case law, I would remove the

13   "if guilty, what theory of liability," putting aside also it

14   does sort of go to the jurors in deliberation and their process

15   itself.  I guess Mr. Ricco, Mr. Donaldson, Mr. Legon, if you

16   have something, I would ask that you propose it.  Otherwise,

17   we'll modify this verdict form consistent with what we've

18   talked about today and provide the next iteration of the form

19   to the parties later tonight or tomorrow at some point.  But I

20   would ask that to the extent there is some case law or

21   something like that, if you could get it to us tonight relating

22   to that particular issues.

23           Obviously we could still modify if you still have an

24   objection and you come up with case law, I'll still consider

25   it.  I just want to get the next iteration out to you folks.

OA1BDAR5

1   Why don't we do this, I'll get the next iteration out to

2   everyone.  And if you do research and you figure something out

3   that should be tweaked, just let us know as soon as you can.

4   The verdict sheet isn't that long.  It's about to become

5   shorter.  Okay.  Is there anything else with regard to the

6   verdict sheet?

7           MR. MEAD:  No, your Honor.

8           THE COURT:  From the defense?

9           MR. RICCO:  No, your Honor.  Thank you.

10          THE COURT:  And are there any outstanding issues that

11  we have not discussed that we should address at this stage?

12          MR. MEAD:  No, your Honor.

13          THE COURT:  From the defense.

14          MR. RICCO:  No, your Honor.  But just for the sake of

15  the record, I think before the lunch break I had said I wanted

16  to take a look at a document.

17          THE COURT:  Yes.

18          MR. RICCO:  And I did, and I shared that document with

19  the government, and they were able to answer the question I had

20  in my mind about it, so it's a moot issue.

21          THE COURT:  Okay.  That's great.  One less thing.  I

22  mean, look, this is a job where you have to make decisions, but

23  if I have one less, that's fine with me.  But obviously if

24  there are things that come up overnight, please let us know and

25  we can address it tomorrow.  It seems to me as if we will --

OA1BDAR5

1    let's see.  I will allocute Mr. Darden in the morning, and

2    we'll see where that goes.  All right.  Anything else from the

3    government?

4              MR. MEAD:  No, your Honor.

5              THE COURT:  From the defense?

6              MR. DONALDSON:  No, your Honor.

7              THE COURT:  Okay.  So I think that's fine.  We don't

8    have to be on the record for this.

9              (Discussion held off the record)

10             THE COURT:  We'll stand adjourned.  I'll see everybody

11    at 10.  Back on the record.  So does the defense request for

12    the time being that the sidebar conversation remain sealed?  In

13    other words, could we get the transcript and that it not be

14    read, that it remain under seal, available only to me, but not

15    to the government and not to the defense at this stage?

16             MR. RICCO:  For now, Judge.

17             THE COURT:  For now.  So I don't know whether that's

18    possible.  Is there any objection from the government?

19             MR. MEAD:  No, your Honor.

20             THE COURT:  So that portion of the sidebar will remain

21    under seal only available to me at this stage.  Okay.

22             MR. RICCO:  Thank you, Judge.

23             THE COURT:  Thank you very much.  We'll stand

24    adjourned.  See everybody tomorrow morning.

25             (Adjourned to October 2, 2024 at 10:00 a.m.)

```
1                    INDEX OF EXAMINATION
2    Examination  of:                        Page
3    ROSALIND BREWER
4    Direct By Mr. Kinder . . . . . . . . . . . . 923
5    OLIVIA SEBADE
6    Direct By Mr. Kinder . . . . . . . . . . . 937
7    Cross By Mr. Ricco . . . . . . . . . . . . 955
8    JAMIN DERSHOWITZ
9    Direct By Mr. Donaldson  . . . . . . . . . 978
10   Cross Mr. Thompson . . . . . . . . . . . .1003
11                   GOVERNMENT EXHIBITS
12   Exhibit No.                           Received
13    2106, 2111, 2112, 2147, 2502, 2509   . . . . 936
14    1001 and 1002  . . . . . . . . . . . . . . 938
15    2103   . . . . . . . . . . . . . . . . . . 985
16    2104   . . . . . . . . . . . . . . . . . . 987
17    2109   . . . . . . . . . . . . . . . . . . 990
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300