OADDDarF

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4             v.                            23 Cr. 134 (VSB)

5   CALVIN DARDEN, JR.,

6                                           Trial

            Defendant.
7   ------------------------------x

8                                           New York, N.Y.
9                                           October 4, 2024
                                            10:00 a.m.
10

11  Before:

12                  HON. VERNON S. BRODERICK,

13                                          District Judge
                                            -and- Jury-
14                       APPEARANCES

15  DAMIAN WILLIAMS
        United States Attorney for the
16      Southern District of New York
    KEVIN MEAD
17  WILLIAM C. KINDER
    BRANDON C. THOMPSON
18      Assistant United States Attorneys

19  DONALDSON CHILLIEST & MCDANIEL LLP
    BY:  XAVIER R. DONALDSON
20      -and-
    ANTHONY RICCO
21      Attorneys for Defendant

22  Also Present:
    Alexander Ross, Paralegal
23  Arjun Ahuja, Paralegal
    Melissa Baccari, FBI Special Agent

24

25

OADDDarF

1        (Trial resumed)

2        (In open court; jury not present)

3        THE COURT:  You may be seated.

4        So it's my understanding the jurors are all here.

5        Do we have the laptop with the exhibits?

6        MR. MEAD:  Yes, your Honor, we do.

7        THE COURT:  Is it fairly self-explanatory concerning

8   how to access it?

9        MR. MEAD:  Let me just talk to the paralegal for one

10  second.

11       THE COURT:  Sure.  Go ahead.

12       While you're doing that, it occurred to me last night

13  that -- so you just open it up and power it up?

14       MR. AHUJA:  There's a drive connected to it, but

15  there's no password and it should be self-explanatory.

16       THE COURT:  Is there a power cord?

17       MR. AHUJA:  Yes.

18       THE COURT:  Okay.  It occurred to me that the one

19  sentence that I added to the charge with the agreement of the

20  parties -- let's see.  Here it is.  So they don't have it in

21  the hard copy.  I don't know whether the parties want to create

22  an insert that contains the -- I think it was, the defendant

23  was on supervised release for those prior fraud schemes until

24  August 28, 2020.

25       It's up to the parties.  I mean, literally, it would

OADDDarF

1    just be one page that we'd send back indicating where it was

2    inserted.

3            MR. MEAD:  It seems the current situation seems fine

4    to us.  The Court read the extra sentence and noted that it

5    wasn't, you know, on the sheet.  That being said, if the

6    defense feels strongly about changing the page, we would --

7            MR. DONALDSON:  I don't want to do anything else

8    related to it.  I think we should leave it as is.

9            THE COURT:  Leave it as is.

10           MR. DONALDSON:  Yes.

11           THE COURT:  Okay.  That's fine.

12           I did, as Mr. Mead mentioned, say to them that it

13   wasn't part of it, but I was -- it was part of the charge.

14           So, I'm sorry, the laptop is where now?

15           MR. KINDER:  Right there.

16           THE COURT:  So, Ms. Disla, could you hand to the CSO

17   the laptop?

18           COURT SECURITY OFFICER:  How are you?

19           THE COURT:  So if we could just hand that to the jury.

20   It's got a thumb drive in it.  They can plug it in to charge

21   it, and all they need to do is plug in the thumb drive and they

22   can start looking.  Yes.

23           COURT SECURITY OFFICER:  No problem, your Honor.

24           THE COURT:  Thank you.

25           So my thought would be, for the first 15, 20 minutes

OADDDarF

1    or so, if I could ask counsel to remain relatively close just

2    in case there's an initial question.  After that, if you want

3    to go to the cafeteria, or whereever, I think the witness rooms

4    are still -- well, do you still have access to the witness

5    rooms?

6            MR. DONALDSON:  I didn't check this morning, but I'm

7    sure we do.

8            THE COURT:  That's fine.

9            Does Ms. Disla have your contact information to get in

10   touch with you?

11           MR. MEAD:  Yes, your Honor.

12           THE COURT:  Mr. Donaldson?

13           MR. DONALDSON:  I'm not sure, your Honor, but I'll

14   make sure she does.

15           THE COURT:  Yes.

16           MR. DONALDSON:  I'm not going to go away, but I might

17   step outside to enjoy this day.  But I'll be on the benches or

18   within striking distance, someplace close.

19           THE COURT:  That's fine, as long as it's not too far.

20           All right.  So I'll just be waiting.  I'll probably be

21   in back, but are there any issues that we should address?

22           MR. MEAD:  Not from the government.

23           MR. DONALDSON:  No, your Honor.  Thank you.

24           THE COURT:  Okay.  Thank you very much.

25           (Recess taken)

OADDDarF

1          THE COURT:  All right.  If we could go on the record.

2          MR. DONALDSON:  He just went to the bathroom, Judge.

3          THE COURT:  Okay.  Well, I think initially the

4     preliminary remarks will be that we did receive a note.  It's

5     been marked as Court Exhibit One.

6          My deputy clerk is going to hand the note first to the

7     government, and you should obviously take a picture of it, and

8     second to the defense.  Then once Mr. Darden returns, I have a

9     suggestion about -- well, I have a question and then perhaps a

10    suggestion about how to address the note.

