O9CUDARC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          23 Cr. 134 (VSB)

 5   CALVIN DARDEN, JR.,

 6                                          Conference
                   Defendant.
 7   ------------------------------x

 8
                                          New York, N.Y.
 9                                        September 12, 2024
                                          1:30 p.m.
10

11   Before:

12                    HON. VERNON S. BRODERICK,

13                                          U.S. District Judge

14
                          APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  KEVIN MEAD
          WILLIAM KINDER
18        BRANDON THOMPSON
          STEPHEN J. RITCHIN
19        Assistant United States Attorneys

20   XAVIER R. DONALDSON
          Attorney for Defendant
21
     ANTHONY L. RICCO
22        Attorney for Defendant

23   STEVEN LEGON
          Attorney for Defendant
24
     Also Present:
25
          Alexander Ross, Paralegal Specialist USAO
```

O9CUDARC

1          THE COURT:  Okay.  If counsel could please identify

2     themselves for the record.

3          MR. MEAD:  Good afternoon, your Honor.  A.U.S.A. Kevin

4     Mead appearing for the government, joined at counsel table by,

5     in order, William Kinder, Brandon Thompson, Stephen Ritchin,

6     and Alexander Ross.

7          THE COURT:  Okay.  And for the defense.

8          MR. DONALDSON:  Your Honor, for Mr. Darden, Xavier

9     Donaldson, standing to my left, of course.

10          Introduce yourself.

11          MR. RICCO:  Anthony Ricco.  Good afternoon, your

12     Honor.

13          THE COURT:  All right.  Good afternoon.

14          MR. LEGON:  And Steven Legon, your Honor, good

15     afternoon.

16          THE COURT:  All right good.

17          MR. DONALDSON:  And, of course, Mr. Darden is present.

18          THE COURT:  Yes.

19          THE DEFENDANT:  Good afternoon your Honor.

20          THE COURT:  Good afternoon, Mr. Darden.

21          You may be seated.

22          MR. DONALDSON:  Thank you.

23          THE COURT:  The matter is on for final pretrial

24     conference.  We're scheduled to start jury selection on Tuesday

25     a.m. and just so the parties are aware, in order to accommodate

O9CUDARC

1    the attorneys and staff we're going to be -- and so that we're

2    not cramped, we're going to be in Courtroom 110 and we'll do

3    jury selection in 110 and the trial will be conducted in

4    Courtroom 110.  And so with regard -- I know -- I think

5    Ms. Disla has communicated with regard to tech run-through, it

6    the tech run-through will be down in 110.

7          And just in terms of logistics in terms of jury

8    selection, you know, there is, on the Court's website under my

9    name there is rules for jury selection, but, basically, I

10   intend to have 12 jurors and two alternates.  And so we will --

11   Ms. Disla will initially call out 32 names, folks we'll fit as

12   many folks as we can, there's more space down in 110, so we'll

13   fit more people in the box and then in the first row of the

14   courtroom, in the gallery, we'll fill out the rest of the 32.

15   I will then -- and I'll provide instructions.  I'll have

16   preliminary instructions for the jury, for all of the

17   prospective jurors indicating -- describing the process.  With

18   regard to juror No. 1, prospective juror No. 1, that juror will

19   be asked all of the voir dire questions, and the other jurors

20   will be instructed to follow along, they'll have typically it's

21   a pencil or a pen to mark the questions to which they would

22   answer yes.

23         So you may have noticed the questions are designed so

24   that if there are no answers, we're not going to follow up.

25   And that's why some of questions, the wording is a little

O9CUDARC

strange, but that's designed -- by design so that it's only

with regard to yes answers.

So if a juror is excused for cause they will --

Ms. Disla will then call out another name and that, whatever

prospective juror whose name is called, will take the seat that

the juror who has been relieved for cause, where that juror had

been sitting.  Once we go through and all the questions have

been asked and I hear from the parties with regard to

anywhere -- if they believe that certain people should be

struck for cause, we'll then go through the second round of

questions with the biographical information, and then the

strikes, we'll have the strikes, where we will the defense will

have ten and the government will have six, and then one each on

the alternates.

So, first with regard to that, are there any questions

with regard to the jury selection?  From the government?

MR. MEAD:  No, your Honor.

THE COURT:  From the defense?

MR. DONALDSON:  No, Judge.  Thank you.

THE COURT:  Okay.  All right.  Thank you.

Obviously, if anything does come up, you should feel

free to raise that.  Now, I know we had sent the voir dire

questions we proposed to ask the jurors to counsel earlier.

Let me ask, have the folks from the government had an

opportunity to review it?

O9CUDARC

1              And then I'll turn to the defense.

2              MR. MEAD:  Yes, your Honor.

3              THE COURT:  All right.  And the defense,

4    Mr. Donaldson?

5              MR. DONALDSON:  Yes.  We have received them.  And,

6    yes, we have had the opportunity to review them.

7              THE COURT:  Okay.  So, first, let's -- well, have

8    you -- I assume, since there was -- the time was so tight you

9    haven't had time to consult with one another about any

10   potential requests, so I'll just --

11             Yes, Mr. Donaldson?

12             MR. DONALDSON:  I'm sorry?

13             THE COURT:  No.  I was just going to ask.  So I would

14   just hear from each of the parties if there's anything,

15   additional questions you believe should be added or things,

16   modifications to the questions as they currently stand.

17             Yes, from the government, Mr. Mead?

18             MR. MEAD:  Very minor things, your Honor.  On question

19   No. 7.

20             THE COURT:  7.

21             MR. MEAD:  The length of the trial, I think we should

22   just make it clear for the jury that the trial will start on

23   the following Monday, so the jury understands from the timing

24   perspective.

25             On page 3, your Honor, Mr. Legon is not on the list of

O9CUDARC

1    attorneys for the defense.  I assume he'll be present at the

2    trial, although if that's wrong --

3              MR. LEGON:  Yes.

4              THE COURT:  Okay.  So page 3, we will add Mr. --

5              Let me ask, Mr. Donaldson, will Ms. Reed be attending?

6              MR. DONALDSON:  Yes.  She will be attending.

7              THE COURT:  Okay.  We can just add Mr. Legon.

8              MR. DONALDSON:  Judge, while we're talking about that,

9    one second, let me make sure I'm clear on this.  Hold on one

10   second.

11             THE COURT:  I'm sorry.  Could you repeat that?

12             MR. DONALDSON:  Just one second, Judge.  I think we

13   need to add our intern-paralegal as well, Justin Lebrun as

14   well.

15             THE COURT:  Justin Lebrun?

16             MR. DONALDSON:  L-E-B-R-U-N.

17             THE COURT:  So J-U-S-T-I-N?

18             MR. DONALDSON:  That's correct.

19             THE COURT:  L-E-B-R-U-N.

20             MR. DONALDSON:  Yes.

21             THE COURT:  Okay.  And I'm sorry, what title?

22             MR. DONALDSON:  Paralegal.

23             THE COURT:  Paralegal.  And any additional folks who

24   we should -- other than the list of witnesses and other things,

25   any additional attorneys or folks assisting the attorneys?

O9CUDARC

1        MR. MEAD:  Not for the government.

2        MR. DONALDSON:  No, your Honor.  Thank you.

3        THE COURT:  All right.  Great.  Thank you.

4        Yes, Mr. Mead.

5        MR. MEAD:  And then I'm not sure what the Court's

6   practice is on the instructing jury or when the Court plans to

7   do it but this is a case with some press attention, and so we'd

8   ask that there be some sort of instruction about not

9   researching the case or discussing it.

10       THE COURT:  And I haven't printed it out.  But what I

11   would say, Mr. Mead, from -- I'm having a senior moment with

12   regard to the trial that you and your colleagues tried in front

13   of me.

14       MR. MEAD:  Pasqual.

15       THE COURT:  So in Pasqual, you may recall that I made

16   some preliminary remarks to everyone, which I can't remember,

17   but I think -- I'm not sure in the front-end comments include,

18   you know, not discussing, you know, the case and the like.  If

19   it doesn't, I can include that in the front-end discussion, as

20   opposed to the longer discussion after we get a jury, just to

21   make sure that the jury pool that it's clear to them also.

22       MR. MEAD:  We think that makes sense, your Honor.

23   Thank you.

24       THE COURT:  All right.

25       MR. MEAD:  And nothing else of substance.  When would

O9CUDARC

1    the Court like us to provide the list of names and places?

2            THE COURT:  I mean, if you can do it by close of

3    business tomorrow, that would be great.

4            MR. MEAD:  Yes, your Honor.

5            THE COURT:  So we can add any -- we have to print out

6    enough, I think we have 60 prospective -- 52, 55, 55

7    prospective jurors.  So we have to print out copies for each of

8    them.

9            MR. MEAD:  We'll have it by the end of the day

10    tomorrow.

11            MR. DONALDSON:  Judge, I'm sorry.  There's just one

12    other thing.

13            THE COURT:  Yes.

14            MR. DONALDSON:  On paragraph 21, page 3, just to

15    change the title related to myself.  It's no longer Donaldson,

16    Chilliest & McDaniel.  McDaniel is now Judge Edwards in Supreme

17    Court.  Chilliest and I are no longer partners.  So it should

18    just be Xavier R. Donaldson, Attorney at Law.

19            THE COURT:  Okay.  The law firm, so it will read the

20    law firm, Xavier R. Donaldson, Attorney at Law.

21            MR. DONALDSON:  That's perfect.  Thank you.

22            THE COURT:  Okay.  All right.  Anything else with

23    regard to the voir dire, Mr. Donaldson?

24            MR. DONALDSON:  Yes, Judge.  We are -- the defense

25    team is going to get together and maybe put this in writing,

O9CUDARC

1    but we are going to ask for some language on implicit bias.

2    It's been my practice, normally, another Court, when the jurors

3    are seated, you're going to do the introduction statement and

4    something after that, it's my practice to generally request

5    certain implicit bias language at that time, then at another

6    time, and then thereafter.  So we would like to have the

7    opportunity to put something together to provide that to the

8    Court and the government so that the parties can review that

9    and hopefully put that language in there.

10            THE COURT:  All right.  I know that that was part of

11    the voir dire.  What I'd like to get, a couple of things, I

12    think some of my colleagues may do it.  I've never provided or

13    given instructions with regard to that.  So I'd like the

14    parties to, A, meet and confer about it, but, B -- and if there

15    is some sort of agreement, that both parties would agree upon

16    that could be provided to the jury in my preliminary remarks

17    and it may be a little premature but suggestions with regard to

18    anything in connection with the jury charge, I'll hear from it.

19    But, otherwise, I'll make a ruling on whether or not I'll give

20    that.  And, obviously, to the extent, Mr. Donaldson there

21    are -- you can point to examples in other cases before my

22    colleagues and the language that they've used.  Obviously, I

23    would look to that.  I have a vague recollection that

24    Judge Schofield may provide such instructions at least in the

25    preliminary remarks, but I'm not sure.

O9CUDARC

1          MR. DONALDSON:  Yes.  I know Judge Marrero did it for

2    us in a case we had a couple of years ago, and few judges in

3    the Eastern District did it for me in some federal cases over

4    there.  And I'm fairly certain that these fine prosecutors here

5    won't object too much to some very good implicit biases, fair

6    language to go on the record.

7          THE COURT:  Let me put it this way.  I haven't given

8    it a tremendous amount of thought, but, you know, there are

9    various instructions about bias and the like, and that's what

10   the voir dire questions are designed to provide the jury with.

11   So, I guess what I would say, if there's agreement, fantastic.

12   Right?  You know, I'm not going to, you know -- I mean --

13   absent, you know -- I'm not going to stand in the way if

14   there's agreement, an agreement as to language, but if there's

15   not and there's a decision that has to be made, I'll hear the

16   arguments and figure it out.

17         MR. DONALDSON:  That's all we ask.  I appreciate that,

18   Judge.  Thank you.

19         THE COURT:  Okay.  So it would be in my preliminary --

20   so I can get that, you know, it doesn't necessarily have to be

21   close of business tomorrow, but certainly by, you know, Sunday,

22   Monday, at the latest, I would need to have that so I can

23   evaluate it and be prepared to either make a ruling before we

24   bring the jurors over or insert the language in my preliminary

25   remarks.

O9CUDARC

1          MR. DONALDSON:  Judge, yes, we can have that to you in

2     very short order, more likely than not, by tomorrow, and just

3     for the record purposes, there's like codified language now in

4     the New York State Supreme Courts in their codified language

5     and other states.  So we can -- there's language that we'll

6     provide to the government rather quickly, and I'm sure, again,

7     they won't have too many objections.  It will be nice, fair

8     language to make sure everybody is fairly determining the

9     result of this case.  So we'll be good.

10         THE COURT:  Okay.  I mean, I'm not -- I'm not as

11    sanguine that there will be necessarily agreement.  I

12    understand that there is a desire and the intention, but we'll

13    just take it as it comes.

14         So, Mr. Donaldson, any other things with regard to the

15    voir dire as distributed earlier today?

16         MR. DONALDSON:  Not at this time, Judge.  Thank you.

17         THE COURT:  All right.  Well, the only thing I'd ask,

18    to the extent there is that I get -- with regard to specific

19    questions, other than the issue of the implicit bias, I'd ask

20    by the close of business tomorrow, so that we can get those

21    questions finalized, understanding that, you know, my remarks

22    are sort of separate and that's why, with regard to the

23    implicit bias I'll hear from the parties about that.  But if

24    you get it by the close of business tomorrow, that's also

25    great.

O9CUDARC

1           All right.  So that, I think, I think covers the

2    logistics and what we'll do is we'll turn the comments that

3    have been made today and provided to the parties to make sure

4    that we've incorporated everything that the folks have said but

5    just to summarize, question 7 we'll indicate for the trial is

6    not going to start next week, it will start the following week,

7    on that Monday, change the -- in question 21, and Mr. Legon,

8    add Mr. Lebrun, Mr. Legon as counsel and Mr. Lebrun as a

9    paralegal, and those are the -- and then I'll -- we'll -- if

10   the parties -- we may hold off until we get the list of folks

11   and then circulate stuff.

12           So I know I said close of business tomorrow.

13   Mr. Mead, if you can get it to us sooner, that would be

14   fantastic.

15           MR. MEAD:  We can do that, your Honor.

16           THE COURT:  And if there's agreement, in other words,

17   if you can run it by defense and they can add, you know, if

18   there are going to be additional folks or just to make sure

19   that everybody agrees on the list, that would be great.

20           My law clerk has just informed me that in the script

21   itself, in the preliminary remarks, the initial remarks, I do

22   indicate that when the trial starts, no harm in, I think,

23   included it in two places, just to know that it will be

24   covered.

25           Okay.  All right.  So let's turn to the motions *in*

O9CUDARC

 1 | *limine*.  There have been two motions that have been filed, one

 2 | by the government on September 5th and the other on

 3 | September 12th.  Let me ask defense counsel -- obviously the

 4 | one today is just today, but does the defense intend to file

 5 | anything with regard to the September 5th filing of the

 6 | government?

 7 |         This is the motion *in limine* to preclude evidence in

 8 | cross-examining with regard to athlete 3's NCAA suspension.

 9 |         MR. DONALDSON:  Yes, Judge.  I spoke to the government

10 | about that earlier.  I think we have to -- in our opinion,

11 | his -- his and what a witness testifies, their credibility

12 | becomes an issue, so should the direct relate to issues related

13 | to whether or not athlete 3, who I'm thinking is a -- are we

14 | allowed to say his name on the record now?

15 |         (Counsel confer)

16 |         MR. DONALDSON:  I'm sorry.  I just wanted to make sure

17 | we were okay with saying the name on the record.

18 |         THE COURT:  Yes.

19 |         MR. DONALDSON:  So we're talking about Mr. Wiseman,

20 | then, yes, we, as I informed the government, we will be cross

21 | examining Mr. Wiseman and/or his mother related to any and all

22 | issues that directly relate to their credibility, specifically

23 | if they're -- not if, we believe there might be information

24 | related to them, either Mr. Wiseman or his mother violating

25 | certain rules regarding conduct that an athlete is supposed to