11         (Pause in proceedings)

12         THE COURT:  Okay.  If we could go back on the record,

13    as I mentioned, we did receive a note.  It's been marked Court

14    Exhibit One, and it states as follows:

15         "Questions:  One, is there an index to reference the

16    exhibits available?

17         Two, if not, can we have the money flow charts for

18    Howard and Parsons?

19         Foreperson, juror no. 5."

20         So I think what I would suggest is the following:  If

21    we can in short order, and with -- obviously the parties have

22    to agree -- a list of the exhibits that went back, that would

23    be the most efficient way, because that way they have the list

24    and they can access anything they want.

25         We could do two things.  We could get them the charts,

OADDDarF

1    and we could get them the exhibits.  I don't know.  Let me ask

2    how quickly would we be able to create a list of the exhibits

3    that were admitted in evidence?

4         MR. RICCO:  It's pretty easy.

5         MR. DONALDSON:  I think they have that available.

6         THE COURT:  You just have to speak up, because the

7    microphones are muted because I have that other conference.

8         MR. DONALDSON:  Okay.  I think that I asked the

9    government's paralegals for something like that a few days ago,

10   and I think they were able to produce something like that

11   pretty quickly.  So I think that exhibit index is easily done.

12   Just so we can make it neutral, it doesn't have Federal

13   Government, X, Y, Z on it, I think that would be fine, and I

14   think we could do that without the chart.  I think it's either

15   or.

16        THE COURT:  It says "if not."

17        MR. DONALDSON:  Right.

18        THE COURT:  If we're going to do the first, that's

19   fine.  The parties need to review it to make sure they're in

20   agreement that it is -- that it can go back, and then we can

21   provide it to the jury.  That would allow them also to locate

22   other exhibits that are part of the -- that are on the laptop,

23   on the thumb drive.

24        MR. DONALDSON:  I think that will be perfectly fine.

25   I think we can get that one done, the first one done pretty

OADDDarF

1    quickly.

2              THE COURT:  All right.  That's fine.

3              So let's get to work on that, and while you're doing

4    that, I'm going to handle my civil fairness hearing.

5              Yes, Mr. Mead.

6              MR. MEAD:  If we're able to do that in agreement, does

7    the Court want to go back on the record, or could the

8    government hand it up to the court staff?

9              THE COURT:  You can hand it to Ms. Disla.  Ms. Disla

10   will hand it to the Court Security Officer, and it will be

11   provided to the jury.

12             MR. MEAD:  Great.  Thank you, your Honor.

13             MR. DONALDSON:  Yes.

14             THE COURT:  Thank you.

15             (Recess taken.)

16             THE COURT:  So if we could go on the record.

17             Did you have some comments, Mr. Donaldson?

18             MR. DONALDSON:  No.  No.  I have no -- no.

19             THE COURT:  So it's a list, as I understand it --

20   well, let me ask, Mr. Mead, was a list generated by the

21   government and provided to the defense?

22             MR. MEAD:  Yes, your Honor.  We took the existing

23   exhibit list that had been provided to the Court and to the

24   defense.  We've removed all the non-admitted exhibits.  We've

25   admitted a column showing when the exhibit was admitted so the

OADDDarF

1    current list shows the admitted exhibits, the exhibit number

2    and then a description of them.

3            THE COURT:  Okay.  Mr. Donaldson, have you reviewed

4    that document?

5            MR. DONALDSON:  Yes.  The defense has reviewed it

6    along with our client, and we find this list acceptable.

7            THE COURT:  Okay.

8            MR. MEAD:  So I haven't spoken about this with

9    Mr. Donaldson.  I think it may be a little bit hard to locate

10   the documents they were looking for.  I don't think we need to

11   give them paper copies, but if we could say to the jury, we

12   understand the exhibits you're looking for are 1101 and 1102 --

13           MR. DONALDSON:  I disagree with that 100 percent.  I

14   don't think that is necessary.  I think the note was pretty

15   clear.  If you can provide us an exhibit list, fine.  If not,

16   then do X, Y, and Z.  So we can do the number one, so I think

17   that's all that's necessary and appropriate at this time.

18           THE COURT:  All right.  I guess what I would say is we

19   can send back the list.  If they have trouble locating it, I'm

20   sure they will send us a note.

21           I understand the rationale by both parties as to why

22   you'd want to do that, but the note does speak in terms of an

23   index.  Then, if not, having the specific exhibits.

24           So what I intend to do -- do we have a copy of the

25   list?

OADDDarF

1        I'll hand the list right now to my deputy clerk.  She

2   will hand it to the court security officer, who will knock on

3   the door and provide it to the foreperson or to the jurors.

4   Okay.

5        MR. DONALDSON:  That's the same list -- the list the

6   Court has is the same list that I have, right?

7        THE COURT:  I believe so.

8        Ms. Disla, if you can let Mr. Donaldson take a look at

9   it just to be sure.

10        MR. MEAD:  Yes.

11        MR. DONALDSON:  If the government said yes, I'm good.

12        THE COURT:  Why don't you look at the first page and

13   see how many pages it is.