O9CUDARC

have regarding mother possibly receiving money that she's not

supposed to be receiving knowing these rules and then

intentionally violating these rules, Mr. Wiseman possibly

knowing certain rules and then intentionally violating those

rules for monetary gain.  That seems to me to be clear, and, I

guess, standard grounds for cross-examination because it does

go directly to their credibility.  So, because in my opinion,

any witness that testifies their credibility is an issue,

should we have the information that we think we're going to

have that goes directly to or indirectly to their credibility,

then we are or should be allowed to cross-examine those

witnesses on that, I don't think we should be restricted in

that way from developing whether or not these people are

telling the truth or at least developing information so that

the jury can properly determine whether or not they're being

credible with their testimony and whether or not they have

certain motives to be incredible.

　　　　　THE COURT:  I guess my question though is, you know,

am I going to receive something in writing?  In other words, I

don't know what the exact rules are.  I don't know -- I haven't

gotten the 3500 material yet, so I don't know whether there was

something in writing from the NCAA.  You know, I have the

government's proffer as to what transpired, but, you know, I,

you know -- I don't know sort of whether there was a back and

forth concerning -- and by back and forth, I am saying between

O9CUDARC

1    the NCAA, Mr. Wiseman and his mother, about -- about it.  I do

2    running recognize that my recollection was that Mr. Wiseman

3    ended up going -- that the suspension was never an issue

4    because he read it was a suspension in connection with college

5    and he went -- he turned professional.  Am I correct about

6    that?

7              MR. KINDER:  That's right, your Honor.

8              THE COURT:  So, I guess, Mr. Donaldson, am I going to

9    receive something in writing or additional -- well, let me,

10    before I -- I apologize, when, in the cue of witnesses, would

11    Mr. Wiseman and his mother be called as witnesses?

12             MR. MEAD:  Towards the end of the first week, your

13    Honor.

14             THE COURT:  Okay.  All right.  So there's some time

15    with regard to that, but, obviously, you know, we'd -- and I

16    don't know whether anyone intends to open on this.  I don't

17    know --

18             So, Mr. Donaldson, is there going to be something I'm

19    going to receive in writing with regard to this?

20             MR. DONALDSON:  I can put something in writing.  I

21    think I would need -- I shouldn't say need, but I think it

22    would be helpful if the government had any more information

23    related to what they're trying to preclude us from asking

24    about, but I'm speaking in general terms.  But, yes, I can put

25    something in writing before -- before openings, just in case we

O9CUDARC

1    want to open on it.  And also on or before, of course, the

2    first week when he testifies, but I can put something in

3    writing.  It will be very brief.  But, again, it goes directly

4    to what I just said.

5        THE COURT:  Okay.  Well, I think -- so the parties

6    should meet and confer with regard to that.  There's something

7    in the motion itself where the government is, as I understand

8    it, seeking to preclude questioning about the suspension itself

9    and why I guess the suspension was -- so the parties should

10   talk about that.

11       And, Mr. Donaldson, when do you think you might be

12   able to -- assuming you're able to discuss it over the next day

13   or so with the parties, when do you think you're going to be

14   able to get me something?

15       MR. DONALDSON:  It can be done by Monday or Tuesday of

16   next week.

17       THE COURT:  All right.  Why don't we say Tuesday?

18       MR. DONALDSON:  Jury selection is Tuesday.

19       THE COURT:  So, by Wednesday, I'd like to get that.

20   So if you get it to me earlier, that's great.  If there's

21   anything -- but I guess what I would ask is, to the extent that

22   if there's information that's communicated with the defense

23   about the contours of the questioning the government would seek

24   to preclude or additional details about the fact about the

25   suspension including any -- I'm not saying that you necessarily

O9CUDARC

1    need to dig this up, if it's not something that is already out

2    there, the actual suspension, any communications back and

3    forth, I just don't know what, you know, what there is.  I mean

4    it -- and the timing, in other words, when did Mr. Wiseman make

5    the decision to go pro versus notified of the suspension.  In

6    other words, I don't know, to the extent he had already made up

7    his mind up he was going pro and then the NCAA says,

8    unbeknownst to them that he's already sort of made that

9    decision or whether they knew it or not and they still issued

10   the suspension, I don't know.  I don't know.

11          Yes, do you know, Mr. Kinder?

12          MR. KINDER:  I don't think I know the answer to the

13   precise question you just asked.  I think the point of the

14   government's motion --

15          THE COURT:  Can I ask you to, if you could pull the

16   microphone.

17          MR. KINDER:  Sure.  I think the timing of the

18   suspension issue still does not go to either witnesses'

19   credibility or truthfulness.  We certainly will meet and confer

20   with the defense, but our view, I think as stated, in the

21   motion that we're seeking preclusion of any questioning or

22   evidence about the NCAA's suspension and the facts and

23   circumstances underlying it because nothing about those

24   circumstances goes to the credibility or truthfulness of the

25   witnesses.  We expect that Mr. Wiseman will testify -- would

O9CUDARC

1    testify, if asked, of course we're seeking to preclude that,

2    that there was nothing -- that he was not aware of this

3    payment, which was for moving expenses when his family was

4    moving from Nashville to Memphis, and we expect that his mother

5    would say that she did not think that there was anything wrong

6    with accepting this payment from a coach who the family had had

7    a relationship with, and that for both witnesses, once the

8    NCAA, two years later, looked at this transaction after

9    Mr. Wiseman had announced he was planning to attend the

10   University of Memphis, they were completely cooperative with

11   the NCAA's review.  And so there's nothing about these facts

12   that go to their truthfulness or their credibility.

13           THE COURT:  Okay.  All right.  All right.  So as I --

14   you know, with regard to that, you know, I'll get any

15   additional argument from the defense and whatever the

16   government wishes to add.  I mean, the timing, at least in my

17   opinion, without indicating one way or the other my sense, but

18   if, in fact, you know, Mr. Wiseman had already made the

19   decision or and/or announced it in some way, before the NCAA

20   came out with this suspension, you know, it didn't impact one

21   way -- in other words, putting aside -- putting aside

22   impeachment, it's not something that was going through his mind

23   in terms of going to the pros or not, you know, because my

24   understanding of the scheme, the alleged scheme, was that

25   moneys were going to be -- were borrowed, such that to be

O9CUDARC

1    provided to Mr. Wiseman, I think if this is -- if I'm correct,

2    so that -- to -- grease the wheels, whatever, to get him to be

3    more amenable to signing with a particular agency.  So I just

4    want to get a sense of the timing with regard to that so that I

5    have it in mind in considering the defense's arguments about

6    why they should be permitted to question Mr. Wiseman and his

7    mother about these facts.

8         Okay.  And, so, Mr. Donaldson, the second -- the issue

9    of the second letter --

10         And I'll grant the government's request to file the

11   letter, September 12th letter under seal.

12         But does the defense intend to respond to that?  And,

13   similarly, if there is going to be a written response, you can

14   file that under seal also.  Does the defense intend to file

15   anything with regard to the government's September 12th

16   letter?

17         MR. DONALDSON:  This is the letter for today, right?

18         THE COURT:  Correct.

19         MR. DONALDSON:  Yes.  We do as well.  And we can do

20   that, I guess, in short order as well.  I just have to go

21   through it a few more times and speak to cocounsel.  But, yes,

22   we plan on doing something as well.

23         THE COURT:  All right.  So if that could be done in

24   the same timeframe as the response to the September 5th.

25   Obviously, they should be two separate responses, one, the

O9CUDARC

1    September 5th response could be filed on the docket, the

2    response to the September 12th, the government's

3    September 12th letter could be filed under seal in connection

4    with that in light of the fact that it is going to be a

5    challenge and in light of the fact that they're -- that my

6    understanding is that the text messages have already been

7    provided to the defense.

8              Is that correct, Mr. Mead?

9              MR. MEAD:  Yes, your Honor.

10             THE COURT:  All right.  So I'd like to -- and there

11   was an argument that the government put forth under 403, I

12   think I'd need or I'd want to see the text messages that could

13   be filed under seal also.  So that it, you know, I can make an

14   assessment concerning any prejudicial impact or more

15   specifically assess the prejudicial impact of the statements.

16             MR. MEAD:  Without getting into details at all, your

17   Honor, because we're in open court, it's a relatively long

18   thread, and the messages are quite spread out.  We could

19   attempt to provide kind of all of them to the Court or we could

20   provide kind of a sampling of them to the Court.  Which might

21   be more manageable.  And then, of course, if the defense

22   disagrees with our sampling, they could supplement on their

23   own.

24             THE COURT:  I guess I would say, and this also goes to

25   the statements the government wishes to get in that are -- that

O9CUDARC

1    are going to -- that the government wishes to offer the text

2    messages or emails where the argument is being made that Mr. --

3    that the witnesses's statements are provided for context.  I'd

4    like to get those also.

5            I think the issue is, you know, and, look, and I don't

6    know, you know, there may be certain -- I mean, I don't know

7    that the government is saying that, well, they should all be

8    precluded, but -- so I should probably see all of the

9    statements, because, to the extent that the response is, well,

10   the response is, no, they should all come in or, well, no, with

11   regard to certain of them, they're not as prejudicial as

12   others.

13           I just don't know from what the government has

14   provided.  And my thought process with regard to the statements

15   the government intends to offer, that would be in furtherance

16   of the conspiracy by Mr. Briscoe, the communications between

17   Mr. Briscoe and the witness, the potential witness.  But my

18   understanding is the government is not going to call him.  I'd

19   like to see what the -- there may be certain ones where there's

20   no context needed, he where he makes a flat-out statement and,

21   therefore, the response whether is, okay, or, yes, or whatever,

22   and there may be others where the context is important.  So I'd

23   like to see that also.

24           MR. MEAD:  We can put in a short letter before the

25   weekend, and we can, one, provide the text messages of concern

O9CUDARC

1    to the Court which may be a quite long file, but we'll show

2    some of them.

3              THE COURT:  Yes.

4              MR. MEAD:  And then separately, we can refer in that

5    when we provide that to the Court, we can refer to the exhibits

6    with the text we propose to introduce because we'll have

7    provided that to the Court by the end of the day today so the

8    Court can look at the messages for context.

9              THE COURT:  That makes sense.  That would be very

10   helpful.

11             MR. DONALDSON:  And, Judge, just on that point --

12             THE COURT:  Yes.

13             MR. DONALDSON:  -- I guess I'm jumping around in my

14   list here, but I just now is relevant to my list.

15             So there were two letters from the government today.

16   So the September --

17             THE COURT:  Two?

18             MR. DONALDSON:  Well, strike that.

19             The one we're talking about now is regarding the

20   motion that they filed that they're -- regarding these text

21   messages, my concern with that is what the way I'm looking at

22   it, text messages between Briscoe and the defendant about the

23   fraud, now, if -- my concern up front is that if --

24             Am I missing something?

25             THE COURT:  No.  That's part of it, but, yes.

O9CUDARC

1              MR. DONALDSON:  Right.  So my certain is if Briscoe,

2     if Briscoe is not testifying and they're entering these or

3     trying to enter these statements or these text messages that's

4     a coconspirator, etc., which I get, the issue I want to front

5     now and so that we can be prepared to resolve the objections as

6     they come along, the context of some of those as we talked

7     about earlier, the context of some of those text messages

8     should not be or cannot be explained by the government.  I

9     guess what I'm trying to get in front of is, typically, in

10    these trials, the government will say with the coconspirator's

11    statements that they will have someone testify and he will say

12    what someone else what he heard someone else said in

13    furtherance of the conspiracy.  I get all of that.  And then he

14    will he ask him, how did -- what did that mean to you or

15    explain that statement, etc., I get that.  But if we don't have

16    the declarant, the person who sent, the emails, the text

17    message, to explain or say what the context or the inferences

18    are or whatever or the substance of the text message, my

19    concern is thinking, further down the line, the government

20    holding up text messages in closing saying, this was said, CP

21    means Chandler Parsons, or when he said -- when they used the

22    pronouns "he", the "he" meant somebody or the pronoun "she"

23    meant X, Y, Z.  That's a concern because if the person who sent

24    the text message is not testifying to say who the "he" who is

25    referring to or who the "she" is that they were referring to.

O9CUDARC

1    The government can't get up there and tell the jury who the

2    "he" is in the text messages or who the "she" is in the text

3    messages or who the C.P. stands for in the text messages or

4    anything of that nature.  The traditional method of their

5    presenting evidence will be absent without the person who sent

6    the text message or the person who received the text message.

7    And so I want to --

8             THE COURT:  Well --

9             MR. DONALDSON:  I just want to front that issue now --

10            THE COURT:  Sure.

11            MR. DONALDSON:  -- because we're going to probably

12    object to almost any text message that comes in where we don't

13    have the sender or the receiver of the text message or the

14    email to testify as to the context, meaning, inferences, etc.

15    of the substance of the text message or email.  I hope I'm not

16    being confusing.

17            THE COURT:  No.  But I think what I'd have to see is

18    case law supporting what you're saying because, you know, in a

19    case where there's a conspiracy and the coconspirators are

20    communicating with one another, and in particular, if they're

21    actually a joint trial, you're not going to have that, you

22    never have that.  So there may be arguments that the government

23    is going to make where they're asking the jury to draw

24    inferences based upon testimony of other witnesses.  So, for

25    example, you know, we never signed a contract, we never had

O9CUDARC

1    conversations with Mr. Briscoe, we never had conversations with

2    Mr. Darden.  And, obviously, the defense will challenge -- do

3    whatever the cross-examination is and may have information

4    that, no, in fact, there were conversations or there were other

5    things.  So with regard to the, sort of, wholesale -- and

6    obviously we can deal with it on a -- exhibit-by-exhibit

7    basis --

8              MR. DONALDSON:  Right.

9              THE COURT:  -- but as a general matter -- and there

10   may be arguments about in marshaling the evidence, how the

11   government presents it, but I would have to see, you know, case

12   law where you have a situation where it's alleged

13   coconspirators having a conversation where a Court has

14   precluded either the admission of those emails, texts, or

15   whatever, or even recordings, on the -- where the note --

16   understanding that the government needs to establish, right,

17   the existence of the conspiracy and the like --

18             MR. DONALDSON:  Right.

19             THE COURT:  -- but traditionally, and, you know, I can

20   either make a ruling based upon a proffer in advance that

21   they'll come in subject to connection or there will be

22   testimony already setting up whether it's from some of the

23   witnesses already setting up the nature of that, even if there

24   isn't a cooperator who will testify about it.

25             MR. DONALDSON:  To be clear, I'm not suggesting that,

O9CUDARC