14        MR. DONALDSON:  It's good, Judge.  It's good.

15        THE COURT:  Thank you.

16        All right.  Ms. Disla, thank you.

17        MR. DONALDSON:  Thank you.

18        THE COURT:  So, counsel, what I would ask is if you

19   could maybe remain in the courtroom for a few minutes just in

20   case there is a note concerning the list.  In other words, they

21   want to ask specific questions about where the documents are.

22        I'm handing Court Exhibit One back to my deputy clerk,

23   and I'll just be -- I don't have any more conferences, so you

24   should feel free to either stay here or just be close in case.

25        MR. DONALDSON:  All right.  Very good.

OADDDarF

1              THE COURT:  Thank you very much.

2              MR. RICCO:  Judge, so we're here, either in the

3    conference room the Court has provided --

4              THE COURT:  Terrific.  We'll come and get you there or

5    we'll send you an email if you want to go down and grab

6    something in the cafeteria.

7              MR. DONALDSON:  Thank you.

8              MR. RICCO:  But if we do that, Judge, we'll let Ms.

9    Disla know.

10             THE COURT:  All right.  Thank you.

11             (Recess taken.)

12             THE COURT:  You can be seated.

13        So we have a note, "we the jury have reached a verdict

14   in the case of *United States of America v. Calvin Darden, Jr.*"

15   It's signed by the foreperson, juror no. 5.

16        Now, initially the jury sent out an envelope.  That

17   envelope actually had the verdict sheet in it.  When I saw

18   that, I returned the verdict sheet to the jury room and said

19   that we should have a note.

20        So we're going to mark this as Court Exhibit Two.  The

21   parties can make a copy of it, and then we'll get the jury.

22        Anything before we get the jury?

23             MR. DONALDSON:  No, Judge.

24             MR. MEAD:  No, your Honor.

25             THE COURT:  Okay.  We can get the jury.  Thank you.

OADDDarF

1            (In open court; jury present)

2            THE COURT:  You may be seated.

3            So, ladies and gentlemen, I received a note and it

4    reads as follows:  "We the jury have reached a verdict in the

5    case *United States of America v. Calvin Darden, Jr.*"  Signed by

6    the foreperson, juror no. 5, and it's been marked as Court

7    Exhibit Two.

8            So let me ask the foreperson, have you reached a

9    verdict?

10            JUROR:  Yes, Judge.

11            THE COURT:  Okay.  Ms. Disla, if you could get the

12    verdict sheet from the foreperson.

13            Thank you.

14            Okay.  Ms. Disla, if you could please read the

15    verdict.

16            THE DEPUTY CLERK:  Okay.  *United States of America v.*

17    *Calvin Darden, Jr.*, 23 CR 134, jury verdict form.

18            Okay.  Count One.

19            THE COURT:  No need to read the italicized portion.

20            THE DEPUTY CLERK:  Got it.

21            THE COURT:  Go ahead.

22            THE DEPUTY CLERK:  "Count One, conspiracy to commit

23    wire fraud or bank fraud.  On Count One, the charge of

24    conspiracy to commit wire fraud or bank fraud, we the jury find

25    the defendant:

OADDDarF

1           A, with respect to Chandler Parsons, guilty;

2           B, with respect to Dwight Howard, guilty.

3           Two, Count Two, wire fraud.  On Count Two, the charge

4    of wire fraud, we the jury find the defendant:

5           A, with respect to Chandler Parsons, guilty;

6           B, with respect to Dwight Howard, guilty.

7           Three, Count Three, bank fraud.  On Count Three, the

8    charge of bank fraud, we the jury find the defendant guilty.

9           Four, Count Four, conspiracy to commit money

10   laundering.  On Count Four, the charge of conspiracy to commit

11   money laundering, we the jury find the defendant guilty.

12          Five, Count Five, money laundering.  On Count Five,

13   the charge of money laundering, we the jury find the defendant

14   guilty.

15          Final instruction, once you have answered all the

16   instructions, please have the foreperson sign and date the

17   verdict sheet.  Notify the Marshal that you have reached a

18   verdict."

19          Dated October 4, 2024, 2:47 p.m.  Juror no. 5,

20   foreperson.

21          THE COURT:  Thank you.

22          Ms. Disla, if I could ask you to please poll the jury.

23          THE DEPUTY CLERK:  Juror no. 1, is this your verdict?

24          JUROR:  Yes.

25          THE DEPUTY CLERK:  Juror no. 2, is this your verdict?

OADDDarF

1           JUROR:  Yes.

2           THE DEPUTY CLERK:  Juror no. 3, is this your verdict?

3           JUROR:  Yes.

4           THE DEPUTY CLERK:  Juror no. 4, is this your verdict?

5           JUROR:  Yes.

6           THE DEPUTY CLERK:  Juror no. 5, is this your verdict?

7           JUROR:  Yes.

8           THE DEPUTY CLERK:  Juror no. 6, is this your verdict?

9           JUROR:  Yes.

10          THE DEPUTY CLERK:  Juror no. 7, is this your verdict?

11          JUROR:  Yes.

12          THE DEPUTY CLERK:  Juror no. 8, is this your verdict?

13          JUROR:  Yes.

14          THE DEPUTY CLERK:  Juror no. 9, is this your verdict?

15          JUROR:  Yes.

16          THE DEPUTY CLERK:  Juror no. 10, is this your verdict?

17          JUROR:  Yes.

18          THE DEPUTY CLERK:  Juror no. 11, is this your verdict?

19          JUROR:  Yes.

20          THE DEPUTY CLERK:  Juror no. 12, is this your verdict?

21          JUROR:  Yes.

22          THE COURT:  Okay.  Thank you very much, Ms. Disla.

23          Ladies and gentlemen, thank you very much.  You've now

24  completed your jury service, and I know I speak on behalf of

25  the parties in thanking you for your careful attention during

OADDDarF

1    the trial and for your patience when we were delayed.