```
1    as I said, that the -- if -- let's start with the if, if they
2    establish the existence of the coconspirator rule and they --
3    if they satisfy the three elements, etc., fine, that's not the
4    issue.  What I'm saying is I just wanted to front so that when
5    we're -- when this comes up during the trial --
6              THE COURT:  Sure.
7              MR. DONALDSON:  -- and then we're objecting, I don't
8    want to say per exhibit, but when certain things come up,
9    that's -- I guess I should just, as you finally said, that we
10   will be, and I guess the Court will be addressing it as the
11   exhibits come in and we approach each exhibit, but that's just
12   something that I think I wanted to tell the Court early on,
13   that that may be coming up and that may be happening so we
14   won't during the trial, start just objecting.
15             THE COURT:  Okay.  All right.  So, I guess, in line
16   with that, what I would ask is that, obviously, the 3500 --
17             Well, let me ask, Mr. Mead, has the 3500 material, my
18   recollection, is that there was some indication it's been
19   provided to the defense?
20             MR. MEAD:  Yes, your Honor.  It was produced very
21   early in the case, and it's been produced in an ongoing way to
22   them since then.
23             THE COURT:  Okay.  So what I would ask is, you know,
24   during the trial that the government obviously --
25             I can't remember.  Did I request a witness list from
```

O9CUDARC

1    the government?

2              MR. MEAD:  Yes, your Honor, by the end of the day

3    today.

4              THE COURT:  All right.  Okay.  But as the trial roles

5    along, if you could provide the defense with, you know, the

6    first week, these are the witnesses, certainly the first couple

7    of days, these are the witnesses we intend to call and their

8    general order, obviously, understanding that some witnesses may

9    be -- you may need to call out of turn because they're lay

10   witnesses, they're not in -- they have a flight, whatever it

11   may be, just so that we -- in addition, provide -- I know that

12   the exhibits, I take it, the exhibits have also been provided

13   to the defense?

14             MR. MEAD:  Yes, your Honor.

15             THE COURT:  You know, provide the defense an idea

16   about, you know, which exhibits are going to be offered, you

17   know, any particular day so that we could provide and front end

18   any arguments outside the presence of the jury without having

19   to go to sidebar about objections to specific documents in

20   advance of the trial in advance of the jury coming in.

21             MR. MEAD:  That makes sense, your Honor.

22             THE COURT:  Okay.  All right.  All right.  So I'm

23   going to be getting some additional submissions with regard to

24   the two motions *in limine* more recently filed by the government

25   from the defense.

O9CUDARC

1          So let's turn to the motions that have been -- that

2     have already been filed and briefed by the parties.  So let me

3     hear --

4          So I'll hear any additional arguments the parties wish

5     to make as I understand --

6          Well, let's first confirm that -- I think it's

7     witness 1 -- that witness 1, the government doesn't intend to

8     call witness 1.  Is that correct, Mr. Mead?

9          MR. MEAD:  Yes, with a caveat, your Honor.

10          THE COURT:  Okay.

11          MR. MEAD:  The caveat, and we said this in our letter,

12     is we certainly don't intend to call him in our case in chief.

13     We do reserve the right to call him in rebuttal.  There's a

14     conceivable defense of essentially blaming witness 1 by the

15     defendant.  If the defendant starts to go down that road, I

16     think it's entirely fair of us to call witness 1.  And I can

17     say we've also served a slightly unusual if-as-when subpoena on

18     witness 1 when for the rebuttal case only to ensure that he is

19     available in case we do need to call him.  So certainly not

20     calling him in the chase in chief, not introducing his

21     statement to the agent.  Some of his statements in the course

22     of kind of the facts at issue will come in.  You know, people

23     will say, I spoke with witness 1, he said X, but not calling

24     him in our case in chief, not introducing his statements to the

25     agents.

O9CUDARC

1          THE COURT:  Okay.  Let me ask with regard to witness

2     1's spouse.  Is witness 1's spouse someone the government --

3     would witness 1's spouse be in the same position as witness 1

4     as a potential rebuttal witness?

5          MR. MEAD:  I think that's right, your Honor.

6     Witness 1's spouse received a good chunk of the proceeds of the

7     fraud.  We're certainly not planning to call her in our case in

8     chief but I can imagine things coming out in the defense case

9     that would cause us to call her in rebuttal.

10         THE COURT:  Okay.  And, similarly, has witness 1's

11    spouse received an if-as-and-when subpoena, or, no?

12         MR. MEAD:  No, your Honor.  And as I'm thinking about

13    the subpoena to witness 1, the FBI, we've asked the FBI to

14    serve witness 1.  We've provided a courtesy copy of the

15    subpoena to the defense.  I'm not sure whether he's actually

16    physically been served, but if he hasn't, that will happen

17    soon.

18         THE COURT:  Okay.  And do you know whether witness 1

19    or witness 1's spouse, whether they have counsel?

20         MR. MEAD:  I don't believe so, but defense may have

21    better sense than we do.

22         THE COURT:  Mr. Donaldson, do you know whether

23    witness 1 or witness 1's spouse has counsel?

24         MR. DONALDSON:  I do not know.

25         THE COURT:  Okay.  All right.  I would, just again, if

O9CUDARC

 1    the FBI is going to go and serve them, but if they have

 2    counsel, you might be able to just circumvent them.  That was

 3    the only reason for my asking that question.

 4              Okay.  So --

 5              MR. DONALDSON:  Judge, just to -- just to --

 6              THE COURT:  Yes.

 7              MR. DONALDSON:  I'm sorry.  Just to button that

 8    witness 1 issue up, we are, of course, going to rely on the

 9    contents of our motion, and while we think witness 1 shouldn't

10    be allowed to testify, rebuttal, direct, or otherwise, so we'll

11    just rely on that information in that motion.

12              THE COURT:  Okay.  Well, what I would say, I'm not --

13    I think that right now the motion is moot --

14              MR. DONALDSON:  Right.

15              THE COURT:  -- except to the extent that the

16    government believes during the -- either during direct

17    examination or otherwise, somehow the door has been opened,

18    although there won't be a rebuttal case unless the defense puts

19    on a case, but I guess, what I would say, Mr. Donaldson, I

20    could see, if there's questioning, I want to -- and I'm not

21    saying that the government may basically say, no, we changed

22    our mind, we want to call him in case in chief, or we might

23    want to utilize a statement that was made, and I just want to

24    get, to the extent that that happens, I want to get as much

25    advance notice of that as possible, because there's the

O9CUDARC

1    competency issue and there's the issue with regard to legal

2    arguments with regard to the statement and why that statement

3    should be permitted in if there's not -- even if -- even if the

4    testimony is not.  So, you know, similarly -- and I would say

5    that regard to any change in mind with regard to the

6    government's direct case, but certainly, with regard to

7    rebuttal, you know, I'd need to know in advance because we need

8    to take care of that, or if the government does additional and

9    basically may agree or come to the conclusion that the

10   witness -- that there wouldn't be a need for competency

11   hearing, the government would agree that the witness -- putting

12   aside what the witness may have been able to say in the past,

13   the witness, as a witness who would testify at trial is not in

14   a condition that would elicit relevant information or relevant

15   and reliable information.

16           MR. MEAD:  If and when it comes up, we'll immediately

17   alert the Court.

18           THE COURT:  Okay.  All right.  So that -- that, I

19   think, takes care of the defense's motion, understanding that

20   everybody has reserved rights with regard to argument, if

21   things change.

22           So let me see.  So there were various other motions *in

23   limine* that were put forth related to the government's motions

24   *in limine*.  So let me first hear if there's an additional

25   argument that the government would like to make with regard to

O9CUDARC

its motion *in limine* regarding I guess the prior frauds, the

testimony, the prior testimony of Mr. Darden, the issue about

the preclusion of certain defense arguments with regard to --

and the prior good acts, negligence of the victims, prior good

acts, and the Cohen jail text.

    MR. THOMPSON:  Yes, your Honor.  Certainly with

respect to evidence of the prior schemes, the government would

like the opportunity to argue further.  And I'll start there.

    THE COURT:  Okay.

    MR. THOMPSON:  Evidence of what is described as the

defendant's prior schemes, and the government's motion *in*

*limine* should be admitted both as direct evidence and then also

admitted purposes under Rule 404(b), with respect to direct

evidence, evidence of the defendant's prior schemes and his

conviction for those schemes provides context and dimension to

facts at issue with respect to the conduct in this trial.

Specifically, the government anticipates calling a witness who

is a lawyer, a general counsel for the WNBA, and the government

anticipates that individual's testimony to establish that the

background check of a potential buyer or an individual who

would acquire a WNBA team was relevant and a previous felony

conviction could preclude an individual from acquiring a WNBA

team.  And that's relevant, your Honor, because it explains and

gives context why certain documents that were created and

passed along by the defendant in connection with this fraud did

O9CUDARC

1    not include his name on it and why he included the name of

2    certain other individuals.

3           With respect to the 404(b) --

4           THE COURT:  Let me ask though, you said could preclude

5    the person from an ownership interest.  Is that --

6           MR. THOMPSON:  I would say, your Honor, that a felony

7    conviction -- this witness will likely testify that a felony

8    conviction would certainly be relevant to the WNBA's board of

9    directors in determining who they would select to purchase the

10    team, to acquire a team.

11           THE COURT:  So it would be information that would be

12    provided to the board of directors to the WNBA but it's not

13    preclusive -- in other words, it's not automatic?  In other

14    words, there are certain rules and the WNBA basically says, if

15    you're a convicted felon, you can't have an ownership interest

16    in a team?

17           MR. THOMPSON:  I do not believe the witness would

18    testify that it would be strictly prohibited and delineated

19    somewhere as preclusive.

20           THE COURT:  So let me ask, and, again, this is

21    separate and apart from the other -- the other bases the

22    government seeks to offer the prior felony convictions, why

23    then is it relevant for the witness to say that it's a felony

24    conviction as opposed to certain things that come up in a

25    background check could be preclusive of Mr. Darden being an

O9CUDARC

1    owner and that the lawyer become aware of that and I don't know

2    there may have been -- there were two lawyers involved, so but

3    one of them, my understanding is, actually had a communication

4    with Mr. Darden, so why does it need -- and, again, in this

5    context, why does it need -- why does the felony conviction --

6    why is that relevant as opposed to something came up in the

7    background check in other -- because it's not entirely

8    preclusive, right, and even if it were, I guess, you know, why

9    wouldn't it be that something came up and Mr. Darden was -- it

10   was already determined that he couldn't have an ownership

11   interest?

12            MR. THOMPSON:  Yes, your Honor, that's a plausible

13   argument.  The direct evidence says that evidence is to provide

14   context and dimension and here the prior convictions do just

15   that.  The witness testifying at a high level of generality

16   that the Court just offered that there was something in the

17   background check, it invites actually more speculation as to

18   what was the basis for which this individual was not permitted

19   to purchase the team.  And that's actually not called for under

20   the rule of direct evidence and also probably more potential

21   prejudicial to the defendant.

22            THE COURT:  Yes.  But I would just issue a curative

23   instruction.  In other words, look, through there are two

24   separate things going on here.  And, so, what I guess what I'm

25   questioning is with regard to this witness and providing

O9CUDARC

1    context, how much did -- do you really need that it's a felony

2    as opposed to something else in the person's background, you

3    know, that, for example, they ask for their tax record or they

4    need their bank accounts.  Like, this is not really related,

5    but like when you go apply for co-op and they want to look at

6    your bank accounts to see how much money you have in the bank,

7    you know, here, in other words, it could have been something

8    like that, that he doesn't have the financial wherewithal and

9    that could be preclusive of him having an ownership interest.

10            So I guess I'm not as sanguine about the felony

11    conviction being something that would come in this -- in this

12    particular context as direct evidence if it could be sanitized

13    and there could be a curative introduction, given he doesn't

14    have to speculate as to what this reason is.  It's not relevant

15    to their consideration.  That's putting aside the other bases

16    that the government seeks to offer that information.

17            MR. THOMPSON:  Understood, your Honor.

18            And if the Court will allow me now, I'll transition to

19    the 404 --

20            THE COURT:  Sure.

21            MR. THOMPSON:  Your Honor, the defendant's conduct in

22    the prior scheme should be admitted for permitted purposes

23    under Rule 404(b).  It's important to provide some context for

24    each of these three schemes, your Honor.  So I'll first do that

25    and then I'll explain how they are essentially identical to the

O9CUDARC

1    means in which the defendant carried out the schemes in this

2    case.

3            Your Honor should also have a transcript from case

4    *United States v. Harvey Newkirk*.  That was before Judge Rakoff

5    14 Cr. 534.  A copy of that transcript has also been provided

6    to the defense.  I will make some citations to that transcript.

7    And if the Court will allow me to read certain passages because

8    they demonstrate how the defendant's conduct in the prior

9    schemes is a one-for-one and should, therefore, be admitted.

10           THE COURT:  Let me ask a question, Mr. Thompson, which

11   is the following:  Has the government produced Mr. Darden's

12   3500 from that trial?

13           MR. THOMPSON:  Yes, your Honor.

14           THE COURT:  Okay.  Is that 3500 material part of the

15   materials that I'm going to get, or, no?

16           Yes, Mr. Mead?

17           MR. MEAD:  It's been produced in discovery.  We don't

18   typically separately stamp the 3500 for a defendant.  If the

19   Court wants it, we, of course, can provide it to the Court

20   though.

21           THE COURT:  I guess the question is, when it was

22   provided to defense counsel, was it basically, you know, the

23   binder that was provided to the defense in the Newkirk case?

24   In other words, with his 3500 material, or was it documents

25   interspersed in there?

O9CUDARC

1      MR. MEAD:  So the Newkirk trial it was a while ago.

2      THE COURT:  Yes.

3      MR. MEAD:  And so A.U.S.A.s were gone and so, just to

4  be totally transparent with the Court about what we did, we got

5  access to the shared drive file for that Newkirk case.  We

6  found a 3500 folder for Mr. Darden digitally.  We looked

7  through it.  We reduped it and then we produced everything in

8  it to Mr. Darden's counsel.  We understand it to be kind of a

9  one-for-one match of the 3500 in the Newkirk case, but just, is

10  it possible something was missed because it was nine years ago?

11  It's conceivably possibly.

12      THE COURT:  Okay.  I mean, I guess I would like, if

13  you can segregate, I would like to have that, just in case

14  things come up.

15      Do you know, Mr. Mead, or who Mr. Darden's attorney

16  was back then?

17      MR. MEAD:  I was just having an off-the-record

18  conversation.

19      MR. DONALDSON:  Federal Defenders, I believe.

20      THE COURT:  It was the Federal Defenders?  All right.

21      I'm sorry, Mr. Thompson.  Go ahead.

22      MR. THOMPSON:  Not at all, your Honor.

23      So the first of the previous schemes is a boxing

24  scheme.  The defendant represented to a victim that the

25  victim's loan of 400 -- $450,000 would be used to plan a

O9CUDARC

1  purported boxing match.  The defendant also represented that

2  witness 1 would provide financial support and provided the