2            So if you want, I'll come back in a moment to thank

3    you individually, but you're also free to leave.  So feel free

4    to go back, and I just have to deal with something briefly with

5    the parties, but I'll be back in a moment, okay?

6            All right.  Thank you.  You're dismissed.

7            (Jury dismissed)

8            (In open court; jury not present)

9            THE COURT:  Okay.  You may be seated.

10           Ms. Disla will mark the verdict form as Court Exhibit

11   Three, and the parties can take a photograph of the exhibit.

12           Now, with regard to next steps, with regard to any

13   post-trial motions, the parties should meet and confer and

14   within a week provide me with a schedule with regard to any

15   post-trial motions.  I am going to go back and see the jurors.

16   I think there's some other issues we still have to take up, so

17   I'd ask for the parties to remain here and I'll be back

18   shortly.  All right?

19           Thank you very much.  I'll see you in just a few

20   moments.

21           (Recess taken.)

22           THE COURT:  You can be seated.

23           All right.  I'll hear from the government.  Does the

24   government have an application?

25           MR. MEAD:  Your Honor, the government is seeking the

OADDDarF

1    defendant's remand.

2            THE COURT:  Okay.  Well, let me ask -- so I'll hear

3    from the government with regard to that as to the bases for

4    that request.

5            MR. MEAD:  Yes, your Honor.

6            As the Court is aware, the standard changes once a

7    defendant has been convicted.  The standard is whether a Court

8    can find by clear and convincing evidence that the person is

9    not likely to flee or pose a danger to the safety of any other

10   person or the community.

11           We're moving on both grounds, your Honor, although

12   primarily on the danger to the community ground.  We don't

13   think the Court can make a finding by clear and convincing

14   evidence that the defendant is not a danger to commit an

15   additional fraud like the one he committed here.

16           The defendant is a lifelong fraudster.  This will be

17   his third fraud conviction and his third multi million dollar

18   fraud conviction.  In 2004, he was convicted in state court in

19   Manhattan of a fraud.  He was a stock broker.  He committed a

20   fraud against his employer and against various investors.  That

21   fraud was millions of dollars.  He received a sentence of I

22   think less than four years.  It was a state sentence, so the

23   sentencing is a little bit complicated.

24           When he got out of jail, he was quickly again

25   committing a sophisticated fraud which he was able to commit

OADDDarF

even though he had a public criminal record, which is difficult

of course.  In that case, he had a fake deal to buy Maxim

Magazine, stole several million dollars in connection with

that, also had a fake deal for an NBA exhibition game in Taiwan

and stole $500,000 through that.

He got a lawyer involved in the scheme with him who

was prosecuted.  That was Newkirk.  Our office signed up the

defendant as a cooperator.  He testified at trial.  There was a

conviction, and, as a result, he only got a year in jail.

He also of course impersonated his father to further

those frauds, as the Court heard from the transcript when we

read it in.  He only got a year in jail, but he of course did

not learn his lesson from that case.  He was very quickly again

committing fraud here.

Part of the fraud in this case, in particular the part

committed against Chandler Parsons, was done while the

defendant was on supervised release in this district.  The

frauds he committed were quite sophisticated.  They took place

over years.  They involved forged documents.  They involved the

defendant impersonating his own father and using people who the

victims trusted, like Charles Briscoe, Mr. Howard's agent, to

further the fraud.

The defendant is financially sophisticated.  He

laundered the proceeds of this fraud through a number of

different companies.  He used shell companies.  He used a shell

OADDDarF

bank account with the name of another person on it to hide his

proceeds, and he spent all of the money on himself immediately.

Given this defendant's background, we don't think

there's any way to find by clear and convincing evidence that

he's not likely to do this again, and of course the standard is

clear and convincing evidence.  And, in particular, the fact

that he committed this fraud partially while on supervised

release demonstrates how difficult it is to prevent this kind

of fraud by the defendant even if the Court imposes conditions

short of detention.

We're also moving on a flight risk ground, your Honor.

We concede that this is a less compelling ground than the

danger of the community.  We are not aware of the defendant

failing to appear in the past.  That being said, the defendant

has served relatively short jail terms in the past and he's

facing a much more substantial jail term in this case.  Our

guideline calculation, which the defense may dispute, is

approximately 135 to 168 months.  That's a very substantial

sentence.  That's much more substantial than he served in the

past, and he's a fifty-year-old man, so there's a substantial

portion of his life that he's likely to spend in jail.

We're also likely to seize all of his assets.  All of

his assets and his possessions are based on fraud.  His house

was bought from fraud money; his cars bought from fraud money;

and his art, his jewelry, the other items in his house were

OADDDarF

1    bought with fraud money.  So he's going to be divest of assets,

2    and that I think provides an additional reason for him to flee.