3  victim with a promissory note with witness 1's name on it.

4          Your Honor, in this case, there are multiple instances

5  in which the defendant used witness 1's name on contracts where

6  the materials that were provided to victims without witness 1's

7  authorization.  And pointing to transcript page 840 --

8          THE COURT:  One second.  Yes.

9          MR. THOMPSON:  Lines 3 through 9:

10 "Q.  Have you ever used --

11         Your Honor, to step back for a minute, I'm reading

12 from a transcript.  However, we have been you using witness 1

13 throughout this proceeding so I will be using witness 1 in the

14 place of --

15         THE COURT:  That's fine.

16         MR. THOMPSON:  Okay.

17 "Q.  Have you ever used witness 1's name on contracts

18 associated with Rain's business?

19 "A.  I have.

20 "Q.  Was that with or without his authorization?

21 "A.  That was without.

22 "Q.  Was that with or without his knowledge?

23 "A.  Without.

24         That's exactly what the defendant did in this case.

25         In addition, your Honor, in the boxing scheme, the

O9CUDARC

1    defendant impersonated witness 1 using a phone in phone calls

2    and in messages.  I would point your Honor to transcript

3    page 850 to 851, starting on line 22, at page 850:

4    "Q.  Have you ever impersonated witness 1 using the 4067

5    number?

6    "A.  I have.

7    "Q.  Have you ever impersonated witness 1 with the intent of

8    fooling Mr. Newkirk?

9    "A.  I have not.

10   "Q.  Have you ever impersonated witness 1 on telephone calls

11   that Mr. Newkirk participated on?

12   "A.  I have.

13   "Q.  And when you did that, would you alter your voice in any

14   way?

15   "A.  No.

16          So, your Honor, the defendant has explained that in

17   carrying out previous frauds he used witness 1's name on

18   documents that he passed to victims, he impersonated witness 1

19   in conversations with victims in the past, just as he has in

20   this case.

21          Turning to --

22          THE COURT:  I apologize.

23          MR. THOMPSON:  Yes, your Honor.

24          THE COURT:  I apologize, Mr. Thompson, but was that --

25   was this number also used in this case, the 4067, or, no?

O9CUDARC

1          MR. THOMPSON:  It's a different number at issue in

2    this matter, your Honor.

3          THE COURT:  Okay.  All right.  Go ahead.

4          MR. THOMPSON:  However, the 4067 number in the

5    previous frauds was the defendant portrayed was associated as

6    witness 1, just as he has with certain numbers at issue in this

7    matter.

8          THE COURT:  Okay.  But the numbers -- the portrayed

9    number, 4067, was that number or an actual number of witness 1

10   or not?  And, similarly, in the numbers utilized in this case,

11   was that --

12         MR. THOMPSON:  I do not know the answer with respect

13   to the 2014 matter, whether the subscriber information for the

14   4067 number and whether it was actually associated with

15   witness 1.  And the numbers at issue in our case in which the

16   defendant held himself out or caused victims to believe that

17   that they were speaking with witness 1 were not subscribed in

18   the name of witness 1.

19         THE COURT:  Okay.  All right.  Go ahead.

20         MR. THOMPSON:  The second previous scheme is described

21   in the government's motions as the exhibition scheme.  The

22   defendant used witness 1's name and his professional reputation

23   to develop contacts and arrange for purported -- or arranged

24   financing for purported basketball games.  The defendant

25   convinced a Taiwanese entertainment company to invest half a

O9CUDARC

1    million dollars, again, to purportedly an NBA to take place in

2    Taipei.  And in connection with this fraud, the defendant

3    represented that witness 1 had meetings and had discussions

4    with NBA officials and owners of the Knicks.  Again, your

5    Honor, the defendant impersonated witness 1 to induce victims

6    as part of the exhibition scheme to wire him money.  I direct

7    your Honor to transcript page 941 beginning at line 19.

8         THE COURT:  Okay.

9         MR. THOMPSON:  I direct --

10   "Q.  I direct you to the first paragraph of this document where

11   it refers to a professional basketball exhibition game in

12   Taiwan.

13   "A.  Yes.

14        MR. RICCO:  Which page?

15        MR. THOMPSON:  This is page 941 of the transcript.

16   "A.  Yes.

17   "Q.  Can you briefly describe the crime that you pled to in

18   that count?

19   "A.  Sure.  I was negotiating with a gentleman in Taiwan about

20   bringing a basketball game or having a professional basketball

21   game in Taiwan and I got him to basically send the money up

22   front because the game had occurred if that is sufficient.

23   "Q.  Did you impersonate witness 1 in connection with that?

24   "A.  I did.

25   "Q.  And in addition to that exhibition of the basketball game,

O9CUDARC

did you also take part in an attempt to organize the business

venture relating to the national basketball association?

"A.  I did.

"Q.  Did you impersonate witness 1 in connection with that

venture?

"A.  I did.

        In addition, your Honor, in the second scheme

exhibition scheme we're discussing, the defendant also signed

on witness 1's behalf without witness 1's knowledge and sent

emails in which he held himself out or pretended to be

witness 1, I would direct your Honor to transcript page 1046.

        THE COURT:  Okay.

        MR. THOMPSON:  Beginning at line 2.

"Q.  You did sign documents on behalf of witness 1 in that,

correct?

"A.  I'm sure.

"Q.  You testified that this was all done without the knowledge

of witness 1, right?

"A.  That -- I testified that what exactly was done without the

knowledge of my father.

"Q.  Impersonating him?

"A.  Yes.  That was done without his knowledge.

"Q.  Emailing as him?

"A.  Yes.  That's correct.

"Q.  Signing as him?

O9CUDARC

1    "A.  Of course.

2         And the third scheme, your Honor, the defendant

3    convinced a financing company to provide a bridge loan of

4    3.1 million based on representations that he and codefendant

5    made -- excuse me, that a coconspirator made they intended to

6    purchase Maxim Magazine.  As part of this fraud, the defendant

7    and a coconspirator impersonated witness 1 to convince

8    investors, again, relying on witness 1 -- witness 1's

9    professional reputation and his status, impersonating

10   witness 1, they induced victims to loan them money in

11   furtherance of this fraud with one victim provided the

12   defendant with five and a half million dollars.

13        Again, your Honor, as part of this fraud, the

14   defendant signed a promissory note as witness 1.  That's

15   transcript 879 pages 13 to 23.  I won't read that citation

16   unless your Honor would like me.  I'm just pointing you to it.

17   The defendant signed emails as victim -- excuse me, as witness

18   1 in connection with this fraud.  I would direct the Court to

19   transcript page 889, lines 1 through 10, and transcript

20   page 896, lines 14 to 22.  The defendant impersonated witness 1

21   on the phone to victims.  I would point your Honor to

22   transcript page 923 to 925, lines 17 to 19, and I will read a

23   citation, your Honor, at page 899, in which the defendant

24   explains how he impersonated witness 1 to induce his victims.

25        THE COURT:  Okay.

O9CUDARC

1          MR. THOMPSON:  Page 899 starting at line 11:

2     "Q.  Did there come a time that you --

3          MR. RICCO:  Which page are you on?

4          MR. THOMPSON:  Page 899.

5          MR. RICCO:  899?

6          THE COURT:  Yes.  Line 11.

7          MR. THOMPSON:  Line 11.

8     "Q.  Did there come a time that you spoke by telephone with

9     representatives of Combest Capital?

10    "A.  I did.

11    "Q.  Approximately how many times were you on the phone with

12    Combest?

13    "A.  I believe it was three, maybe four.

14    "Q.  So with respect to the first time that you ever spoke on

15    the phone with Combest, did you do that as yourself or

16    impersonating witness 1?

17    "A.  As myself.

18    "Q.  Did you have any discussions with Mr. Newkirk regarding

19    the conversations you had with Combest as yourself?

20    "A.  I did.

21    "Q.  Can you describe that conversation?

22    "A.  Yes.  He told me that they weren't comfortable with me in

23    the deal and that it had to be, in order for them to move

24    forward, it had to be witness 1.

25    "Q.  Following the signing of the letter of intent, did you

O9CUDARC

1    have any -- did you have another conversation over the phone

2    with Combest representatives?

3    "A.  I did.

4    "Q.  And at that time, did you speak as yourself or as

5    witness 1?

6    "A.  As witness 1.

7    "Q.  And why did you do that?

8    "A.  Because they had just said that they didn't want me

9    involved in the deal and that they wanted witness 1 to speak or

10   they wanted, you know, witness 1 on the phone.

11           So, your Honor, the three frauds that I just

12   summarized for the Court and the transcript citations that your

13   Honor indulged me in allowing me to read demonstrate that the

14   conduct that the defendant carried out in the past is identical

15   to what he did to perpetrate the fraud in this case.  First,

16   the defendant impersonated witness 1 using the phone, either in

17   phone calls or sending text messages to induce individuals to

18   believe that they were speaking with witness 1.  This happened

19   with respect to a coconspirator, and it also happened with

20   respect to certain bankers that were at issue or that were

21   involved in this fraud.  Second, the defendant, as in his

22   previous frauds in this case, fostered the impression that

23   witness 1 would be involved in this fraudulent transaction.

24   The defendant circulated documents that gave the impression

25   that witness 1 would be involved in this transaction to acquire

O9CUDARC

1    a professional sports team.  The government anticipates calling

2    witnesses who will testify that they were under the impression

3    or given the impression that they were speaking with witness 1

4    throughout conversations with the defendant.  And your Honor,

5    all of this underscores that the purposes that this evidence of

6    the previous schemes should be admitted for the purpose of

7    intent, plan, knowledge, motives, and *modus operandi*, which are

8    permissible purposes under Rule 404(b).

9         With respect to knowledge, evidence of the previous

10   schemes clearly shows that the defendant knows how to carry out

11   fraud.  He -- it also demonstrates his plan and his intent.

12   The defendant had a playbook when it came to carrying out his

13   frauds.  The previous -- the evidence of the previous schemes

14   shows that he knew how to plan and execute these crimes and

15   that he intended to do it in a particular way because he had

16   been successful in particular *modus operandi*, that is by

17   impersonating witness 1.

18         The *modus operandi* piece, your Honor, I want to

19   underscore that this is not a situation where the government

20   seeks to introduce prior bad acts or previous convictions in

21   which a defendant merely impersonates various people.  This is

22   very specific.  The defendant impersonates the same individual,

23   witness 1, and conveys an impression that is witness 1 through

24   the same channels, through the phone, by sending emails, and by

25   circulating documents with witness 1's signature.  So there is

O9CUDARC

1  a direct one-for-one here.

2          And, finally, your Honor, with respect to *modus*

3  *operandi*, that is -- this evidence is particularly important

4  because of the conversation, the colloquy you had with my

5  colleague, Mr. Mead.  The jury will be shielded from witness 1

6  in this case because, reserving the rights that the parties

7  just had in its discussion with the Court, there is a

8  possibility in which the jury never hears from witness 1 and

9  that would leave them with the false impression that this was

10 not a repeated pattern by the defendant, this was not his *modus*

11 *operandi*, to impersonate witness 1.  So the evidence should

12 come in there for that reason as well.

13         So, finally, with respect to 403 balancing, your

14 Honor, the evidence is nearly identical to one another.  So

15 there's no risk that it is more sensational or disturbing and

16 no basis for to be precluded under the 403 balancing.

17         I'm happy, your Honor, to explain now why each of the

18 defense's arguments on this point fails, or if you'd like to

19 hear from the defense first.

20         THE COURT:  Why don't I hear from Mr. Donaldson, and

21 then we can come back to, you know, why you believe that the

22 arguments fail.

23         Okay.  Mr. Donaldson, do you have anything to add with

24 regard to the papers that you submitted --

25         MR. DONALDSON:  Yes, Judge.

O9CUDARC

1      THE COURT:  -- or with regard to the arguments that

2   Mr. Thompson just made?

3      MR. DONALDSON:  Yes, Judge.  I do.  I'll try to be

4   brief, if I can?  Sometimes it's a little hard, but I'll try.

5      I think that one of the government's arguments, all

6   three of them are, in my opinion, fail miserably.  Initially,

7   as a general proposition, from our position, there is no

8   similarity here, the government is simply trying to substitute

9   the prior cases for this case to, what we believe, is fill in

10  some gaps for the lack of evidence that they for this case.

11  So, and I'll go backwards, part of that starts with the -- with

12  the recent acknowledgment, and that is, when they were saying

13  it, I was writing it but they then admitted it, they are

14  arguing propensity and they're trying to couch it in the terms

15  of 404(b), but they're really using -- it's really actually

16  substituting the prior cases for the evidence for this case and

17  their lack thereof, and they just admitted that when they said

18  that the person who they claim my client is trying to

19  impersonate, they don't have that person, so, therefore, we

20  need to bring this evidence in to substitute for what they

21  don't have.

22      THE COURT:  My understanding of what Mr. Thompson said

23  is that there are going to be witnesses who will testify, not

24  witness 1, but a witness who will testify, I was under the

25  impression that I was speaking with witness 1 or that witness 1

O9CUDARC

1    was part of the deal, or that -- or that witness 1 was sending

2    me an email or a text, and so I assume, with regard to emails

3    and texts, they will be evidence that will show that that was

4    an email, IP address or phone number or something that --

5         Let me ask, Mr. Thompson, will there be evidence that

6    certain communications came from IP addresses or phones that

7    are associated with the defendant?

8         MR. THOMPSON:  Your Honor, I don't believe that the

9    government anticipates introducing IP address evidence but the

10   government anticipates introducing other bases why the witness

11   believe that they were speaking to and corresponding with

12   witness 1.

13        THE COURT:  Okay.  And with regard to proof that that

14   simply wasn't the case, what is the evidence with regard to

15   that?

16        MR. THOMPSON:  With respect to that --

17        THE COURT:  That wasn't -- in other words, that they

18   were, in fact -- that they weren't -- in other words, that

19   witness 1 was not involved?

20        MR. THOMPSON:  One bases is subscriber records for

21   certain phones that were used to correspond with certain of the

22   witnesses that the government anticipates calling.

23        THE COURT:  Okay.  And the subscriber information is

24   associated with, in other words, where --

25        MR. THOMPSON:  With at least one of the phone numbers

O9CUDARC

1    the subscriber has, the defendant's address is listed as the

2    address of record for that particular phone number and also an

3    email account that the subscriber records for that email

4    account are associated with the defendant.

5              THE COURT:  And at the time, where was the defendant

6    living?

7              MR. THOMPSON:  In Atlanta -- in Georgia.

8              THE COURT:  All right.  And where was witness 1

9    living?

10              (Counsel confer)

11              MR. THOMPSON:  Your Honor, forgive me, at the time

12    relevant to this case and the frauds, my understanding is the

13    defendant was between Atlanta and New York.

14              THE COURT:  Okay.

15              MR. THOMPSON:  But to answer your question, witness 1

16    was in Georgia.

17              THE COURT:  Okay.  But not in the -- well, was

18    witness 1's home -- did witness 1 live with the defendant?

19              MR. THOMPSON:  I do not believe so.

20              THE COURT:  Okay.  All right.  Thank you.

21              MR. DONALDSON:  Judge, I was going to --

22              THE COURT:  Let me ask just another question:  Is

23    knowledge and intent -- are you taking knowledge and intent off

24    the table?  In other words, or is that going to be an issue in

25    the case?  In other words, the defendant's knowledge and

O9CUDARC

1    intent?

2            MR. DONALDSON:  Well, let me -- if I can go backwards

3    before I get to that.

4            THE COURT:  Okay.

5            MR. DONALDSON:  If you don't mind, I think the Court

6    hit part of what I was getting to was the government's argument

7    that this impersonation has to stand on the fact that, in fact,