3            Obviously, he's appeared here.  He appeared here today

4    without being detained.  That said, the calculus with him has

5    changed.

6            We were in plea negotiations with the defendant.  He

7    never accepted a plea.  That's of course his right.  It

8    indicates, though, that he thought he had a substantial chance

9    of getting away with this.  Now that chance has evaporated and

10   he's faced with the choice of spending more than a decade in

11   jail perhaps or attempting to flee.

12           So we think for those reasons, your Honor, detention

13   is justified on both risk of flight and danger to the

14   community.

15           THE COURT:  Okay.  Let me first comment on, the

16   defendant has a right to go to trial and his exercise of that

17   right -- I'm not going to look behind that to sort of figure

18   out that issue.  In other words, I'm not going to -- when you

19   say there were plea negotiations, was there ever a written plea

20   offer made?

21           MR. MEAD:  There were two written plea offers, your

22   Honor.  I may get the dates slightly wrong.  I believe one in

23   February and one in July of this year.

24           THE COURT:  Okay.  So I'm not going to sort of go

25   behind that.  I mean, a defendant can choose to go to trial,

OADDDarF

1    obviously, represented by counsel.  It's the defendant's

2    choice, regardless of what the defendant's and counsel's views

3    are with regard to what the possible defenses are.  So, I'm not

4    going to put that into the calculus.

5         But let me ask, with regard to risk of flight, and you

6    should know, does the government have any evidence that

7    Mr. Darden has any connections to any foreign countries?

8    Understanding someone could flee within the United States.  I

9    understand that.  But, in other words, is there any reason to

10   think either connections to foreign countries or the government

11   is aware of some sort of preparations or anything like that

12   with regard to flight?

13        MR. MEAD:  We're not aware of any substantial

14   connections to foreign countries, and we're not aware of any

15   preparations for flight.

16        THE COURT:  Although I recognize the issue of this

17   fraud beginning while Mr. Darden was on supervised release, in

18   connection with his prior convictions, state conviction and

19   then after his conviction, federally, was there any evidence

20   that Mr. -- well, and putting to the side the supervised

21   release, that he committed fraud during the pendency of the

22   cases, both in terms of the state case, the earlier federal

23   case before Judge Rakoff, and then, lastly, here?  In other

24   words, does the government have any evidence that while

25   Mr. Darden has been on release, that even if it's not direct

OADDDarF

1    evidence of fraud, but evidence of other sort of financial

2    transactions, opening of accounts, things like that, that could

3    possibly be indicia of preparing for some sort of illegal

4    activity, financial activity?

5            MR. MEAD:  We're not aware of any evidence like that.

6    All I'll say on that point is it's difficult for us to get that

7    kind of evidence.  We don't have any phone or his emails from

8    that period, but we're not aware of any evidence.

9            THE COURT:  Okay.  Let me hear from the defense.

10           MR. RICCO:  Yes.

11           THE COURT:  Yes, Mr. Ricco.

12           MR. RICCO:  So, Judge, I think I'll start with the

13   defendant appears.  He appeared here.  I think that he showed

14   great respect for the Court throughout, you know, throughout

15   the proceedings, and has always communicated with counsel.

16           The defendant was made very well aware that he could

17   be convicted in this case and what that would mean.  And I

18   would say, Judge, I looked at his testimony before Judge Rakoff

19   and, you know, reviewing that testimony, I didn't see any

20   testimony about bad acts or crimes that took place between

21   those two proceedings.  I think it's something that would have

22   come out in proffer sessions and would have been something that

23   would have been a part of the testimony.

24           I would also say, Judge, since he's been out on this

25   case, I don't think there's been any evidence that he's been

1    involved in the kind of crimes that he's been convicted of.  So

2    there are circumstances where the defendant is not a threat,

3    he's not always a threat to the community, and though it's not

4    a lot of evidence, there is some evidence of it.

5           The defendant has a wife, and family, and parents who

6    are not doing too well.  Health reasons.  He has great

7    incentives to stay or be a part of his family.

8           I can tell the Court that during these court

9    proceedings, I was in regular touch with his mother, had no

10   contact with his father at all.  I think Mr. Donaldson may have

11   at one point.  And so he has a strong incentive to stay.  His

12   family needs him.  He knows he's facing a prison sentence here.

13          He also recognizes, Judge, in this circumstance --

14   look, he could be in a situation with no banking, no --

15   whatsoever, no closing of accounts, no openings of accounts, no

16   removal of monies from any accounts.  And, you know, we could

17   restrict his access, you know, no internet.

18          Judge, you know, it could even be a situation where

19   your Honor says, look, put him on home detention; he doesn't

20   leave the home other than, you know, counsel, and of course any

21   emergencies related to his parents.  We could severely restrict

22   the defendant's access and means to engage in the kind of

23   conduct that has derailed his life and the life of, you know,

24   other individuals.