8    that didn't happen, that these people were not, in fact,

9    speaking to witness 1.  And that's part of the problem.  That's

10   what I'm saying they're substituted.  Because there is going to

11   be evidence that they can't contest that their witnesses

12   actually did speak to witness 1, that their witnesses actually

13   did have Zoom calls with witness 1 as opposed to the other

14   cases, I believe, where those witnesses probably would say they

15   saw, they spoke to the person in advance, so then they didn't

16   know who they were speaking to on the phone so then they

17   thought, X, Y, Z.  That's not the case in this particular

18   situation.  There is significant evidence that their witnesses

19   spoke to witness 1, recognized witness 1's voice, knew

20   witness 1 for quite some time, and knew that it was him that

21   they were speaking to.  So to now come back and say, well,

22   later on, we're -- we don't know who we were talking to, that's

23   an issue of fact for the jury to decide, not for them to

24   substitute prior cases and say, well, he impersonated back then

25   so he must be impersonating now.

O9CUDARC

1           THE COURT:  That argument goes to MO, but it doesn't

2       go to knowledge and intent.  So I understand what you're

3       saying, that -- and the government can argue, you know,

4       inferences and the like, but is knowledge and intent going to

5       be something that the defense is going to take off the table?

6           MR. DONALDSON:  Unfortunately for me, I don't like

7       taking things off tables.

8           THE COURT:  But you have to understand, I mean, the

9       law seems fairly clear that if those issues are left open, even

10      to the extent there's some case law that suggests that even if

11      it's an argument -- even if it isn't directly challenged, if

12      it's sort of -- that it has to be explicit to be taken off --

13      to eliminate the argument that -- and, again, the law is

14      obviously is -- you know, Second -- in the Second Circuit takes

15      an inclusive approach, unlike, I think, in state court where I

16      think it's much more difficult for the people to -- with regard

17      to 404(b) type of evidence, but in the circuit -- so I take

18      from what you're saying, at least right now, it's not off the

19      table.  Is that correct?

20          MR. DONALDSON:  I'm saying that, right now, yes.  But

21      even if, to continue that analysis, we still have to -- again,

22      we still have to go to the other steps, even if that was true,

23      and even if we're saying that a fraud did not occur, that this

24      was not a fraud and this did not occur as they are saying it

25      occurred, and if we are saying that there was not an

O9CUDARC

1    impersonation because they, they being the government, have

2    specific information that witness 1 specifically participated

3    in several meetings or phone calls with several of their

4    witnesses that cannot be contested, then the other way they can

5    say that this is similar to the other part is to try to couch

6    it in a whole different argument is to say, well, it's not the

7    same but, now, you know what, because intent is the issue, we

8    can use these prior incidences to show intent, that goes right

9    back to propensity and that goes right back to unfairly

10   prejudicial, but they're trying to find a circle way of

11   substituting again, which is what they're really doing, trying

12   to substitute prior convictions and prior conduct for the

13   lapses or lack of evidence in this case and having this jury

14   when that sits here convict him based upon something that

15   happened 14 years ago and not based upon what they're charging

16   him with.  And that's what the government is doing.

17        So even if we say that knowledge and intent is an

18   issue, they still can't over the unfairly prejudicial part of

19   trying to convict him based upon propensity and claiming that

20   he impersonated, when, in fact, they have information that he

21   didn't.

22        THE COURT:  Although -- let me ask with regard to the

23   nature of the prior convictions and the fraud scheme, am I

24   correct, you're not arguing that they're somehow -- well, are

25   you arguing that they're somehow more -- somehow more egregious

O9CUDARC

1    than the allegations that the government has put forth in the

2    indictment?

3         MR. DONALDSON:  Taking -- taking more egregious, as

4    far as conduct, does not -- does not only go by similarity, it

5    also goes by volume.  If you have, one, two, three, four claims

6    by the government that he impersonated, one, two, three, four

7    different times, then that, by definition would make it more --

8    or more, I guess -- I guess egregious or unfairly prejudicial

9    because of the number.  So if you said I have one case that was

10   similar and say, well, that's not -- because it's the same

11   facts, then that can't be more prejudicial.

12        THE COURT:  But, again, let's separate out the idea of

13   *modus operandi* and even separate out witness 1.

14        MR. DONALDSON:  Okay.

15        THE COURT:  The issue of committing false -- fraud by

16   false presentences, making representations that aren't true,

17   putting aside witness 1, my understanding of the indictment is

18   that, again, putting aside witness 1, that there were

19   representations made that the government alleges in this case

20   were false, my understanding of the prior frauds is that there

21   were representations made other than witness 1's involvement

22   that were the government -- well, the government alleges and

23   that maybe there's testimony about, that were false.  So the

24   issue, again, comes back to, you know, because each of the

25   issues under 404(b), MO, knowledge, intent, are separate bases.

O9CUDARC

1          MR. DONALDSON:  Right.

2          THE COURT:  I mean, maybe if you could point to cases

3     where the government's making an argument with regard to each,

4     and MO is one of them, and the facts with regard to MO sort of

5     overtake the other arguments that are made such that Courts v.

6     have precluded any testimony about that, when, again, knowledge

7     and intent is something that hasn't been taken off the table.

8          So I understand the argument you're making with regard

9     to MO, and the intensely factual information that perhaps I

10    would need to get in advance of making an MO determination, but

11    with regard to sort of knowledge and intent, as I read the case

12    law, MO is something the government has to affirmatively

13    establish similarities between the two.  With regard to

14    knowledge and intent and making false statements and the like

15    to induce folks, victims, to do certain things, you know the

16    case law appears to suggest that, you know, and here there are

17    crimes to which Mr. Darden pled guilty and then subsequently

18    testified to.

19         MR. DONALDSON:  I think that your Honor is correct

20    related to one -- well, of course, you're correct to the

21    inclusionary approach developed and adopted by the Second

22    Circuit.  We understand that completely.  But it still is

23    within the Court's complete discretion whether or not to allow

24    substantially similar convictions related to substantial

25    similar crimes, three of which from a knowledge or intent

O9CUDARC

analysis and whether or not that still approaches unfairly or

unduly prejudicial to the point where the jury is no longer

considering the evidence that it has before it, but

substituting the prior convictions for what the lack of what

the government has and then concluding or basis of the

conviction on that.

Notwithstanding knowledge or intent, notwithstanding

the inclusionary approach, we still, they still, can't get past

the significantly unfairly prejudicial effect of this jury

hearing about three prior convictions that they're alleging

were similar and that's what they're going to have to try to

allege that, that they were similar, to bring those up,

that's -- that part would be significant departure from what we

would consider to be a fair process, and that's why I believe

the Second Circuit, even though it has an inclusionary

approach, leaves it in the fine discretion of the Court to

decide whether or not that kind of evidence is necessary for

them to go forward with their case, which in this instance it

clearly must not be -- clearly is not except for, like they

acknowledge, the fact that they have an absence of evidence

related to these -- to this case, and they're using the prior

convictions to substitute for that.  Literally, we don't have

this element, you use that prior conviction, replace it there,

and go that way.  That's what this imagery is turning out to

be.  And that is what Second Circuit, I believe, frowns upon

O9CUDARC

1    when they start trying to convict, not on evidence, but on

2    things from the past.  Notwithstanding the fact that it's 14

3    years old and time lapse and all that stuff.

4              THE COURT:  But let's talk about the timing.  Right?

5              MR. DONALDSON:  Before we get --

6              THE COURT:  Go ahead.  Okay.

7              MR. DONALDSON:  I have to use the bathroom.  Okay.

8              THE COURT:  All right.  Sorry.  So why don't we

9    take -- come back at 3:20, and we'll continue the argument from

10   there.

11             MR. DONALDSON:  Very good.  Thank you.

12             THE COURT:  All right.  We'll stand adjourned.

13             (Recess)

14             THE COURT:  Okay.  Actually before, Mr. Donaldson, you

15   continue, Mr. Legon, if I could, you need to file a notice of

16   appearance in this case, that would be great.

17             MR. LEGON:  Certainly, your Honor.  As soon as I get

18   back to my computer, I'll draft one.

19             THE COURT:  Fantastic.  All right.  Go ahead,

20   Mr. Donaldson.

21             MR. DONALDSON:  Judge, I think -- maybe I was

22   answering one of your questions, but I think, I'm purely -- I

23   appear to be done with the 404(b) arguments, to the arguments.

24             THE COURT:  Okay.

25             MR. DONALDSON:  Yes.  I think we covered as much as I

O9CUDARC

1    need to cover on that right now.

2              THE COURT:  All right.  Is there anything that you --

3    the government hasn't addressed the other -- certain defense

4    arguments, the negligence of the victims, if you want to -- or

5    the prior good acts or potential punishment or the Cohen jail

6    text.

7              So -- well, let me ask, Mr. Thompson would you be

8    doing any argument on that?  Or is the government not going to

9    be saying anything additional with regard to those?

10             MR. THOMPSON:  I think my colleagues will handle some

11   of the other motions, your Honor, that you just recited.

12             THE COURT:  All right.

13             MR. THOMPSON:  Let me know if your Honor was

14   interested in hearing rebuttal.

15             THE COURT:  Yes.  I'll hear you on the issue of

16   404(b).

17             MR. THOMPSON:  Your Honor, the defense focused

18   principally or ended his remarks on the 403 balance increase.

19   So I'll start there.  The probative value of the prior

20   convictions, the evidence of the prior convictions is clearly

21   high.  There is a one for one essentially the same conduct was

22   perpetrated in the past convictions.  It's modus, intent, and

23   knowledge.  The probative value speaks for itself.

24             There is also, the risk of prejudice inquiry is also

25   limited, your Honor.  The evidence is not more sensational or

O9CUDARC

1    more disturbing.  They are financial crimes in which the

2    conduct again is essentially the same.  It's not -- the

3    probative is not outweighed, and certainly not substantially

4    outweighed.

5              Just briefly, your Honor, to address why the defense's

6    argument is incorrect both today in its oral commentary and on

7    the papers, the defense argues with respect to temporal

8    limitation that Rule 609(b)'s ten-year limitation on

9    convictions or more than ten years old precludes the government

10   from introducing evidence of the prior frauds for purposes

11   permitted under 404(b), that is clearly incorrect.  Neither of

12   those two rules includes any temporal limitation with respect

13   to use of convictions for purposes that are permitted under

14   Rule 404(b).  In fact, I would point the Court to the 2011

15   commentary notes which say that the limitations of 609 are not

16   applicable if the conviction is admitted for a purpose other

17   than to prove a witness' character for untruthfulness.  And, of

18   course, your Honor, they're multiple decisions from the Second

19   Circuit in which the appellate court has affirmed decisions

20   from district courts admitting bad acts and previous

21   convictions for purposes that were allowed under Rule 404(b)

22   that are much further in time than the defendant's convictions

23   in this case.  I point the Court to the *United States v.*

24   *Curley*, 639 F.3d 50, 59, Second Circuit.  They said that the

25   District Court did not abuse its discretion in admitting

O9CUDARC

1  previous convictions for domestic abuse that were over 15 years

2  old and there were admitted with respect to intent.  The

3  defense spoke about not just the temporal issue with respect to

4  the previous frauds, but also the number of them in *United*

5  *States v. Abreu*, 2023, WL 8270427 at *2.  The Second Circuit

6  held that a district court's admission of drug-related

7  paraphernalia on two separate occasions, 11 years and 13 years

8  ago, was not error because the prior acts, despite their

9  temporal remoteness, there was striking similarity between the

10 prior acts and the conduct at trial, just as there is here.

11        So, there is no temporal limitation to the

12 introduction of this evidence for permitted purposes under

13 404(b).  There is no risk that the prejudice outweighs or

14 significantly outweighs its probative value.  And for those

15 reasons, your Honor, we should be permitted to introduce the

16 evidence.

17        THE COURT:  Let me ask, doesn't 609, 609 speaks to a

18 defendant, when a defendant is going to testify, right?

19        MR. THOMPSON:  That's right, your Honor.  609 speaks

20 about use of prior convictions for impeachment purposes on

21 cross-examination, your Honor.  And since your Honor asks, if

22 you'll allow me, the arguments with respect to 609 in the

23 defense's brief are incorrect, in and of itself, because the

24 defendant was convicted, the judgment was entered in 2016, the

25 rule says that the ten-year limitation dates to what's later,

O9CUDARC

1    the date of conviction or when the defendant finished his

2    period of incarceration, which was 2017.  So, even in analyzing

3    these convictions, if the government intended to use them for

4    impeachment purposes on cross, they would not precluded under

5    Rule 609.

6            THE COURT:  Well, that's 609(b).

7            MR. THOMPSON:  That's right, your Honor.

8            THE COURT:  But 609 -- I mean -- my understanding is

9    that the defendant pled guilty to two frauds -- but then pled

10   guilty again in January of 2015, so that the ten-year, am I

11   correct, the ten years hasn't even rung, even assuming that 609

12   somehow would somehow apply?

13           MR. THOMPSON:  That's correct, your Honor.  That's

14   correct.  First of all, it does not apply because the

15   government, for the purpose of the motion, your Honor, we are

16   discussing right now we are seeking to introduce as evidence --

17   for direct evidence under Rule 404(b), there are no temporal

18   limitations under either of those purposes, even engaging with

19   the previous convictions, for 609 purposes, the ten-year

20   limitation does not apply because the conviction was within the

21   ten-year period and the date of the defendant's release from

22   custody was 2017, and the date of conviction or the release

23   from custody, the later ones, would trigger the ten-year rule.

24           THE COURT:  Okay.  All right.  Mr. Donaldson, is there

25   anything you want to add with regard to 609 argument that has

O9CUDARC

1  been made in the papers or in light of what Mr. Thompson has

2  said?

3          MR. DONALDSON:  Nothing at this point, Judge.  No.

4          THE COURT:  Okay.  All right.  All right.  So with

5  regard to the other arguments that are put forth, I don't know,

6  Mr. Mead, are you going to handle that or someone else on the

7  team with regard to the negligence of the victims, the prior

8  good acts and potential punishment and then or maybe -- maybe I

9  should deal -- well, and then the last thing being the Cohen

10  text.

11          MR. MEAD:  I'll start with the last one because I

12  think it's the shortest and the easiest.

13          We make a bunch of arguments in our papers that we

14  think are correct.  In our letter today we put in a footnote

15  explaining that we think that motion is not moot largely

16  because of the person who is not going to be testifying now.

17  I'm sure the defense hasn't had a chance to fully think that

18  through but in our view is that even if there had been a basis

19  to cross-examine before, there's now clearly no basis to

20  introduce those text messages.

21          THE COURT:  Because it would just literally just

22  become -- like, there's no witness on the stand, so it would

23  just be what, I mean, even to lay -- here's, the text a

24  basically?

25          MR. MEAD:  Exactly, exactly, your Honor.

O9CUDARC