25          Judge, for what it's worth, counsel has had some

OADDDarF

1    dealings with the defendant.  I can tell your Honor, when in

2    preparation of this case, I traveled down to Atlanta, I met

3    with the defendant, his family.  And I think the conviction,

4    Judge, would be difficult, is difficult.  I think this is --

5    there's evidence to show that he's not a threat to the

6    community such that the Court can impose circumstances on him

7    to address those concerns on -- the defendant's passport is in

8    the possession of the government, and he has no travel recently

9    outside of the United States.  And the Court can restrict his

10    travel, restrict his movement, restrict his access.

11         And I think, Judge, those things would be sufficient

12    between now and sentencing.  We'll do everything we can to get

13    this case to sentencing soon.  And, you know, sometimes the

14    issue is difficult, but notwithstanding Mr. Darden, Jr.'s

15    conduct, I think there have been times in his life where he's

16    not been engaged in this type of conduct, and I think this is

17    one of those times, Judge.  And I think that he recognizes the

18    severity of what -- you know, what would happen here should he

19    -- you know, should he deviate one inch.

20         So we would ask that the Court make a finding by clear

21    and convincing evidence that he is -- to the extent that one

22    would say that he's a threat, that there are circumstances that

23    could be put in place to curtail that, and that he is not a

24    risk of flight.  And to the extent that he is, circumstances

25    could be put in play to prevent that from happening.

OADDDarF

1          THE COURT:  All right.  I apologize.  I was looking at

2   computer screen, Mr. Ricco, because I wanted to see exactly

3   what the bail conditions are.

4          Now, first, as a preliminary matter, as to bail

5   conditions that are currently set, I believe they would not be

6   sufficient.  However, I do think that we could craft conditions

7   such that that would make it so I can in fact make a finding

8   that, based upon these conditions, that Mr. Darden is not a

9   danger to the community.

10         I think flight, with regard to flight, there doesn't

11  appear to be any evidence.  There are substantial ties.

12  Mr. Darden has family in Atlanta and other parts of the

13  country.  He does have parents who are elderly, and certainly

14  information on his father indicates certain health conditions.

15  So I think his ties are sufficient that the risk of flight is

16  minimal, and, as a United States citizen, it would be very

17  difficult for him to go somewhere else.

18         But what are the current conditions of his release?  I

19  apologize.  I was trying to look it up on the docket.  I guess,

20  first, is there a bond or was there a release and, if so, who

21  signed the bond?

22         I don't know why I'm not able to -- perhaps I could

23  prevail on -- oh, wait.  There we go.  All right.  Ms. Disla is

24  printing that out.

25         But I think that the bail conditions -- okay.  So it's

OADDDarF

1    a $75,000 personal recognizance bond cosigned by three

2    financially responsible people; travel restricted to Northern

3    District of Georgia and points in between -- it says for travel

4    purposes, but I assume that's for purposes of meeting with

5    lawyers and the like; no contact with codefendants.

6          So here are the additional conditions.  Now, I have no

7    contact with any of the codefendants or alleged victims outside

8    the presence of counsel; do not open any new financial,

9    business, personal bank accounts, debit or credit card

10   accounts, lines of credit, or loans without prior approval from

11   pretrial services; do not manage, take possession of or invest

12   funds belonging to any third party.

13         So with regard to that, I would actually add not only

14   third party but with regard to anyone.  So even if they are

15   funds of his own.  So, basically, of anyone.

16         Now my deputy has actually handed me the actual bond.

17   So it does include the same provisions:  Do not sell, transfer,

18   or give away any asset valued at $100,000 or more.  There I

19   think -- without notifying, obtaining permission of pretrial

20   services, except for fees to attorney.  So that is going to

21   change to "do not sell, transfer, or give any asset of -- any

22   asset valued at" -- it will be "$1,000 or more, without

23   notifying, obtaining permission from pretrial services."  I'll

24   still include except for fees to attorney retained to represent

25   you in the criminal case.

OADDDarF

1      So is there a bond?  Because it says, the bond to be

2  secured by a property worth approximately a million dollars

3  owned by the defendant's mother.

4      MR. RICCO:  That was done, your Honor, and that's in

5  place.

6      THE COURT:  All right.  So that's pledged.

7      So is that property in Georgia?

8      MR. RICCO:  Yes, it is, Judge.

9      THE COURT:  Okay.  Then the conditions were to be met

10  by April 12 of 2023.

11      So with regard to the amount of the bond and the

12  security, in other words, the million dollar -- and assuming,

13  and the government should check to make sure that all steps

14  have been taken for the -- and I don't know what the law is in

15  Georgia.  I know in New York you have to --

16      MR. RICCO:  You have to file a judgment.

17      THE COURT:  Okay.  So there's a judgment.

18      MR. RICCO:  No.  In New York you do.  I don't know if

19  in Georgia --

20      THE COURT:  Yes.  Just make sure there is, in fact,

21  that security.

22      With regard to I think home confinement, GPS

23  monitoring, Mr. Darden is not allowed to leave the home except

24  for medical visits that are -- well, if there's an emergency,

25  that's one thing, but he is not allowed to leave the home

OADDDarF

1    unless it's a doctor's appointment and he informs pretrial

2    services of that.

3            With regard to -- let me ask Mr. Ricco, has Mr. Darden

4    been working?