```
1            THE COURT:  All right.

2            MR. MEAD:  Then we turn to the defenses, I think

3    there's kind of two issues here, one of which is whether these

4    are allowable defense and, then, two, is when the Court should

5    preclude them.  On whether they're allowable defenses, I think

6    it's just black letter law that they're not.  We cite Second

7    Circuit cases saying that they aren't.  The defense points to a

8    civil case in which negligence evidence was allowed.  Of

9    course, in a civil fraud case negligence and reliance is part

10   of a case.  In a criminal case, black letter law, it's not.

11   None of these defenses are admissible.  The defense has not put

12   forward any basis for thinking that they even might be

13   admissible.

14           The next question is, well, the defense says, just

15   trust us, let's figure it out as we go along and see what

16   happens and see whether they should come in.  And, obviously,

17   the problem with that is we don't know what the defense is

18   going to argue.  The defense can put you the idea put the idea

19   out there just by asking a single question, they can open on

20   it, they can close on it.  We don't know until it's out of

21   their mouth.  That's why we move all the time in advance to

22   preclude irrelevant arguments to make sure that defense doesn't

23   make them because the second they make them even in one

24   sentence the cat can be out of the bag.  It happens in trials,

25   you know, all across the district.  We don't think there's any
```

O9CUDARC

1   other reason here.  If the defense wants to put forward, kind

2   of, a more clear reason, about like, I should be able to ask

3   this specific question or introduce this specific piece of

4   evidence, you know, that contravenes that general rule, we're

5   happy to engage with the defense on that and then with the

6   Court, if necessary, but idea that they should be able to just

7   kind of throw up whatever arguments they want even though we've

8   identified them in advance as plainly irrelevant and

9   inadmissible, I think, is wrong.

10          THE COURT:  All right.  Anything on the potential good

11   acts or punishment -- the text, we've already dealt with.

12          All right.  So let me hear from Mr. Donaldson.

13          MR. DONALDSON:  Judge, I mean, I understand the

14   government's position that they do it all the time in all their

15   cases, but I -- I have tried my fair share of federal cases and

16   state cases and I try real hard not to ask inappropriate,

17   improper, or unlawful questions.  So I won't be doing that.  So

18   that's all.

19          THE COURT:  Well, let me ask:  Then do you agree that

20   this issue about whether some of the victim -- Athlete 1,

21   Athlete 2, that their negligence, you're not going to be asking

22   questions relating -- that suggest that somehow they are

23   negligent in whatever and you're not going to cross-examine

24   with regard to that?

25          MR. DONALDSON:  No.  I won't be -- I'm saying that I

O9CUDARC

1    will not be making an argument that the fraud didn't happen

2    because of some negligence of somebody else.  If there is --

3    not if -- we will be questioning their witnesses related to

4    credibility issues and things directly related -- that are

5    relevant to cross-examination purposes.  That's what we would

6    definitely will be doing, but we will not be arguing to the

7    jury that this fraud didn't happen because someone else was

8    negligent.  That, we definitely won't be doing that.

9             THE COURT:  All right.  Well, I guess the issue is

10   not -- and it may not necessarily be so much an argument, but

11   if the examination is such to say, for example, you know, when

12   you were talking with the defendant, you know, did you -- what

13   investigation did you do concerning the defendant, what

14   investigation did you do concerning the underlying transaction,

15   what, you know, what sort of things -- in other words, that

16   suggests that -- that the victim, him or herself had certain --

17   that should have done all this stuff, and they didn't do it,

18   without even if you don't stand up in opening or summations to

19   say, look, they didn't do, X, they didn't do Y, it's sort of

20   putting it out there.  So, I understand what you're saying,

21   Mr. Donaldson, that you're going to examine the witnesses, but

22   the suggestion by asking, you know, you didn't do due diligence

23   here, did you, is that they were somehow negligent or somehow

24   they should have and didn't, which, although even if the

25   argument isn't directly made, it's through the examination, you

O9CUDARC

1    know, even if it's just at the end you say, you know, ladies

2    and gentlemen, you know, I haven't been able to cover

3    everything, so when you I go back to the jury room, I want you

4    to think about all questions I've asked and things like that,

5    and, you know, which is something that I imagine, it may be

6    said on summation and may be also, you know, both sides may

7    say, you know, ask the jury to basically think about all of the

8    evidence and think about -- so I guess my -- I guess what I'm

9    saying is that it may -- the issue -- it may not just be the

10   ultimate decision is about what is argued to the jury but what

11   information has come out --

12           MR. DONALDSON:  So, Judge, I'd like to --

13           MR. RICCO:  Your Honor, can we have a moment, please?

14           THE COURT:  Yes.  Go ahead.

15           (Counsel confer)

16           MR. DONALDSON:  Judge, I -- Sorry, Judge.

17           THE COURT:  That's okay.

18           MR. DONALDSON:  Judge, I'm sorry.

19           THE COURT:  Yes.

20           MR. DONALDSON:  I'm looking at my little notes here,

21   what do I have, to see what I have.

22           We are not arguing that the victim's negligence,

23   failure to discover fraud, makes him not guilty.  That's not

24   what we're arguing.  We are not arguing that their lack of due

25   diligence was the cause of the fraud.  I don't know if you were

O9CUDARC

1    saying that, but that's what I have here.  That's not what

2    we're arguing, and -- but the questions that you just raised as

3    hypotheticals, strange enough, are directly related to what --

4    what the government said related to one of the witnesses in

5    their background check and the applications related to the WNBA

6    and things like that.  So, let's say, for example,

7    hypothetically speaking, let's just say, hypothetically

8    speaking, so everybody gets a good grasp of the facts here,

9    just hypothetically speaking they bring in Mr. D.C.,

10   Mr. Dershowitz, who says something about that, we do a

11   background check of all persons who are going to want to

12   purchase in NBA, who want to purchase a team for the WNBA

13   because our board of governors have to approve etc., etc.,

14   etc., so we have to do a background check.  Using the Court's

15   hypothetical, I would be somehow constrained or refrained from

16   asking questions directly related to something that they ask in

17   direct, which I'm sure I can't be restrained from doing.  So,

18   I'm not -- my -- any questions that I may or may not have

19   related to the -- I don't want to use the phrase "due

20   diligence" but the background or what they did related to

21   the -- to the fraud is not again to -- and I think this is

22   appropriate, as they would argue knowledge is intent is for a

23   particular purpose, my questions related to my

24   cross-examination is for a particular purpose and that has

25   nothing to do with what I said earlier what my conclusion will

O9CUDARC

1   be, and my -- again, my anticipation of this argument by the

2   government is that we're not arguing that their fraudulent

3   conduct played a role -- we are arguing that some of their

4   fraudulent conduct played a role in their credibility in the

5   jurors' ability to determine their credibility.  So if my

6   background questions relate to whether or not their conduct was

7   within itself fraudulent or their intent was somehow motivated

8   by fraud, of course, that must be relevant because it goes to

9   their credibility as witnesses, but has nothing to do with

10   whether or not it's -- their negligence is the cause of the

11   fraud.  That's not the purpose of the question.

12         THE COURT:  I'm not sure exactly -- whatever your

13   defense is going to be, and to the extent -- I'm not sure if

14   you were suggesting that some of the witnesses, you believe,

15   were engaging in some fraud of their own, and I don't know

16   that, but what I will say is with, regard to

17   cross-examination -- I mean, it's not -- it's not a question --

18   I mean, there are ways to deal with this issue, if there's

19   even -- whether there's agreement or not.  If something is not

20   a defense, the jury can be instructed that, you know, the

21   witness' negligence and the lack of diligence and the like is

22   not a defense to fraud, something like that.  And so, you know,

23   the limitation of the questioning you ask may raise the specter

24   in the jury's mind or maybe negligence has something to do,

25   well we can disabuse them of that through instructions at the

O9CUDARC

1    time of the testimony in particular but certainly in the

2    instructions that they're provided, you know, at the end.  If

3    what you're saying is the questions that will be asked in this

4    regard go to a different argument that you're going to make,

5    all right, well, I mean, I obviously need to see that, and if

6    the argument is -- it's hard to know what the questions are

7    until they're asked, but there is a way to deal with it, if

8    they're not legally -- if the jury can't legally consider a

9    victim's negligence and the like.  You know, they can be told

10   that's not an issue, and even told that, you know --

11            Well, again, I don't know what the cross-examination

12   is going to be but and whether --

13            But let me ask, so do you agree that in terms of -- in

14   making a defense that because you -- as I heard you say that

15   you're not going to argue that the negligence -- because in

16   essence the negligence and the lack of due diligence is not a

17   defense for fraud.

18            MR. DONALDSON:  Yes, Judge.  I'm pretty clear what the

19   Second Circuit law is not that.  It's not a civil case.  We're

20   not arguing dirty hands and things like.  That's not what we're

21   here for.  So, I'm pretty clear on that.  The short answer,

22   yes.

23            THE COURT:  All right.  Okay.

24            So let me ask you, Mr. Mead, is there anything else

25   from the government, with regard to these last two negligence

O9CUDARC

1    issues and the prior good acts and the like?

2              MR. MEAD:  I mean, I'm a little unclear on where we've

3    left things.  Your Honor, you know Mr. Dershowitz is the GC of

4    the WNBA.  He did do some sort of background investigation.  I

5    think that's a perfectly appropriate topic generally for the

6    defense to inquire about.  I mean, what I'm worried about, you

7    know, more Dwight Howard, our primary victim, gets up and

8    testifies and there's cross-examination about you didn't even

9    google this guy, you didn't talk to these people, you didn't,

10   you know, consult with someone where sending $7 million.

11   That's the line of cross-examination I'm worried about.  I

12   think it's plainly inadmissible.  I think that a judicial

13   instruction to disregard that defense is quite helpful, but,

14   obviously, it's better to keep the cat in the bag if we can do

15   that.

16             THE COURT:  Yes.  I mean I guess the issue though is,

17   Mr. Mead, I understand what you're saying, I just don't know --

18   A, I don't know what the cross-examination is going to be and

19   so, what I -- I do have my decision but what I would suggest is

20   that we come loaded with curative instructions with regard to

21   these type of issues and the questions that you're concerned

22   about and also that we consider those issues as we look at the

23   jury charge of things to, in essence, to take off the table

24   because there may be certain -- cross-examination may, yes, go

25   to negligence, yes, go to, you know, their -- how could you

O9CUDARC

1    not -- I mean if you google his name, it's going to come up

2    that he was involved in fraud or whatever.  I mean, look, I

3    don't think that's going to be a question, but there are

4    certain questions that could be utilized in different ways.

5    And so, even if the defense doesn't make the negligence

6    argument as Mr. Donaldson has indicated that they won't or the

7    due diligence argument.

8            So I take there's nothing else.  I'm going to sort of

9    give the parties sort of my decision on the issues that are

10   currently outstanding with regard to the outstanding motions:

11           First, with regard to the defendant's motion *in limine*

12   to preclude the testimony victim of individual 1, so in light

13   of the government's representation that it does not intend to

14   call individual 1 to testify in its case in chief, defendant's

15   motion to preclude this testimony is moot.  However, the

16   government has reserved, and it mentioned here today also its

17   right to call individual 1 in its rebuttal case if defendant

18   suggests that individual 1 was, in some way responsible for the

19   fraud.  Although I am not asking defendant to commit at this

20   time to any particular defense, I do not foreclose the

21   possibility of the defense opening the door to testimony from

22   individual 1 or others concerning individual 1's involvement or

23   lack of involvement in the charged fraud schemes.  I note that

24   an argument that individual 1 was either involved in the fraud

25   or benignly participated in some way does not negate

O9CUDARC

1    defendant's involvement in defrauding the victims.  At some

2    point closer to the time the government rests its case, I'm

3    going to ask the defendant whether -- whether he intends to

4    argue that individual 1 is in some way responsible for any

5    fraud schemes or was involved in the charged frauds in some

6    way, and maybe, based upon the arguments I heard today, there

7    may be testimony about individual 1 speaking with some of the

8    victims or somehow being involved in some way.

9              If the government speaks to call individual 1 or to

10   otherwise introduce any statements of individual 1 made during

11   interviews with the government in any rebuttal case or as

12   indicated here if the government changes its mind and wishes to

13   have that evidence offered in its direct case, I'll hear the

14   parties with regard to their respective positions.  That

15   includes a hearing, whether there's a hearing that should be

16   necessary that should be necessarily with regard to individual

17   one's competency, and, obviously, that would occur prior to any

18   testimony I would hear -- any testimony the jury would hear

19   from individual 1 should the government seek to elicit his

20   testimony.  And with regard to the admissibility of

21   individual 1's statement to the government, the government

22   would need to establish why that statement is admissible under

23   the Rules of Evidence.  So that's a bridge we don't need to

24   cross it right now but I put that out there so that we can move

25   quickly through that issue, if it comes up in the government's

O9CUDARC

1    direct case or any rebuttal the government might request.

2             Now with regard to the government's other motions *in*

3    *limine*.  First, the government moves to admit evidence related

4    to the defendant's three prior frauds pursuant to Rule 404(b).

5    Second, the government moves to preclude certain defense

6    arguments as irrelevant.  Third, the government moves to

7    preclude cross-examination of athlete 1 regarding a text

8    message that he sent to codefendant Darryl Cohen following

9    Cohen's arrest.

10            First, with regard to prior frauds, the government

11   seeks to offer evidence of the following three prior criminal

12   schemes that defendant participated in and pled guilty to on

13   January 16, 2015:  One, a fraud in which defendant deceived a

14   lender into loaning money to purportedly organize a

15   professional boxing match that never came to pass; two, a fraud

16   in which the defendant deceived a lender into loaning money

17   purported to organize an NBA exhibition game that never came to

18   pass; and, three, a fraud in which defendant obtained

19   investments from victims under fraudulent pretenses purportedly

20   for the purpose of purchasing Maxim Magazine.  The government

21   proffers that this evidence is admissible both as direct

22   evidence of the instant charged conduct and because it is

23   probative of the defendant's intent, knowledge, plan, modus

24   operandi, and the absence of mistake pursuant to Federal Rule

25   of Evidence 404(b).  Defendant argues that this evidence should

O9CUDARC

be precluded because there is no similarity between the prior

frauds and the instant charged conduct and because of the risk

that the jury may improper infer from this conduct that

defendant has a propensity to commit crimes and thereby infer

that he committed the instant offenses.  In addition, defendant

argues that this evidence should also be precluded under Rule

of evidence 609(b) because defendant's conviction is more than

ten years old and is, therefore, presumptively inadmissible.

Having considered the parties' arguments, although I

am inclined to admit this evidence, I do not make the ruling at

this time but will wait to see if defendant explicitly disavows

knowledge and intent as a defense and proceeds to

cross-examination witnesses consistent with such a disavowal as

I understand that seems highly unlikely at this stage, but I'm

still going to reserve decision for now.

Here are the basis of my ruling, with regard to

Federal Rule of Evidence 609(b):  So, as an initial matter,

defendant's argument that his conviction is inadmissible under

Rule 609(b) entirely misplaced, Rule 609 provides that if a

defendant in a criminal case testifies, his or her "character

for truthfulness "may be impeached by evidence of a criminal

conviction under certain conditions.  The government has not

moved to admit the fact of defendant's prior conviction as

impeachment evidence, rather it moved solely pursuant to Rule

404(b)  to admit the evidence related to defendant's prior

O9CUDARC

conduct in its case in chief.  It is worth noting, however,
that even if Rule 609 governed the admissibility of such
evidence, defendant's argument for preclusion is factually and
legally incorrect.  The more stringent balancing test required
under Federal Rule of Evidence 609(b) only applies "if more
than ten years have passed since conviction or release from
confinement, whichever is later.  The ten-year period is
calculated from the start -- from the start of the trial, which
here, will be September 23rd, and I'm citing *United States v.
Weichert*, 783 F.2d 23, 26, as well as *United States v. Pedroza*,
750 F.2d 187, 187 at 203.

        Thus, regardless of whether defendant's
November 4, 2014, conviction, which is when I understand
Mr. Darden pled guilty initially to two fraud schemes, or
January 16, 2015, serve as the controlling date, both
convictions are just under ten years old.  Therefore,
Rule 609(b) does not provide grounds for exclusion.  Moreover,
Rule 609 clearly states that it only applies if more than
ten years have passed since the witness' conviction or release