5            MR. RICCO:  No, Judge.

6            THE COURT:  Okay.

7            MR. RICCO:  During the pendency of this, no.

8            THE COURT:  All right.  That's to continue.

9            MR. RICCO:  Right.

10           THE COURT:  So not to go outside and look for a job or

11   anything like that.

12           With regard to any work from the home, there will be

13   no work from the home.

14           With regard to access to computers, he can use his

15   phone.  The communications he can have are still limited as

16   indicated in the instruction, but you're not to use the

17   internet, full stop.  Right.  With the exception of email

18   communication and texts with family.  All right.  But no

19   internet searches and the like.

20           With regard to any bank accounts that you control,

21   you're to provide that information within the next week to not

22   only pretrial but to the government, and you're to provide them

23   with the ability to access, by access I mean view, those

24   accounts, so that they can be monitored.

25           That means -- so, all of these restrictions are placed

OADDDarF

```
 1    upon you, but you cannot, just to be clear, utilize anyone else
 2    to carry out other things.  If there are certain financial
 3    transactions that you believe you need to take in advance of
 4    your sentencing, you're to tell pretrial services and your
 5    attorneys, and they're to speak to the government to determine
 6    whether or not those financial -- how to go about, if at all,
 7    those financial activities.
 8              In other words, you're not to transfer any assets.
 9    You're not to -- either assets under your name or that you
10    control.  In other words, you can't direct others to basically
11    transfer assets.  Well, let me ask, are there any other --
12    those are the conditions off the top of my head.
13              MR. RICCO:  And, Judge, if I may?
14              THE COURT:  Yes.
15              MR. RICCO:  With respect to even travel here to New
16    York, you know, we have no objection to his remaining in
17    northern Georgia, and to the extent that -- he can always
18    communicate with us via Zoom for the things that we have to do
19    and sentencing, and this way just no traveling at all.  If we
20    need to go, if there's a need for it --
21              THE COURT:  You need to see him --
22              MR. RICCO:  -- we'll notify pretrial, we'll notify the
23    government, and have that tightly monitored.
24              THE COURT:  Okay.  So I think that makes sense.  In
25    other words, and let me just restate it just to make sure I
```

OADDDarF

1    understand, there will be no travel, as there normally would be

2    to come to New York to visit counsel.  Those communications and

3    otherwise -- and obviously in my comments about using the phone

4    and otherwise, he can obviously communicate with counsel.  That

5    any communications, though, or any preparation for sentencing

6    will be done and motions and the like will be done remotely,

7    and that any travel to New York must be pre-approved.  In other

8    words, by letting pretrial know, but through me.  So that

9    Mr. Darden is going to have to remain in his home.

10          Let me ask the government, are there any other

11   restrictions that the government believes would be appropriate?

12          I know obviously the government sought detention, but

13   that's not my ruling here today.

14          MR. MEAD:  No, your Honor, and we appreciate the

15   conditions you've crafted.  Those make sense to us.

16          THE COURT:  Okay.  Look, Mr. Darden, let me be clear

17   about something --

18          Thank you, Marshals.

19          If I get an inkling that anything untoward is

20   happening, I'm going to remand you.

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  No question.  So you need to abide by the

23   terms of your release.  If there is an issue that comes up,

24   speak to your lawyers.  Don't let things just hang out there.

25          So I think in terms of the modification of the bond, I

1    don't know if the government could and the defense could

2    interface with pretrial here, because obviously they need to

3    make arrangements for -- well, let me ask Mr. Donaldson,

4    Mr. Ricco, how long is Mr. Darden going to be in New York?

5            MR. RICCO:  He's going back -- the latest he is going

6    to be in New York is tomorrow morning.

7            THE COURT:  Okay.  So you should reach out to pretrial

8    as soon as this is done to make sure.  I don't know who

9    Mr. Darden's pretrial services officer is in Georgia.  I don't

10   know what their abilities are in terms of electronic monitoring

11   and home detention, but I want those arrangements to start now,

12   and so that by next week that will be in place.

13           But during the pendency, in other words, before you

14   have the monitoring, in other words, the ankle bracelet or

15   however they monitor in Georgia, the terms of house arrest --

16   and I don't know whether it's home detention or not, but it

17   will be either house arrest or home detention.  I can't

18   remember the exact distinction.  They are terms of art.  But

19   why don't we make it house arrest, because I think it's more

20   restrictive.  But that applies.  In other words, you have to

21   stay at home.

22           So I would like, after this proceeding is done, for

23   the parties to reach out to pretrial to start that rolling.

24           So all the other conditions will remain in place that

25   are part of the current bond.  There will be a modification, as

OADDDarF

1    I said, to add for home incarceration, with electronic

2    monitoring, the ability to -- so, with regard to just the

3    financial issues, you know, the provision of the bank accounts

4    either controlled directly or indirectly by Mr. Darden must be

5    disclosed to pretrial and to the government.  The ability to

6    access those accounts or monitor those accounts must be

7    provided.

8            The amount with regard to do not sell, transfer, or

9    give away any asset valued at, it's $1,000 or more, without

10   notifying or obtaining permission, except for the attorneys'

11   fees.

12           Now, with regard to, do not manage, take possession or

13   invest funds belonging to anyone.  Do not -- it says to third

14   parties, but I think to anyone.