from confinement forward, whichever is later.  Thus, even if
the conviction itself occurred more than ten years ago,
defendant was released from confinement on August 29, 2017,
just over eight years ago.  In addition, should the defendant
elect to testify at trial, the government will likely be
permitted to cross-examine defendant concerning the conviction

O9CUDARC

1    pursuant to 609(a).  Prior convictions involving crimes of

2    dishonesty or false representations are automatically

3    admissible under 609(a)(2) as they bear on a witness's

4    propensity to testify truthfully.  And there I'm citing the

5    *United States v. Estrada*, 430 F.3d 606, 615.  In one of the

6    essential elements as they bear on propensity on truthfulness

7    and one of the essential elements of wire fraud is "obtaining

8    money or property by means or false or fraudulent pretenses,

9    representations, or promises," and that's a direct quote from

10   the statute itself.  However, I will hold my decision in

11   abeyance until such time as defendant indicates he's going to

12   take the stand, and the government indicates its intention to

13   impeach him on his prior convictions.  Now, with regard to Rule

14   404(b), I find that the evidence of defendant's prior conduct

15   is likely admissible for several purposes pursuant to Rule

16   404(b) and that the probative value of this evidence is not

17   outweighed by the risk of undue prejudice.  Under Rule 404(b)

18   "evidence of a crime, wrong, or act is not admissible to prove

19   a person's character in order to show that on a particular

20   occasion the person acted in accordance with the character."

21   However, such evidence, "may be admissible for another purpose,

22   such as proving motive, opportunity, intent, preparation, plan,

23   knowledge, identity, absence of mistake, or lack of evidence --

24   lack of accident", and citing there 404(b)(2).

25        In deciding whether to admit 404(b) evidence, district

O9CUDARC

courts must ensure that the evidence is, "One, advance for a proper purpose; two, relevant to the crime for which the defendant is on trial; three, more probative than prejudicial; and; four, if requested, admitted with a limiting instruction to the jury." and I'm citing *United States v. Agudelo*, 141 Fed. App'x 13, 15.

As the government notes, the Second Circuit has adopted an inclusionary approach to admitting evidence of other crimes, wrongs, or acts under 404(b) for any purposes other than to show a defendant's criminal propensity. And I'm citing *United States v. LaFlam,* 369 F.3d 153, 156. Under this approach, "all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402" should be admitted. And I'm citing *United States v. Ahaiwe*, which is at 2023 WL 4196954 at *3.

Evidence of defendant's prior conduct is probative of defendant's knowledge or intent. In his opposition largely sidesteps the government's argument that evidence of defendant's role in each of the three schemes is knowledge and intent instead relying on the argument that the prior conduct is "not remotely"connected in the instant action due to the "differences in context and circumstances." Defendant's argument does not address the issue of his knowledge and intent. As an initial matter, it appears that defendant

O9CUDARC

intends to argue that he did not act with the requisite intent
to commit the charged crimes, thereby placing knowledge and
intent squarely at issue.  In fact, defendant states that "he
is innocent of the alleged crimes in the instant action and
that he did not commit the crime -- did not commit the offenses
as charged in the superseding indictment."  That's in the
opposition brief at 8.  To take knowledge and intent out of the
case, "A defendant must make some statement to the Court
sufficient -- of sufficient clarity to indicate that the issue
will not be disputed."  I'm citing *United States v. Pitre*
there, that's P-I-T-R-E, 960 F.2d, 1112, 1119, "A defendant may
do so either by putting forward a particular theory of defense
or specifically offering to stipulate."  And I'm citing *United
States v. Ozsusamlar*, 428 F. Supp. 2d 161, 168.  Here,
defendant has not stated or suggested that he disavows
knowledge or intent as a defense.  In this circuit "Where a
defendant claims that his conduct has an innocent explanation,
prior act evidence is generally admissible to prove that the
defendant acted with the state of mind necessary to commit the
offense charged."  And I'm citing *United States v. Zackson*, 12
F3d. 1178, 1182.  In addition and contrary to defendant's
suggestion otherwise, when intent is in dispute, prior act
evidence is admissible during the government's case in chief,
and I'm citing *Pitre* again there, at 1120.

        Moreover, prior act evidence particularly probative of

O9CUDARC

1    knowledge and intent in the context of crimes of fraud, and I'm

2    citing the *United States v. Illori* there, which is 2022 WL

3    2452258 at *6. Here, the prior conduct is sufficiently similar

4    to the charged conduct to warrant its admission as the

5    defendant himself acknowledges defendant impersonated and

6    leveraged the success of individual 1 in order to defraud and

7    deceive the victims in each of the prior schemes -- excuse me

8    prior -- yes, in each the prior schemes, conduct which the

9    government also alleges the defendant engaged in here. In

10   addition, at least two of the previous schemes involved

11   professional sports. It involved the use of false pretenses or

12   representation to commit the prior frauds, facts of which are

13   also relevant to the charged conduct. Thus, this evidence is

14   probative of knowledge and intent. In addition, and for the

15   same reasons, defendant's prior conduct is also relevant to

16   show absence of mistake.

17          I also find that defendant's argument that he will be

18   unfairly prejudiced by the admission of this evidence

19   unpersuasive. The evidence related to the defendant's prior

20   conduct does not involve conduct that is any more sensational

21   or inflammatory than the charged conduct. And I'm citing

22   *United States v. Livoti*, 196 F. 3d 322, 326. Neither of

23   defendant's cases cited cases are persuasive. In *United States

24   v. Narzikulov*, N-A-R-Z-I-K-U-L-O-V, which is a 2021 WL 2255486

25   at *2, the Court reserved ruling on the admissibility of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9CUDARC

defendant's plea allocution in a prior criminal case which

involved "nearly identical facts" to the charged conduct, thus

increasing the risk of potential prejudice.  In addition, the

defendant relies on *United States v. Carneglia*, which is

somewhat puzzling.  There, the Court granted the defendant the

government's motion *in limine* to preclude the defendant from

eliciting evidence that murders of two individuals the

defendant was charged with committing were previously charged

against other individuals.  That is plainly not the issue here,

nor is the Court's ruling at all relevant to the government's

motion.  In addition, any risk that the jury may infer

propensity can be further mitigated by my issuing a curative

instruction.  Thus, the probative value of such evidence is not

substantially outweighed by the danger of unfair prejudice.

However, I will not make a final ruling with regard to this

evidence but will wait to see if defendant explicitly disavows

knowledge and intent as a defense and proceeds to open and

cross-examine witnesses consistent with such disavowing.

Again, it appears that that is unlikely to occur, but the

defense is free to make whatever arguments on opening and

whatever examination it wishes to do on cross-examination.

Understanding that the evidence will likely come in, if

knowledge and intent and absence and mistake are still issues

that are in this case.

            Two, with regard to the defense, preclusion of defense

O9CUDARC

arguments:  First, with regard to the negligence of the

victims, the government also moves to preclude defendant from

arguing that athlete 1 and athlete 2 acting negligently or were

gullible.  In opposition, defendant argues both that the

government's motion is premature because he has not indicated

that he intends to make such an argument and that it should,

nonetheless, be denied because whether the testimony victims

acted negligently is a question for the jury.  And here again,

we had some arguments which appeared to indicate that some of

the questioning may actually go to something other than the

victim's negligence and in connection with their due diligence

and the like.  Now, I agree with the government that evidence

of or arguments regarding the negligence evidence of athlete 1

and athlete 2 is likely irrelevant.  The law in this circuit is

clear that because "Reliance is not an element of criminal

fraud" and because "the unreasonableness of a fraud victim in

relying or not on a misrepresentation does not bear on a

defendant's criminal intent."  "Defendant's facing wire fraud

charges may not assert a "gullible victim defense."  I'm citing

*United States v. Weaver*, 860 F.3d 90, 96.  Defendant has not

raised any compelling arguments or authority that would

persuade me to depart from this authority.  Indeed, defendant

fails to acknowledge the cases cited by the government, nor

does the defendant address the threshold relevancy question.

Instead, the defendant avers that Courts have "often held" that

O9CUDARC

1    whether a victim acted negligently is a question to be decided

2    by a jury.  This argument misses the mark entirely.  The

3    question raised by the government's motion is not who should

4    weigh the credibility of witnesses, but rather whether the

5    state of mind of athlete 1 and athlete 2 is relevant at all.

6    In addition, defendants cited authority is wholly inapposite.

7    Defendant cited *Cruz v. United Auto Workers Union Loc. 2300*,

8    which is at 2019 WL 3239843 at *3, an out-of-district, civil

9    wrongful-death action.  There, unlike here, whether plaintiff

10   was negligent was relevant to the elements of certain claims,

11   and the Court found that the plaintiff's negligence was,

12   therefore, a question for the jury.  The Court did not hold,

13   contrary to defendant's suggestion otherwise, that the

14   negligence of fraud -- that the negligence of fraud victims is

15   a relevant question for a jury in a criminal case.  Although

16   defendant will likely not be permitted to argue or introduce

17   any evidence suggesting that athlete 1 or athlete 2 were

18   negligent, I will hold my final ruling in abeyance pending the

19   specific arguments and questions asked at trial.  In addition,

20   I will consider giving a curative instruction, as I indicated

21   here today, both after the testimony in question, should it be

22   raised by the government, as implicating certain negligence or

23   blame-the-victim defenses and a specific charge to the jury

24   making it clear that the victim's negligence is not a defense

25   to fraud or money-laundering charges.

O9CUDARC

1          Now, with regard to a prior good acts and potential

2     punishment, the government also moves to preclude the

3     government from introducing any evidence of any "good acts" to

4     disprove his guilt as well as any evidence or arguments

5     regarding his family background, health, age, pretrial

6     detention, or any other similar factors.  Although I agree with

7     the government that such evidence is unlikely to have any

8     probative value, I will hold my ruling on this motion in

9     abeyance at trial to see what exactly the evidence may be with

10     regard to that.  Of course, there are certain limited

11     circumstances under the Rules of Evidence when certain

12     character -- whether a defendant could call character

13     witnesses.  I'm not at all saying that that's something that's

14     going to occur here.  I'm not saying that certain questions may

15     go to the defendant's character on cross-examination.  However,

16     I believe I need to wait to hear exactly what the evidence will

17     be.

18          Now, with regard to the Cohen jail texts, the

19     government also moved to preclude the defendant from

20     introducing a text message sent by athlete 1 to codefendant

21     Darryl Cohen as irrelevant and unfairly prejudicial pursuant to

22     Rules 402 and 403.  Defendants suggest that it should be

23     permitted to cross-examine athlete 1 regarding this text

24     message in order to provide the jury with "full understanding

25     of the dynamics between athlete 1 and Cohen and to challenge

O9CUDARC

1   any potential bias or motives that could impact the integrity

2   of the testimony.

3           My understanding, am I correct that athlete 1 is the

4   individual who the government has indicated they will not be

5   calling to testify?

6           MR. MEAD:  That's correct, your Honor.

7           THE COURT:  All right.  So, first, however, besides

8   referring generally to unspecified context, the defendant fails

9   to explain why the dynamics between athlete 1 and Cohen,

10  including any bias or ill will that athlete 1 may have had

11  toward Cohen are relevant to any fact or issue in this trial.

12  Indeed, as the government points out, athlete 1 was the victim

13  of two entirely separate frauds committed by different

14  individuals, and defendant does not -- does not identify any

15  overlap between the schemes or participants, nor did defendant

16  object to the severance of defendant's trial for Cohen's trial?

17  In addition to lacking probative value, permitting defendant to

18  cross examine athlete 1 regarding this text would cause

19  confusion, mislead the jury, be a waste of time, and be

20  unfairly prejudicial.  Therefore, defendant is precluded from

21  introducing this text message or cross-examining athlete 1

22  about its contents.

23          I also rule that since athlete 1 will not be

24  testifying, that this motion is largely moot because there will

25  be no -- I cannot conceive of a way that text message comes in

O9CUDARC

1    at this stage, both how a foundation would be laid or

2    otherwise, but in any event, I just don't see how that text

3    message about a different defendant impacts the defendant here

4    or shows some bias towards the defendant here.  And the

5    defendant hasn't established that connection for me.

6             Now, I think I received -- so as I understand it, the

7    government has provided the list of exhibits or the exhibits

8    themselves and 3500 material to the defense.  So I don't think

9    there's anything to be said with regard to that.  And so I do

10   expect to get those materials at some point later today.

11            Okay.  So those are my rulings.  Are there any

12   questions with regard to that?  Mr. Mead?

13            MR. MEAD:  Just one question on the 404(b) ruling,

14   your Honor.

15            THE COURT:  Yes.

16            MR. MEAD:  We're not going to introduce, kind of,

17   like, the transcript of his previous conviction at the

18   beginning of the case obviously.

19            THE COURT:  Or open on it.

20            MR. MEAD:  Right.  We're not planning to open on it.

21   We do think that our early witnesses may mention his conviction

22   as kind of a part of their story.

23            THE COURT:  Well, just provide -- I think you need to

24   sing a few more notes.

25            MR. MEAD:  Sure.  Sure.

O9CUDARC

1          THE COURT:  In other words, how -- is it something

2     that they became aware of -- in other words, what's the context

3     that it would be raised in?  And, in addition, so I have the

4     quotes from the prior testimony, I take it that is -- that

5     doesn't necessarily encompass all of the evidence the

6     government would seek to admit in its direct case relating to

7     the prior conviction.  So I would want to know, and it maybe it

8     will become obvious when I see the exhibits, but will the

9     government be offering, for example, a defendant's plea

10    allocution on January 15 -- or January 2015 in addition to the

11    testimony or other things?

12         MR. MEAD:  So, right now our thought is to proving up

13    the prior convictions and the facts of that, is we've marked

14    his trial transcripts, which the Court has seen.

15         THE COURT:  Yes.

16         MR. MEAD:  And then I think is the judgment from the

17    S.D.N.Y. case.  I'm not expecting that we'll be adding anything

18    else.

19         THE COURT:  Okay.

20         MR. MEAD:  We may find something.

21         Circling back to the Court's first question, John

22    Brock is going object to be our first witness.  We had expected

23    to ask him if he was aware of the defendant's previous

24    conviction, and expect him to say, yes, that he was aware in

25    part because some people in the case were aware of it and some

O9CUDARC

1    people were not aware of it, and that obviously can be kind of

2    significant in determining -- so, for example, if Mr. --

3    because they were aware of it, they knew that it might be a

4    problem in terms of buying the WNBA team, and that's a part of

5    the story about how the fraud works.  You know, I think --

6              THE COURT:  So, wait a minute.  I apologize.

7    Mr. Brock is?

8              MR. MEAD:  Sorry, yes, your Honor.  Mr. Brock,

9    essentially on the Atlanta Dream side, he's in charge of

10   selling the team.

11             THE COURT:  Okay.  So this is the witness though where

12   I was kind of playing, sort of sanitizing it --

13             MR. DONALDSON:  Actually, no.  No.  That's not the

14   witness.

15             THE COURT:  So this is --

16             MR. DONALDSON:  That's not the same witness.

17             THE COURT:  Well, I guess the question is, Mr. Mead,

18   to cut to where I think you were going, are you going to be

19   allowed to ask -- is he going to be allowed to testify about

20   his knowledge of the prior conviction?

21             MR. MEAD:  Yes, your Honor.  And my thinking is, it

22   seems extremely unlikely that the defense will, in fact,

23   disclaim knowledge and intent.  So the sanitization, it was --

24             MR. DONALDSON:  I'm sorry.

25             MR. MEAD:  I'm sorry.

O9CUDARC

1          MR. DONALDSON:  I didn't hear that last part.

2          MR. MEAD:  It sounds extremely unlikely that the

3    defense will disclaim knowledge and intent such that kind of

4    the sanitization of that testimony, if we do it, will be kind

5    of confusing and pointless.  Obviously, if even on, like,

6    Sunday night, they email us and say, we are affirmatively

7    disclaiming knowledge and intent, we can adjust for the

8    Mr. Brock's testimony on Monday morning, but I think it's hard

9    to say and let the defense decide mid-trial when we've got

10   witnesses who are going to bring it up.

11         THE COURT:  What I would say is, I think that there is

12   a time limitation on this, and I would imagine that, you know,

13   unless there's no opening, because the defense doesn't have to

14   open, that the issue will be, you know -- I will know by that

15   time, and therefore, be able to make a ruling with regard to

16   Mr. Brock if, in fact, I don't have a clear understanding

17   because the opening doesn't -- either because there isn't an

18   opening or because it doesn't -- well, I mean, again, it would

19   have to be explicit, it has to be clear.  Typically, in cases

20   it's either a stipulation or otherwise, but I think it's likely

21   I'll be able to make that call before Mr. Brock testifies.

22         MR. MEAD:  Then, your Honor, we have kind of a little

23   bit of a grab bag of other stuff that's not related to the

24   filed motions.  I don't know if you want to give the defense a

25   chance.

O9CUDARC