15           With regard to any assets, you're not to have any

16   financial transactions with any assets without notifying

17   obviously your counsel, but pretrial and the government, with

18   regard to any transfers.  That includes assets you own directly

19   or indirectly.

20           Okay.  I think there either may be a need to sign an

21   amended bond, although I don't know that, so I'd ask the

22   parties or -- well, those are the conditions I'm setting.  I

23   don't know if they need to -- you need to contact the criminal

24   clerk's office in magistrate court to -- I just don't know.  We

25   could do a supplemental -- yes, we'll do an order with regard

OADDDarF

 1    to that, but my oral order is sufficient.  In other words, that

 2    these are the conditions that you have to abide by, Mr. Darden.

 3             THE DEFENDANT:  Yes, sir.

 4             THE COURT:  All right.  Let me ask -- so within a week

 5    the parties will provide me with any scheduling with regard to

 6    any motion, post-verdict motion practice, and the parties will

 7    start the ball rolling with regard to the modifications

 8    necessary for home incarceration with electronic monitoring.

 9    If there are problems with that, I'd like to be notified of

10    that, but I expect that to be accomplished by next week.

11             The government should just confirm that everything

12    that is needed to be done to create a security interest in the

13    property down in Georgia has been done.

14             Yes, Mr. Ricco.

15             MR. RICCO:  Yes.  Judge --

16             THE COURT:  I'm sorry.  Just to your point, the last

17    point was that travel is going to be now just your Northern

18    District of Georgia.  Any travel outside of the Northern

19    District of Georgia must be approved by me.  Okay?

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Yes, Mr. Ricco.

22             MR. RICCO:  Yes.  So, Judge, my only concern is the

23    defendant has a relationship with his pretrial service officer

24    in Georgia and he has 24-hour capability of cell number.  My

25    only concern is if there's a medical hospital emergency --

OADDDarF

1          THE COURT:  Yes.

2          MR. RICCO:  -- related to his parents, that the

3     defendant have the right to do that, but contact his pretrial

4     service officer in Georgia beforehand and get that approval

5     beforehand.

6          THE COURT:  Okay.  So just so that I know, so you

7     reference to 24 hours.  That means he has access to his

8     pretrial officer, can call or text or whatever.  Now, with

9     regard to medical emergencies, they will apply to Mr. Darden's

10    own medical emergencies, or medical emergencies of immediate

11    family.  So that includes your wife, your daughter, your

12    mother, and your father.  That's what it's limited to.

13         Mr. Darden must immediately notify, and he can use his

14    phone obviously to communicate with pretrial, and that's the

15    other condition, actually, the phone.  No use of the internet,

16    except to use your phone to call or contact family members.  So

17    the emergency can apply to the immediate family members as just

18    delineated, but pretrial services must be notified immediately.

19    In other words, of the medical emergency and where you're

20    going.

21         THE DEFENDANT:  Yes, sir.

22         THE COURT:  Obviously, there will be a notification

23    through the electronic monitoring, but you want to avoid the

24    electronic monitoring being triggered, because that will lead

25    to your arrest, and people will start looking for you at that

OADDDarF

1    point.  Okay?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  But you should notify them not only of the

4    nature of the emergency but where you're going.

5              Okay.  Anything else?

6              MR. MEAD:  Sentencing date, your Honor.

7              THE COURT:  Yes.  So, Ms. Disla, could we have a date

8    about a hundred days out?

9              THE DEPUTY CLERK:  Friday, January 17, 2025, at 11:00

10   a.m.

11             THE COURT:  All right.  So it's January 17, 2025.

12             MR. DONALDSON:  Judge, could we have a different

13   Friday --

14             THE COURT:  Yes.

15             MR. DONALDSON:  -- if possible?  That's the Friday

16   before the holiday.

17             THE COURT:  Okay.  Yes.

18             THE DEPUTY CLERK:  Monday, January 27.

19             THE COURT:  The 27th.

20             MR. DONALDSON:  That works, Judge.  Thank you.

21             THE COURT:  At 11:00 a.m.

22             MR. RICCO:  And, Judge, we're going to work hard to

23   make that a real sentencing date.

24             THE COURT:  That's fine.  Obviously, then, with regard

25   to any motion practice, that should be done during that time

OADDDarF

```
 1   period, because I guess what I'll say is, obviously, that's

 2   fine, and I understand if there is -- we should try, and I

 3   agree we should try and get everything done in that time

 4   period.

 5           So, Mr. Darden, what that also means is you need to

 6   use the time between now and then obviously to speak with your

 7   lawyers about motions and sentencing, but also to get your

 8   affairs in order, whatever that may be, because I'm unlikely to

 9   grant an extension based on the fact that you haven't had an

10   opportunity to get your affairs in order, an extension of your

11   sentencing date.  Okay?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  Anything else from the government?

14           MR. MEAD:  No, your Honor.

15           THE COURT:  Anything else from the defense?

16           MR. RICCO:  No, your Honor.

17           THE COURT:  So just let me know if there are issues

18   with regard to the home incarceration and detention, and we

19   will issue an order, it may not hit the docket today, but by

20   Monday, outlining the additional conditions.

21           All right.  Thank you very much.  We'll stand

22   adjourned.

23           (Adjourned)

24

25
```