```
 1              THE COURT:  Yes.  So, Mr. Donaldson, with regard to
 2     the issue of the -- I take the government's first witness,
 3     Mr. Brock, who I guess will testify that he did become aware
 4     somehow that Mr. Darden had a previous felony conviction, one
 5     or more, I don't know exactly what the details are, do you have
 6     any comments about what the government has said?  I mean, if
 7     knowledge and intent hasn't been taken off the table, you know,
 8     based upon my ruling, putting aside the MO issue, I think
 9     knowledge, intent, absent of mistake will be at issue, and I
10     would be inclined to allow Mr. Brock to basically -- and,
11     again, I don't know the context.  That -- it sounds as if would
12     be similar to what was proffered that he was aware of the prior
13     conviction and that would present a problem for a potential
14     owner or someone to have an ownership interest, though not
15     entirely preclusive, it would present a problem, and as I
16     understand that, that is testimony offered to explain why on
17     some documents Mr. Darden's name doesn't appear.
18              MR. DONALDSON:  Yes.  I think we are of the position
19     that -- first, I think the government's statement related to
20     Mr. Brock's testimony and it's somehow that part of the
21     testimony being part of the story, let's say, from a defense
22     perspective we understand that, there is a way though that we
23     think that that type of information can be elicited from the
24     government without using the words "felony," etc.  So we may be
25     able to come to some type of agreement, myself and the
```

O9CUDARC

1    government, related to what that information would be, so that

2    we can move forward in enough time so the Court can address

3    that.  So I think that we would like to -- I think that we can

4    talk to the government about how to sanitize that so that it's

5    appropriately elicited and then we can move forward from there.

6        THE COURT:  Okay.  So I guess what I would say with

7    regard to that, that's fine, the parties can talk about that,

8    but I am not sure it entirely eliminates the issue of the

9    felonies coming in, at some other point in time.  In other

10   words, the knowledge and intent is still an issue.  And so, you

11   know, and so -- it might be sanitized with regard to Mr. Brock,

12   but maybe not with regard to others.  So I might need to

13   basically say, not only can't they speculate about why

14   Mr. Brock -- you know, whatever the issue may be that had an

15   impact on the purchase of the team, that -- I just don't want

16   the jury to start -- so I understand what you're saying, but it

17   doesn't necessarily eliminate the felony issue overall in the

18   case because, as I indicated, unless knowledge, intent, or

19   absent of mistake are taken off the table, it's still -- it's

20   still evidence that I'm going to allow in.  You know, what --

21   what the -- what that consists of, whether, obviously -- I'll

22   make specific evidentiary rulings on the exhibits as the

23   government presents them, including sort of the testimony and

24   then whatever -- I guess it's the judgments of conviction, but

25   it's likely -- it's likely to come in.  I mean, it's highly

O9CUDARC

1    likely to come in based upon the arguments I've heard today.

2         I guess -- I guess what I'm saying, Mr. Donaldson, you

3    can still talk about the government about it, and it's up to

4    you, but I'm not sure, you know --

5         MR. DONALDSON:  Judge, you know, I personally think

6    that I want to get to the meat and heart of it as quickly as

7    possible and get this issue resolved.  So I am probably going

8    to send something to the Court related to this issue

9    conclusively, probably within 24 hours.  I completely

10   understand that, you know, Brock or -- and I think they're

11   confusing witnesses a little bit, but Brock doing his part

12   about testifying about what he heard or knew whatever and

13   Dershowitz during his testimony about the application and what

14   was in the application, things like that, and then the Court

15   having to decide whether or not -- not decide, but issue a

16   ruling on 404(b), depending on knowledge and intent, which the

17   Court is may be correct is likely coming in anyway.  So if

18   that's the case, then all of this first part is probably moot,

19   and I want to reach that as quickly as possible.

20        THE COURT:  Okay.

21        MR. DONALDSON:  So I'm probably going to send

22   something to the Court in a reasonable amount of time so that

23   we can address that and clear that up.

24        THE COURT:  All right.  Okay.  No.  That's fine.

25        And there may be some back and forth.  Because I've

O9CUDARC

1    had cases where some back and forth about, I mean, is that

2    sufficient, I mean, is it sufficient to take it off the table,

3    is it not.

4            So, that's fine, Mr. Donaldson.  And we can -- we can

5    talk about that, perhaps on Tuesday, if I have the information

6    and the parties' relative positions.  So I'll take a look at

7    that, you know, and you should look at, you know, what other

8    Courts have found to be sufficient, to literally take that off

9    the table.  And it's understanding, even if -- I don't know how

10   the trial is going to progress.  So it could be that something

11   is -- I'm in no way precluding the defense from, you know,

12   pivoting and deciding, do you know what, no, we're going to

13   throw this in, we're going to have it -- so I understand

14   that -- and so even by, Mr. Donaldson, you making a -- taking

15   it off the table, you still have the opportunity -- I mean, it

16   still could come in, if you change -- if you sort of change

17   your examination and such, that I feel it opens the door, the

18   stuff still may come in, just to -- in the interest of letting

19   everybody know where that stands.

20           MR. DONALDSON:  All right.

21           THE COURT:  Because it's not just -- I apologize.  It

22   should be more clear.  So it's not just a stipulation that gets

23   put in, it's what actually happens in front of the jury.

24           MR. DONALDSON:  Right.

25           THE COURT:  And so it's got to be, you know, the two

O9CUDARC

1    have to be consistent, both in terms of opening and

2    cross-examination, and then summation.

3          All right.  Mr. Mead, you said there were some other

4    things?  Go ahead.

5          MR. MEAD:  First off, your Honor, we superseded

6    against the defendant in July.  This is the first appearance.

7    He needs to be arraigned.

8          THE COURT:  Okay.  All right.

9          Let me ask:  Mr. Darden, have you received a copy of

10   the superseding indictment?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  And have you had an opportunity to read

13   it?

14         THE DEFENDANT:  Yes, I have.

15         THE COURT:  And do you waive its public reading or do

16   you wish me to read it to you?

17         THE DEFENDANT:  I waive it, your Honor.

18         THE COURT:  All right.  And have you had time to speak

19   with your attorneys about that superseding indictment?

20         THE DEFENDANT:  I have, your Honor.

21         THE COURT:  Okay.  How do you plead?

22         THE DEFENDANT:  Not guilty.

23         THE COURT:  Okay.  All right.  Thank you.

24         Mr. Mead.

25         MR. MEAD:  Another issue is that the defense case,

O9CUDARC

1    your Honor, we have not received a witness list, Rule 26.2

2    material, Rule 16 material.  Obviously if the defense isn't

3    planning on putting on a case or is only planning on calling

4    Mr. Darden, that's fine.  The defense represented about a month

5    ago that they expected to have a three-day defense case.  I

6    have some understanding that that was kind of a conservative in

7    the sense of that was the outer-most bounds of defense case, it

8    would likely be shorter.  We're now very close to trial

9    obviously.  If there are people the defense is seriously

10   considering calling, we should get a witness list and we should

11   get Rule 26.2 statements from them and then we should be

12   getting exhibits.  I would just ask that the defense be

13   instructed to do that.

14           THE COURT:  Okay.  All right.

15           Well, let me hear from Mr. Donaldson with regard to

16   that.  And, obviously, some of this may -- well, let me hear

17   from you, Mr. Donaldson.

18           MR. DONALDSON:  We will get the government a witness

19   list as soon as possible.

20           And there is no way that our defense case will last

21   three days.

22           THE COURT:  Okay.

23           MR. DONALDSON:  There is no way, if we had a defense

24   case, it will last three days.

25           THE COURT:  Okay.  And with regard to timing, on the

O9CUDARC

1    list of witnesses, what is the estimate with regard to when you

2    would provide the list to the government?

3                MR. DONALDSON:  Within 24 hours.

4                THE COURT:  Okay.  All right.  And so there may be

5    some back and forth?  If I could get, if possible,

6    Mr. Donaldson, if I could be copied on that correspondence?

7                MR. DONALDSON:  Absolutely.

8                THE COURT:  Okay.  All right.  Thank you.

9                And with regard to exhibits, you know, are there any

10   exhibits you anticipate, in other words, that you could -- or

11   not with regard to those three witnesses.

12               MR. DONALDSON:  Not yet, but as far as an exhibit

13   list, I think we can have -- we may have something to the

14   government in short order as well, but that wouldn't be 24

15   hours.

16               THE COURT:  Both in 24 hours?

17               MR. DONALDSON:  No.  We're still working on that, but

18   the witness list, I could get you that rather quickly.  The

19   exhibit list, I'm still tinkering with that one.

20               THE COURT:  We can discuss that.  I mean, obviously,

21   any defense case is a ways off.

22               Mr. Mead, anything else?

23               MR. MEAD:  A couple more, your Honor.  One is the

24   defense has said at some point that they were considering

25   recalling some of our witnesses in their defense case.  Almost

O9CUDARC

1    all of our witnesses are traveling from somewhere else.  It

2    would be highly burdensome.  They're going to get a shot at

3    cross-examination.  I'm not sure if the defense is still

4    thinking about that.  I can imagine, kind of, truly extenuating

5    circumstances that would allow them to recall a witness, but I

6    don't think they should go in with the plan of recalling our

7    witnesses because it's going to drag out the trial and be very

8    burdensome.

9            MR. RICCO:  Judge, we have no such intention.  That is

10   not an accurate representation of what was said.  We recognize

11   witness travel, etc., etc.  That was told explicitly to the

12   government when Mr. Mead raised this in a conversation that we

13   previously had.

14           THE COURT:  Okay.  So I understand that absent

15   anything unusual that the examination for witnesses will be

16   done once and, obviously, you know, if something comes up,

17   there may be an issue with regard to a witness and we can deal

18   with that, but I'll -- I'll anticipate that once a witness is

19   done, they're done, absent, you know, coming back for rebuttal

20   or absent a specific reason why the defense is going to call

21   the witness in their case.

22           MR. RICCO:  That's correct, Judge.  And that's how our

23   understanding, and that's what was expressed to the government.

24           THE COURT:  All right.  Thank you.

25           Yes, Mr. Mead.

O9CUDARC

1          MR. MEAD:  In terms of timing, I still think it makes

2     sense to tell the jury two and a half weeks.  For the Court, I

3     think we're optimistic we're going to be done maybe

4     substantially faster than that.

5          THE COURT:  Okay.

6          MR. MEAD:  I think the government's case is very

7     likely to be done by the second week, maybe even midway through

8     the second week, not a promise, but just to the Court is

9     thinking that through.

10          THE COURT:  Okay.

11          MR. MEAD:  In terms of scheduling, we have a lot of

12     witnesses coming in from all over the country.  I think we're

13     going to be fine in terms of having people on tap.  There may

14     be a day where we say, Judge, it's 4:40 or something, and could

15     we end early, and hope the Court is okay.  We'll absolutely do

16     our best, believe me.

17          THE COURT:  So this is -- you know, the last trial I

18     did when I was a prosecutor was in front of a judge, and we

19     were -- we were ending at 5:30, and it was like 5:25.  And I

20     said, you know, Judge, you know, we were out of witnesses and

21     we had gone through a bunch of witnesses that day, and I won't

22     disclose who it was, but shakes her head and goes, well, all

23     right, but just this one time.  So I just -- I would say,

24     Mr. Mead, I understand that there may be issues and witnesses

25     may move more quickly than others.  You know, what I would

O9CUDARC

1    suggest, and I don't know whether this -- I don't know whether

2    they're going to be government witnesses, like phone records,

3    things, like, that you have somebody in the hopper who, you

4    know, can be -- that designated witness basically to call in,

5    but I understand that, you know, sometimes things move more

6    quickly, and because of witnesses' scheduling, but as much

7    notice as possible that I get so that we can -- A, the defense

8    can find out, but more critically, the jury knows when we're

9    going to need them and the timing so we can let them know as

10    quickly as we can, that, oh, we're going to end at 4, we may

11    end early today, things like that.

12          MR. MEAD:  Absolutely, your Honor.

13          THE COURT:  Obviously, I mean, you know, a little bit

14    of time, but if it's half, yeah.

15          MR. MEAD:  We're certainly not expecting that, I.

16    Think we're going to be totally fine.  I just wanted to flag

17    that for the Court.

18          THE COURT:  Also understanding that things do happen,

19    you know, especially, you know, now it's more likely storms and

20    people coming in from different -- especially if they're

21    cutting it like close in terms of, you know, trying to come in

22    the day before and then the next thing you know their flights

23    are cancelled.  Just, as I said, Mr. Mead, as much notice as

24    possible with regard to the timing issues.

25          MR. MEAD:  Next up, Dwight Howard, our primary victim

O9CUDARC

1    and maybe the most significant witness in the case is going to

2    be a contestant on the network television show, Dancing with

3    the Stars during the time of the trial.  So he'll be on network

4    television kind of in the evening of the trial.

5            THE COURT:  Okay.

6            MR. MEAD:  I don't think there's anything for the

7    Court to do about that.  We've got a voir dire question asking

8    if people watch it.  I just -- it's a weird enough issue that I

9    just wanted to alert the Court.

10           THE COURT:  Yes.  And I had not been following that.

11   I think my law clerk was more up to speed on that than I was,

12   you know, because -- I almost put in the comments, like, why,

13   Dancing with the Stars, why not, you know, The Masked Singer,

14   not realizing that there was a specific witness was going to be

15   on Dancing with the Stars.  I'm not sure there's anything to do

16   with regard to that.  I mean, can I tell the jury -- well,

17   think about whether I can -- obviously, they're not going to

18   discuss the case.  The parties should meet and confer and

19   decide whether I tell the jury they can't watch Dancing with

20   the Stars or that they can.  I don't know whether -- I can

21   instruct them that, you know, whether or not Mr. Howard and how

22   well he dances has nothing to do with the case here.  But what

23   I would say is, think about that and the implications of that

24   because there may be people who watch it and maybe no one does,

25   but they are going to see a witness, it's a little unusual,

O9CUDARC

1   they're going to see a witness or television.  So even though

2   the witness isn't going to say anything about it, whether and

3   what instructions I should give in connection with that.

4           MR. MEAD:  That makes sense, your Honor.

5           A couple more things, as to one of our witnesses, we

6   have some topics of potential cross-examination that we think

7   are both inappropriate and highly confidential that is separate

8   from the letter we sent the Court today --

9           THE COURT:  Okay.

10          MR. MEAD:  -- to a different witness?  We've spoken

11  about that with the defense.  The defense informed us today

12  that they are going to try and cross-examine on those subjects.

13  I think we'll likely submit another sealed letter to the Court

14  about that at quickly as possible.

15          THE COURT:  All right.

16          MR. MEAD:  We sent the defense, just to provide the

17  Court notice, we sent the defense a letter informing them that

18  if the defendant testified, we did plan to ask about his

19  previous convictions.  There's the convictions the Court has

20  already talked about.  There's a separate conviction from, I

21  think 2005.  We provided them notice under Rule 609(b).  It's a

22  fraud conviction.  We did intend to ask about it.  I'm sure the

23  defense disagrees.  I don't think the Court needs to deal with

24  it now.  We have no idea if the defendant is going to testify.

25          THE COURT:  Okay.

O9CUDARC

1          MR. MEAD:  We also informed the defense that the

2     defendant gave a postarrest statement.  The Court may have

3     remembered there was a motion to suppress that statement.  The

4     government said it was not going to use that statement in its

5     case.  We included a footnote.  The Second Circuit has said

6     that cross-examination on such a postarrest statement is

7     permissible.  We just put the defense on notice that if he

8     testifies, we fully intend to cross-examine him based on that

9     postarrest statement.  We've produced -- we informed the

10    defense that we intend to introduce a lot of evidence based on

11    Rule 902.11.  I don't think the defense is a contesting that,

12    but, obviously, if that issue percolates further, we'll inform

13    the Court.

14          THE COURT:  902.11, just give me...

15          MR. MEAD:  Sure.  Sorry, your Honor.  The little

16    certification at the end of subpoenas saying this is a business

17    record.

18          THE COURT:  I see.  Okay.

19          MR. MEAD:  Yes.  I think it's all -- I think it's all

20    sufficient --

21          THE COURT:  I mean I just -- because, obviously, if

22    there are issues with regard to that, I would need to know, so

23    if I can just confirm that it's not going to be an issue, just

24    so I can make the ruling.  And, obviously, you know, the

25    certification is what it is, the rule says what it says, but,

O9CUDARC

1    you know, I would need to -- I would want to, A, know about the

2    information, and, I think give the government as much notice as

3    possible, if there's going to be an issue with regard to

4    getting a witness here on that.

5          MR. MEAD:  That makes sense, your Honor.  I don't

6    think there will be an issue, but we'll, of course, let the

7    Court know.

8          THE COURT:  Yes.

9          MR. MEAD:  The defendant's, in terms of exhibits, the

10   defendant's father shares the same name and has some

11   involvement in the facts of this case.

12         THE COURT:  Yes.

13         MR. MEAD:  We expect to introduce, for example, bank

14   opening statements and he'll need to kind of prove his bank

15   account it was.  Those bank account statements and other things

16   like that will have PII on them, like Social Security numbers

17   and dates of birth.  Our view is that is relevant here, right,

18   because it's a specific identifier, so you know Calvin Darden

19   is the Calvin Darden on trial and not the other Calvin Darden.

20   We are planning, we may file something.  We're planning to kind

21   of make those exhibits subject to some sort of protective order

22   so that, like, the press can't get Social Security numbers.  We

23   have floated that to the defense, but I suspect they're okay

24   with that as well.

25         THE COURT:  I mean, I guess as the threshold question,

O9CUDARC

1   is there going to be a dispute with regard to, you know, bank

2   accounts, phone records, things like that, that -- in other

3   words, is that going to be something that's contested or does

4   the government -- I mean, there's also another argument the

5   government wants to affirmatively establish that this is the

6   defendant's and there's no -- so the jury -- there's no

7   speculation?

8           MR. MEAD:  I think both the latter and I think also,

9   you know, some of our evidence that the defendant was

10  impersonating his, you know, his father with the same name is

11  based on kind of, well, on this bank statements, you know, it's

12  him, and he lists this phone number and that's phone number

13  that's having these communications.  So I think it's hard to

14  get away from.

15          THE COURT:  All right.  That's fine.

16          MR. MEAD:  We're in talks with some stipulations with

17  the defense, we may work those out, but kind of the trial is

18  shrinking in a helpful way.  So I don't think we're going to

19  have a big problem.

20          And then, finally, I don't know what the Court's

21  typical practice is on allocution as to a plea offer, there is

22  no active plea offer.  The plea offers have expired.  But just

23  for the record, we did make two formal plea offers to the

24  defense, and it is my understanding that the defendant chose to

25  reject them.

O9CUDARC

1          THE COURT:  Okay.  All right.  With regard to, let me

2     just ask, with regard to that, to that issue, accepting that

3     the plea offers have expired, I take it, Mr. Donaldson, you

4     received --

5          Were they sent to Mr. Donaldson?

6          MR. MEAD:  They were, your Honor.

7          THE COURT:  All right.  They were received, the plea

8     offers; is that correct?

9          MR. DONALDSON:  Yes, your Honor.

10          THE COURT:  And without saying the substance of your

11     communication with your client, those offers were -- your

12     client was made aware of those offers, is that accurate?

13          MR. DONALDSON:  Yes.

14          THE COURT:  Okay.  And that in connection with that,

15     let me ask Mr. Mead, was there an explicit rejection or was --

16     did the time come and pass?

17          MR. MEAD:  I'll let the defense counsel speak to that.

18     My recollection was that there was an expiration date, and I

19     was called on the expiration date by defense counsel and said

20     that he was taking the deal.

21          THE COURT:  Okay.  All right.  Mr. Donaldson, is that

22     consistent with your recollection?

23          MR. DONALDSON:  Yes.

24          THE COURT:  Okay.  All right.  With regard to each of

25     the -- were there two?

O9CUDARC

1              MR. MEAD:  There were, your Honor.  Yes.

2              THE COURT:  With regard to each of the offers?

3              MR. DONALDSON:  Yes.

4              THE COURT:  Okay.  All right.

5              All right.  Anything else from the government?

6              MR. MEAD:  No, your Honor.

7              THE COURT:  Mr. Donaldson, anything from the defense?

8              MR. DONALDSON:  No.  Except we, regarding the

9    exhibits, I know the Court wants the defense to provide hard

10   copy exhibits as well, of our exhibits.  I think that's

11   correct?

12             THE COURT:  That's correct.  Look, let me just -- just

13   to be clear with regard to your witness list and exhibit list,

14   you don't have to do anything.  Right?  So the fact that I

15   issued an order asking the government to provide me with their

16   exhibits had nothing to do with what the defense is going to

17   do.  However, I've been informed today that the -- that the

18   defense does -- there are witnesses the defense intends to call

19   and there may be exhibits that they're going to offer, but I

20   just want to be clear that I'm in no way -- even if the defense

21   provides a list of witnesses or they don't have to call anyone.

22   Right?

23             MR. DONALDSON:  Okay.

24             THE COURT:  You don't have to do anything.  So with

25   that -- with that understanding, yes, at some point,

O9CUDARC

1    Mr. Donaldson, if there are exhibits that you intend to show

2    the witnesses you're going to call, that -- in other words,

3    affirmatively to get in, in your case in chief, yes, I would

4    like to see them.  If there are documents you have that you're

5    going to use for cross-examination, you can cross-examine them

6    with anything, whatever you want, but, but, but be aware, that

7    if I find during the -- that it's -- that the document needs to

8    in evidence, you know, that's a separate issue that we'll have

9    to deal with, with regard to laying a foundation and I'll rule

10   on.

11              MR. DONALDSON:  Of course.

12              THE COURT:  And there may not be an objection.  I mean

13   the government may be fine with it.  So to the extent there are

14   going to be certain documents in particular, things that you've

15   gotten in discovery that the government may not be object to

16   being offered, if you can -- obviously, I don't -- as soon as

17   you can, but at the latest after the government is done with a

18   witness, if there are certain documents that you intend to

19   offer through that, I'd ask you try and have a conversation so

20   that -- so we're not doing too much stuff at sidebar or in a

21   break.

22              MR. DONALDSON:  Absolutely, Judge.

23              THE COURT:  Anything else?

24              MR. DONALDSON:  Not from the defense.

25              THE COURT:  All right.  No?  Okay.  Okay.  All right.

O9CUDARC

1    Well, thank you everyone.  Thank you for the arguments today.

2            Mr. Mead, you indicated there might be some additional

3    motions *in limine*.  What would be the timing on getting me

4    something on those issues?

5            MR. MEAD:  So I think it's just the potential

6    cross-examination point, unless I'm forgetting something?

7    Would Monday be okay for the Court?

8            THE COURT:  That's fine.  That's fine.

9            And then, Mr. Donaldson, any response by Wednesday?

10           MR. DONALDSON:  That's fine, Judge.  Thank you.

11           THE COURT:  All right.  Just so that I can get a

12   ruling so that people -- and if you could, indicate whether or

13   not either side -- whether opening statements, whether there's

14   something that hinges on opening statements, that will give me

15   a sense of when you need to -- obviously, I'm going to try and

16   do it before we have openings, but just to be -- just to be

17   sure.

18           And just so you know, my trial days, 10 o'clock to

19   5:30, a break in the morning, break in the afternoon, break in

20   the morning, you know, will be 11:45 or so.  We basically break

21   for lunch at about 12:45, come back at 2.  And as I said, in

22   the evening -- I mean in the afternoon, you know, the jury will

23   get an afternoon snack, and I'll try and do -- do the break at

24   around 3, 3:30, 3:30, 3:45, or even 4, depending upon where

25   things stand.  So that they can have their break and have their

O9CUDARC

1   snack.

2           If there are issues that we want to -- that the

3   parties wish to take up with me, I'd ask you let us know by

4   9 o'clock the night before so we can plan on being here at 9 or

5   9:30 so that we're not impinging on the jury's time and the

6   time we have to hear testimony.

7           Okay.  All right.  So I will see everyone on Tuesday.

8   110.

9           And remember, tomorrow there is the electronic

10  walk-through or whatever for each side, I guess in 110.  I

11  don't know what time, what time that's supposed to occur, but

12  just so that everybody gets that done, but we're not

13  familiar -- we, obviously, that's not our courtroom.  So I

14  think we're all going to be learning things at that time, but

15  just to make sure everything works.  All right.  No one should

16  do anything in a courtroom without first testing it out.

17          And, no relation, I don't think, to Christopher

18  Darden, who, you know --

19          THE DEFENDANT:  No relation.

20          THE COURT:  -- who unfortunately, you know, didn't do

21  that with regard to the gloves so...

22          All right.  So I'll see everybody on Tuesday.

23          Thank you very much.

24          MR. MEAD:  Thank you very much.

25                          o0o